

02-CV-01683-DOCTRM   $Ex 9-11$

**EXHIBIT 9**

**Preston|Gates|Ellis** LLP

June 30, 2003

**VIA FACSIMILE AND REGULAR MAIL**

Bob Carlson
Christensen O'Connor Johnson
    & Kindness
1420 Fifth Avenue
Suite 2800
Seattle, WA 98101-2347

      **Re:**    *Valve, L.L.C. v. Sierra Entertainment, Inc.*

Dear Bob:

      This is in response to your letter of June 25. It appears that we cannot resolve our disagreement regarding the application of the extraterritoriality doctrine to this case. Vivendi conducts relevant business out of both its Washington and California offices. At a minimum, Valve is entitled to full discovery from Vivendi regarding activities in those offices and between those offices and any foreign offices in order to investigate the extent that these United States offices were involved in licensing cybercafes worldwide.

      Your representation that all European licensing is handled in France, with no participation of U.S. representatives, is likewise subject to verification and testing through discovery. For instance, Valve is entitled to understand those operations and whether Dawn Gonzalez, Mike Schenck, or any other Vivendi representative had relevant contact or discussions with those representatives in France. Likewise, you informed me that Vivendi is investigating the role that U.S. representatives played in licensing in the Asia/Pacific markets. It appears from the minimal discovery already provided that U.S. representatives played some role in licensing cybercafes in that region. *See* SIERRA 00002-00003 (spreadsheet from Chris Schenck files listing Asia/Pacific licensing activity).

      In addition to the fact that the question of extraterritoriality is a question of fact subject to testing and verification through discovery (and that alone entitles Valve to the discovery it seeks), you are mistaken as to the application of *Subafilms* in the first instance. *Subafilms* applies to contributory infringement claims. Moreover, *Subafilms* only spoke to the issue of whether the allegation of *mere* authorization stated a claim under the Copyright Act. As alleged in the Complaint, Vivendi *directly* infringed Valve's copyright by violating the scope of its license. *See Sun v. Microsoft*, 188 F.3d 1115, 1121 (9th Cir. 1999). Therefore, *Subafilms* does not apply as you argue it does.

      Given that Vivendi intends to stand by its objection, Valve will shortly bring a motion to compel discovery on this issue. Please advise me as soon as possible if you have reconsidered your position.

A LAW FIRM  |  A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

925 FOURTH AVENUE, SUITE 2900   SEATTLE, WA 98104-1158   TEL: (206) 623-7580   FAX: (206) 623-7022   www.prestongates.com
Anchorage   Coeur d'Alene   Hong Kong   Orange County   Portland   San Francisco   Seattle   Spokane   Washington, DC

Page 2

On a separate issue, we note from a review of your recent discovery that entities other than Sierra Online have engaged in the licensing activities at issue in this suit. Particularly, it appears that Vivendi Universal and Havas Interactive are alter egos, licensees, and/or successors, to Sierra Online with respect to cybercafe licensing activities. See, for example, SIERRA 000056 (Authorized Cyber-Café License Agreement); SIERRA 000357 (Fax cover page to Vivendi Universal Interactive regarding Site License Agreement with Havas Interactive); SIERRA 000396 (Havas Interactive Pay-For-Play Site License Agreement). In light of this discovery, we request that you stipulate to adding those parties to this . lawsuit, and that formal service of these parties be waived.

At your request, I will destroy the copy of the document labeled Sierra 251-275, which you claim is privileged. Valve reserves any right it may have to challenge that designation in the future.

I will also shortly forward a new version of the Protective Order that includes the language we agreed upon as outlined in my June 23 letter. For now, we have agreed to carry out discovery pursuant to the Protective Order until we can reach agreement on the last issue of access by Vivendi's in-house counsel and finalize the Protective Order for presentation to the Court.

Lastly, I would like to schedule a discovery conference with you to discuss Vivendi's failure to produce documents and information regarding its licensing activities of cybercafes carried out and conducted within the United States (putting aside the issue of non-US licensing, on which we have reached an impasse). The small amount of documents produced to us consists mainly of licensing agreements with United States cybercafes and some related correspondence with those entities. Most of that material was produced from Dawn Gonzalez's files. It does not appear that you produced any internal correspondence between and among other Vivendi employees (for instance memoranda or emails) on the subject of cybercafe licensing. There is a lack of marketing plans, forecasts, or other such material that may reflect cybercafe licensing activities. Further, there appears to be no documents produced from Eric Roeder's files whatsoever. We understand that some documents that he has may be privileged (although he is a Vice President of Vivendi Universal Games and therefore is not always acting within his role as legal counsel), but there are no such documents disclosed on your privilege log. Therefore, it would appear that his files, along with the files of other Vivendi decision makers, were not searched for responsive documents. In short, Vivendi's collection of discoverable documents appears to be incomplete. Please let me know when you would be available either on Wednesday of this week to hold a discovery conference on this issue.

Very truly yours,

PRESTON GATES & ELLIS LLP

By
Jason P. Holtman

JPH:jph
cc:    Valve
K:\36063\00014\JPH\JPH_L21WI

```
                              ********************
                        ***     TX REPORT     ***
                              ********************


        TRANSMISSION OK

        TX/RX NO              4270
        CONNECTION TEL        606300014#2062240779
        SUBADDRESS
        CONNECTION ID
        ST. TIME             06/30 17:16
        USAGE T              01'29
        PGS.                    3
        RESULT               OK
```

# Preston|Gates|Ellis LLP

**FAX COVER SHEET**

| | | | |
|---|---|---|---|
| **TO:** | Mr. Robert J. Carlson | **FAX NO:** | (206) 224-0779 |
| **COMPANY:** | Christensen, O'Connor, Johnson & Kindness PLLC | **CONFIRMATION NO:** | (206) 682-8100 |
| **FROM:** | Jason P. Holtman | **CLIENT-MATTER NO:** | #99992-89001 |
| **DATE:** | June 30, 2003 | **TOTAL NUMBER OF PAGES INCLUDING THIS COVER SHEET:** | 3 |

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CONTACT:   [X] FAX OPERATOR: (206) 623-7580
                                                          [ ] NAME:
                                                              EXT:

**COMMENTS**

Please see attached.

**EXHIBIT 10**

**Preston|Gates|Ellis** LLP

July 2, 2003

**VIA FACSIMILE AND REGULAR MAIL**

Bob Carlson
Christensen O'Connor Johnson
  & Kindness
1420 Fifth Avenue
Suite 2800
Seattle, WA 98101-2347

       Re:    *Valve, L.L.C. v. Sierra Entertainment, Inc.*

Dear Bob:

      I wanted to bring to your attention what appears to be a copy of an INTERNATIONAL DISTRIBUTOR AGREEMENT between Vivendi Universal Games, Inc. and Asian Media Development Group ("AMDG") with an effective date of November 1, 2002 ("AMDG Agreement"). The document was found on the following website: *<http://www.pbase.com/ ivan168/amdg_sucks>*. I have attached a copy of the AMDG Agreement for your information.

      The AMDG Agreement directly bears on the representations that you have made to me on behalf of your client regarding its involvement in licensing Valve products abroad. In relevant part, the AMDG Agreement provides:

          This INTERNATIONAL DISTRIBUTOR AGREEMENT is made and entered into effective November 1, 2002 (the "Effective Date") by and between Vivendi Universal Games, Inc., a Delaware corporation, and its direct and indirect subsidiaries, with its principal place of business at 6080 Center Drive, 10th Floor, Los Angeles, CA 90045 ("COMPANY"), and Asia Media Development Group, a Philippine corporation. . .

          2(b)  Nature of Distribution. The appointment of DISTRIBUTOR only grants to DISTRIBUTOR a license to distribute COMPANY products to DISTRIBUTOR'S customers in the Territory, and does not grant any right, title, or interest in any COMPANY Product to DISTRIBUTOR.

          3(m)  Compliance with U.S. Export Laws. DISTRIBUTOR acknowledges that COMPANY's export of the COMPANY Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States ("Export Laws") . . .

A LAW FIRM  |  A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

925 FOURTH AVENUE, SUITE 2900  SEATTLE, WA 98104-1158  TEL: (206) 623-7580  FAX: (206) 623-7022  www.prestongates.com

Anchorage  Coeur d'Alene  Hong Kong  Orange County  Portland  San Francisco  Seattle  Spokane  Washington, DC

Page 2

5(a)  COMPANY Acceptance.  All orders for COMPANY Products by DISTRIBUTOR shall be subject to acceptance in writing by COMPANY at its principle place of business and shall not be binding until the earlier of such acceptance or shipment, and, in the case of acceptance by shipment, only as to the portion of the order actually shipped.

7(a)  Shipment.  DISTRIBUTOR shall take delivery of all COMPANY Products FOB Fresno, California, USA.  Shipment will be made to DISTRIBUTOR identified warehouse facilities or freight forwarder, subject to approval in writing by COMPANY in advance of shipment.  Unless specified in DISTRIBUTOR's order, COMPANY will select the mode shipment and the carrier. . . .

17(e)  Choice of Law, Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA.  THE APPLICATION OF THE UNITED NATIONS CONVENTION OF CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS IS EXPRESSLY EXCLUDED.  The parties agree that any claim asserted in any legal proceeding by one party against the other shall be commenced and maintained in any state or federal court located within the County of Los Angeles, State of California, USA, having subject matter jurisdiction with respect to the dispute between the parties.  Both parties submit to the jurisdiction of such courts over each of them personally in connection with such litigation, and waive any objection

The AMDG Agreement is substantial evidence of Vivendi's domestic presence directly involved in the infringing activities at issue in this suit.  Not only is Vivendi listed as a Delaware corporation, but its principal place of business is given as Los Angeles California.  You will also note that products are exported from Fresno, California and that the parties chose to be governed by domestic law and to avail themselves of United States courts.  In light of such activity, the narrow exception discussed in *Subafilms*, upon which you continue to wrongly rely, is clearly not applicable.  Vivendi cannot invoke *Subafilms* to avoid its discovery obligations.

It appears that the AMDG Agreement is intended for the purpose of distributing Valve product to cybercafes.  Given the nature of AMDG's business, it appears that the 20,000 units of Counterstrike being purchased at $2.00 a copy pursuant to the AMDG Agreement are intended for distribution in cybercafes and that Vivendi had full knowledge and participation in this distribution scheme.  For instance, in regard to Vivendi products, AMDG is required to buy 1000 units and receives 19 additional paper licenses for each unit (20,000 seats), while in regard to Valve products, AMDG has an obligation to buy 20,000 units.

Further, the AMDG Agreement makes it very likely that other agreements of this nature presently exist and that Vivendi has engaged in similar conduct in the past.  Valve is entitled to such information and related documents.

We intend to bring this document  to the Court's attention in connection with our motion to compel discovery from Vivendi.

Page 3


Please advise me as soon as possible if you have reconsidered your position regarding Vivendi's refusal to produce information and documents concerning its activities abroad. Furthermore, please provide me with answers to the other issues raised in my letter of June 30 so that we may resolve them in a timely manner.


Very truly yours,

PRESTON GATES & ELLIS LLP


By
Jason P. Holtman

JPH:jph
cc:     Valve
K:\36063\00014\JPH\JPH_L21WO

**ivan168 | all galleries | amdg_sucks | page1.jpg**

previous | next

## INTERNATIONAL DISTRIBUTOR AGREEMENT

This INTERNATIONAL DISTRIBUTOR AGREEMENT (the "Agreement") is made and entered into effective November 1, 2002 (the "Effective Date"), by and between Vivendi Universal Games, Inc., a Delaware corporation, and its direct and indirect subsidiaries, with its principal place of business at 6080 Center Drive, 10th floor, Los Angeles, CA 90045 ("COMPANY"), and Asian Media Development Group, a Philippine corporation , with its principal place of business at 2/F Jannov Plaza, 2295 Don Chino Roces Avenue, 1231 Makati City, Philippines ("DISTRIBUTOR").

### RECITALS

WHEREAS, COMPANY publishes and distributes certain computer software products, including the products listed in Exhibit A hereto; and

WHEREAS, COMPANY desires to distribute its products in a world market; and

WHEREAS, DISTRIBUTOR has expressed an interest to act as an independent distributor of certain COMPANY products under the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, COMPANY and DISTRIBUTOR agree as follows:

1. **Definitions.** Whenever used in this Agreement, the following terms shall have the following specified meanings:

   (a)   "Dealer" means an entity authorized hereunder, which resells COMPANY Products (as that term is defined herein) to end users.

   (b)   "COMPANY Documentation" means any and all manuals, specifications, user guides and other documentation regarding the COMPANY Products.

   (c)   "COMPANY Software" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by COMPANY and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto.

   (d)   "COMPANY Products" means COMPANY Software packaged together with the appropriate COMPANY Documentation.

   (e)   "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which DISTRIBUTOR has the right to distribute the enumerated COMPANY Products in the Territory.

   (f)   "End-User" means an individual or entity which purchases COMPANY Products, for its own use, and not for redistribution.

   (g)   "License Agreement" means COMPANY's standard form license agreement, a copy of which is included at the beginning of all user guides with respect to COMPANY Software distributed by COMPANY, as the same may be modified or amended from time to time.

   (h)   "Prohibited Country" means a country to which export or re-export of any COMPANY Products, is prohibited by United States law without first obtaining the permission of the United States Office of Export Administration or its successor.

**page1.jpg**

other sizes: small medium original

(i) All references in this Agreement to the "sale" of or "selling" COMPANY Software shall mean the sale of a license to use such COMPANY Software. All references in this Agreement to the "purchase" of COMPANY Software shall mean the purchase of a license to use such COMPANY Software.

2. **Appointment as Authorized COMPANY DISTRIBUTOR.**

(a) Appointment. Subject to the terms and conditions of this Agreement, COMPANY hereby appoints DISTRIBUTOR, and DISTRIBUTOR hereby accepts such appointment, as an independent distributor of COMPANY Products solely in the territory set forth in Exhibit A to this Agreement ("Territory").

(b) Nature of Distribution. The appointment of DISTRIBUTOR only grants to DISTRIBUTOR a license to distribute COMPANY Products to DISTRIBUTOR's customers in the Territory, and does not grant any right, title or interest in any COMPANY Product to DISTRIBUTOR.

(c) On-Line Sales. COMPANY hereby grants DISTRIBUTOR the right to market and sell the COMPANY Products through on-line services and the Internet only within the Territory. DISTRIBUTOR is prohibited from distributing any COMPANY Products via electronic means, including downloading. COMPANY reserves the right to review DISTRIBUTOR's on-line materials regarding the COMPANY Products and may at any time require DISTRIBUTOR to modify or remove such materials; DISTRIBUTOR agrees to immediately comply with such notice.

(d) Sales Literature. COMPANY will furnish DISTRIBUTOR with reasonable quantities (in COMPANY's sole judgment) of COMPANY's existing sales literature if desired by DISTRIBUTOR for the initial introduction of the COMPANY Products within the Territory at no charge. COMPANY reserves the right to charge a reasonable fee for any additional materials provided by it to DISTRIBUTOR.

(e) COMPANY's Reserved Rights.

(1) Changes in Products and Support. COMPANY reserves the right at any time, in its sole discretion and without liability to DISTRIBUTOR, to change, or to add to or delete from the list of COMPANY Products. Additionally, COMPANY reserves the right to modify COMPANY Products during the term hereof in its sole discretion. DISTRIBUTOR acknowledges that some COMPANY Products may contain content which has been licensed to COMPANY by third parties. In the event one or more of these licenses is terminated, COMPANY reserves the right to unilaterally remove the affected COMPANY Product from this Agreement and DISTRIBUTOR covenants to cease all distribution of such COMPANY Product(s) within fifteen (15) days following its receipt of notice thereof.

(2) COMPANY and Third-Party Distribution of COMPANY Products Within the Territory.

(i) OEM Distribution. DISTRIBUTOR acknowledges that COMPANY has granted and/or in the future may grant OEM rights to third parties relating to one or more of the COMPANY Products in the Territory.

(ii) On-Line and Mail Order Sales. DISTRIBUTOR acknowledges that COMPANY and/or third parties may sell COMPANY Products either on-line or through mail order to individuals located in the Territory and COMPANY shall have no liability to DISTRIBUTOR with respect to such sales.

VUG International Distributor Agreement                    Page 2
AMDG 11/1/01

page2.jpg

other sizes: small medium original

**ivan168 | all galleries | amdg_sucks | page3.jpg**

previous | next

3. **Obligations of DISTRIBUTOR.** DISTRIBUTOR warrants and represents that it has and will maintain, the capacity, facilities and personnel necessary to carry out its obligations under this Agreement and in particular that:

(a) **Promotion Efforts.** DISTRIBUTOR will use its best efforts to market and sell COMPANY Products both vigorously and aggressively to Dealers within the Territory and to distribute COMPANY Products within the Territory.

(b) **Dealer Qualifications.** DISTRIBUTOR will appoint and maintain Dealers that have the financial capacity, facilities, technical capacity and desire to market and sell COMPANY Products competently.

(c) **DISTRIBUTOR-Dealer Agreement.** Prior to engaging in any transaction with a Dealer involving any COMPANY Products, DISTRIBUTOR and each Dealer shall execute an agreement authorizing the Dealer to resell COMPANY Products. DISTRIBUTOR agrees to furnish to COMPANY in writing the name, address and telephone number of each Dealer. It is a material obligation of DISTRIBUTOR to contractually restrict the territory where each Dealer may resell the localized COMPANY Products to no countries or regions outside the Territory granted hereunder. Any agreement with any Dealer with respect to any COMPANY Product shall provide that the rights of the of Dealer with respect to such COMPANY Product shall terminate following the expiration or early termination of this Agreement, and such Dealer shall be obligated to cease the use, sale, distribution, or marketing of the COMPANY Product upon such termination of this Agreement in accordance with the applicable provisions hereof, subject to the period to continue to sell COMPANY Product described in Section 12(b)(7). Each Dealer agreement shall expressly state that the continued sale, distribution, or marketing of any COMPANY Product following the termination of this Agreement for any reason (except as expressly provided in this Agreement) constitutes an infringement of COMPANY's trademarks and copyrights, and COMPANY shall have the right to directly enforce its rights and remedies against such Dealer in connection with such infringement, although DISTRIBUTOR shall remain primarily liable to COMPANY for any such infringement.

(d) **Minimum Commitments.** DISTRIBUTOR agrees and guarantees to purchase from COMPANY at least the minimum quantities of each of the COMPANY Products set forth in Exhibit A (the "Guarantee") in the time period set forth in Exhibit A (the "Guarantee Period"). In the event DISTRIBUTOR does not purchase the agreed upon Guarantee during the Guarantee Period, DISTRIBUTOR agrees to render payment for the difference between the royalties guaranteed and the royalties actually paid during the Guarantee Period at the expiration of the Guarantee Period. If DISTRIBUTOR has not paid one-half (1/2) of the Guarantee at the mid-point of the Guarantee Period, COMPANY shall have the right to terminate this Agreement in accordance with Section 12(b)(5) hereinbelow. In the event DISTRIBUTOR fails to achieve the Guarantee within the Guarantee Period, COMPANY shall have the right to terminate this Agreement upon thirty (30) days prior written notice.

(e) **Inventory.** DISTRIBUTOR will maintain an inventory of COMPANY Products sufficient to serve adequately the needs of Dealers on a reasonably timely basis.

(f) **Dealer Support.** DISTRIBUTOR will provide Dealers with training, technical support and other assistance appropriate in promoting COMPANY Products. DISTRIBUTOR will transmit to Dealers all COMPANY literature and other information that COMPANY requests be transmitted to them.

(g) **DISTRIBUTOR Personnel and Working Conditions.** DISTRIBUTOR will train and maintain a sufficient number of capable technical and sales personnel at its expense: (1) to serve the needs of its Dealers or End-Users for COMPANY Products, service and support; and (2) otherwise to carry out the responsibilities of DISTRIBUTOR under this Agreement. DISTRIBUTOR shall secure safe and humane working conditions and reasonable environmental protections in its distribution of COMPANY Product.

VUG International Distributor Agreement                                      Page 3.
AMDG 11/7/02

PBase | galleries | forum | search                                    help | login

ivan168 | all galleries | amdg_sucks | page4.jpg

previous | next



ivan168 | all galleries | amdg_sucks | page5.jpg

previous | next

(f)  **COMPANY Packaging.** DISTRIBUTOR will distribute COMPANY Products with all packaging, warranties, disclaimers and License Agreement intact as shipped from COMPANY, and will instruct each of its Dealers as to the nature and terms of the License Agreement applicable to the COMPANY Software. DISTRIBUTOR shall be bound by all of the terms and conditions of the License Agreement with respect to such copy. DISTRIBUTOR must receive written pre-approval from COMPANY on all DISTRIBUTOR produced marketing and sales materials, including but not limited to, packaging and collateral materials, that reference COMPANY Software prior to release of such material. DISTRIBUTOR shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the COMPANY Products within the Territory.

(m)  **Compliance with U.S. Export Laws.** DISTRIBUTOR acknowledges that COMPANY's export of the COMPANY Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data ("Direct Product" as used hereinafter means the immediate product, including processes and services, derived from the use of COMPANY Products). DISTRIBUTOR agrees and shall cause each of its Dealers, employees, agents and representatives to agree not to export or re-export any COMPANY Products or Direct Products of COMPANY Products to any Prohibited Country. DISTRIBUTOR agrees to indemnify COMPANY against any claim, demand, action, proceeding, investigation, loss, liability, cost and expense, including, without limitation attorney's fees, suffered or incurred by COMPANY and arising out of or related to any violation (whether intentional or unintentional) by DISTRIBUTOR its employees, agents, representatives and Dealers of any of the warranties or covenants of this Section 3(m).

(o)  **Governmental Approval.** If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to assure the right of remittance abroad of U.S. dollars pursuant to Section 6 hereof, DISTRIBUTOR shall immediately take whatever steps may be necessary in this respect, and any changes incurred in connection therewith shall be for the account of DISTRIBUTOR. DISTRIBUTOR shall keep COMPANY currently informed of its efforts in this connection. COMPANY shall be under no obligation to ship COMPANY Products to DISTRIBUTOR hereunder until DISTRIBUTOR has provided COMPANY with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(o)  **Market Conditions.** DISTRIBUTOR will advise COMPANY promptly concerning any market information that comes to DISTRIBUTOR's attention regarding COMPANY Products, COMPANY's market position or the continued competitiveness of COMPANY Products in the marketplace.

(p)  **Dealing with End-Users.** Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of COMPANY Software from DISTRIBUTOR, DISTRIBUTOR shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the License Agreement. A sample copy of the License Agreement shall be available from DISTRIBUTOR for review by all prospective End-Users dealing with DISTRIBUTOR. Should any End-User return to DISTRIBUTOR any unopened COMPANY Software in the original sealed package in which it was distributed by COMPANY, DISTRIBUTOR shall provide such End-User with a full refund of all sums paid by the End-User therefor. In no event shall COMPANY provide any such refund to any End-User who has obtained the copy or copies in question from or through DISTRIBUTOR.

VUG International Distributor Agreement                              Page 5
AMDG 19/03

**page5.jpg**

other sizes: small medium original



PBase | galleries | forum | search     help | login

**ivan168 | all galleries | amdg_sucks | page6.jpg**

previous | next

4. Inspections; Records and Reporting.

(a) Reports. DISTRIBUTOR will provide to COMPANY written reports for every one month period or when requested by COMPANY, showing:

(1) DISTRIBUTOR's shipments of COMPANY Products by units and local currency volume;

(2) forecasts of DISTRIBUTOR's anticipated orders;

(3) any other information COMPANY reasonably requests.

(b) Notification. DISTRIBUTOR will notify COMPANY in writing of any claim or proceeding involving COMPANY Products within seven (7) days after DISTRIBUTOR learns of such claim or proceeding. DISTRIBUTOR will also report promptly to COMPANY all claimed or suspected product defects. DISTRIBUTOR will also notify COMPANY in writing not more than seven (7) days after any change in the management or control of DISTRIBUTOR, or any transfer of a majority share of DISTRIBUTOR's voting control or a transfer of substantially all its assets.

(c) Records. DISTRIBUTOR will maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to distribution of COMPANY Products and will permit examination thereof by authorized representatives of COMPANY at all reasonable times. For the purpose of verifying compliance by the DISTRIBUTOR with the provisions of this Agreement, DISTRIBUTOR agrees that COMPANY and its representatives will be permitted full access to, and will be permitted to make copies of or abstracts from, the books and records of DISTRIBUTOR relating to inventory levels, manufacturing, sales, and distribution. COMPANY will be permitted to audit such books and records at reasonable intervals.

5. Order and Return Procedure.

(a) COMPANY Acceptance. All orders for COMPANY Products by DISTRIBUTOR shall be subject to acceptance in writing by COMPANY at its principal place of business and shall not be binding until the earlier of such acceptance or shipment, and, in the case of acceptance by shipment, only as to the portion of the order actually shipped.

(b) Controlling Terms. The terms and conditions of this Agreement and of the applicable COMPANY invoice or confirmation will apply to each order accepted or shipped by COMPANY hereunder. The terms and conditions contained in any of DISTRIBUTOR's purchase orders, confirmations, or other business forms will not apply to any order notwithstanding COMPANY's acknowledgment or acceptance of such order.

(c) Cancellation. COMPANY reserves the right to cancel any orders by DISTRIBUTOR and accepted by COMPANY as set forth above, or to refuse or delay shipment thereof, if DISTRIBUTOR fails to comply with the terms and conditions of this Agreement. COMPANY also reserves the right to discontinue the publication, manufacture or distribution of any or all COMPANY Products at any time, and to cancel any orders for such discontinued COMPANY Products without liability of any kind to DISTRIBUTOR or to any other person or entity. No such cancellation, refusal or delay will be deemed a termination (unless COMPANY so advises DISTRIBUTOR) or breach of this Agreement by COMPANY.

(d) Defective Merchandise. DISTRIBUTOR acknowledges and agrees that CD-ROM technology has evolved to the point where in the present day defective media is only caused by End-User abuse of the CD-ROM. Therefore, DISTRIBUTOR shall not be entitled to return any so-called "defective merchandise" to COMPANY for credit or exchange.

VUG International Distributor Agreement                          Page 6
AMDG 110/92

---

**page6.jpg**

other sizes: small medium original



**ivan168 | all galleries | amdg_sucks | page7.jpg**

**previous | next**

(e)  Stock Balancing.  All purchases made by DISTRIBUTOR hereunder shall be final.  DISTRIBUTOR may not return any COMPANY Product to COMPANY for credit or exchange.

6.  Prices and Payment.

(a)  Prices to DISTRIBUTOR.  DISTRIBUTOR shall pay COMPANY for all COMPANY Products shipped by COMPANY a price in accordance with that set forth in Exhibit A.  COMPANY shall have the right to amend its pricing at any time with respect to any or all COMPANY Products with at least thirty (30) days prior written notice to DISTRIBUTOR.  Such change shall not apply to any order placed by DISTRIBUTOR prior to the effective date of such change.

(b)  Taxes, Tariffs, Fees.  COMPANY's price does not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which COMPANY may be required to pay or collect upon the delivery of COMPANY Products or upon collection of the price for such COMPANY Products.  In the event any fees payable by DISTRIBUTOR are subject to any tax withholding, DISTRIBUTOR shall pay to COMPANY an additional amount such that following such payment, COMPANY receives the amount it would have received had no such withholding been made.

(c)  Payment Terms.  DISTRIBUTOR agrees to make available to COMPANY such statements of the DISTRIBUTOR's financial condition as COMPANY may require.  COMPANY reserves the right at all times, either generally or with respect to any specific purchase order of DISTRIBUTOR, to vary, change or limit the amount or duration of credit to be allowed to DISTRIBUTOR.  Unless COMPANY agrees to maintain a sufficient credit line to support purchases of the Products.  Repeated or sustained suspensions/interruptions of credit may be grounds for termination of this Agreement as may be deemed appropriate in the sole and absolute judgment of COMPANY.  Subject to the foregoing, DISTRIBUTOR shall pay all invoices rendered by COMPANY on a Net thirty (30) day basis.  All payments shall be made in United States dollars, free of any withholding tax, and of any currency control or other restriction to COMPANY at the address designated by COMPANY.  Unless otherwise agreed by COMPANY in writing, to the time of submission of any order for COMPANY Products purchased hereunder, DISTRIBUTOR shall:

(1)  Cash Payment.  Pay by wire transfer to a bank account designated by COMPANY the amount owed by DISTRIBUTOR for the COMPANY Products ordered (plus any applicable taxes, shipping and other charges), in cash, by prepaid international money order, VISA or Mastercard.  All transaction fees related to DISTRIBUTOR's payment will be borne entirely by DISTRIBUTOR.

7.  Shipment, Risk of Loss and Delivery.

(a)  Shipment.  DISTRIBUTOR shall take delivery of all COMPANY Products FOB Fresno, California, USA.  Shipment will be made to DISTRIBUTOR identified warehouse facilities or freight forwarding, subject to approval in writing by COMPANY in advance of shipment.  Unless specified in DISTRIBUTOR's order, COMPANY will select the mode of shipment and the carrier.  DISTRIBUTOR will be responsible for and pay all packing, shipping, freight and insurance charges, which charges COMPANY may require DISTRIBUTOR to pay in advance.

(b)  Risk of Loss.  All risk of loss of or damage to COMPANY Products will pass to DISTRIBUTOR upon delivery by COMPANY to the carrier, freight forwarder or DISTRIBUTOR, whichever occurs first.  DISTRIBUTOR will bear the risk of loss or damage in transit.

(c)  Partial Delivery.  Unless DISTRIBUTOR clearly advises COMPANY to the contrary in writing, COMPANY may make partial shipments of DISTRIBUTOR's orders, to be separately invoiced and

VUG International Distributor Agreement                                        Page 7
AMDG 11/1/02

page7.jpg

other sizes: small medium original

**PBase | galleries | forum | search**                                                                 **help | login**

**ivan168 | all galleries | amdg_sucks | page8.jpg**

previous | next



paid for when due. Delay in delivery of any installment shall not relieve DISTRIBUTOR of its obligation to accept the remaining deliveries.

(d) Delivery Schedule; Delays. COMPANY will use reasonable efforts to meet DISTRIBUTOR's requested delivery schedule for COMPANY Products, but COMPANY reserves the right to refuse, cancel or delay shipment to DISTRIBUTOR if DISTRIBUTOR has failed to perform any of its obligations under this Agreement. Should orders for COMPANY Products exceed COMPANY's available inventory, COMPANY will allocate its available inventory and make deliveries on an equitable basis to the extent practicable. In no event, shall COMPANY be liable for any damages, direct, consequential, special or otherwise, to DISTRIBUTOR or to any other person or entity for failure to deliver or for any delay or error in delivery of COMPANY Products for any reason whatsoever.

8. DISTRIBUTOR Determines its Own Per Copy Fees. DISTRIBUTOR is free to determine unilaterally its own pricing of the COMPANY Software to its Dealers. Although COMPANY may publish suggested wholesale, retail or Dealer prices, these are suggestions only and DISTRIBUTOR shall be entirely free to determine the actual prices at which COMPANY Products are sold to its Dealers.

9. DISTRIBUTOR's Warranties and Representations Regarding Treatment of Dealers. DISTRIBUTOR hereby warrants and represents to COMPANY as follows:

(a) Dealer Pricing. DISTRIBUTOR will inform each Dealer that it is free to determine unilaterally its own prices and that, although COMPANY may publish lists showing suggested retail prices for COMPANY Products, these are suggestions only.

(b) Non-Discrimination Among Dealers. In working with its Dealers, DISTRIBUTOR shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Dealers, including but not limited to those which govern discriminatory pricing.

10. Trademarks, Trade Names and Copyrights.

(a) Trademark Use During Agreement. During the term of this Agreement, DISTRIBUTOR is authorized by COMPANY to use the trademarks COMPANY uses for COMPANY Products solely in connection with DISTRIBUTOR's advertisement, promotion and distribution of COMPANY Products. DISTRIBUTOR agrees that it will cause to be affixed, conspicuously and legibly on all marketing materials incorporating any part of the COMPANY Software, appropriate copyright and trademark notices in the name of COMPANY. DISTRIBUTOR agrees not to alter, erase, deface, or overprint any such mark on anything provided by COMPANY.

(b) No DISTRIBUTOR Rights in Trademarks or Copyrights. DISTRIBUTOR has paid no consideration for the use of COMPANY's trademarks, logos, copyrights, trade secrets, trade names or designations, and nothing contained in this Agreement shall give DISTRIBUTOR any interest in any of them. DISTRIBUTOR acknowledges that COMPANY owns and retains all proprietary rights in all COMPANY Products, and agrees that it will not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect the validity or enforceability of any trademark, trade name, trade secret, copyright or logo belonging to or licensed to COMPANY (including, without limitation, any act, or assistance to any act, which may infringe or lead to the infringement of any copyright in the COMPANY Products). DISTRIBUTOR agrees not to attach any additional trademarks, logos or trade designations to any COMPANY Product.

(c) No Continuing Right. Upon expiration or termination of this Agreement, DISTRIBUTOR will cease advertising and use of all COMPANY names, marks, logos and designations.

VUG International Distributor Agreement                                                                 Page 7
AMDG 11/1/02

**page8.jpg**

other sizes: small medium original



ivan168 | all galleries | amdg_sucks | page9.jpg

previous | next

(d)  Obligation to Protect.  DISTRIBUTOR agrees to use reasonable efforts to protect COMPANY's proprietary rights and to cooperate COMPANY's efforts to protect its proprietary rights.

(e)  Security.  At no time shall DISTRIBUTOR re-compile, decompile or disassemble any COMPANY Software.  DISTRIBUTOR shall not at any time use or attempt to use any COMPANY Software in any form other than the object code form in which copies thereof are distributed by COMPANY, or to generate any source code thereof.  DISTRIBUTOR shall not alter or modify any COMPANY Software, or any portion or aspect thereof, of use or refer to any COMPANY Software in the creation of any derivative work, without COMPANY's prior written consent.  DISTRIBUTOR shall preclude its agents, employees, and contractors from engaging in any conduct inconsistent with the terms of this Section 10(e) by means of appropriate agreements and/or such other security measures as may be necessary in order to preclude such conduct.  COMPANY reserves the right to review DISTRIBUTOR's agreement and security measures and to require DISTRIBUTOR to amend agreements and take steps to bolster the security measures that are necessary in COMPANY's sole judgment.  DISTRIBUTOR shall not at any time market any copy of COMPANY Product which has not been produced by COMPANY.

(f)  Breach.  DISTRIBUTOR understands and agrees that COMPANY will suffer irreparable harm in the event that DISTRIBUTOR fails to comply with any of its obligations pursuant to this Section 10, and that monetary damages in such event would be substantial and inadequate to compensate COMPANY.  Consequently, in such event COMPANY shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by DISTRIBUTOR, without showing or proving any actual damages sustained by COMPANY.

(g)  Dealer or End-User Breaches.  DISTRIBUTOR shall promptly report to COMPANY any breach of the License Agreement of which DISTRIBUTOR becomes aware.  COMPANY shall have the right, but not the obligation, to pursue any and all such infringements.

(h)  Filing and Recording.  Upon request, DISTRIBUTOR agrees to assist COMPANY in the filing and recording of COMPANY's trade names, copyrights, patents and trademarks in the Territory, all costs to be paid by COMPANY.

11.  Assignment.  DISTRIBUTOR is appointed an authorized COMPANY DISTRIBUTOR because of DISTRIBUTOR's commitments in this Agreement, and further because of COMPANY's confidence in DISTRIBUTOR, which confidence is personal in nature.  The rights granted to DISTRIBUTOR hereunder are personal in nature and DISTRIBUTOR shall not assign this agreement to any third party, and DISTRIBUTOR may not delegate its duties hereunder without the prior written consent of COMPANY.  Any attempted assignment or delegation without the required consent shall be void and of no effect.

12.  Duration and Termination of Agreement.

(a)  Term.  Subject to prior termination in accordance with the provisions contained herein, the term hereof shall commence as of the effective date described in Section 17(d) herein and expire upon the expiration of all Distribution Terms for COMPANY Products distributed pursuant to this Agreement.

(b)  Termination for Cause.  This Agreement may be terminated forthwith by either party upon the occurrence of the following, by one party giving written notice thereof to the other party by registered or certified mail, in which this Agreement shall terminate on the date set forth in such notice.  The date of mailing said written notice shall be deemed the date on which notice of termination of this Agreement shall have been given.

(1)  If any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or

## page9.jpg

other sizes: small medium original

ivan168 | all galleries | amdg_sucks | page10.jpg

previous | next



against DISTRIBUTOR or if DISTRIBUTOR shall make an assignment for the benefit of creditors; or

(2)    A material breach by either party of any of the terms of this Agreement or any other agreement between the parties hereto which breach is not remedied by the breaching party to the other party's reasonable satisfaction within thirty (30) days of the breaching party's receipt of notice of such breach from the other party in the event of a breach of Section 6 hereunder and within ninety (90) days for all other breaches.

(3)    By COMPANY, if DISTRIBUTOR is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a DISTRIBUTOR's common stock or the equivalent, shall be considered a substantial change in control hereunder).

(4)    By COMPANY, if DISTRIBUTOR sells: (i) any copies of the COMPANY Product; (ii) any copies of the COMPANY Product outside the Territory; or (iii) any copies of the COMPANY Product to any person or entity which DISTRIBUTOR has reason to believe may sell the COMPANY Product outside the Territory; or

(5)    By COMPANY, if DISTRIBUTOR has not paid COMPANY one-half (½) of the Guarantee at the mid-point of the Guarantee Period.

(c)    Termination at Will.  COMPANY shall have the right to terminate the Agreement for no cause, at will upon ninety (90) days written notice.

(d)    Orders After Termination Notice.  In the event that any notice of termination of this Agreement is given, COMPANY will be entitled to reject all or part of any orders received from DISTRIBUTOR after notice but prior to the effective date of termination if availability of COMPANY Products is insufficient at that time to fully meet the needs of COMPANY and its customers.  In any case, COMPANY may limit monthly shipments to DISTRIBUTOR during said period to DISTRIBUTOR's average monthly shipments from COMPANY during the three months prior to the date of notice of termination.  All shipments made by COMPANY during said period, shall be delivered solely upon a cash with order basis.

(e)    Effect of Termination.  Upon termination of this Agreement:

(1)    COMPANY, at its option, may recapture any or all COMPANY Products then in DISTRIBUTOR's possession at per copy prices not greater than the per copy prices paid by DISTRIBUTOR for such Products;

(2)    DISTRIBUTOR shall provide COMPANY with a written report detailing all inventory of the COMPANY Products in its possession at the effective date of termination within ten (10) business days.  COMPANY shall then have a period of ten (10) business days to elect to purchase any portion of said inventory at DISTRIBUTOR's actual cost of such goods.  Provided that DISTRIBUTOR has remained in compliance with all material terms of this Agreement throughout the term, DISTRIBUTOR may continue to sell from its remaining inventory until such inventory is depleted or for a period of six (6) months, whichever period is shorter.

(3)    All orders or portions thereof remaining not shipped as of the effective date of termination shall automatically be cancelled.

VUG International Distributor Agreement                                    Page 10
AMDG 11/1/02

## page10.jpg

other sizes: small medium original

ivan168 | all galleries | amdg_sucks | page11.jpg

previous | next



(4)  For a period of one (1) year after the date of termination, DISTRIBUTOR shall make available to COMPANY for inspection and copying all books and records of DISTRIBUTOR that pertain to DISTRIBUTOR's performance of and compliance with its obligations, warranties and representations under this Agreement.

(5)  DISTRIBUTOR shall cease using any COMPANY trademark, logo or trade name;

(6)  All trademarks, trade names, patents, samples, literature and sales aids of every kind shall remain the property of COMPANY. Within thirty (30) days after the termination of this Agreement, DISTRIBUTOR shall prepare all such items for its possession for shipment, as COMPANY may direct, at COMPANY's expense. DISTRIBUTOR shall not make or retain any copies of any confidential items or information which may have been entrusted to it. Effective upon the termination of this Agreement, DISTRIBUTOR shall cease to use all trademarks, marks, and trade names of COMPANY.

(7)  Unless COMPANY invokes its rights under section 12(b) above, DISTRIBUTOR may continue to sell all COMPANY Products purchased by it during the term of the Agreement for a period of three (3) months. If the Agreement was terminated pursuant to Section 12(b)(5) hereinabove, the DISTRIBUTOR shall pay COMPANY the difference between one-half (1/2) of the Guarantee and the amount of royalties DISTRIBUTOR had paid to COMPANY at the mid-point of the Guarantee Period in addition to DISTRIBUTOR's obligation to pay COMPANY any royalties owing COMPANY since that point in time.

(f)  Survival. COMPANY's rights and DISTRIBUTOR's obligations to pay COMPANY all amounts due hereunder, as well as DISTRIBUTOR's obligations under Section 3(d), 3(i), (4), 4(c), 5, 6, 10, 12, 13, 14(c), 15, 16, and 17 shall survive termination of this Agreement.

13.  Relationship of the Parties. DISTRIBUTOR's relationship with COMPANY during the term of this Agreement will be that of an independent contractor. DISTRIBUTOR will not have, and will not represent that it has, any power, right or authority to bind COMPANY, or to assume or create any obligation or responsibility express or implied, on behalf of COMPANY or in COMPANY's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of DISTRIBUTOR and COMPANY, nor of creating the relationships of employer/employee, franchisor/franchisee, or principal/agent between the parties. In all matters relating to this Agreement, neither DISTRIBUTOR nor its employees or agents are, or shall act as, employees of COMPANY within the meaning or application of any obligations or liabilities to COMPANY by reason of an employment relationship. DISTRIBUTOR shall reimburse COMPANY for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon COMPANY by virtue of any such law with respect to employees of DISTRIBUTOR in performance of this Agreement.

14.  Indemnification.

(a)  Indemnification of DISTRIBUTOR.   COMPANY agrees to defend, indemnify and hold DISTRIBUTOR harmless for any loss, damage or liability for any claimed infringement of any United States patent right, copyright and trade secret, asserted by any third person or entity arising out of DISTRIBUTOR's use of any COMPANY Products, provided (1) that DISTRIBUTOR is promptly notified in writing by DISTRIBUTOR of any such claim against DISTRIBUTOR, (2) that DISTRIBUTOR authorizes COMPANY to assume sole control over the defense of any such claim thereafter, together with the right to settle or compromise such claim, and (3) that DISTRIBUTOR makes available to COMPANY such information, assistance and authority as may be reasonably requested by COMPANY in order to enable COMPANY to defend any such claim. In the event any such claim is asserted, COMPANY shall have the right without limitation, at its option either (a) to obtain such rights and/or licenses from the claimant as may be necessary to enable DISTRIBUTOR to continue using and/or marketing the COMPANY Products which are the subject of the claim, and/or

**page11.jpg**

other sizes: small medium original



(b) to modify the COMPANY Products with respect to which such claim is asserted so as to avoid further claimed infringement by such person or entity.

(b) **No Combination Claims.** Notwithstanding Section 14(a), COMPANY shall not be liable to DISTRIBUTOR for any claim arising from or based upon the combination, operation or use of any COMPANY Product with equipment, data or programming not supplied by COMPANY, or arising from any alteration or modification of COMPANY Products.

(c) **Indemnification of COMPANY.** DISTRIBUTOR agrees to defend, indemnify, and hold COMPANY, its affiliated companies and subsidiaries and their respective officers, directors, employees and agents harmless from and against any loss, claim, cost, expense, liability or damage including reasonable attorney's fees and costs, resulting or arising in any way from its performance of the obligations hereunder, or from its or its employees' negligence, misrepresentations or other actions, illegal or unauthorized conduct in the promotion of the Products or any other act or omission arising out of or relating to this Agreement.

15. **Disclaimer of Warranties; Limited Liability.**

(a) **Disclaimer of Warranties.** DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE COMPANY SOFTWARE, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. COMPANY FURTHER DISCLAIMS ALL WARRANTIES WITH REGARD TO YEAR 2000 COMPLIANCE OF THE COMPANY SOFTWARE. SPECIFICALLY, COMPANY MAKES NO WARRANTIES THAT THE PERFORMANCE OR FUNCTIONALITY OF THE COMPANY SOFTWARE WILL NOT BE AFFECTED BY DATES PRIOR TO, DURING OR AFTER THE YEAR 2000, OR THAT THE COMPANY SOFTWARE WILL BE CAPABLE OF CORRECTLY PROCESSING, PROVIDING, AND/OR RECEIVING DATE INFORMATION WITHIN AND BETWEEN CENTURIES, INCLUDING THE PROPER EXCHANGE OF DATE INFORMATION BETWEEN PRODUCTS OR APPLICATIONS.

(b) **Limitation of Liability.** UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO DISTRIBUTOR ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY DISTRIBUTOR TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. DISTRIBUTOR acknowledges and agrees that (1) DISTRIBUTOR has no expectation and has received no assurances that its business relationship with COMPANY will continue beyond the stated term of this Agreement or its earlier termination in accordance with Section 12 hereunder, that any investment by DISTRIBUTOR in the promotion of COMPANY Products will be recovered or recouped, or that DISTRIBUTOR shall obtain any anticipated amount of profits by virtue of this Agreement; and (2) DISTRIBUTOR shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of COMPANY Products or in any goodwill created by its efforts hereunder.

**page12.jpg**

other sizes: small medium original



16. **Confidentiality.** In the course of this Agreement, it is anticipated that DISTRIBUTOR will learn confidential or proprietary information about COMPANY. DISTRIBUTOR will keep confidential this information and any other information which DISTRIBUTOR may acquire with respect to COMPANY's business, including, but not limited to, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until COMPANY consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of DISTRIBUTOR. DISTRIBUTOR will not disclose to others, without COMPANY's consent, the subject of this relationship without first providing COMPANY with the opportunity to review and offer reasonable objection to the contemplated publication. This undertaking to keep information confidential will survive the termination of this Agreement. It is understood, however, that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to DISTRIBUTOR without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to COMPANY with respect to such information; (iii) is or becomes part of the public domain through no fault of DISTRIBUTOR; (iv) is independently ascertainable or developed by DISTRIBUTOR or its employees; (v) is required to be disclosed by administrative or judicial action provided that DISTRIBUTOR immediately after receiving notice of such action notifies COMPANY of such action to give COMPANY the opportunity to seek any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of COMPANY. DISTRIBUTOR will require each of its employees performing services relating to the Work to execute a Confidentiality Agreement, if requested by COMPANY. At the termination of this Agreement, DISTRIBUTOR will return to COMPANY all drawings, specifications, manuals and other printed or reproduced material (including information stored on machine readable media) provided by COMPANY.

17. **General.**

   (a) **Waiver and Modification.** No waiver or modification of this Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

   (b) **Notices.** All notices and demands hereunder shall be in writing and shall be served by personal delivery, express courier, or shall at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be by certified or registered airmail, return receipt requested, and shall be deemed complete upon receipt. If receipt of such notice or demand is refused or a party has changed its address without informing the other, the notice shall be deemed to have been given and received upon the seventh (7th) day following the date upon which it is first postmarked by the postal service of the sender's nation.

   (c) **Attorney's Fees.** In the event any litigation is brought by either party in connection with this Agreement, the prevailing party in such litigation shall be entitled to recover from the other party all the costs, attorney's fees and other expenses incurred by such prevailing party in the litigation.

   (d) **Complete Execution.** This Agreement shall become effective only after it has been signed by DISTRIBUTOR and accepted by COMPANY.

   (e) **Choice of Law, Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA. THE APPLICATION OF THE UNITED NATIONS CONVENTION OF CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS IS EXPRESSLY EXCLUDED. The parties agree that any claim asserted in any legal proceeding by one party against the other shall be commenced and maintained in any state or federal court located within

VUG International Distributor Agreement
AMDG 11/7/02                                                Page 13

**page13.jpg**

other sizes: small medium original

ivan168 | all galleries | amdg_sucks | page14.jpg

previous | next

the County of Los Angeles, State of California, USA, having subject matter jurisdiction with respect to the dispute between the parties. Both parties hereby submit to the jurisdiction of such courts over each of them personally in connection with such litigation, and waive any objection to venue in such courts and any claim that such forum is an inconvenient forum. The English language version of this Agreement controls when interpreting this Agreement.

(f) **Severability.** In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. In the event the inferenced provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(g) **Force Majeure.** COMPANY shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond COMPANY's control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(h) **Entire Agreement.** This Agreement including all Schedules and Exhibits constitute and contain the entire agreement between the parties with respect to the subject matter hereof and supersede any prior oral or written agreements. Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each and has been delivered to the parties. This Agreement may not be changed, modified, amended or supplemented, except in writing signed by all parties to this Agreement. Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(i) **Benefits of Agreement.** The terms of this Agreement are intended solely for the benefit of the parties hereto. They are not intended to confer upon any third party the status of a third party beneficiary. Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement.

Vivendi Universal Games, Inc.

Asian Media Development Group

HUBERT LARENAUDIE

ARTURO R. DAZA, JR.

Senior Vice-President & Director

President

18 November 2002

18 November 2002

VUG International Distributor Agreement                                          Page 14
AMDG 1 V1 01

---

## page14.jpg

other sizes: small medium original

ivan168 | all galleries | amdg_sucks | Page 15.jpg

previous | next



**EXHIBIT A**

COMPANY Products and Prices in DISTRIBUTOR:

| COMPANY Product | Price *(in USD) |
| --- | --- |
| Half Life Counterstrike | $2.00 |

*Price means US dollars that DISTRIBUTOR agrees to pay COMPANY for each unit purchased.

2. **Distribution Term:**

Subject to early termination in accordance with the provisions contained herein, the Distribution Term shall begin on the Effective Date of the Agreement and continue in full force for a period of twelve (12) months. The Distribution Term shall be from November 1, 2002 to October 31, 2003.

3. **Guarantee and Guarantee Period:**

Within the applicable Distribution Term of the Agreement, DISTRIBUTOR guarantees sales of no less than twenty thousand (20,000) units of Half Life Counterstrike.

4. **Payment Terms:**

Concurrent or prior with COMPANY's receipt of a Purchase Order, DISTRIBUTOR agrees to pay COMPANY for the total amount of the applicable Purchase Order.

5. **Territory:**

Philippines

VUG International Distributor Agreement    Page 15
AMDG 11/7/02

**Page 15.jpg**

other sizes: small medium large original

ivan168 | all galleries | amdg_sucks | Page 15bc.jpg

previous | next

**EXHIBIT A**

1. COMPANY Products and Prices in DISTRIBUTOR:

A.

| COMPANY Product | License Fee (in USD)* |
| --- | --- |
| Diablo II | $100,000.00 |
| Starcraft | $ 50,000.00 |
| Alien V. Predator 2 | $ 10,000.00 |
| Empire Earth | $100,000.00 |

B. WarCraft III    $200,000.00

*The License Fee includes a maximum of one thousand (1,000) units of each COMPANY Product and nineteen (19) additional licenses for each unit of COMPANY Product solely for use in Cybercafes. Solely by way of clarification, each Cybercafe will be obtaining twenty (20) Licenses for each COMPANY Product (one (1) unit of finished goods and nineteen (19) Paper Licenses.)

2. Distribution Term:

Subject to early termination in accordance with the provisions contained herein, the Distribution Term shall be from November 1, 2002 to October 31, 2003.

3. Minimum Guarantee:

During the applicable Distribution Term of the Agreement, DISTRIBUTOR guarantees payments for COMPANY Products of no less than US$400,000.00 (the "Guarantee".)

During the applicable Distribution Term of the Agreement, DISTRIBUTOR guarantees distribution of COMPANY Products to no less than 1,000 Cybercafes.

4. Payment Terms:

DISTRIBUTOR agrees to pay COMPANY the Guarantee as follows:
   a) One hundred fifty thousand US dollars (US$150,000.00) sixty (60) days after signature of this Agreement.
   b) One hundred fifty thousand US dollars (US$150,000.00) one hundred twenty (120) days after signature of this Agreement.
   c) One hundred sixty thousand US dollars (US$160,000.00) one hundred eighty (180) days after signature of this Agreement.

5. Cybercafe Licenses:

The Cybercafes shall require a per computer license for COMPANY Products. The fee for the COMPANY Products in this Agreement is based on a minimum of twenty (20) computers per Cybercafe. In the event the Cybercafe has more than twenty (20) computers, the Cybercafe shall be required to purchase additional licenses. Cybercafes must purchase additional licenses for a minimum of ten (10) computers. In the event the Cybercafe needs to purchase additional licenses, the Cybercafe shall receive a discount of twenty percent (20%) off the cost of said COMPANY Product. Under no circumstances shall a Cybercafe receive a discount for COMPANY Products in the event it has less than twenty (20) computers.

VUG International Distributor Agreement - Cybercafe                    Page 15
AMDG 131202

### Page 15bc.jpg

other sizes: small medium large original

PBase | galleries | forum | search                                          help | login

**ivan168 | all galleries | amdg_sucks | Page 16b.jpg**

previous | next



**DISTRIBUTOR Marketing Obligation:**

Within the applicable Distribution Term of the Agreement, DISTRIBUTOR's Marketing Obligation for Diablo II, StarcraFt, Alien Vs. Predator 2 and Empire Earth is no less than fifty thousand dollars (US$50,000.00) and no less than twenty thousand dollars (US$20,000.00) for Warcraft III. The Marketing Obligation shall fund all forms of marketing, promotional and advertising activities exclusively for COMPANY Products listed in this Agreement, including but not limited to production of posters, banners, point of sale and display materials, advertising across all print and electronic media, promotional events or product launches and all other marketing or advertising costs relating to third parties and shall not include salary or payroll costs relating to marketing or sales of COMPANY Products. Distributor must obtain written approval from COMPANY with respect to all marketing, promotional and advertising publications prior to their release. COMPANY shall be permitted to audit books and records, in accordance with section 4(c) of the Agreement, relating to the Marketing Obligation of COMPANY Products.

Distributor shall take all steps reasonably necessary to assure that the Marketing Obligation is fulfilled with respect to this Agreement. In the event that Distributor fails to fulfill the Marketing Obligation under the Agreement, Distributor shall pay to Company seventy thousand dollars (US$70,000.00) as liquidated damages for its failure to meet its obligations in fulfilling the Marketing Obligation.

7. Territory:

   Philippines

8. Authorized Channel of Distribution:

   Cybercafes

VUG International Distributor Agreement - Cybercafe                    Page 16
AMDG 11/1/01

## Page 16b.jpg

other sizes: small medium large original

```
                    ********************
                    ***   TX REPORT   ***
                    ********************


    TRANSMISSION OK

    TX/RX NO              4306
    CONNECTION TEL        606300014#2062240779
    SUBADDRESS
    CONNECTION ID
    ST. TIME             07/02 13:21
    USAGE T              15'57
    PGS.                 21
    RESULT               OK
```

# Preston|Gates|Ellis LLP

**FAX COVER SHEET**

| | | | |
|---|---|---|---|
| **TO:** | Mr. Robert J. Carlson | **FAX NO:** | (206) 224-0779 |
| **COMPANY:** | Christensen, O'Connor, Johnson & Kindness PLLC | **CONFIRMATION NO:** | (206) 682-8100 |

| | | | |
|---|---|---|---|
| **FROM:** | Jason P. Holtman | **CLIENT-MATTER NO:** | #36063-00014 |
| **DATE:** | July 2, 2003 | **TOTAL NUMBER OF PAGES INCLUDING THIS COVER SHEET:** | 21 |

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CONTACT:   [ X ] FAX OPERATOR: (206) 623-7580

                                   [   ] NAME:

                                        EXT:

**COMMENTS**

**EXHIBIT** 11

JUL-17-2003 THU 03:19 PM CHRISTENSEN O' CONNOR          FAX NO. 206 224 0779          P. 04

07/18/2003 10:40 FAX 31025807P          Knowledge Adventure Exec          ☒001

## INTERNATIONAL DISTRIBUTOR AGREEMENT

This INTERNATIONAL DISTRIBUTOR AGREEMENT (the "Agreement") is made and entered into effective November 1, 2002 (the "Effective Date"), by and between Vivendi Universal Games, Inc., a Delaware corporation, and its direct and indirect subsidiaries, with its principal place of business at 6080 Center Drive, 10ᵗʰ floor, Los Angeles, CA 90045 U.S.A. ("COMPANY"), and Asian Media Development Group, a Philippine corporation , with its principal place of business at 2/F Jannov Plaza, 2295 Don Chino Roces Avenue, 1231 Makati City, Philippines ("DISTRIBUTOR").

### RECITALS

WHEREAS, COMPANY publishes and distributes certain computer software products, including the products listed in Exhibit A hereto; and

WHEREAS, COMPANY desires to distribute its products in a world market; and

WHEREAS, DISTRIBUTOR has expressed an interest to act as an independent distributor of certain COMPANY products under the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual covenants and agreements hereinafter set forth, COMPANY and DISTRIBUTOR agree as follows:

I.      Definitions.   Whenever used in this Agreement, the following terms shall have the following specified meanings:

     (a)    "Cybercafe" means a business entity which is authorized hereunder to purchase COMPANY Software from an Authorized Cybercafe Distributor (as defined below) and provide use of such Company Software on its premises to customers on a "pay-for-play" basis. Cybercafes shall be deemed to include, Net Cafes, LAN Gaming Centers and Network Gaming Centers.

     (b)    "Authorized Channel" means the channel specified in Section 8 of Exhibit A, hereto, which represents DISTRIBUTOR's sole avenue of commercial exploitation of Company Software.

     (c)    "Authorized Cybercafe-Distributor" means an entity authorized by DISTRIBUTOR and COMPANY, which provides COMPANY Products (as that term is defined herein) to end users on a "pay for play" basis.

     (d)    "COMPANY Documentation" means any and all manuals, specifications, user guides and other documentation regarding the COMPANY Products.

     (e)    "COMPANY Software" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by COMPANY and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto.

     (f)    "COMPANY Products" means COMPANY Software packaged together with the appropriate COMPANY Documentation.

     (g)    "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which DISTRIBUTOR has the right to distribute the enumerated COMPANY Products in the Territory.

     (h)    "End-User" means a customer who pays to play COMPANY Products at a Cybercafe.

**CONFIDENTIAL**          **SIERRA000531**

PAGE 1/19 * RCVD AT 7/18/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4193824 * CSID:31025807P8 * DURATION (mm-ss):12-20

JUL-17-2003 THU 03:19 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 05

07/18/2003 10:41 FAX 31025807'          Knowledge Adventure Exec          @002

(i)  "License Agreement" means COMPANY's standard form license agreement, a copy of which is included at the beginning of all user guides with respect to COMPANY Software distributed by COMPANY, as the same may be modified or amended from time to time.

(j)  "Marketing Obligation" means funds Distributor uses exclusively for marketing, promotional and advertising activities related to COMPANY Products.

(k)  "Paper License" means a license which COMPANY grants to a Cybercafe which authorizes the Cybercafe to install COMPANY Products on their computers.

(l)  "Prohibited Country" means a country to which export or re-export of any COMPANY Products, is prohibited by United States law without first obtaining the permission of the United States Office of Export Administration or its successor.

(m)  "Territory" " means only the countries listed in Exhibit A attached hereto, but only as their political borders exist on the date of this Agreement. The Territory excludes foreign countries' embassies, and foreign military and governmental installations, located within the territory.

(n)  All references in this Agreement to the "sale" of or "selling" COMPANY Software shall mean the sale of a license to use such COMPANY Software. All references in this Agreement to the "purchase" of COMPANY Software shall mean the purchase of a license to use such COMPANY Software.

**1.   Appointment as Authorized COMPANY DISTRIBUTOR**

(a)  Exclusive Appointment. Subject to the terms and conditions of this Agreement, COMPANY hereby appoints DISTRIBUTOR as an independent, exclusive distributor of COMPANY Products solely in the Territory, and DISTRIBUTOR hereby accepts such appointment. All rights not expressly granted to DISTRIBUTOR hereunder are reserved by COMPANY.

(b)  On-Line Sales. COMPANY hereby prohibits DISTRIBUTOR from marketing and selling the COMPANY Products through on-line services and the Internet. DISTRIBUTOR is prohibited from distributing any COMPANY Products via electronic means, including downloading.

(c)  COMPANY's Reserved Rights.

(1)  Changes in Products and Support. COMPANY reserves the right at any time, in its sole discretion and without liability to DISTRIBUTOR, to change, or to add to or delete from the list of COMPANY Products. Additionally, COMPANY reserves the right to modify COMPANY Products during the term hereof in its sole discretion. DISTRIBUTOR acknowledges that some COMPANY Products may contain content which has been licensed to COMPANY by third parties. In the event one or more of these licenses is terminated, COMPANY reserves the right to unilaterally remove the affected COMPANY Product from this Agreement and DISTRIBUTOR covenants to cease all distribution of such COMPANY Product(s) within fifteen (15) days following its receipt of notice thereof. DISTRIBUTOR shall notify the Authorized Cybercafe Distributor to contact the Cybercafes and instruct the Cybercafes to remove the affected COMPANY Product from their machines. DISTRIBUTOR shall be responsible for obtaining all remaining inventory of COMPANY Products from the Authorized Cybercafe Distributor and returning the affected COMPANY Products to COMPANY.

**CONFIDENTIAL**

SIERRA000532

PAGE 2/18 * RCVD AT 7/18/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):12-20

    (2)   COMPANY and Third-Party Distribution of COMPANY Products Within the Territory.

        (i)   Distribution Rights: DISTRIBUTOR acknowledges that COMPANY has granted and/or in the future may grant rights to third parties relating to one or more of the COMPANY Products in the Territory. In no way do the terms stated herein confer any exclusive rights of Distribution to DISTRIBUTOR or otherwise grant DISTRIBUTOR any rights not expressly contained herein and all such rights are expressly reserved by COMPANY.

        (ii)  On-Line and Mail Order Sales: DISTRIBUTOR acknowledges that COMPANY and/or third parties may sell COMPANY Products either on-line or through mail order to individuals located in the Territory and COMPANY shall have no liability to DISTRIBUTOR with respect to such sales.

**3.**    **Obligations of DISTRIBUTOR.** DISTRIBUTOR warrants and represents that it has and will maintain, the capacity, facilities and personnel necessary to carry out its obligations under this Agreement and in particular that:

    (a)   Authorized Cybercafe Distributor Qualifications. DISTRIBUTOR will authorize and maintain that the Authorized Cybercafe Distributor has the financial capacity, facilities, technical capacity and desire to market and sell COMPANY Products to Cybercafes competently.

    (b)   Authorized Cybercafe Distributor Agreement. Prior to engaging in any transaction with a Authorized Cybercafe Distributor involving any COMPANY Products, DISTRIBUTOR and such Authorized Cybercafe Distributor shall execute an agreement authorizing the Authorized Cybercafe Distributor to resell COMPANY Products to Cybercafes within the Territory. DISTRIBUTOR agrees to furnish to COMPANY in writing the name, address and telephone number of the Authorized Cybercafe Distributor. It is a material obligation of DISTRIBUTOR to contractually restrict the Territory where the Authorized Cybercafe Distributor may resell the COMPANY Products to no countries or regions outside the Territory granted hereunder. Any agreement with the Authorized Cybercafe Distributor with respect to any COMPANY Product shall provide that the rights of the of Authorized Cybercafe Distributor with respect to such COMPANY Product shall terminate following the expiration or early termination of this Agreement, and such Authorized Cybercafe Distributor shall be obligated to cease the use, sale, distribution, or marketing of the COMPANY Product upon such termination of this Agreement in accordance with the applicable provisions hereof. The Authorized Cybercafe Distributor agreement shall expressly state that the continued sale, distribution, or marketing of any COMPANY Product following the termination of this Agreement for any reason (except as expressly provided in this Agreement) constitutes an infringement of COMPANY's trademarks and copyrights, and COMPANY shall have the right to directly enforce its rights and remedies against DISTRIBUTOR and Authorized Cybercafe Distributor in connection with such infringement, although DISTRIBUTOR shall remain primarily liable to COMPANY for any such infringement.

    (c)   Minimum Commitments. DISTRIBUTOR agrees and guarantees to purchase from COMPANY at least the minimum quantities of each of the COMPANY Products set forth in Exhibit A (the "Guarantee"). DISTRIBUTOR agrees to payments for COMPANY Products set forth in Exhibit A in accordance with the terms described in Section 4 of Exhibit A ("Payment Terms"). In the event DISTRIBUTOR does not purchase the agreed upon Guarantee and provide payment in accordance with the Payment Terms, COMPANY shall have the right to terminate this Agreement in accordance with Section 12(b)(5) hereinbelow.

    (d)   Authorized Cybercafe Distributor Support. DISTRIBUTOR will provide Authorized Cybercafe Distributor with training, technical support and other assistance appropriate in promoting COMPANY Products. DISTRIBUTOR will transmit to Authorized Cybercafe Distributor all COMPANY literature and other information that COMPANY requests be transmitted to them.

**CONFIDENTIAL**        **SIERRA000533**

JUL-17-2003 THU 03:21 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 07

07/18/2003 10:42 FAX 31025807C          Knowledge Adventure Exec          ☒004

(e)   DISTRIBUTOR Personnel and Working Conditions.  DISTRIBUTOR will train and maintain a sufficient number of capable technical and sales personnel at its expense: (1) to serve the needs of its Authorized Cybercafe Distributor or Cybercafes for COMPANY Products, service and support; (2) Cybercafes shall be responsible for assisting their End Users in the use of COMPANY Products. Under no circumstances shall the Cybercafe instruct an End User to contact either COMPANY or DISTRIBUTOR for assistance regarding COMPANY Products. Only authorized personnel of the Cybercafe shall contact DISTRIBUTOR for assistance regarding COMPANY Products; and (3) otherwise to carry out the responsibilities of DISTRIBUTOR under this Agreement. DISTRIBUTOR shall secure safe and humane working conditions and reasonable environmental protections in its distribution of COMPANY Product.

(f)   Technical Expertise.  DISTRIBUTOR and its staff will be conversant with the technical language conventional to COMPANY Products and similar computer products in general.

(g)   DISTRIBUTOR Covenants. DISTRIBUTOR covenants and agrees:

(1)   Efforts.  To conduct business in a manner that reflects favorably on the goodwill and reputation of COMPANY; and

(2)   Marketing Practices.  To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of COMPANY Products that are inconsistent with the literature distributed by COMPANY, including all warranties and disclaimers contained in COMPANY literature; and

(3)   Marketing Through Authorized Cybercafe Distributors.  To refrain from selling COMPANY Products to an Authorized Cybercafe Distributor that cannot agree to comply with obligations similar to those contained in this Section 3, entitled "Obligations of DISTRIBUTOR"; and

(4)   Object Code.  To distribute COMPANY Software only in the machine-readable object code format in which it is received by DISTRIBUTOR from COMPANY, and only on the tangible media on which it is received by DISTRIBUTOR from COMPANY; and

(5)   Copying.  To refrain from permitting the copying of COMPANY Software onto any other media for purposes of redistribution to others, and not to use, copy, print or display any COMPANY Software, or permit any Authorized Cybercafe Distributor to use, copy, print or display any COMPANY Software, in any manner except in connection with, and for the purpose of of COMPANY Software to others in accordance with this Agreement; and

(6)   Renting.  To refrain from renting or lending any COMPANY Software or the use, copying, printing or display of any COMPANY Software, in any manner except as expressly authorized under this Agreement.

(7)   License Agreement/Paper License.  Not to add to, delete or otherwise vary any of the terms and conditions of the License Agreement or the Paper License

(8)   Trademark and Trade Name.  Not to distribute any COMPANY Products under any trade names or trademarks other than those employed by COMPANY with respect thereto without the prior written approval of COMPANY.

(9)   Withholding Tax.  That any withholding tax imposed upon payments made to COMPANY by DISTRIBUTOR under this Agreement may be used as a foreign tax credit in the same fiscal year by COMPANY against its obligations under applicable United States tax laws. DISTRIBUTOR understands and agrees that should such tax credits be disallowed or unusable,

CONFIDENTIAL

SIERRA000534

PAGE 4/19 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4183824 * CSID:3102580766 * DURATION (mm-ss):12-26

the royalty rates set forth in EXHIBIT A may be unilaterally raised by COMPANY to offset the effect of the withholding tax.

(h)   Warranty Service and Support. DISTRIBUTOR shall comply with COMPANY programs for in warranty replacement and post warranty support for COMPANY Products.

(i)   Compliance with Law. DISTRIBUTOR will comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder and in any of its dealing with Authorized Cybercafe Distributors and with respect to COMPANY Products.

(j)   COMPANY Packaging. DISTRIBUTOR will distribute COMPANY Products with all packaging, warranties, disclaimers and License Agreement intact as shipped from COMPANY, and will instruct each of its Authorized Cybercafe Distributors as to the nature and terms of the License Agreement applicable to the COMPANY Software. DISTRIBUTOR shall be bound by all of the terms and conditions of the License Agreement with respect to such copy. DISTRIBUTOR must receive written pre-approval from COMPANY on all DISTRIBUTOR produced marketing and sales materials, including but not limited to, packaging and collateral materials, that reference COMPANY Software prior to release of such material. DISTRIBUTOR shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the COMPANY Products within the Territory.

(k)   Compliance with U.S. Export Laws. DISTRIBUTOR acknowledges that COMPANY's export of the COMPANY Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data ("Direct Product" as used hereafter means the immediate product including processes and services, derived from the use of COMPANY Products). DISTRIBUTOR agrees and shall cause each of its Authorized Cybercafe Distributors, employees, agents and representatives to agree not to export or re-export any COMPANY Products or Direct Products of COMPANY Products to any Prohibited Country. DISTRIBUTOR agrees to indemnify COMPANY against any claim, demand, action, proceeding, investigation, loss, liability, cost and expense, including, without limitation attorney's fees, suffered or incurred by COMPANY and arising out of or related to any violation (whether intentional or unintentional) by DISTRIBUTOR its employees, agents, representatives and Authorized Cybercafe Distributor of any of the warranties or covenants of this Section 3(k).

(l)   Governmental Approval. If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to assure the right of remittance abroad of U.S. dollars pursuant to Section 6 hereof, DISTRIBUTOR shall immediately take whatever steps may be necessary in this respect, and any changes incurred in connection therewith shall be for the account of DISTRIBUTOR. DISTRIBUTOR shall keep COMPANY currently informed of its efforts in this connection. COMPANY shall be under no obligation to ship COMPANY Products to DISTRIBUTOR hereunder until DISTRIBUTOR has provided COMPANY with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(m)   Market Conditions. DISTRIBUTOR will advise COMPANY promptly concerning any market information that comes to DISTRIBUTOR's attention regarding COMPANY Products, COMPANY's market position or the continued competitiveness of COMPANY Products in the marketplace.

**CONFIDENTIAL**          **SIERRA000535**

07/16/2003 10:43 FAX 3102580707          Knowledge Adventure Exec          @006

4.   **Inspections: Records, Reporting and Compliance.**

    (a)   Reports. DISTRIBUTOR will provide to COMPANY written reports for every one month period or when requested by COMPANY, showing

        (1)   All Cybercafes where Authorized Cybercafe Distributor has entered into an agreement; and

        (2)   any other information COMPANY reasonably requests.

    (b)   Notification. DISTRIBUTOR will notify COMPANY in writing of any claim or proceeding involving COMPANY Products within seven (7) days after DISTRIBUTOR learns of such claim or proceeding. DISTRIBUTOR will also report promptly to COMPANY all claimed or suspected product defects. DISTRIBUTOR will also notify COMPANY in writing not more than seven (7) days after any change in the management or control of DISTRIBUTOR or any transfer of a majority share of DISTRIBUTOR's voting control or a transfer of substantially all its assets.

    (c)   Records. DISTRIBUTOR will maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to distribution of COMPANY Products and will permit examination thereof by authorized representatives of COMPANY at all reasonable times. For the purpose of verifying compliance by the DISTRIBUTOR with the provisions of this Agreement, DISTRIBUTOR agrees that COMPANY and its representatives will be permitted full access to, and will be permitted to make copies of or abstracts from, the books and records of DISTRIBUTOR relating to inventory levels, manufacturing, sales, and distribution. COMPANY will be permitted to audit such books and records at reasonable intervals.

    (d)   Compliance. COMPANY or COMPANY's representative shall have the right to access Cybercafes, where COMPANY Products have been installed, during regular business hours, to inspect the usage of COMPANY Products and Cybercafe compliance with the terms of the Paper License.

5.   **Order and Return Procedure.**

    (a)   Cancellation. COMPANY reserves the right to cancel any orders by DISTRIBUTOR and accepted by COMPANY as set forth above, or to refuse or delay shipment thereof, if DISTRIBUTOR fails to comply with the terms and conditions of this Agreement. COMPANY also reserves the right to discontinue the publication, manufacture or distribution of any or all COMPANY Products at any time, and to cancel any orders for such discontinued COMPANY Products without liability of any kind to DISTRIBUTOR or to any other person or entity. No such cancellation, refusal or delay will be deemed a termination (unless COMPANY so advises DISTRIBUTOR) or breach of this Agreement by COMPANY.

    (b)   Defective Merchandise. DISTRIBUTOR acknowledges and agrees that CD-ROM technology has evolved to the point where in the present day defective media is only caused by End-User abuse of the CD-ROM. Therefore, DISTRIBUTOR shall not be entitled to return any so-called "defective merchandise" to COMPANY for credit or exchange.

    (c)   Stock Balancing. All purchases made by DISTRIBUTOR hereunder shall be final. DISTRIBUTOR may not return any COMPANY Product to COMPANY for credit or exchange.

**CONFIDENTIAL**          **SIERRA000536**

HC

PAGE 6/19 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4163824 * CSID:3102580765 * DURATION (mm-ss):12-20

6.   **Prices and Payment**

   (a)   **Prices to DISTRIBUTOR.** DISTRIBUTOR shall pay COMPANY for all COMPANY Products shipped by COMPANY at a price in accordance with that set forth in Exhibit A. COMPANY shall have the right to amend its pricing at any time with respect to any or all COMPANY Products with at least thirty (30) days prior written notice to DISTRIBUTOR. Such change shall not apply to any order placed by DISTRIBUTOR prior to the effective date of such change.

   (b)   **Taxes, Tariffs, Fees.** COMPANY's price does not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which COMPANY may be required to pay or collect upon the delivery of COMPANY Products or upon collection of the price for such COMPANY Products. In the event any fees payable by DISTRIBUTOR are subject to any tax withholding, DISTRIBUTOR shall pay to COMPANY an additional amount such that following such payment, COMPANY receives the amount it would have received had no such withholding been made.

   (c)   **Payment Terms.** DISTRIBUTOR agrees to make available to COMPANY such statements of the DISTRIBUTOR's financial condition as COMPANY may request. COMPANY reserves the right at all times, either generally or with respect to any specific purchase order of DISTRIBUTOR, to vary, change or limit the amount or duration of credit to be allowed to DISTRIBUTOR. DISTRIBUTOR agrees to maintain a sufficient credit line to support purchases of the Products. Repeated or sustained suspensions/interruptions of credit may be grounds for termination of this Agreement as may be deemed appropriate in the sole and absolute judgment of COMPANY. All payments shall be made in United States dollars, free of any withholding tax, and of any currency control or other restrictions to COMPANY at the address designated by COMPANY. Unless otherwise agreed by COMPANY in writing, at the time of submission of any order for COMPANY Products purchased hereunder, DISTRIBUTOR shall:

      (1)   **Cash Payment.** Pay by wire transfer to a bank account designated by COMPANY the amount owed by DISTRIBUTOR for the COMPANY Products ordered (plus any applicable taxes, shipping and other charges), in cash, by prepaid international money order, VISA or Mastercard. All transaction fees related to DISTRIBUTOR's payment will be borne entirely by DISTRIBUTOR. Payment via wire transfer shall be made to the following account:

            Bank of America
            1850 Gateway Blvd.
            Concord, CA 94520
            ABA No. 121-000-358
            Account No. 12333-32277
            SWIFT No. BOFA-US-6S
            Beneficiary: Vivendi Universal Games, Inc.

7.   **Shipment, Risk of Loss and Delivery.**

   (a)   **Shipment.** DISTRIBUTOR shall take delivery of all COMPANY Products FOB Fresno, California, USA. Shipment will be made to DISTRIBUTOR identified warehouse facilities or freight forwarder, subject to approval in writing by COMPANY in advance of shipment. Unless specified in DISTRIBUTOR's order, COMPANY will select the mode of shipment and the carrier. DISTRIBUTOR will be responsible for and pay all packing, shipping, freight and insurance charges, which charges COMPANY may require DISTRIBUTOR to pay in advance.

   (b)   **Risk of Loss.** All risk of loss of or damage to COMPANY Products will pass to DISTRIBUTOR upon delivery by COMPANY to the carrier, freight forwarder or DISTRIBUTOR, whichever occurs first. DISTRIBUTOR will bear the risk of loss or damage in transit

CONFIDENTIAL

SIERRA000537

JUL-17-2003 THU 03:22 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 11

07/16/2003 10:45 FAX 31025807F          Knowledge Adventure Exec          ☒008

(c) _Partial Delivery._  Unless DISTRIBUTOR clearly advises COMPANY to the contrary in writing, COMPANY may make partial shipments of DISTRIBUTOR's orders, to be separately invoiced and paid for when due. Delay in delivery of any installment shall not relieve DISTRIBUTOR of its obligation to accept the remaining deliveries.

(d) _Delivery Schedule: Delays._  COMPANY will use reasonable efforts to meet DISTRIBUTOR's requested delivery schedule for COMPANY Products, but COMPANY reserves the right to refuse, cancel or delay shipment to DISTRIBUTOR if DISTRIBUTOR has failed to perform any of its obligations under this Agreement. Should orders for COMPANY Products exceed COMPANY's available inventory, COMPANY will allocate its available inventory and make deliveries on an equitable basis to the extent practicable. In no event, shall COMPANY be liable for any damages, direct, consequential, special or otherwise, to DISTRIBUTOR or to any other person or entity for failure to deliver or for any delay or error in delivery of COMPANY Products for any reason whatsoever.

8.   **DISTRIBUTOR Determines Its Own Per Copy Fees.**  DISTRIBUTOR is free to determine unilaterally its own pricing of the COMPANY Software to its Authorized Cybercafe Distributors. Although COMPANY may publish suggested wholesale, retail or Authorized Cybercafe Distributors prices, these are suggestions only and DISTRIBUTOR shall be entirely free to determine the actual prices at which COMPANY Products are sold to its Authorized Cybercafe Distributors.

9.   **DISTRIBUTOR's Warranties and Representations Regarding Treatment of Authorized Cybercafe Distributor.**  DISTRIBUTOR hereby warrants and represents to COMPANY as follows:

(a) _Authorized Cybercafe Distributor Pricing._  DISTRIBUTOR will inform each Authorized Cybercafe Distributors that it is free to determine unilaterally its own prices and that, although COMPANY may publish lists showing suggested retail prices for COMPANY Products, those are suggestions only.

(b) _Non-Discrimination Among Authorized Cybercafe Distributors._  In working with its Authorized Cybercafe Distributors, DISTRIBUTOR shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Authorized Cybercafe Distributors, including but not limited to those which govern discriminatory pricing.

10.  **Trademarks. Trade Names and Copyrights.**

(a) _Trademark Use During Agreement._  During the term of this Agreement, DISTRIBUTOR is authorized by COMPANY to use the trademarks COMPANY uses for COMPANY Products solely in connection with DISTRIBUTOR's advertisement, promotion and distribution of COMPANY Products. DISTRIBUTOR agrees that it will cause to be affixed, conspicuously and legibly on all marketing materials incorporating any part of the COMPANY Software, appropriate copyright and trademark notices in the name of COMPANY. DISTRIBUTOR agrees not to alter, erase, deface, or overprint any such mark on anything provided by COMPANY.

(b) _No DISTRIBUTOR Rights in Trademarks or Copyrights._  DISTRIBUTOR has paid no consideration for the use of COMPANY's trademarks, logos, copyrights, trade secrets, trade names or designations, and nothing contained in this Agreement shall give DISTRIBUTOR any interest in any of them. DISTRIBUTOR acknowledges that COMPANY owns and retains all proprietary rights in all COMPANY Products, and agrees that it will not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect the validity or enforceability of any trademark, trade name, trade secret, copyright or logo belonging to or licensed to COMPANY (including, without limitation, any act, or assistance to any act, which may infringe or lead to the infringement of any copyright in the COMPANY Products). DISTRIBUTOR agrees not to attach any additional trademarks, logos or trade designations to any COMPANY Product.

**CONFIDENTIAL**

**SIERRA000538**

PAGE 8/19 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/6 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):12-20

(c)   No Continuing Right.  Upon expiration or termination of this Agreement, DISTRIBUTOR will cease advertising and use of all COMPANY names, marks, logos and designations.

(d)   Obligation to Protect.   DISTRIBUTOR agrees to use reasonable efforts to protect COMPANY's proprietary rights and to cooperate COMPANY's efforts to protect its proprietary rights.

(e)   Security   At no time shall DISTRIBUTOR re-compile, decompile or disassemble any COMPANY Software.  DISTRIBUTOR shall not at any time use or attempt to use any COMPANY Software in any form other than the object code form in which copies thereof are distributed by COMPANY, or to generate any source code thereof.  DISTRIBUTOR shall not alter or modify any COMPANY Software, or any portion or aspect thereof, or use or refer to any COMPANY Software in the creation of any derivative work, without COMPANY's prior written consent.  DISTRIBUTOR shall preclude its agents, employees, and contractors from engaging in any conduct inconsistent with the terms of this Section 10(e) by means of appropriate agreements and/or such other security measures as may be necessary in order to preclude such conduct.   COMPANY reserves the right to review DISTRIBUTOR's agreement and security measures and to require DISTRIBUTOR to amend agreements and take steps to bolster the security measures that are necessary in COMPANY's sole judgment. DISTRIBUTOR shall not at any time market any copy of COMPANY Product which has not been produced by COMPANY.

(f)   Breach.  DISTRIBUTOR understands and agrees that COMPANY will suffer irreparable harm in the event that DISTRIBUTOR fails to comply with any of its obligations pursuant to this Section 10, and that monetary damages in such event would be substantial and inadequate to compensate COMPANY. Consequently, in such event COMPANY shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by DISTRIBUTOR, without showing or proving any actual damages sustained by COMPANY.  .

(g)   Authorized Cybercafe Distributors or Cybercafe Breaches.  DISTRIBUTOR shall promptly report to COMPANY any breach of the License Agreement of which DISTRIBUTOR becomes aware. COMPANY shall have the right, but not the obligation, to pursue any and all such infringements.

(h)   Filing and Recording.  Upon request, DISTRIBUTOR agrees to assist COMPANY in the filing and recording of COMPANY's trade names, copyrights, patents and trademarks in the Territory, all costs to be paid by COMPANY.

11.   Assignment.   DISTRIBUTOR is appointed an authorized COMPANY DISTRIBUTOR because of DISTRIBUTOR's commitments in this Agreement, and further because of COMPANY's confidence in DISTRIBUTOR, which confidence is personal in nature.  The rights granted to DISTRIBUTOR hereunder are personal  n nature and DISTRIBUTOR shall not assign this agreement to any third party, and DISTRIBUTOR may not delegate its duties hereunder without the prior written consent of COMPANY. Any attempted assignment or delegation without the required consent shall be void and of no effect.

12.   Duration and Termination of Agreement.

(a)   Term.  Subject to prior termination in accordance with the provisions contained herein, the term hereof shall commence as of the effective date described in Section 17(d) herein and expire upon the expiration of all Distribution Terms for COMPANY Products distributed pursuant to this Agreement.

(b)   Termination for Cause.  This Agreement may be terminated forthwith by either party upon the occurrence of the following, by one party giving written notice thereof to the other party by registered or certified mail, in which this Agreement shall terminate on the date set forth in such notice. The date of mailing said written notice shall be deemed the date on which notice of termination of this Agreement shall have been given.

**SIERRA000539**

CONFIDENTIAL

JUL-17-2003 THU 03:24 PM CHRISTENSEN O'CONNOR        FAX NO. 206 224 0779            P. 13

07/16/2003 10:48 FAX 31025807F        Knowledge Adventure Exec                      ☑ 010

    (1)    if any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or against DISTRIBUTOR or if DISTRIBUTOR shall make an assignment for the benefit of creditors; or

    (2)    A material breach by either party of any of the terms of this Agreement or any other agreement between the parties hereto which breach is not remedied by the breaching party to the other party's reasonable satisfaction within thirty (30) days of the breaching party's receipt of notice of such breach from the other party in the event of a breach of Section 6 hereunder and within ninety (90) days for all other breaches.

    (3)    By COMPANY, if DISTRIBUTOR is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a DISTRIBUTOR's common stock or the equivalent, shall be considered a substantial change in control hereunder);

    (4)    By COMPANY, if DISTRIBUTOR sells: (i) any copies of the COMPANY Product; (ii) any copies of the COMPANY Product outside the Territory; or (iii) any copies of the COMPANY Product to any person or entity which DISTRIBUTOR has reason to believe may sell the COMPANY Product outside the Territory; or

    (5)    By COMPANY, if DISTRIBUTOR has not paid COMPANY in accordance with the Payment Terms.

(c)    *Termination at Will.*  COMPANY shall have the right to terminate the Agreement for no cause, at will upon thirty (30) days written notice.

(d)    *Orders After Termination Notice.*  In the event that any notice of termination of this Agreement is given, COMPANY will be entitled to reject all or part of any orders received from DISTRIBUTOR after notice but prior to the effective date of termination if availability of COMPANY Products is insufficient at that time to fully meet the needs of COMPANY and its customers. In any case, COMPANY may limit monthly shipments to DISTRIBUTOR during said period to DISTRIBUTOR's average monthly shipments from COMPANY during the three months prior to the date of notice of termination. All shipments made by COMPANY during said period, shall be delivered solely upon a cash with order basis.

(e)    *Effect of Termination.*  Upon termination of this Agreement:

    (1)    COMPANY, at its option, may reacquire any or all COMPANY Products then in DISTRIBUTOR's possession at per copy prices not greater than the per copy prices paid by DISTRIBUTOR for such Products.

    (2)    DISTRIBUTOR shall provide COMPANY with a written report detailing all inventory of the COMPANY Products in its possession at the effective date of termination within ten (10) business days. COMPANY shall then have a period of ten (10) business days to elect to purchase any portion of said inventory at DISTRIBUTOR's actual cost of such goods. Provided that DISTRIBUTOR has remained in compliance with all material terms of this Agreement throughout the term.

    (3)    All orders or portions thereof remaining not shipped as of the effective date of termination shall automatically be canceled.

**CONFIDENTIAL**      **SIERRA000540**

PAGE 10/19 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):12-20

JUL-17-2003 THU 03:24 PM CHRISTENSEN O'CONNOR        FAX NO. 206 224 0779        P. 14

07/16/2003 10:47 FAX 31025807f        Knowledge Adventure Exec        ☒011

(4)  For a period of two (2) year after the date of termination, DISTRIBUTOR shall make available to COMPANY for inspection and copying all books and records of DISTRIBUTOR that pertain to DISTRIBUTOR's performance of and compliance with its obligations, warranties and representations under this Agreement.

(5)  DISTRIBUTOR shall cease using any COMPANY trademark, logo or trade name.

(6)  All trademarks, trade names, samples, literature and sales aids of every kind shall remain the property of COMPANY. Within thirty (30) days after the termination of this Agreement, DISTRIBUTOR shall prepare all such items in its possession for shipment, as COMPANY may direct, at COMPANY's expense. DISTRIBUTOR shall not make or retain any copies of any confidential items or information which may have been entrusted to it. Effective upon the termination of this Agreement, DISTRIBUTOR shall cease to use all trademarks, marks, and trade names of COMPANY. In the event the Authorized Cybercafe Distributor is in possession of any trademarks, trade names, samples, literature and sales aids, DISTRIBUTOR shall be responsible for collecting all items from the Authorized Cybercafe Distributor and returning these materials to COMPANY.

(7)  If the Agreement was terminated pursuant to Section 12(b)(5) hereinabove, the DISTRIBUTOR shall pay COMPANY the full amount of the Guarantee as set forth in the Payment Terms.

(f)  <u>Survival</u>. COMPANY's rights and DISTRIBUTOR's obligations to pay COMPANY all amounts due hereunder, as well as DISTRIBUTOR's obligations under Section 3(c), 3(g), (4), 4(c), 5, 6, 10, 12, 13, 14(c), 15, 16, and 17 shall survive termination of this Agreement.

13.  <u>Relationship of the Parties</u>. DISTRIBUTOR's relationship with COMPANY during the term of this Agreement will be that of an independent contractor. DISTRIBUTOR will not have, and will not represent that it has, any power, right or authority to bind COMPANY, or to assume or create any obligation or responsibility—express or implied, on behalf of COMPANY or in COMPANY's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of DISTRIBUTOR and COMPANY, nor as creating the relationships of employer/employee, franchisor/franchisee, or principal/agent between the parties. In all matters relating to this Agreement, neither DISTRIBUTOR nor its employees or agents are, or shall act as, employees of COMPANY within the meaning or application of any obligations or liabilities to COMPANY by reason of an employment relationship. DISTRIBUTOR shall reimburse COMPANY for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon COMPANY by virtue of any such law with respect to employees of DISTRIBUTOR in performance of this Agreement.

14.  <u>Indemnification</u>.

(a)  <u>Indemnification of DISTRIBUTOR</u>. COMPANY agrees to defend, indemnify and hold DISTRIBUTOR harmless for any loss, damage or liability for any claimed infringement of any United States patent right, copyright and trade secret, asserted by any third person or entity arising out of DISTRIBUTOR's use of any COMPANY Products, provided (1) that COMPANY is promptly notified in writing by DISTRIBUTOR of any such claim against DISTRIBUTOR, (2) that DISTRIBUTOR authorizes COMPANY to assume sole control over the defense of any such claim thereafter, together with the right to settle or compromise such claim, and (3) that DISTRIBUTOR makes available to COMPANY such information, assistance and authority as may be reasonably requested by COMPANY in order to enable COMPANY to defend any such claim. In the event any such claim is asserted, COMPANY shall have the right without limitation, at its option either (a) to obtain such rights and/or licenses from the claimant as may be necessary to enable DISTRIBUTOR to continue using and/or marketing the COMPANY Products which are the subject of the claim, and/or

**CONFIDENTIAL**        **SIERRA000541**

PAGE 11/19 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102590766 * DURATION (mm-ss):12-20

(b) to modify the COMPANY Products with respect to which such claim is asserted so as to avoid further claimed infringement by such person or entity.

(b) No Combination Claims.  Notwithstanding Section 14(a), COMPANY shall not be liable to DISTRIBUTOR for any claim arising from or based upon the combination, operation or use of any COMPANY Product with equipment, data or programming not supplied by COMPANY, or arising from any alteration or modification of COMPANY Products.

(c) Indemnification of COMPANY.  DISTRIBUTOR agrees to defend, indemnify, and hold COMPANY, its affiliated companies and subsidiaries and their respective officers, directors, employees and agents harmless from and against any loss, claim, cost, expense, liability or damage including reasonable attorney's fees and costs, resulting or arising in any way from its performance of the obligations hereunder, or from its or its employees' negligence, misrepresentations or other tortious, illegal or unauthorized conduct in the promotion of the Products or any other act or omission arising out of or relating to this Agreement.

15.   Disclaimer of Warranties;  Limited Liability.

(a) Disclaimer of Warranties.  DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED.  DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE COMPANY SOFTWARE, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b) Limitation of Liability.  UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO DISTRIBUTOR ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY DISTRIBUTOR TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  DISTRIBUTOR acknowledges and agrees that (1) DISTRIBUTOR has no expectation and has received no assurances that its business relationship with COMPANY will continue beyond the stated term of this Agreement or its earlier termination in accordance with Section 12 hereunder, that any investment by DISTRIBUTOR in the promotion of COMPANY Products will be recovered or recouped, or that DISTRIBUTOR shall obtain any anticipated amount of profits by virtue of this Agreement; and (2) DISTRIBUTOR shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of COMPANY Products or in any goodwill created by its efforts hereunder.

16.   Confidentiality.  In the course of this Agreement, it is anticipated that DISTRIBUTOR will learn confidential or proprietary information about COMPANY.  DISTRIBUTOR will keep confidential this information and any other information which DISTRIBUTOR may acquire with respect to COMPANY's business, including, but not limited to, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until COMPANY consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of

CONFIDENTIAL

SIERRA000542

DISTRIBUTOR. DISTRIBUTOR will not disclose to others, without COMPANY's consent, the subject of this relationship without first providing COMPANY with the opportunity to review and offer reasonable objection to the contemplated publication. This undertaking to keep information confidential will survive the termination of this Agreement. It is understood, however that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to DISTRIBUTOR without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to COMPANY with respect to such information; (iii) is or becomes part of the public domain through no fault of DISTRIBUTOR; (iv) is independently ascertainable or developed by DISTRIBUTOR or its employees; (v) is required to be disclosed by administrative or judicial action provided that DISTRIBUTOR immediately after receiving notice of such action notifies COMPANY of such action to give COMPANY the opportunity to seek any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of COMPANY. DISTRIBUTOR will require each of its employees performing services relating to the Work to execute a Confidentiality Agreement, if requested by COMPANY. At the termination of this Agreement, DISTRIBUTOR will return to COMPANY all drawings, specifications, manuals and other printed or reproduced material (including information stored on machine readable media) provided by COMPANY.

17. **General.**

   (a) **Waiver and Modification.** No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

   (b) **Notices** All notices and demands hereunder shall be in writing and shall be served by personal delivery, express courier, or mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be by certified or registered airmail, return receipt requested, and shall be deemed complete upon receipt. If receipt of such notice or demand is refused or a party has changed its address without informing the other, the notice shall be deemed to have been given and received upon the seventh (7th) day following the date upon which it is first postmarked by the postal service of the sender's nation.

   (c) **Attorney's Fees.** In the event any litigation is brought by either party in connection with this Agreement, the prevailing party in such litigation shall be entitled to recover from the other party all the costs, attorney's fees and other expenses incurred by such prevailing party in the litigation.

   (d) **Complete Execution.** This Agreement shall become effective only after it has been signed by DISTRIBUTOR and accepted by COMPANY.

   (e) **Choice of Law, Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA. THE APPLICATION OF THE UNITED NATIONS CONVENTION OF CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS IS EXPRESSLY EXCLUDED. The parties agree that any claim asserted in any legal proceeding by one party against the other shall be commenced and maintained in any state or federal court located within the County of Los Angeles, State of California, USA, having subject matter jurisdiction with respect to the dispute between the parties. Both parties hereby submit to the jurisdiction of such courts over each of them personally in connection with such litigation, and waive any objection to venue in such courts and any claim that such forum is an inconvenient forum. The English language version of this Agreement controls when interpreting this Agreement.

**SIERRA000543**

CONFIDENTIAL

(f)  <u>Severability.</u>  In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect.  In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(g)  <u>Force Majeure.</u>  COMPANY shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond COMPANY's control, including but not limited to acts of God, war, riot, embargoes; acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(h)  <u>Entire Agreement.</u>  This Agreement including all Schedules and Exhibits constitute and contain the entire agreement between the parties with respect to the subject matter hereof and supersede any prior oral or written agreements.  Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each and has been delivered to the parties.  This Agreement may not be changed, modified, amended or supplemented, except in writing signed by all parties to this Agreement.  Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(i)  <u>Benefits of Agreement.</u>  The terms of this Agreement are intended solely for the benefit of the parties hereto.  They are not intended to confer upon any third party the status of a third party beneficiary.  Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assign of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement.

Vivendi Universal Games, Inc.

HUBERT LARENAUDIE

Senior Vice-President & Director

18 November 2002

Asian Media Development Group

ARTURO B. DIACO, JR.

President

18 November 2002

**CONFIDENTIAL**          **SIERRA000544**

07/16/2003 10:50 FAX 31025607€          Knowledge Adventure Exec :          ☒015

## EXHIBIT A

1. **COMPANY Products and Prices to DISTRIBUTOR:**

   A.   <u>COMPANY Product</u>                          <u>License Fee(in USD)*</u>
        Diablo II                                       $100,000.00
        Starcraft                                       $ 50,000.00
        Alien V. Predator 2                             $ 10,000.00
        Empire Earth                                    $100,000.00

   B.   WarCraft III                                    $200,000.00

   *The License Fee includes a maximum of one thousand (1,000) units of each COMPANY Product and
   nineteen (19) additional licenses for each unit of COMPANY Product solely for use in Cybercafes. Solely
   by way of clarification, each Cybercafe will be obtaining twenty (20) Licenses for each COMPANY
   Product (one (1) unit of finished goods and nineteen (19) Paper Licenses.)

2. **Distribution Term:**

   Subject to early termination in accordance with the provisions contained herein, the Distribution Term shall
   be from November 1, 2002 to October 31, 2003.

3. **Minimum Guarantee:**

   During the applicable Distribution term of the Agreement, DISTRIBUTOR guarantees payments for
   COMPANY Products of no less than US$460,000.00 (the "Guarantee").

   During the applicable Distribution term of the Agreement, DISTRIBUTOR guarantees distribution of
   COMPANY Products to no less than 1,000 Cybercafes.

4. **Payment Terms:**

   DISTRIBUTOR agrees to pay COMPANY the Guarantee as follows:
   a) One hundred fifty thousand US dollars (US$150,000.00) sixty (60) days after signature of this
      Agreement.
   b) One hundred fifty thousand US dollars (US$150,000.00) one hundred twenty (120) days after signature
      of this Agreement.
   c) One hundred sixty thousand US dollars (US$160,000.00) one hundred eighty (180) days after signature
      of this Agreement.

5. **Cybercafe Licenses:**

   The Cybercafes shall require a per computer license for COMPANY Products. The fee for the COMPANY
   Products in this Agreement is based on a minimum of twenty (20) computers per Cybercafe. In the event
   the Cybercafe has more than twenty (20) computers, the Cybercafe shall be required to purchase additional
   licenses. Cybercafes must purchase additional licenses for a minimum of ten (10) computers. In the event
   the Cybercafe needs to purchase additional licenses, the Cybercafe shall receive a discount of twenty
   percent (20%) off the cost of said COMPANY Product. Under no circumstances shall a Cybercafe receive
   a discount for COMPANY Products in the event it has less than twenty (20) computers.

CONFIDENTIAL

SIERRA000545

6. **DISTRIBUTOR Marketing Obligation:**

Within the applicable Distribution Term of the Agreement, DISTRIBUTOR's Marketing Obligation for Diablo II, Starcraft, Alien Vs. Predator 2 and Empire Earth is no less than fifty thousand dollars (US$50,000.00) and no less than twenty thousand dollars (US$20,000.00) for Warcraft III. The Marketing Obligation shall fund all forms of marketing, promotional and advertising activities exclusively for COMPANY Products listed in this Agreement, including but not limited to production of posters, banners, point of sale and display materials, advertising across all print and electronic media, promotional events or product launches and all other marketing or advertising costs relating to third parties and shall not include salary or payroll costs relating to marketing or sales of COMPANY Products. Distributor must obtain written approval from COMPANY with respect to all marketing, promotional and advertising publications prior to their release. COMPANY shall be permitted to audit books and records, in accordance with section 4(c) of the Agreement, relating to the Marketing Obligation of COMPANY Products.

Distributor shall take all steps reasonably necessary to assure that the Marketing Obligation is fulfilled with respect to this Agreement. In the event that Distributor fails to fulfill the Marketing Obligation under the Agreement, Distributor shall pay to Company seventy thousand dollars (US$70,000.00) as liquidated damages for its failure to meet its obligations in fulfilling the Marketing Obligation.

7. **Territory:**

Philippines

8. **Authorized Channel of Distribution:**

Cybercafes

**CONFIDENTIAL**          **SIERRA000546**

**ADDENDUM 1**
**TO THE**
**INTERNATIONAL DISTRIBUTOR AGREEMENT**

This document ("Addendum 1"), shall as of the date of complete execution, serve to amend the **INTERNATIONAL DISTRIBUTOR AGREEMENT** of November 1, 2002 ("Agreement") by and between Vivendi Universal Games, Inc. ("COMPANY") and Asian Media Development Group ("DISTRIBUTOR").

**The Agreement shall be amended in the following respects only:**

1.  *The following shall be added to Section 2 of Exhibit A entitled Distribution Term:*

    The parties agree the Distribution Term shall be extended to December 31, 2004.

**All other terms and conditions of the Agreement will remain in full force and effect.**

Vivendi Universal Games, Inc.                    Asian Media Development Group

_____                        ARTURO D. BLAGO, JR.
Officer                                           Officer

_____V P_____                          _President_____
Title                                            Title

___01/24/03_____                           _01/24/02_____
Date                                             Date

**CONFIDENTIAL**

Add 1 to International Distribution Agreement – Cybercafe
AMDG 11/1/01

SIERRA 000547

PAGE 17/18 * RCVD AT 7/16/2003 10:34:25 AM [Pacific Daylight Time] * SVR:LAE-C-81/0 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):12-20

JUL-17-2003 THU 03:27 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 21

07/18/2003 10:51 FAX 31025807f          Knowledge Adventure Exec          ☒018

ADDENDUM 2
TO THE
INTERNATIONAL DISTRIBUTOR AGREEMENT

This document ("Addendum 2"), shall as of the date of complete execution, serve to amend the INTERNATIONAL DISTRIBUTOR AGREEMENT of November 1, 2002 ("Agreement") by and between Vivendi Universal Games, Inc. ("COMPANY") and Asian Media Development Group ("DISTRIBUTOR").

The Agreement shall be amended in the following respects only:

1.   The following product shall replace Section 1(B) of Exhibit A entitled Company Products and Prices:

| Company Product | License Fee (in USD) |
|---|---|
| WarCraft III | $200,000.00 |

*The License Fee for WarCraft III includes twenty thousand (20,000) jewel case units labeled "Cybercafe Commercial Use Edition" by means of a sticker placed on the outside of each jewel case unit.

All other terms and conditions of the Agreement will remain in full force and effect.

Vivendi Universal, Games, Inc.                    Asian Media Development Group

                                                  ARTURO B. DIAGO, JR.
Officer                                           Officer

V P                                               President
Title                                             Title

01/24/03                                          01/24/03
Date                                              Date

**CONFIDENTIAL**

PAGE 18/19 * RCVD AT 7/18/2003 10:54:25 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102590786 * DURATION (mm-ss):12-20

JUL-17-2003 THU 03:28 PM ChRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 22

07/16/2003 10:51 FAX 31025807F          Knowledge Adventure Exec          ☒019

## ADDENDUM 3
## TO THE
## INTERNATIONAL DISTRIBUTOR AGREEMENT

This document ("Addendum 3"), shall as of the date of complete execution, serve to amend the INTERNATIONAL DISTRIBUTOR AGREEMENT of November 1, 2002 ("Agreement") by and between Vivendi Universal Games, Inc. ("COMPANY") and Asian Media Development Group ("DISTRIBUTOR").

The Agreement shall be amended in the following respects only:

1. The following product shall be added to Section 1 of Exhibit A entitled Company Products and Prices:

   | Company Product | Price *(in USD) |
   | --- | --- |
   | Diablo II: Lord of Destruction | $5.00 |

   *Price means US dollars that DISTRIBUTOR agrees to pay COMPANY for each unit purchased.

2. The following shall be added to Section 3 of Exhibit A entitled Minimum Guarantee:

   During the calendar year 2003, DISTRIBUTOR guarantees total purchases of no less than seven hundred thousand US dollars (US$700,000.00).

3. Payment Terms:

   For every Purchase Order received from DISTRIBUTOR, DISTRIBUTOR agrees to pay by either one of the following payment methods:

   a). Concurrent or prior with COMPANY's receipt of a Purchase Order, DISTRIBUTOR agrees to pay COMPANY for the total amount of the applicable Purchase Order; or

   b). Concurrent or prior with COMPANY's receipt of a Purchase Order, DISTRIBUTOR agrees to procure an Irrevocable Letter of Credit from an issuing bank acceptable to COMPANY for the total amount of the applicable Purchase Order payable within sixty (60) days naming COMPANY as the beneficiary and the Bank of America as the advising bank which Letter of Credit will, *inter alia,* permit partial shipments DISTRIBUTOR acknowledges that no products will be shipped absent receipt of payment of the aforementioned Letter of Credit.

All other terms and conditions of the Agreement will remain in full force and effect.

Vivendi Universal Games, Inc.          Asian Media Development Group

_____          _____
Officer                                              Officer

SvP ASiA                                    PRESIDENT
_____          _____
Title                                                 Title

15/04/03                                    22/04/03
_____          _____
Date                                                Date

Add 3 to International Distribution Agreement -- Cybercafe
AMDG 11/1/01

**CONFIDENTIAL**          SIERRA000549

JUL-17-2003 THU 03:28 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 23

07/16/2003 10:52 FAX 31025807f          Knowledge Adventure Exec :          Ø001/015

## INTERNATIONAL DISTRIBUTOR AGREEMENT

This INTERNATIONAL DISTRIBUTOR AGREEMENT (the "Agreement") is made and entered into effective November 1, 2002 (the "Effective Date"), by and between Vivendi Universal Games, Inc., a Delaware corporation, and its direct and indirect subsidiaries, with its principal place of business at 6080 Center Drive, 10th floor, Los Angeles, CA 90045 ("COMPANY"), and Asian Media Development Group, a Philippine corporation , with its principal place of business at 2/F Jannov Plaza, 2295 Don Chino Roces Avenue, 1231 Makati City, Philippines ("DISTRIBUTOR").

### RECITALS

WHEREAS, COMPANY publishes and distributes certain computer software products, including the products listed in Exhibit A hereto; and

WHEREAS, COMPANY desires to distribute its products in a world market; and

WHEREAS, DISTRIBUTOR has expressed an interest to act as an independent distributor of certain COMPANY products under the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual covenants and agreements hereinafter set forth, COMPANY and DISTRIBUTOR agree as follows:

1.   **Definitions.** Whenever used in this Agreement, the following terms shall have the following specified meanings:

   (a)   "Dealer" means an entity authorized hereunder, which resells COMPANY Products (as that term is defined herein) to end users.

   (b)   "COMPANY Documentation" means any and all manuals, specifications, user guides and other documentation regarding the COMPANY Products.

   (c)   "COMPANY Software" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by COMPANY and identified in the attached Exhibit A. Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto.

   (d)   "COMPANY Products" means COMPANY Software packaged together with the appropriate COMPANY Documentation.

   (e)   "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which DISTRIBUTOR has the right to distribute the enumerated COMPANY Products in the Territory.

   (f)   "End-User" means an individual or entity which purchases COMPANY Products, for its own use, and not for redistribution.

   (g)   "License Agreement" means COMPANY's standard form license agreement, a copy of which is included at the beginning of all user guides with respect to COMPANY Software distributed by COMPANY, as the same may be modified or amended from time to time.

   (h)   "Prohibited Country" means a country to which export or re-export of any COMPANY Products, is prohibited by United States law without first obtaining the permission of the United States Office of Export Administration or its successor.

**CONFIDENTIAL**          **SIERRA000550**

PAGE 1/15 * RCVD AT 7/16/2003 10:46:47 AM [Pacific Daylight Time] * SVR:LAE-C-01/B * DNIS:4103824 * CSID:31025807f * DURATION (mm-ss):10-42

(i)   All references in this Agreement to the "sale" of or "selling" COMPANY Software shall mean the sale of a license to use such COMPANY Software. All references in this Agreement to the "purchase" of COMPANY Software shall mean the purchase of a license to use such COMPANY Software.

2.   **Appointment as Authorized COMPANY DISTRIBUTOR**

(a)   Appointment.  Subject to the terms and conditions of this Agreement, COMPANY hereby appoints DISTRIBUTOR, and DISTRIBUTOR hereby accepts such appointment, as an independent, distributor of COMPANY Products solely in the territory set forth in Exhibit A to this Agreement ("Territory").

(b)   Nature of Distribution.  The appointment of DISTRIBUTOR only grants to DISTRIBUTOR a license to distribute COMPANY Products to DISTRIBUTOR's customers in the Territory, and does not grant any right, title or interest in any COMPANY Product to DISTRIBUTOR.

(c)   On-Line Sales.  COMPANY hereby grants DISTRIBUTOR the right to market and sell the COMPANY Products through on-line services and the Internet only within the Territory. DISTRIBUTOR is prohibited from distributing any COMPANY Products via electronic means, including downloading. COMPANY reserves the right to review DISTRIBUTOR's on-line materials regarding the COMPANY Products and may at any time require DISTRIBUTOR to modify or remove such materials; DISTRIBUTOR agrees to immediately comply with such notice.

(d)   Sales Literature.  COMPANY will furnish DISTRIBUTOR with reasonable quantities (in COMPANY's sole judgment) of COMPANY's existing sales literature if desired by DISTRIBUTOR for the initial introduction of the COMPANY Products within the Territory at no charge. COMPANY reserves the right to charge a reasonable fee for any additional materials provided by it to DISTRIBUTOR.

(e)   COMPANY's Reserved Rights.

(1)   Changes in Products and Support.  COMPANY reserves the right at any time, in its sole discretion and without liability to DISTRIBUTOR, to change, or to add to or delete from the list of COMPANY Products. Additionally, COMPANY reserves the right to modify COMPANY Products during the term hereof in its sole discretion. DISTRIBUTOR acknowledges that some COMPANY Products may contain content which has been licensed to COMPANY by third parties. In the event one or more of these licenses is terminated, COMPANY reserves the right to unilaterally remove the affected COMPANY Product from this Agreement and DISTRIBUTOR covenants to cease all distribution of such COMPANY Product(s) within fifteen (15) days following its receipt of notice thereof.

(2)   COMPANY and Third-Party Distribution of COMPANY Products Within the Territory.

(i)   OEM Distribution:  DISTRIBUTOR acknowledges that COMPANY has granted and/or in the future may grant OEM rights to third parties relating to one or more of the COMPANY Products in the Territory.

(ii)   On-Line and Mail Order Sales:  DISTRIBUTOR acknowledges that COMPANY and/or third parties may sell COMPANY Products either on-line or through mail order to individuals located in the Territory and COMPANY shall have no liability to DISTRIBUTOR with respect to such sales.

**CONFIDENTIAL**          **SIERRA000551**

JUL-17-2003 THU 03:29 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 25

07/16/2003 10:54 FAX 31025807E          Knowledge Adventure Exec          ☒003/015

3.   **Obligations of DISTRIBUTOR.** DISTRIBUTOR warrants and represents that it has and will maintain, the capacity, facilities and personnel necessary to carry out its obligations under this Agreement and in particular that:

(a)   *Promotion Efforts.* DISTRIBUTOR will use its best efforts to market and sell COMPANY Products both vigorously and aggressively to Dealers within the Territory and to distribute COMPANY Products within the Territory.

(b)   *Dealer Qualifications.* DISTRIBUTOR will authorize and maintain Dealers that have the financial capacity facilities, technical capacity and desire to market and sell COMPANY Products competently.

(c)   *DISTRIBUTOR-Dealer Agreement.* Prior to engaging in any transaction with a Dealer involving any COMPANY Products, DISTRIBUTOR and such Dealer shall execute an agreement authorizing the Dealer to resell COMPANY Products. DISTRIBUTOR agrees to furnish to COMPANY in writing the name, address and telephone number of each Dealer. It is a material obligation of DISTRIBUTOR to contractually restrict the territory where each Dealer may resell the Localized COMPANY Products to no countries or regions outside the Territory granted hereunder. Any agreement with any Dealer with respect to any COMPANY Product shall provide that the rights of the of Dealer with respect to such COMPANY Product shall terminate following the expiration or early termination of this Agreement, and such Dealer shall be obligated to cease the use, sale, distribution, or marketing of the COMPANY Product upon such termination of this Agreement in accordance with the applicable provisions hereof, subject to the period to continue to sell COMPANY Product described in Section 12(d)(7). Each Dealer agreement shall expressly state that the continued sale, distribution, or marketing of any COMPANY Product following the termination of this Agreement for any reason (except as expressly provided in this Agreement) constitutes an infringement of COMPANY's trademarks and copyrights, and COMPANY shall have the right to directly enforce its rights and remedies against such Dealer in connection with such infringement, although DISTRIBUTOR shall remain primarily liable to COMPANY for any such infringement.

(d)   *Minimum Commitments.* DISTRIBUTOR agrees and guarantees to purchase from COMPANY at least the minimum quantities of each of the COMPANY Products set forth in Exhibit A (the "Guarantee") in the time period set forth in Exhibit A (the "Guarantee Period"). In the event DISTRIBUTOR does not purchase the agreed upon Guarantee during the Guarantee Period, DISTRIBUTOR agrees to render payment for the difference between the royalties guaranteed and the royalties actually paid during the Guarantee Period at the expiration of the Guarantee Period. If DISTRIBUTOR has not paid one-half (1/2) of the Guarantee at the mid-point of the Guarantee Period, COMPANY shall have the right to terminate this Agreement in accordance with Section 12(b)(5) hereinbelow. In the event DISTRIBUTOR fails to achieve the Guarantee within the Guarantee Period, thereafter, COMPANY shall have the right to terminate this Agreement upon thirty (30) days prior written notice.

(e)   *Inventory.* DISTRIBUTOR will maintain an inventory of COMPANY Products sufficient to serve adequately the needs of Dealers on a reasonably timely basis.

(f)   *Dealer Support.* DISTRIBUTOR will provide Dealers with training, technical support and other assistance appropriate in promoting COMPANY Products. DISTRIBUTOR will transmit to Dealers all COMPANY literature and other information that COMPANY requests be transmitted to them.

(g)   *DISTRIBUTOR Personnel and Working Conditions.* DISTRIBUTOR will train and maintain a sufficient number of capable technical and sales personnel at its expense: (1) to serve the needs of its Dealers or End-Users for COMPANY Products, service and support; and (2) otherwise to carry out the responsibilities of DISTRIBUTOR under this Agreement. DISTRIBUTOR shall secure safe and humane working conditions and reasonable environmental protections in its distribution of COMPANY Product.

**CONFIDENTIAL**          **SIERRA000552**

PAGE 3/15 * RCVD AT 7/18/2003 10:45:47 AM (Pacific Daylight Time) * SVR:LAE-C-81/8 * DNIS:4103824 * CSID:3102588766 * DURATION (mm-ss):10-42

(b)   **Technical Expertise.** DISTRIBUTOR and its staff will be conversant with the technical language conventional to COMPANY Products and similar computer products in general.

(i)   **DISTRIBUTOR Covenants.** DISTRIBUTOR covenants and agrees:

(1)   **Efforts.** To conduct business in a manner that reflects favorably on the goodwill and reputation of COMPANY; and

(2)   **Marketing Practices.** To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of COMPANY Products that are inconsistent with the literature distributed by COMPANY, including all warranties and disclaimers contained in COMPANY literature; and

(3)   **Marketing Through Dealers.** To refrain from selling COMPANY Products to any Dealer that cannot agree to comply with obligations similar to those contained in this Section 3, entitled "Obligations of DISTRIBUTOR"; and

(4)   **Object Code.** To distribute COMPANY Software only in the machine-readable object code format in which it is received by DISTRIBUTOR from COMPANY, and only on the tangible media on which it is received by DISTRIBUTOR from COMPANY; and

(5)   **Copying.** To refrain from permitting the copying of COMPANY Software onto any other media for purposes of redistribution to others, and not to use, copy, print or display any COMPANY Software, or permit any Dealer to use, copy, print or display any COMPANY Software, in any manner except in connection with, and for the purpose of marketing and selling copies of COMPANY Software to others in accordance with this Agreement; and

(6)   **Renting.** To refrain from renting or lending any COMPANY Software or the use, copying, printing or display of any COMPANY Software, in any manner except in connection with, and for the purpose of marketing and selling copies of COMPANY Software to others in accordance with this Agreement; and

(7)   **License Agreement.** Not to add to, delete or otherwise vary any of the terms and conditions of the License Agreement; and

(8)   **Trademark and Trade Name.** Not to distribute any COMPANY Products under any trade names or trademarks other than those employed by COMPANY with respect thereto without the prior written approval of COMPANY.

(9)   **Withholding Tax.** That any withholding tax imposed upon payments made to COMPANY by DISTRIBUTOR under this Agreement may be used as a foreign tax credit in the same fiscal year by COMPANY against its obligations under applicable United States tax laws. DISTRIBUTOR understands and agrees that should such tax credits be disallowed or unusable, the royalty rates set forth in EXHIBIT A may be unilaterally raised by COMPANY to offset the effect of the withholding tax.

(j)   **Warranty Service and Support.** DISTRIBUTOR shall comply with COMPANY programs for in warranty replacement and post warranty support for COMPANY Products.

(k)   **Compliance with Law.** DISTRIBUTOR will comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder and in any of its dealing with Dealers and with respect to COMPANY Products.

**CONFIDENTIAL**          **SIERRA000553**

VUG International Distributor Agreement          Page 4
AMDG 11/1/02

PAGE 4/15 * RCVD AT 7/16/2003 10:45:47 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4183824 * CSID:310256076@ * DURATION (mm-ss):10-42

JUL-17-2003 THU 03:30 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 27

07/16/2003 10:55 FAX 3102580770          Knowledge Adventure Exec          ☑005/015

(l)   COMPANY Packaging.  DISTRIBUTOR will distribute COMPANY Products with all packaging, warranties, disclaimers and License Agreement intact as shipped from COMPANY, and will instruct each of its Dealers as to the nature and terms of the License Agreement applicable to the COMPANY Software.  DISTRIBUTOR shall be bound by all of the terms and conditions of the License Agreement with respect to such copy.  DISTRIBUTOR must receive written pre-approval from COMPANY on all DISTRIBUTOR produced marketing and sales materials, including but not limited to, packaging and collateral materials, that reference COMPANY Software prior to release of such material.  DISTRIBUTOR shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the COMPANY Products within the Territory.

(m)   Compliance with U.S. Export Laws.  DISTRIBUTOR acknowledges that COMPANY's export of the COMPANY Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data ("Direct Product" as used hereafter means the immediate product, including processes and services, derived from the use of COMPANY Products).  DISTRIBUTOR agrees and shall cause each of its Dealers, employees, agents and representatives to agree not to export or re-export any COMPANY Products or Direct Products of COMPANY Products to any Prohibited Country.  DISTRIBUTOR agrees to indemnify COMPANY against any claim, demand, action, proceeding, investigation, loss, liability, cost and expense, including, without limitation attorney's fees, suffered or incurred by COMPANY and arising out of or related to any violation (whether intentional or unintentional) by DISTRIBUTOR its employees, agents, representatives and Dealers of any of the warranties or covenants of this Section 3(m).

(n)   Governmental Approval.  If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to assure the right of remittance abroad of U.S. dollars pursuant to Section 6 hereof, DISTRIBUTOR shall immediately take whatever steps may be necessary in this respect, and any changes incurred in connection therewith shall be for the account of DISTRIBUTOR.  DISTRIBUTOR shall keep COMPANY currently informed of its efforts in this connection.  COMPANY shall be under no obligation to ship COMPANY Products to DISTRIBUTOR hereunder until DISTRIBUTOR has provided COMPANY with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(o)   Market Conditions.  DISTRIBUTOR will advise COMPANY promptly concerning any market information that comes to DISTRIBUTOR's attention regarding COMPANY Products, COMPANY's market position or the continued competitiveness of COMPANY Products in the marketplace.

(p)   Dealing with End-Users.  Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of COMPANY Software from DISTRIBUTOR, DISTRIBUTOR shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the License Agreement.  A sample copy of the License Agreement shall be available from the DISTRIBUTOR for review by all prospective End-Users dealing with DISTRIBUTOR.  Should any End User return to DISTRIBUTOR any unopened COMPANY Software in the original sealed package in which it was distributed by COMPANY, DISTRIBUTOR shall provide such End -User with a full refund of all sums paid by the End-User therefor.  In no event shall COMPANY provide any such refund to any End-User who has obtained the copy or copies in question from or through DISTRIBUTOR.

**CONFIDENTIAL**          **SIERRA000554**

PAGE 5/15 * RCVD AT 7/16/2003 10:46:47 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):10-42

4. **Inspections; Records and Reporting.**

   (a)   <u>Reports</u>. DISTRIBUTOR will provide to COMPANY *written reports for every one month period or* when requested by COMPANY, showing

        (1)   DISTRIBUTOR's shipments of COMPANY Products by units and local currency volume;

        (2)   forecasts of DISTRIBUTOR's anticipated orders;

        (3)   any other information COMPANY reasonably requests.

   (b)   <u>Notification</u>. DISTRIBUTOR will notify COMPANY in writing of any claim or proceeding involving COMPANY Products within seven (7) days after DISTRIBUTOR learns of such claim or proceeding. DISTRIBUTOR will also report promptly to COMPANY all claimed or suspected product defects. DISTRIBUTOR will also notify COMPANY in writing not more than seven (7) days after any change in the management or control of DISTRIBUTOR or any transfer of a majority share of DISTRIBUTOR's voting control or a transfer of substantially all its assets.

   (c)   <u>Records</u>. DISTRIBUTOR will maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to distribution of COMPANY Products and will permit examination thereof by authorized representatives of COMPANY at all reasonable times. For the purpose of verifying *compliance by the DISTRIBUTOR with the provisions of this Agreement,* DISTRIBUTOR agrees that COMPANY and its representatives will be permitted full access to, and will be permitted to make copies of or abstracts from, the books and records of DISTRIBUTOR relating to inventory levels, manufacturing, sales, and distribution. COMPANY will be permitted to audit such books and records at reasonable intervals.

5. **Order and Return Procedure.**

   (a)   <u>COMPANY Acceptance</u>. All orders for COMPANY Products by DISTRIBUTOR shall be subject to acceptance in writing by COMPANY at its principal place of business and shall not be binding until the earlier of such acceptance or shipment, and, in the case of acceptance by shipment, only as to the portion of the order actually shipped.

   (b)   <u>Controlling Terms</u>. *The terms and conditions of this Agreement and of the applicable COMPANY* invoice or confirmation will apply to each order accepted or shipped by COMPANY hereunder. The terms and conditions contained in any of DISTRIBUTOR's purchase orders, confirmations, or other business forms will not apply to any order notwithstanding COMPANY's acknowledgment or acceptance of such order.

   (c)   <u>Cancellation</u>. COMPANY reserves the right to cancel any orders by DISTRIBUTOR and accepted by COMPANY as set forth above, or to refuse or delay shipment thereof, if DISTRIBUTOR fails to comply with the terms and conditions of this Agreement. COMPANY also reserves the right to discontinue the publication, manufacture or distribution of any or all COMPANY Products at any time, and to cancel any orders for such discontinued COMPANY Products without liability of any kind to DISTRIBUTOR or to any other person or entity. No such cancellation, refusal or delay will be deemed a termination (unless COMPANY so advises DISTRIBUTOR) or breach of this Agreement by COMPANY.

   (d)   <u>Defective Merchandise</u>. DISTRIBUTOR acknowledges and agrees that CD-ROM technology has *evolved to the point where in the present day defective media is only caused by End-User abuse of the* CD-ROM. Therefore, DISTRIBUTOR shall <u>not</u> be entitled to return any so-called "defective merchandise" to COMPANY for credit or exchange.

<b>CONFIDENTIAL</b>        <b>SIERRA000555</b>

JUL-17-2003 THU 03:31 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 29

07/16/2003 10:57 FAX 31025807f          Knowledge Adventure Exec          ☒007/015

(e)   Stock Balancing.  All purchases made by DISTRIBUTOR hereunder shall be final.  DISTRIBUTOR may not return any COMPANY Product to COMPANY for credit or exchange.

6.   Prices and Payment.

(a)   Prices to DISTRIBUTOR.  DISTRIBUTOR shall pay COMPANY for all COMPANY Products shipped by COMPANY a price in accordance with that set forth in Exhibit A.  COMPANY shall have the right to amend its pricing at any time with respect to any or all COMPANY Products with at least thirty (30) days prior written notice to DISTRIBUTOR.  Such change shall not apply to any order placed by DISTRIBUTOR prior to the effective date of such change.

(b)   Taxes, Tariffs, Fees.  COMPANY's price does not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which COMPANY may be required to pay or collect upon the delivery of COMPANY Products or upon collection of the price for such COMPANY Products.  In the event any fees payable by DISTRIBUTOR are subject to any tax withholding, DISTRIBUTOR shall pay to COMPANY an additional amount such that following such payment, COMPANY receives the amount it would have received had no such withholding been made.

(c)   Payment Terms.  DISTRIBUTOR agrees to make available to COMPANY such statements of the DISTRIBUTOR's financial condition as COMPANY may request.  COMPANY reserves the right at all times, either generally or with respect to any specific purchase order of DISTRIBUTOR, to vary, change or limit the amount or duration of credit to be allowed to DISTRIBUTOR.  DISTRIBUTOR agrees to maintain a sufficient credit line to support purchases of the Products.  Repeated or sustained suspensions/interruptions of credit may be grounds for termination of this Agreement as may be deemed appropriate in the sole and absolute judgment of COMPANY.  Subject to the foregoing, DISTRIBUTOR shall pay all invoices rendered by COMPANY on a Net thirty (30) day basis.  All payments shall be made in United States dollars, free of any withholding tax, and of any currency control or other restrictions to COMPANY at the address designated by COMPANY.  Unless otherwise agreed by COMPANY in writing, at the time of submission of any order for COMPANY Products purchased hereunder, DISTRIBUTOR shall:

(1)   Cash Payment.  Pay by wire transfer to a bank account designated by COMPANY the amount owed by DISTRIBUTOR for the COMPANY Products ordered (plus any applicable taxes, shipping and other charges), in cash, by prepaid international money order, VISA or Mastercard.  All transaction fees related to DISTRIBUTOR's payment will be borne entirely by DISTRIBUTOR.

7.   Shipment, Risk of Loss and Delivery.

(a)   Shipment.  DISTRIBUTOR shall take delivery of all COMPANY Products FOB Fresno, California, USA.  Shipment will be made to DISTRIBUTOR identified warehouse facilities or freight forwarder, subject to approval in writing by COMPANY in advance of shipment.  Unless specified in DISTRIBUTOR's order, COMPANY will select the mode of shipment and the carrier.  DISTRIBUTOR will be responsible for and pay all packing, shipping, freight and insurance charges, which charges COMPANY may require DISTRIBUTOR to pay in advance.

(b)   Risk of Loss.  All risk of loss of or damage to COMPANY Products will pass to DISTRIBUTOR upon delivery by COMPANY to the carrier, freight forwarder or DISTRIBUTOR, whichever occurs first.  DISTRIBUTOR will bear the risk of loss or damage in transit.

(c)   Partial Delivery.  Unless DISTRIBUTOR clearly advises COMPANY to the contrary in writing, COMPANY may make partial shipments of DISTRIBUTOR's orders, to be separately invoiced and

CONFIDENTIAL          SIERRA000556

PAGE 7/15 * RCVD AT 7/16/2003 10:46:47 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102580766 * DURATION (mm-ss):10-42

paid for when due.  Delay in delivery of any installment shall not relieve DISTRIBUTOR of its obligation to accept the remaining deliveries.

(d)  Delivery Schedule:  Delays.  COMPANY will use reasonable efforts to meet DISTRIBUTOR's requested delivery schedule for COMPANY Products, but COMPANY reserves the right to refuse, cancel or delay shipment to DISTRIBUTOR if DISTRIBUTOR has failed to perform any of its obligations under this Agreement.  Should orders for COMPANY Products exceed COMPANY's available inventory, COMPANY will allocate its available inventory and make deliveries on an equitable basis to the extent practicable.  In no event, shall COMPANY be liable for any damages, direct, consequential, special or otherwise, to DISTRIBUTOR or to any other person or entity for failure to deliver or for any delay or error in delivery of COMPANY Products for any reason whatsoever.

8.  **DISTRIBUTOR Determines Its Own Per Copy Fees.**  DISTRIBUTOR is free to determine unilaterally its own pricing of the COMPANY Software to its Dealers.  Although COMPANY may publish suggested wholesale, retail or Dealer prices, these are suggestions only and DISTRIBUTOR shall be entirely free to determine the actual prices at which COMPANY Products are sold to its Dealers.

9.  **DISTRIBUTOR's Warranties and Representations Regarding Treatment of Dealers.**  DISTRIBUTOR hereby warrants and represents to COMPANY as follows:

(a)  Dealer Pricing.  DISTRIBUTOR will inform each Dealer that it is free to determine unilaterally its own prices and that, although COMPANY may publish lists showing suggested retail prices for COMPANY Products, those are suggestions only.

(b)  Non-Discrimination Among Dealers.  In working with its Dealers, DISTRIBUTOR shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Dealers, including but not limited to those which govern discriminatory pricing.

10.  **Trademarks.  Trade Names and Copyrights.**

(a)  Trademark Use During Agreement.  During the term of this Agreement, DISTRIBUTOR is authorized by COMPANY to use the trademarks COMPANY uses for COMPANY Products solely in connection with DISTRIBUTOR's advertisement, promotion and distribution of COMPANY Products.  DISTRIBUTOR agrees that it will cause to be affixed, conspicuously and legibly on all marketing materials incorporating any part of the COMPANY Software, appropriate copyright and trademark notices in the name of COMPANY.  DISTRIBUTOR agrees not to alter, erase, deface, or overprint any such mark on anything provided by COMPANY.

(b)  No DISTRIBUTOR Rights in Trademarks or Copyrights.  DISTRIBUTOR has paid no consideration for the use of COMPANY's trademarks, logos, copyrights, trade secrets, trade names or designations, and nothing contained in this Agreement shall give DISTRIBUTOR any interest in any of them.  DISTRIBUTOR acknowledges that COMPANY owns and retains all proprietary rights in all COMPANY Products, and agrees that it will not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect the validity or enforceability of any trademark, trade name, trade secret, copyright or logo belonging to or licensed to COMPANY (including, without limitation, any act, or assistance to any act, which may infringe or lead to the infringement of any copyright in the COMPANY Products).  DISTRIBUTOR agrees not to attach any additional trademarks, logos or trade designations to any COMPANY Product.

(c)  No Continuing Right.  Upon expiration or termination of this Agreement, DISTRIBUTOR will cease advertising and use of all COMPANY names, marks, logos and designations.

**CONFIDENTIAL**          **SIERRA000557**

(d)  Obligation to Protect.  DISTRIBUTOR agrees to use reasonable efforts to protect COMPANY's proprietary rights and to cooperate COMPANY's efforts to protect its proprietary rights.

(e)  Security.  At no time shall DISTRIBUTOR re-compile, decompile or disassemble any COMPANY Software.  DISTRIBUTOR shall not at any time use or attempt to use any COMPANY Software in any form other than the object code form in which copies thereof are distributed by COMPANY, or to generate any source code thereof.  DISTRIBUTOR shall not alter or modify any COMPANY Software, or any portion or aspect thereof, or use or refer to any COMPANY Software in the creation of any derivative work, without COMPANY's prior written consent.  DISTRIBUTOR shall preclude its agents, employees, and contractors from engaging in any conduct inconsistent with the terms of this Section 10(e) by means of appropriate agreements and/or such other security measures as may be necessary in order to preclude such conduct.  COMPANY reserves the right to review DISTRIBUTOR's agreement and security measures and to require DISTRIBUTOR to amend agreements and take steps to bolster the security measures that are necessary in COMPANY's sole judgment.  DISTRIBUTOR shall not at any time market any copy of COMPANY Product which has not been produced by COMPANY.

(f)  Breach.  DISTRIBUTOR understands and agrees that COMPANY will suffer irreparable harm in the event that DISTRIBUTOR fails to comply with any of its obligations pursuant to this Section 10, and that monetary damages in such event would be substantial and inadequate to compensate COMPANY.  Consequently, in such event COMPANY shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by DISTRIBUTOR, without showing or proving any actual damages sustained by COMPANY.

(g)  Dealer or End-User Breaches.  DISTRIBUTOR shall promptly report to COMPANY any breach of the License Agreement of which DISTRIBUTOR becomes aware.  COMPANY shall have the right, but not the obligation, to pursue any and all such infringements.

(h)  Filing and Recording.  Upon request, DISTRIBUTOR agrees to assist COMPANY in the filing and recording of COMPANY's trade names, copyrights, patents and trademarks in the Territory, all costs to be paid by COMPANY.

11.  Assignment.  DISTRIBUTOR is appointed an authorized COMPANY DISTRIBUTOR because of DISTRIBUTOR's commitments in this Agreement, and further because of COMPANY's confidence in DISTRIBUTOR, which confidence is personal in nature.  The rights granted to DISTRIBUTOR hereunder are personal in nature and DISTRIBUTOR shall not assign this agreement to any third party, and DISTRIBUTOR may not delegate its duties hereunder without the prior written consent of COMPANY.  Any attempted assignment or delegation without the required consent shall be void and of no effect.

12.  Duration and Termination of Agreement.

(a)  Term.  Subject to prior termination in accordance with the provisions contained herein, the term hereof shall commence as of the effective date described in Section 17(d) herein and expire upon the expiration of all Distribution Terms for COMPANY Products distributed pursuant to this Agreement.

(b)  Termination for Cause.  This Agreement may be terminated forthwith by either party upon the occurrence of the following, by one party giving written notice thereof to the other party by registered or certified mail, in which this Agreement shall terminate on the date set forth in such notice.  The date of mailing said written notice shall be deemed the date on which notice of termination of this Agreement shall have been given.

(1)  If any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or

CONFIDENTIAL

SIERRA000558

against DISTRIBUTOR or if DISTRIBUTOR shall make an assignment for the benefit of creditors; or

(2)    A material breach by either party of any of the terms of this Agreement or any other agreement between the parties hereto which breach is not remedied by the breaching party to the other party's reasonable satisfaction within thirty (30) days of the breaching party's receipt of notice of such breach from the other party in the event of a breach of Section 6 hereunder and within ninety (90) days for all other breaches.

(3)    By COMPANY, if DISTRIBUTOR is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a DISTRIBUTOR's common stock or the equivalent, shall be considered a substantial change in control hereunder);

(4)    By COMPANY, if DISTRIBUTOR sells: (i) any copies of the COMPANY Product; (ii) any copies of the COMPANY Product outside the Territory; or (iii) any copies of the COMPANY Product to any person or entity which DISTRIBUTOR has reason to believe may sell the COMPANY Product outside the Territory; or

(5)    By COMPANY, if DISTRIBUTOR has not paid COMPANY one-half (½) of the Guarantee at the mid-point of the Guarantee Period.

(c)    <u>Termination at Will.</u>  COMPANY shall have the right to terminate the Agreement for no cause, at will upon ninety (90) days written notice.

(d)    <u>Orders After Termination Notice.</u>  In the event that any notice of termination of this Agreement is given, COMPANY will be entitled to reject all or part of any orders received from DISTRIBUTOR after notice but prior to the effective date of termination if availability of COMPANY Products is insufficient at that time to fully meet the needs of COMPANY and its customers. In any case, COMPANY may limit monthly shipments to DISTRIBUTOR during said period to DISTRIBUTOR's average monthly shipments from COMPANY during the three months prior to the date of notice of termination. All shipments made by COMPANY during said period, shall be delivered solely upon a cash with order basis.

(e)    <u>Effect of Termination.</u>  Upon termination of this Agreement:

(1)    COMPANY, at its option, may reacquire any or all COMPANY Products then in DISTRIBUTOR's possession at per copy prices not greater than the per copy prices paid by DISTRIBUTOR for such Products.

(2)    DISTRIBUTOR shall provide COMPANY with a written report detailing all inventory of the COMPANY Products in its possession at the effective date of termination within ten (10) business days. COMPANY shall then have a period of ten (10) business days to elect to purchase any portion of said inventory at DISTRIBUTOR's actual cost of such goods. Provided that DISTRIBUTOR has remained in compliance with all material terms of this Agreement throughout the term, DISTRIBUTOR may continue to sell from its remaining inventory until such inventory is depleted or for a period of six (6) months, whichever period is shorter.

(3)    All orders or portions thereof remaining not shipped as of the effective date of termination shall automatically be canceled.

**CONFIDENTIAL**          **SIERRA000559**

(4)     For a period of one (1) year after the date of termination, DISTRIBUTOR shall make available to COMPANY for inspection and copying all books and records of DISTRIBUTOR that pertain to DISTRIBUTOR's performance of and compliance with its obligations, warranties and representations under this Agreement.

(5)     DISTRIBUTOR shall cease using any COMPANY trademark, logo or trade name.

(6)     All trademarks, trade names, patents, samples, literature and sales aids of every kind shall remain the property of COMPANY.  Within thirty (30) days after the termination of this Agreement, DISTRIBUTOR shall prepare all such items in its possession for shipment, as COMPANY may direct, at COMPANY's expense.  DISTRIBUTOR shall not make or retain any copies of any confidential items or information which may have been entrusted to it.  Effective upon the termination of this Agreement, DISTRIBUTOR shall cease to use all trademarks, marks, and trade names of COMPANY.

(7)     Unless COMPANY invokes its rights under section 12(b) above, DISTRIBUTOR may continue to sell all COMPANY Products purchased by it during the term of the Agreement for a period of three (3) months.  If the Agreement was terminated pursuant to Section 12(b)(5) hereinabove, the DISTRIBUTOR shall pay COMPANY the difference between one-half (1/2) of the Guarantee and the amount of royalties DISTRIBUTOR had paid to COMPANY at the mid-point of the Guarantee Period in addition to DISTRIBUTOR's obligation to pay COMPANY any royalties owing COMPANY since that point in time.

(f)     Survival.  COMPANY's rights and DISTRIBUTOR's obligations to pay COMPANY all amounts due hereunder, as well as DISTRIBUTOR's obligations under Section 3(d), 3(i), (4), 4(c), 5, 6, 10, 12, 13, 14(c), 15, 16, and 17 shall survive termination of this Agreement.

13.     **Relationship of the Parties.**  DISTRIBUTOR's relationship with COMPANY during the term of this Agreement will be that of an independent contractor.  DISTRIBUTOR will not have, and will not represent that it has, any power, right or authority to bind COMPANY, or to assume any obligation or responsibility express or implied, on behalf of COMPANY or in COMPANY's name, except as herein expressly provided.  Nothing stated in this Agreement shall be construed as making partners of DISTRIBUTOR and COMPANY, nor as creating the relationships of employer/employee, franchisor/franchisee, or principal/agent between the parties.  In all matters relating to this Agreement, neither DISTRIBUTOR nor its employees or agents are, or shall act as, employees of COMPANY within the meaning or application of any obligations or liabilities to COMPANY by reason of an employment relationship.  DISTRIBUTOR shall reimburse COMPANY for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon COMPANY by virtue of any such law with respect to employees of DISTRIBUTOR in performance of this Agreement.

14.     **Indemnification.**

(a)     **Indemnification of DISTRIBUTOR.**  COMPANY agrees to defend, indemnify and hold DISTRIBUTOR harmless for any loss, damage or liability for any claimed infringement of any United States patent right, copyright and trade secret, asserted by any third person or entity arising out of DISTRIBUTOR's use of any COMPANY Products, provided (1) that COMPANY is promptly notified in writing by DISTRIBUTOR of any such claim against DISTRIBUTOR, (2) that DISTRIBUTOR authorizes COMPANY to assume sole control over the defense of any such claim thereafter, together with the right to settle or compromise such claim, and (3) that DISTRIBUTOR makes available to COMPANY such information, assistance and authority as may be reasonably requested by COMPANY in order to enable COMPANY to defend any such claim.  In the event any such claim is asserted, COMPANY shall have the right without limitation, at its option either (a) to obtain such rights and/or licenses from the claimant as may be necessary to enable DISTRIBUTOR to continue using and/or marketing the COMPANY Products which are the subject of the claim, and/or

CONFIDENTIAL

SIERRA000560

(b) to modify the COMPANY Products with respect to which such claim is asserted so as to avoid further claimed infringement by such person or entity.

(b) **No Combination Claims.** Notwithstanding Section 14(a), COMPANY shall not be liable to DISTRIBUTOR for any claim arising from or based upon the combination, operation or use of any COMPANY Product with equipment, data or programming not supplied by COMPANY, or arising from any alteration or modification of COMPANY Products.

(c) **Indemnification of COMPANY.** DISTRIBUTOR agrees to defend, indemnify, and hold COMPANY, its affiliated companies and subsidiaries and their respective officers, directors, employees and agents harmless from and against any loss, claim, cost, expense, liability or damage including reasonable attorney's fees and costs, resulting or arising in any way from its performance of the obligations hereunder, or from its or its employees' negligence, misrepresentations or other tortious, illegal or unauthorized conduct in the promotion of the Products or any other act or omission arising out of or relating to this Agreement.

15. **Disclaimer of Warranties: Limited Liability.**

(a) **Disclaimer of Warranties.** DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE COMPANY SOFTWARE, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. COMPANY FURTHER DISCLAIMS ALL WARRANTIES WITH REGARD TO YEAR 2000 COMPLIANCE OF THE COMPANY SOFTWARE. SPECIFICALLY, COMPANY MAKES NO WARRANTIES THAT THE PERFORMANCE OR FUNCTIONALITY OF THE COMPANY SOFTWARE WILL NOT BE AFFECTED BY DATES PRIOR TO, DURING OR AFTER THE YEAR 2000, OR THAT THE COMPANY SOFTWARE WILL BE CAPABLE OF CORRECTLY PROCESSING, PROVIDING, AND/OR RECEIVING DATE INFORMATION WITHIN AND BETWEEN CENTURIES, INCLUDING THE PROPER EXCHANGE OF DATE INFORMATION BETWEEN PRODUCTS OR APPLICATIONS.

(b) **Limitation of Liability.** UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO DISTRIBUTOR ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY DISTRIBUTOR TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. DISTRIBUTOR acknowledges and agrees that (1) DISTRIBUTOR has no expectation and has received no assurances that its business relationship with COMPANY will continue beyond the stated term of this Agreement or its earlier termination in accordance with Section 12 hereunder, that any investment by DISTRIBUTOR in the promotion of COMPANY Products will be recovered or recouped, or that DISTRIBUTOR shall obtain any anticipated amount of profits by virtue of this Agreement; and (2) DISTRIBUTOR shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of COMPANY Products or in any goodwill created by its efforts hereunder.

CONFIDENTIAL

SIERRA000561

16. **Confidentiality.** In the course of this Agreement, it is anticipated that DISTRIBUTOR will learn confidential or proprietary information about COMPANY. DISTRIBUTOR will keep confidential this information and any other information which DISTRIBUTOR may acquire with respect to COMPANY's business, including, but not limited to, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until COMPANY consents to disclosure, or unless *such knowledge and information otherwise becomes generally available to the public through no fault of DISTRIBUTOR.* DISTRIBUTOR will not disclose to others, without COMPANY's consent, the subject of this relationship without first providing COMPANY with the opportunity to review and offer reasonable objection to the contemplated publication. This undertaking to keep information confidential will survive the termination of this Agreement. It is understood, however that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to DISTRIBUTOR without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to COMPANY with respect to such information; (iii) is or becomes part of the public domain through no fault of DISTRIBUTOR; (iv) is independently ascertainable or developed by DISTRIBUTOR or its employees; (v) is required to be disclosed by administrative or judicial action provided that DISTRIBUTOR immediately after receiving *notice of such action notifies COMPANY of such action to give COMPANY the opportunity to seek any other legal remedies to maintain such confidential information in confidence;* or (vi) is approved for release by written authorization of COMPANY. DISTRIBUTOR will require each of its employees performing services relating to the Work to execute a Confidentiality Agreement, if requested by COMPANY. At the termination of this Agreement, DISTRIBUTOR will return to COMPANY all drawings, specifications, manuals and other printed or reproduced material (including information stored on machine readable media) provided by COMPANY.

17. **General.**

    (a)    Waiver and Modification. No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

    (b)    Notices   All notices and demands hereunder shall be in writing and shall be served by personal delivery, express courier, or mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be by certified or registered airmail, return receipt requested, and shall be deemed complete upon receipt. If receipt of such notice or demand is refused or a party has changed its address without informing the other, the notice shall be deemed to have been given and received upon the seventh (7th) day following the date upon which it is first postmarked by the postal service of the sender's nation.

    (c)    Attorney's Fees. In the event any litigation is brought by either party in connection with this Agreement, the prevailing party in such litigation shall be entitled to recover from the other party all the costs, attorney's fees and other expenses incurred by such prevailing party in the litigation.

    (d)    Complete Execution. This Agreement shall become effective only after it has been signed by DISTRIBUTOR and accepted by COMPANY.

    (e)    Choice of Law, Jurisdiction. *This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA.* THE APPLICATION OF THE UNITED NATIONS CONVENTION OF CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS IS EXPRESSLY EXCLUDED. The parties agree that any claim asserted in any legal proceeding by one party against the other shall be commenced and maintained in any state or federal court located within

CONFIDENTIAL

SIERRA000562

the County of Los Angeles, State of California, USA, having subject matter jurisdiction with respect to the dispute between the parties. Both parties hereby submit to the jurisdiction of such courts over each of them personally in connection with such litigation, and waive any objection to venue in such courts and any claim that such forum is an inconvenient forum. The English language version of this Agreement controls when interpreting this Agreement.

(f)  Severability. In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(g)  Force Majeure. COMPANY shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond COMPANY's control, including but not limited to acts of God, war, riot, embargoes; acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(h)  Entire Agreement. This Agreement including all Schedules and Exhibits constitute and contain the entire agreement between the parties with respect to the subject matter hereof and supersede any prior oral or written agreements. Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each and has been delivered to the parties. This Agreement may not be changed, modified, amended or supplemented, except in writing signed by all parties to this Agreement. Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(i)  Benefits of Agreement. The terms of this Agreement are intended solely for the benefit of the parties hereto. They are not intended to confer upon any third party the status of a third party beneficiary. Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assign of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement.

Vivendi Universal Games, Inc.                    Asian Media Development Group

HUBERT LARENAUDIE                           ARTURO E. DIAGO, JR.

Senior Vice-President & Director                  President

18 November 2002                                 18 November 2002

CONFIDENTIAL

SIERRA000563

JUL-17-2003 THU 03:35 PM CHRISTENSEN O'CONNOR          FAX NO. 206 224 0779          P. 37

07/16/2003 11:02 FAX 31025807'          Knowledge Adventure Exec(          ☑015/015

## EXHIBIT A

1.   **COMPANY Products and Prices to DISTRIBUTOR:**

| COMPANY Product | Price *(in USD) |
| --- | --- |
| Half Life Counterstrike | $2.00 |

*Price means US dollars that DISTRIBUTOR agrees to pay COMPANY for each unit purchased.

2.   **Distribution Term:**

Subject to early termination in accordance with the provisions contained herein, the Distribution Term shall begin on the Effective Date of the Agreement and continue in full force for a period of twelve (12) months. The Distribution Term shall be from November 1, 2002 to October 31, 2003.

3.   **Guarantee and Guarantee Period:**

Within the applicable Distribution Term of the Agreement, DISTRIBUTOR guarantees sales of no less than twenty thousand (20,000) units of Half Life Counterstrike.

4.   **Payment Terms:**

Concurrent or prior with COMPANY's receipt of a Purchase Order, DISTRIBUTOR agrees to pay COMPANY for the total amount of the applicable Purchase Order.

5.   **Territory:**

Philippines

**CONFIDENTIAL**          **SIERRA000564**

Page 15

VUG International Distributor Agreement
AMDG 11/1/02

PAGE 15/15 * RCVD AT 7/16/2003 10:45:47 AM [Pacific Daylight Time] * SVR:LAE-C-01/0 * DNIS:4103824 * CSID:3102588766 * DURATION (mm-ss):10-42