The Honorable Thomas S. Zilly

1

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

8

9  VALVE LLC, a Washington limited liability company,

No.  CV02-1683Z

10

Plaintiff,

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF SIERRA ENTERTAINMENT, INC., AND VIVENDI UNIVERSAL GAMES, INC.**

11

vs.

12

13  SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON LINE, INC.), a Delaware corporation; VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; and VIVENDI UNIVERSAL, S.A., a French foreign corporation,

**JURY DEMAND**

14

15

16

17

Defendants.

18

19  SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON LINE, INC.), a Delaware corporation; and VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation,

20

21

22  Counter-Claimants,

vs.

23

24  VALVE LLC, a Washington limited liability company; GABE NEWELL, an individual;  and SCOTT LYNCH, an individual,

25

26  Counterclaim Defendants.

27

28

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 1 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1    Defendants Sierra Entertainment, Inc. ("Sierra") and Vivendi Universal Games, Inc.

2  ("VUG"), by and through their counsel of record, hereby answer the First Amended

3  Complaint of Valve, LLC ("Valve") and assert the following affirmative defenses and

4  counterclaims, as set forth herein below.

5                                    **ANSWER**

6                        **JURISDICTION AND VENUE**

7    1.    Sierra and VUG admit that this is an action for copyright infringement and

8  breach of contract, denies that they have infringed any copyrights or breached any contract,

9  and deny every other allegation in Paragraph 1.

10    2.    Sierra and VUG admit that this Court has subject matter jurisdiction with

11  respect to activities within the ambit of United States copyright law, admits that this Court

12  has personal jurisdiction over Sierra and VUG, deny that this Court has personal jurisdiction

13  over Vivendi Universal, S.A. ("Vivendi"), deny that the Court has subject matter jurisdiction

14  with respect to overseas activities or actions outside the ambit of the United States copyright

15  law, and deny the remaining allegations in Paragraph 2.

16    3.    Sierra and VUG admit the allegations in Paragraph 3.

17                                  **THE PARTIES**

18    4.    Sierra and VUG deny that Valve is the sole developer of the Valve Games,

19  admit the allegations as to awards received by Valve for the Half-Life game, and lack

20  knowledge or information sufficient to respond to the remaining allegations in Paragraph 4

21  and, on that basis, deny each and every other allegation in Paragraph 4.

22    5.    Sierra and VUG admit the allegations in Paragraph 5.

23    6.    Sierra and VUG admit that VUG is a Delaware Corporation, admit that VUG

24  is a distant subsidiary of Vivendi, admit that VUG's principal place of business in the

25  United States is in Los Angeles, California, and deny the remaining allegations in Paragraph

26  6.

27

28

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 2 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

7.      Sierra and VUG admit that Vivendi is a French corporation, admit that Vivendi is a distant parent corporation of VUG and Sierra, and deny the remaining allegations in Paragraph 7.

8.      Sierra and VUG admit that Sierra and Valve executed a Software Publishing Agreement in March, 2001 (the "2001 Agreement"), as well as subsequent amendments thereto, state that the terms of the 2001 Agreement are as set forth in the documents comprising the 2001 Agreement, with amendments, and deny the remaining allegations in Paragraph 8.

## STATEMENT OF FACTS

9.      Sierra and VUG admit that Sierra and Valve executed the 2001 Agreement in March 2001, admit that VUG is a party to the 2001 Agreement, deny that Vivendi entered into the 2001 Agreement, and state that the remaining allegations in Paragraph 9 state legal conclusions to which no response is required.

10.     Sierra and VUG admit that the Valve Games at issue contain software code commonly referred to as the "Valve Engine," and state that the remaining allegations in Paragraph 10 state legal conclusions to which no response is required.

11.     Sierra and VUG admit that Sierra and/or their distributors or agents have distributed one or more of these Valve Games to cyber-cafés in the United States and in other countries, admit that cyber-cafés are multi-player retail outlets that make computers available for use to consumers for payment, and deny the remaining allegations in Paragraph 11.

12.     Denied.

13.     Denied.

14.     Sierra and VUG admit that Sierra and VUG and/or their agents entered into agreements for the distribution of games developed in part by Valve to cyber-cafés, state that the characterization of the obligations imposed by the 2001 Agreement is a legal

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 3 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

conclusion to which no response is required, and deny the remaining allegations in Paragraph 14.

15.     Sierra and VUG state that the characterization of the obligations imposed by the 2001 Agreement is a legal conclusion to which no response is required, and deny the remaining allegations in Paragraph 15.

16.     Sierra and VUG state that the characterization of the obligations imposed by the 2001 Agreement is a legal conclusion to which no response is required, and deny the remaining allegations in Paragraph 16.

17.     Sierra and VUG state that the characterization of the obligations imposed by the 2001 Agreement is a legal conclusion to which no response is required, and deny the remaining allegations in Paragraph 17.

18.     Sierra and VUG admit that shortly prior to the commencement of this action, Valve claimed that Sierra and VUG did not have the right to distribute Valve Games to cyber-cafés, and deny the remaining allegations in Paragraph 18.

19.     Sierra and VUG admit that Sierra, VUG and/or their agents exercised their rights under the 2001 Agreement to enter into licensing or distribution agreements which permitted distribution of one or more of the Valve Games to cyber-cafés, including an agreement with Asian Media Development Group, and deny the remaining allegations in Paragraph 19.

20.     Sierra and VUG lack knowledge or information sufficient to respond to the allegations in Paragraph 20.

21.     Denied.

22.     Denied.

## COUNT I:  COPYRIGHT INFRINGEMENT

23.     Sierra  and VUG incorporate herein their responses to Paragraphs 1-22 above.

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 4 of 54*

24.     Sierra and VUG lack knowledge or information sufficient to respond to the allegations in Paragraph 24 and on that basis deny them.

25.     Sierra and VUG lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 25 and on that basis deny them.

26.     Sierra and VUG admit that Sierra, VUG and/or their agents or distributors distributed one or more of the Valve Games to cyber-cafés and deny the remaining allegations in Paragraph 26.

27.     Denied.


**COUNT II:  BREACH OF CONTRACT**

28.     Sierra and VUG incorporate herein their responses to Paragraphs 1-27 above.

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 5 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

## AFFIRMATIVE DEFENSES

As separate and affirmative defenses to Valve's First Amended Complaint, and without conceding that the burden of proof as to any of these matters lies with Sierra or VUG, Sierra and VUG allege as follows:

### FIRST AFFIRMATIVE DEFENSE

41.     Each and every separate cause of action alleged in Valve's First Amended Complaint fails to state facts sufficient to constitute a cause of action against Sierra or VUG and fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

42.     This Court lacks subject matter jurisdiction to adjudicate all or some of the claims set forth in Valve's First Amended Complaint.

### THIRD AFFIRMATIVE DEFENSE

43.     Some or all of Valve's claims are barred by the doctrine of express or implied waiver.

### FOURTH AFFIRMATIVE DEFENSE

44.     Valve, by its conduct, is estopped from asserting its claims against Sierra and VUG .

### FIFTH AFFIRMATIVE DEFENSE

45.     Some or all of the relief sought by Valve is barred pursuant to 17 U.S.C. §412.

### SIXTH AFFIRMATIVE DEFENSE

46.     Valve's injuries, if any, were caused in whole or part by the acts of others over which Sierra and VUG had no control and are not responsible.

### SEVENTH AFFIRMATIVE DEFENSE

47.     Valve is barred from obtaining equitable relief by the doctrine of unclean hands.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 6 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1

2

## EIGHTH AFFIRMATIVE DEFENSE

48.     Valve has failed to take reasonable steps to mitigate its damages.

## NINTH AFFIRMATIVE DEFENSE

49.     Sierra and VUG were authorized by Valve to engage in the allegedly infringing conduct.

## TENTH AFFIRMATIVE DEFENSE

50.     Some or all of Valve's claims are barred by the doctrine of laches.

## ELEVENTH AFFIRMATIVE DEFENSE

51.     Valve's breach of contract count is barred by the doctrine of frustration of purpose.

## TWELFTH AFFIRMATIVE DEFENSE

52.     Valve's breach of contract count is barred by mistake of fact.

## THIRTEENTH AFFIRMATIVE DEFENSE

53.     The First Amended Complaint is barred in whole or in part because Valve obtained the 2001 Agreement as a result of fraud.

## FOURTEENTH AFFIRMATIVE DEFENSE

54.     Valve's breach of contract count is barred by failure of consideration.

## FIFTEENTH AFFIRMATIVE DEFENSE

55.     To the extent any contract existed between Sierra, VUG and Valve, Valve failed to perform under such contract, as required by the terms of the contract, and that performance on the part of Valve was a condition precedent to the performance of Sierra's or VUG's obligation.  Sierra and VUG are therefore excused from performance thereunder.

## SIXTEENTH AFFIRMATIVE DEFENSE

56.     Valve's claims are barred by Valve's business compulsion.

## SEVENTEENTH AFFIRMATIVE DEFENSE

57.     If Valve has sustained any damages or incurred any expenses, such damages or expenses, if any, were the result of intervening or superseding events, factors, occurrences

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 7 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1  or conditions, which were in no way caused by Sierra or VUG and for which Sierra and

2  VUG are not liable.

3  ### EIGHTEENTH AFFIRMATIVE DEFENSE

4        58.     Valve may not recover on the claims pleaded in the First Amended

5  Complaint because the damages sought are too speculative and remote.

6  ### NINETEENTH AFFIRMATIVE DEFENSE

7        59.     Valve may not recover on the claims pleaded in the First Amended

8  Complaint because the damages sought are barred in whole or in part by the parties'

9  agreements.

10

11  ### COUNTERCLAIMS

12       By and for its Counterclaims against Counterclaim Defendants Valve, LLC

13  ("Valve") and Gabe Newell and Scott Lynch, Counter-Claimants Sierra and VUG  allege as

14  follows:

15  ### I.

16  ### JURISDICTION AND VENUE.

17        60.     This Court has personal jurisdiction over Plaintiff and Counterclaim

18  Defendant Valve, as Valve is a Washington limited liability company having its principal

19  place of business in this district, and by virtue of Valve's activities conducting business in

20  this district, and by virtue of its consent to personal jurisdiction in the 2001 Agreement.

21        61.     This Court has personal jurisdiction over Gabe Newell, a resident of King

22  County, Washington, as the tortious acts of this Counterclaim Defendant occurred

23  substantially in Washington and had a direct and intended effect on Sierra and VUG in

24  Washington.

25        62.     This Court has personal jurisdiction over Scott Lynch, a resident of King

26  County, Washington, as the tortious acts of this Counterclaim Defendant occurred

27

28

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 8 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

substantially in Washington and had a direct and intended effect on Sierra and VUG in Washington.

63.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§1331 and 1367(a), and pursuant to 28 U.S.C. §1338(a), with respect to Valve's, Sierra's and VUG's activities within the ambit of United States copyright law.

64.     Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## II.

## THE PARTIES.

65.     Plaintiff and Counterclaim Defendant Valve is a Washington Limited Liability Corporation with its principal place of business in Bellevue, Washington.  Valve is a developer of computer software games.

66.     On information and belief, Counterclaim Defendant Gabe Newell is an individual residing in Seattle, Washington.  He is and at all relevant times was the Founder and Managing Director of Valve, and at all times had the authority to act and was acting on behalf of Valve with respect to the matters set forth herein.  Counterclaim Defendant Newell is joined in this action pursuant to Federal Rules of Civil Procedure 13(h) and 20.

67.     On information and belief, Counterclaim Defendant Scott Lynch is an individual residing in King County, Washington.  He is and at all relevant times was the Chief Operating Officer of Valve, and at all times had the authority to act and was acting on behalf of Valve with respect to the matters set forth herein.  Counterclaim Defendant Lynch is joined in this action pursuant to Federal Rules of Civil Procedure 13(h) and 20.

68.     Sierra, previously known as Sierra On-Line, is a Delaware Corporation with its principal place of business in Bellevue, Washington.  At the time of the events described herein, Sierra was a publisher of video games.  Now a studio of VUG, Sierra was one of the earliest developers and largest worldwide publishers of interactive entertainment software. Sierra has released critically acclaimed and award winning titles that represent a wide variety of computer entertainment on game consoles and PC platforms.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 9 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

69.     VUG is a Delaware Corporation with its principal place of business in Los Angeles, California.  VUG is a global leader in multi-platform interactive entertainment.  A leading publisher of PC, console and online-based interactive content, VUG has a portfolio of development studios including Black Label Games, Blizzard Entertainment, Coktel, Knowledge Adventure, NDA Productions, Sierra and Universal Interactive.  Through its Partner Publishing Group, VUG also co-publishes and/or distributes interactive products for a number of strategic partners, including Bits Software, Crave Entertainment, Fox Interactive, Interplay, Majesco, Mythic Entertainment and Simon & Schuster, among others.

### III.

### STATEMENT OF FACTS.

**A.     The Original Agreements.**

70.     On April 27, 1997 Valve and Sierra entered into a Software Publishing Agreement (the "4/27/97 Agreement") for the development of computer software games, including a game that was eventually called Half-Life.  A copy of the 4/27/97 Agreement is attached hereto as Exhibit A.  Although VUG did not execute the 4/27/97 Agreement, VUG participated in the negotiations over that Agreement and, as Sierra's "affiliate," shares in the same rights and obligations as Sierra under the terms of the 4/27/97 Agreement.

71.     Under the 4/27/97 Agreement, Sierra and VUG owned all rights, including intellectual property rights (except for certain limited, defined Valve Underlying Technology) to Half-Life.  4/27/97 Agreement at § 2.4.  The 4/27/97 Agreement did not limit distribution by Sierra or VUG of Half-Life to any particular channel, type of end user, or medium.

72.     The 4/27/97 Agreement also vested in Sierra and VUG the right to sell all sequels of Half-Life and provided that, if Sierra or VUG determined that they wanted a sequel product, Sierra, VUG and Valve would negotiate in good faith to reach an agreement for Valve's development of such a sequel.  If Valve, Sierra and VUG were unable to reach

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

agreement after 30 days of good faith negotiations, Sierra and VUG were entitled to find another party to develop the sequel.

73.     On September 3, 1997, Valve and Sierra entered into a second Software Publishing Agreement (the "9/3/97 Agreement;" collectively with the 4/23/97 Agreement, the "1997 Agreements").  A copy of the 9/3/97 Agreement is attached hereto as Exhibit B. Once again, although VUG did not execute the 9/3/97 Agreement, VUG participated in the negotiations over that Agreement and, as Sierra's "affiliate," shares in the same rights and obligations as Sierra under the terms of the 9/3/97 Agreement.  The 9/3/97 Agreement required Valve to develop three additional games to be published by Sierra and VUG, including Half-Life 2.  As with the first agreement, the 9/3/97 Agreement granted Sierra and VUG ownership of all rights, including intellectual property rights (except for certain limited, defined Valve Underlying Technology), to these games.  9/3/97 Agreement §2.6. Similarly, the 9/3/97 Agreement did not limit distribution by Sierra or VUG of these games to any particular channel, type of end user, or medium.

74.     On July 24, 1998, Valve and Sierra executed an amendment to the 4/27/97 Agreement (the "1998 Amendment").  VUG did not execute this contract but, as an "affiliate" of Sierra under the 4/27/97 Agreement, shares in the same rights and obligations under the 1998 Amendment as Sierra.  Among other changes, the 1998 Amendment changes the name of the game to be developed to Half-Life, doubles the royalty fees for Licensing Revenue from 25% to 50%, decreases the royalty fees for Net Revenues from 27% to 25%, and extends the development schedule for Half-Life by nine months.   A copy of the 1998 Amendment is attached hereto as Exhibit C.

**B.     Valve's Breaches Of The Existing Agreements And Counterclaim Defendants' Extortionate Threats To Negotiate New Terms.**

75.     Counterclaim Defendant Newell formed Valve in 1996 after working for 13 years in various positions at Microsoft.  At the time of the execution of the 4/27/97 Agreement, neither Valve nor Newell had ever published a computer game.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 11 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

76.     Despite Counterclaim Defendants' inexperience, Sierra and VUG undertook in the 4/27/97 Agreement to manufacture, promote, and distribute a computer game later denominated Half-Life.  Sierra and VUG agreed to pay Valve $800,000 in advance royalty payments for the development of this game and, ultimately pursuant to the 1998 Amendment, 25% of net revenue and 50% of licensing revenue in royalty payments for Half-Life.

77.     Slightly more than two months later, Sierra and Valve entered into the 9/3/97 Agreement.  This agreement required Valve to develop three additional games, including Half-Life 2 and two other games (then denominated as Prospero and Prospero 2), and to deliver the games to Sierra for publication according to agreed-upon delivery schedules. Sierra and VUG undertook to manufacture, promote, and distribute these games before Valve had completed a single game.  Sierra and VUG agreed to pay $4.5 million in advance royalty payments, as well as 25% royalties on net and licensing revenues for all three games. By undertaking these obligations under the 1997 Agreements to an unproven developer with unproven products, Sierra and VUG incurred substantial risk.  And, Sierra paid Valve in excess of one million dollars in royalty advances to fund development.

78.     Although the 4/27/97 Agreement required Valve to complete Half-Life by December 1997, Valve did not do so.  On July 24, 1998, Valve and Sierra executed the 1998 Amendment which, among other things, permitted Valve to extend its delivery deadlines for Half-Life by nine months.

79.     Following its initial release as a personal computer game in November 1998, Half-Life was an enormous success.  Half-Life won numerous awards and quickly became one of the best-selling computer software games to date.  Among other reasons for its success, Half-Life was the first game of its kind to allow multiple gamers to play together over the Internet.  This "multi-player functionality" contributed to the formation of a worldwide community of devoted Half-Life fans who eagerly await the long-promised Half-Life 2 sequel, even today.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 12 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

80.     By 1999, in an attempt to leverage their sudden success, Valve and Counterclaim Defendant Newell began to demand that Sierra and VUG relinquish their rights under the 1997 Agreements.

81.     In or about September 2000, just as Valve was nearing completion of two games under development for Sierra and VUG called Counterstrike and Gunman Chronicles, Counterclaim Defendants threatened to indefinitely delay the release of Counterstrike, Gunman Chronicles and Half-Life 2 by diverting resources from these games to the development of games for other publishers.

82.     For example, Newell told Mark Hood in September 2000 that Valve would not sign an interim agreement for the shipping of that year's products until Sierra made concessions under the 1997 Agreements.   Similarly, on October 25, 2000, Newell told David Williamson that Counterstrike would not ship without a new software publishing agreement.  Newell made similar statements at about this time to Hubert Joly, Jim Veevaert and David Grenewetzki, as well.

83.     On November 1, 2000, Valve employee Erik Johnson wrote to Sierra's Jim Veevaert that Counterstrike had been completed and would be delivered to Sierra that evening, copying Newell on the email.  Newell immediately responded, saying that he was stopping delivery of the game until disputes over the proposed new agreement were resolved.  Although Counterclaim Defendants later agreed to piecemeal, interim agreements for the shipment of Counterstrike and Gunman through November, they would not agree to permit the shipment of these products through the holiday season until Sierra and VUG finally agreed to an increase in royalty rates for Valve.

84.     In making these threats, Valve breached various obligations under the 1997 Agreements.  For example, by threatening to discontinue work on Counterstrike, Gunman Chronicles and Half-Life 2, Valve breached its obligation under Section 2.1 of the 9/3/97 Agreement to deliver three games to Sierra according to agreed-upon delivery schedules. By threatening to shop games to other publishers, Valve also breached its obligation under

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 13 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Section 2.2 to give Sierra and VUG the option of making new concepts a product under the agreement.  In addition, Valve violated its obligation under Section 2.3 to refrain from commencing development of any concept or product for its own account or for a third party until Valve had the first three products encompassed by the 9/3/97 Agreement under development.

85.     By this time, Sierra had waited more than two years and expended considerable resources on the development and marketing of Half-Life, Counterstrike, Gunman and Half-Life 2.  Concerned that Counterclaim Defendants could effectively vitiate the benefits of the 1997 Agreements by carrying through on their threats to divert resources to the development of games for other publishers, Sierra found itself with little choice but to acquiesce in Counterclaim Defendants' demands to renegotiate the parties' business relationship.

**C.     Valve's Fraudulent Misrepresentations, Fraudulent Concealment And False Promises To Win New Terms.**

86.     During the parties' negotiations for a new agreement, Counterclaim Defendant Newell told Mr. Joly that Valve sought three concessions:  (a) the transfer of intellectual property rights to all games, as this issue was emotionally important to Newell; (b) higher royalty rates for Valve; and (c) transfer of the ancillary right to distribute the games in non-retail channels, such as direct download over the Internet.  Newell represented that Valve was principally interested in obtaining the intellectual property rights to its games.

**1.     Valve's Concealment And Misrepresentations Regarding Its Intended Online Distribution Technology And Strategy (Later Called Steam).**

87.     During the parties' negotiations over the new agreement, Counterclaim Defendants repeatedly and falsely assured Sierra and VUG that retail sales would remain "the key to [their] strategy."  In September 2000, for example, Newell told Hubert Joly, then

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 14 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

VUG's CEO, that "online is a way to nurture the retail business" and that he "could not understand how one can make money online today."

88.     Sierra and VUG would later learn that these statements were flatly false.  One of the innovations of the Valve games was that they contain a matchmaking function developed on the basis of software licensed from a third party that allows purchasers to play the games with others over the Internet.   In order to do so, however, players were required to host a common version of the game on their computers.  Due to this requirement, at times sizeable patches or updates were required to be downloaded off the Internet, and this process at times could be cumbersome and slow.  At the time of the negotiations, however, Valve was developing and since has completed a technology that it calls "Steam" which Valve states solves this problem.

89.     In addition, Valve has announced that Steam will enable consumers to purchase games directly over the Internet without downloading an extremely large file comprising the entire software product prior to play.  Steam will allow consumers who would normally purchase games from Sierra and VUG at retail to purchase those products online directly from Valve.  The new technology will enable consumers to download games a portion at a time as needed without waiting for the whole game to download.  If Steam works as stated by Valve, it will have a material adverse impact on Sierra's and VUG's "Retail Channel" publishing rights under the 2001 Agreement.

90.     Given the technological complexity of Steam, the announcement by Valve of the completion of Steam during early 2002, and an announcement by Speakeasy that Valve had approached Speakeasy about Steam a year prior to its release in March 2002, it is apparent that Valve was working on the Steam distribution technology long prior to the time the March 2001 Agreement was signed.  Yet, during the negotiations for the Agreement, Valve never disclosed its efforts to develop Steam or its intention to broadly exploit worldwide direct download distribution rights with respect to Half-Life 2 or other games.  To the contrary, Counterclaim Defendant Newell affirmatively represented to Mr. Joly in

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 15 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

September 2000 that retail marketing remained "the key to [their] strategy" and that "online is a way to nurture the retail business." Incredibly, Counterclaim Defendant Newell also stated that he "could not understand how one can make money online today," plainly with the intention to falsely imply that Valve had no present or future strategy to engage in widespread online distribution of the games. This misleading half-truth was Newell's deliberate concealment of the extent to which Valve intended through the parties' negotiations to appropriate the substantial value of the distribution rights to Valve, rather than to Sierra and VUG .

91.     Similarly, in mid-January 2001, Counterclaim Defendant Lynch stated to Suki Hayre of Sierra that the population of online gamers was just 3 million and that "only a fraction of them will be downloading Half-Life 2." This statement confirmed Sierra's and VUG's  understanding, acquired from Valve during the negotiations, that Valve did not intend to exploit online download rights in any material manner.

92.     Any substantial threat to the value of Sierra's and VUG's exclusive retail publication rights was material to the 2001 Agreement. Had Sierra or VUG known about Valve's development of the new Steam distribution technology, they would have realized that their retail distribution rights were in serious jeopardy. Because of Valve's misrepresentations and concealment, however, Sierra and VUG actually and justifiably relied on Valve in believing that by changing the scope of its distribution rights to permit online distribution by Valve, there would be no significant impact to its retail distribution rights. Sierra and VUG therefore agreed to relinquish valuable rights that they owned under the 1997 and 1998 Agreements to Valve pursuant to the 2001 Agreement, including intellectual property ownership as well as certain rights to the online distribution of Half-Life 2 and other Valve games.

93.     Valve continued to conceal its development of the Steam online distribution technology even after the execution of the 2001 Agreement, in order to win additional concessions from Sierra and VUG. For example, under the 2001 Agreement, Sierra and

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

VUG had the right to acquire an unspecified "Game 3" in addition to Team Fortress 2 and Half-Life 2. In or about April 2001, Sierra and VUG began discussions with Valve regarding two sequels to Counterstrike, one known as Counterstrike 2, and the other as Counterstrike: Condition Zero ("CSCZ"). Sierra and VUG attempted to acquire the right to publish CSCZ by separate agreement. When Valve demanded unreasonable terms and threatened to take the game to another publisher, Sierra and VUG exercised their option under the 2001 Agreement to accept CSCZ as Game 3 under the 2001 Agreement. Under the terms of the 2001 Agreement, Game 3 was to be subject to revenue protection for Valve's non-retail distribution of the game. Sierra and VUG waived these protections under false assurances by Counterclaim Defendants Lynch and Newell to Sierra in-house counsel Eric Roeder that Valve had no plans to release a non-retail version of CSCZ, and that waiver of the revenue protection provisions therefore would not affect materially affect the agreement. Valve did not disclose its development of Steam or the significant effect that that technology could have on Sierra's and VUG's retail revenue when making these assurances.

94.     In January 2002, after numerous further delays in the release of Half-Life 2, Sierra and VUG asked Valve directly whether it intended to exploit direct download opportunities. In response to these questions, Douglas Lombardi, Valve's Director of Marketing, falsely stated to Lee Rossini, a Director of Marketing for VUG, that Valve "[didn't] have anything going" in this regard. That this statement was false, and a further deliberate attempt to conceal Valve's intentions, is amply demonstrated by the fact that just two months later, Valve announced the release of Steam as well as at least one already-completed business deal with another company to distribute content using the Steam distribution network.

95.     Thus, it was not until March 2002, nearly a year after the 2001 Agreement was signed, that Valve finally came clean regarding its plans. Newell announced the new Steam technology in a Game Developers' Conference in San Jose. During that conference,

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims (CV02-01683)*
*-Page 17 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Newell acknowledged that with Steam, Valve "can market and have direct communication with customers, sales and distribution, and have customer service and support. . . . You only download what you need and when you need it. It's faster and cheaper than CDs and lastly, no more patches." He also stated that "for those eagerly awaiting Counter-Strike: Condition Zero, that game will be available simultaneously via Steam and retail outlets." Newell also gave interviews to online game news sites such as Shacknews specifically identifying the release of Steam as a threat to retail publishers.

### 2. Valve Falsely Represents That Half-Life 2 And CSCZ Are Near Completion.

96. Counterclaim Defendants made several other false representations during the course of their successful efforts to fraudulently induce Sierra and VUG to enter into the 2001 Agreement. In particular, Counterclaim Defendants falsely represented that Half-Life 2 and CSCZ were in the final stages of development and soon would be ready for release.

97. In a meeting with Mr. Joly in mid-February 2001, for example, Newell represented that Half-Life 2 could be released *that year* "depending on a number of choices." Consistent with Valve's representations regarding the status of Half Life 2, during the negotiations, Valve, Sierra and VUG exchanged projected royalties for the Half-Life 2 game over the 2001 through 2003 period. Counterclaim Defendants adopted this time period for their own royalty projections for Half-Life 2 and never corrected the time period assumption supplied by Sierra and VUG that the game would be on the market and earning royalties in 2001. Because Half Life 2 *has yet to be delivered*, and given all of the work that Valve performed on Steam in the interim, in retrospect, it has become clear that Counterclaim Defendants either deliberately misrepresented, or made statements without any reasonable basis for believing them to be true, regarding the status of the development and anticipated delivery date of Half-Life 2.

98. Similarly, as a further inducement to entering into the new agreement, in March 2001, Counterclaim Defendant Lynch represented to Mr. Joly that CSCZ could be

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims (CV02-01683)*
*-Page 18 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

included as a product under the 2001 Agreement.  Mr. Lynch also represented that given its current status of development, CSCZ would be ready for release on October 31, 2001.  That game was later included as part of the 2001 Agreement as Game 3 pursuant to Addendum 3, signed on December 28, 2001.  While Sierra and VUG certainly knew that the game had not yet been delivered by that date, it also relied on Valve's statements in believing that the game would shortly be ready for publication.  Like Half-Life 2, however, CSCZ proved to be far from delivery.  As discussed in further detail below, Valve did not deliver until October *2003* a seriously flawed build of this game to Sierra as a candidate for Final Milestone under the Agreement.  Again, given Valve's diversion of resources to Steam and its now apparent desire to include Steam within the retail version of CSCZ, which it knew it was undertaking at the time, Mr. Lynch either deliberately misrepresented or had no reasonable basis for making statements regarding the development status and likely delivery dates of CSCZ.

99.     In the end, given Newell's extortionate demands and constant threats to breach the existing Agreements, as well as his and his negotiating team's false promises, false statements, and fraudulent concealment, Sierra and VUG buckled and entered into the 2001 Agreement.  A copy of the 2001 Agreement is attached hereto as Exhibit D.

### D.     The 2001 Agreement.

100.    Although Sierra and VUG relinquished certain intellectual property rights in Valve games under the 2001 Agreement, they retained global rights to manufacture, reproduce, use, distribute, rent, lease and license certain computer games.  The 2001 Agreement, which by its terms is governed by Washington law, broadly grants Sierra and VUG:

> a worldwide, perpetual license to manufacture or cause to be manufactured, reproduce or cause to be reproduced, use, distribute (directly or indirectly), or have distributed, market, advertise, publicly display and perform in connection with such marketing and advertising, rent, lease and license . . . [various games] and Foreign Translations thereof (developed by or for

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Valve) in object code form on an exclusive basis (even as to Valve and its Affiliates . . . ) as Retail Packaged Product.  (2001 Agreement §3.1.4)

101.    With respect to the "Half-Life" game, the Agreement provides that

Sierra shall retain the exclusive (even as to Valve, except for bundles as described in Section 3.1.2) worldwide, license to reproduce, use, distribute (directly or indirectly), and license Retail Packaged Product versions of Half-Life in object code form . . . .  (2001 Agreement §3.1.1)

102.    Under the Agreement,  Sierra and VUG have the right to reproduce, use, distribute, or license Valve-developed games "as Retail Packaged Products."  The Agreement defines a Retail Packaged Product as:

a version of a Product, Add-On Product, Foreign Translation or Platform Extension that: (a) is distributed on only tangible media (e.g. on a CD-ROM); (b) includes as part of the purchase price, the right to receive Sierra product support for a limited period of time (however, Valve and Sierra may mutually agree to include applications thereon which are not so supported); (c) is distributed in packaging of the type typical of game software in the Retail Channel; and (d) is distributed in the Retail Channel.  (2001 Agreement §1)

103.    The incorporated definition of Retail Channel also is very broad:

"brick and mortar" retail outlets; Internet retailers that carry any of electronics, software, games, toys and/or gifts, Internet auction sites; and all other channels now or during the term hereof commonly referred to in the retail trade as 'retail outlets' and distributors and resellers to such "retail outlets."  (*Id.*)

The term "retail outlets" is not defined in the 2001 Agreement.

104.    Valve explicitly agreed in the 2001 Agreement to "use diligent efforts to continuously develop [Half-Life 2, Team Fortress 2 and a third game, later determined to be CSCZ] to completion."  2001 Agreement §§2.1-2.3 & Addendum 3.  These same provisions also require Valve to inform Sierra and VUG of its development schedules for these games upon Sierra's and VUG's request.  *Id.*

105.    The 2001 Agreement imposes good faith obligations on both parties, including the duty not to engage in conduct that would harm the other entity's good will and/or reputation.  In addition, the 2001 Agreement prohibits Valve from:

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

conduct[ing] any business or arrangement directly or indirectly through any Affiliate (by way of license, sublicense, transfer pricing, distribution or otherwise) that results in such party avoiding, bypassing or otherwise altering the intent or terms or conditions of this [2001 Agreement]. (2001 Agreement §9.11)

106.    Under the 2001 Agreement, Valve bore the responsibility for performing quality assurance and other error testing on the games governed by the agreement.  2001 Agreement §2.6.

107.    The 2001 Agreement also requires Valve to translate games into various foreign languages and to provide Sierra and VUG with sufficient source code to enable Sierra and VUG to "localize" the games.  2001 Agreement §2.7.

**E.    Valve's Ongoing Breaches Of Virtually Every Provision Of The 2001 Agreement.**

**1.    Counterclaim Defendants Delayed The Development And Release of Half-Life 2 And CSCZ In Order To Ensure Distribution Over Steam.**

108.    Due to the success of Half-Life and the international following that that game has inspired, Sierra's and VUG's right to distribute the Half-Life 2 sequel represents the crown jewel of both the 9/3/97 Agreement and, later, the 2001 Agreement.  As discussed above, during the parties' negotiations over the 2001 Agreement, Counterclaim Defendants represented that Half-Life 2 was near completion.

109.    Pursuant to the terms of the 2001 Agreement and Addendum 3, Valve had the obligation to use diligent efforts to continuously develop Half-Life 2, Team Fortress 2 and CSCZ to completion.  Although Valve initially indicated that Half-Life 2 would be ready for release in May 2001, it has continually delayed the release date over the course of the 2001 Agreement.  In two occasions prior to July 2003, Valve showed Sierra and VUG a limited, scripted demonstration of Half-Life 2.  Valve represented each time that the game would be ready for release later that year.  Nevertheless, nearly three years after the signing of the 2001 Agreement, Valve has yet to complete Half-Life 2.  In fact, until just a couple of months ago, Valve had failed to provide builds of *any* of the games encompassed by the 2001 Agreement.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 21 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

110.     Similarly, consistent with industry practice, the 2001 Agreement requires Valve to provide a current development schedule for games covered by the agreement upon Sierra's and VUG's request.  Development schedules, in the custom and usage of the computer game and software development industry, require the identification of a specific set of milestones, progress to date on each milestone, and expected dates of completion for each of those milestones.  Valve has consistently refused to provide development schedules to Sierra or VUG upon request, including schedules for Half-Life 2, thereby making it nearly impossible for Sierra and VUG properly and efficiently to plan for the marketing and promotion of these games.

111.     Since Newell's announcement of Steam in March 2002, it has become apparent that Valve delayed the development of CSCZ and Half-Life 2, and diverted resources to Steam throughout the period of development of those two games, so as to ensure the sale and distribution of CSCZ and Half-Life 2 through Steam.  Newell secretly decided that Valve would use Sierra and VUG as the agent to get the Steam code into the hands of consumers, thus using Sierra and VUG , without their knowledge or permission, as an agent of their own destruction to allow Valve to compete with their own distribution channels.  Indeed, Newell has even announced that he intends to strike Steam deals (and may already have done so) as a distribution mechanism *for other game publishers*.  Thus, Valve seeks to use Sierra's and VUG's retail distribution capabilities to force them to put Steam code into the hands of consumers that may also then be used by Sierra's and VUG's *retail publisher competitors*.

112.     In order to do this, Valve linked the development of Steam with the development of CSCZ.   Specifically, Valve has embedded the Steam technology in CSCZ so that Steam will be distributed and installed on Sierra's retail consumers' computers with CSCZ.  Once installed with CSCZ, Steam will allow Valve to bypass Sierra's and VUG's retail distribution network entirely, thereby diverting much of the financial benefit of the 2001 Agreement away from Sierra and VUG.  By delaying completion of Half-Life 2 until

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 22 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

after the release of the Steam-carrying CSCZ, Valve hopes to siphon much of the retail revenues from the highly-anticipated release of Half-Life 2.

### 2.   Valve Breaches The 2001 Agreement And Addendum 3.

113.   On March 9, 2001, shortly before the parties signed the 2001 Agreement, Counterclaim Defendant Lynch represented to Mr. Joly that Valve was developing CSCZ and that the game would be ready for release on October 31, 2001.  Counterclaim Defendant Lynch suggested to Mr. Joly that the game could be designated as the unspecified "Game 3" that Valve was obligated to develop and deliver under the 2001 Agreement.

114.   After the 2001 Agreement was executed, however, Counterclaim Defendants attempted to get Sierra and VUG to waive certain revenue protection rights for CSCZ that would otherwise apply under the terms of the 2001 Agreement, by threatening to give the game to other publishers.  As discussed above, Sierra and VUG instead took the position that they would treat CSCZ as Game 3 under the Agreement, in accordance with the terms thereof.  Valve nevertheless refused to deliver the game under those terms.  Once again, Sierra and VUG had little choice but to acquiesce.

115.   CSCZ finally became Game 3 of the 2001 Agreement through the execution of Addendum 3 on December 28, 2001.  Section 4 of Addendum 3 waives the revenue protection provisions of the 2001 Agreement for CSCZ.  Notwithstanding this waiver, Addendum 3 and the 2001 Agreement imposed several obligations upon Valve, including the obligation to use diligent efforts to continuously develop CSCZ to completion.

116.   Although Valve originally promised that CSCZ would be completed by October 31, 2001, a release candidate was not delivered until two years later.  Sierra and VUG repeatedly requested detailed development schedules—in accordance with the 2001 Agreement and industry practice—but were continuously rebuffed.  In addition, Valve delegated to other companies, such as Ritual and Turtle Rock, its obligation to develop the CSCZ.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 23 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

117.    On April 14, 2003, Sierra and VUG gave Valve formal written notice pursuant to Section 3.13 of the 2001 Agreement that Valve had breached its obligations to use diligent efforts to develop CSCZ to completion and to honor Sierra's and VUG's requests for current development schedules.  Valve did not cure this deficiency within 30 days of this notice (and, in fact, has failed to cure the deficiency to date).  Accordingly, Sierra and VUG are, among other things, entitled to a fourth game with Add-On Products and other rights under the 2001 Agreement, pursuant to the provisions of Section 3.13.

118.    On October 29, 2003, Valve finally delivered a build of CSCZ to Sierra. However, Sierra's initial testing revealed that after delaying delivery of CSCZ for two years, Valve had provided a product riddled with bugs.  Sierra's limited initial testing of this build revealed 81 "bugs," at least 15 of which were "must fixes," *i.e.* serious enough to prevent shipping of the product.  Consequently, over the course of the following months, Sierra and VUG were forced to expend hundreds of hours performing the quality assurance testing that Valve was required to do under the terms of the 2001 Agreement.  Rather than remedy the problems that this testing revealed, Valve has taken the position that as of November 13, CSCZ is "done" and that it is not required to fix the dozens of bugs that remain in the North American version of the product.

119.    Valve has also refused to allow Sierra or VUG to test the multi-player functionality of CSCZ over the Internet, in a real-world environment, as consumers would play it.  Sierra and VUG are aware of numerous problems in the past with the Steam network that cause them to question whether this functionality will work as expected by consumers.  For example, the release of the new Steam technology has burdened Sierra's resources and harmed its reputation.  Among other problems, because Valve has refused to provide telephone support for Steam, Sierra's and VUG's customer service lines have been inundated with phone calls and emails from consumers with various Steam-related issues. On November 26, 2003, for example, the VUG customer support group received dozens of

*Sierra's & VUG's Answer, Affirmative Defenses &
Counterclaims  (CV02-01683)*
*-Page 24 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

telephone calls and dozens of emails in a single day when Valve's Steam authentication servers went down.

120.    Similarly, on September 20, 2001, Valve posted a new "patch" to Half-Life over Steam without properly testing it.  By posting patches over Steam, consumers' Half Life games are automatically updated as soon as they log on to an on-line server to play the game over the Internet.  As a result, and due in part to Valve's refusal to provide sufficient bandwidth as required by the 2001 Agreement, a high percentage of customers' computers crash.  On September 21, Sierra's customer service department received approximately 150 email complaints within 2 hours of Valve's posting of the patch to the site.

121.    Sierra is also informed and believes that in mid-January 2003, a gaming tournament was canceled, in part due to Steam technical problems.

122.    Given these problems, Sierra and VUG have repeatedly requested that they be allowed to test the multi-player functionality of CSCZ over the Internet in a real world environment.  Valve has flatly refused this request.

123.    Valve has also failed to cooperate with the development of adequate localizations of CSCZ for release of the game in Germany, France, Italy, Spain, Korea and China.  Rather than responding promptly to the numerous bugs and other problems that Sierra and VUG discovered in these localizations, Valve insisted that Sierra and VUG release the U.S. version of the game prior to other localized versions—despite the negative effect that a staged release would have on international sales (due to piracy) and the parties' agreement, reached months prior to the October delivery, that the game would be shipped simultaneously worldwide.

124.    Also with respect to CSCZ, Valve has failed to ensure that CSCZ conforms with the agreed-upon October 26, 2001 Game Design Document that was incorporated as Exhibit B to Addenda 3 of the 2001 Agreement.  Specifically, contrary to the terms of the Game Design Document, CSCZ does not allow for 75 total scenarios, provides only limited

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 25 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

cooperative play, does not include 25 new maps playable in both single and multi-player modes, and does not include at least 8 new weapons and items.

125.   With respect to Half-Life 2, in about September 2003, Valve entered into an agreement with a company called ATI permitting ATI to distribute coupons for Half-Life 2 games to consumers who purchase ATI graphics cards.  This agreement violates numerous provisions of the 2001 Agreement, including Valve's obligation to refrain from selling Half-Life 2 prior to its release by Sierra and VUG.

126.   In addition to these breaches, Valve has failed to continuously develop Team Fortress 2 as required by the 2001 Agreement and has refused, despite numerous demands, to provide development schedules for that product.  In fact, Valve has yet to demonstrate to Sierra or VUG *any* portion of a Team Fortress 2 game or to provide any development schedules.  Sierra and VUG therefore believe that Valve has done little, if any, work on this game.

127.   Valve has also refused to cooperate with Sierra and VUG regarding Valve's marketing and promotional plans.

**F.    Valve's Security Breaches.**

128.   In October 2003, it was widely reported in the press that a hacker had stolen the source code for the yet-to-be-released Half-Life 2, CSCZ, CounterStrike 2, and Team Fortress 2.  As a result of the theft of the source code, pirated copies of Half-Life 2 and CSCZ are now being sold throughout the world.  Valve has postponed the release of Half-Life 2 yet again, purportedly due to the theft.

129.   Valve also refuses to provide Sierra and VUG with assurances regarding the security of Half-Life 2 and Valve's other products.  Upon information and belief, a security consulting firm called PivX reported that it had discovered the security vulnerabilities in the Half-Life game code and contacted Valve on April 14, 2003, regarding these lapses. Valve informed PivX that it was working to develop a patch.  However, after a delay of 100 days without the production of a patch, PivX released a free fix for the problem.  In a public

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

release, PivX has claimed that the Half-Life bugs affect both clients and servers, so everyone that plays or serves Half-Life is vulnerable.

130.    Given these problems, Sierra and VUG have repeatedly requested that Valve provide reasonable assurances that Half-Life 2 is not a security threat to consumers.  Valve has failed and refused to provide such assurances.

**G.    Valve's Infringement Of Sierra's and VUG's Retained Rights In Half-Life.**

131.    Sierra and VUG obtained all intellectual property rights to the Valve games encompassed by the 1997 Agreements.  Sierra and VUG relinquished many of these rights in the 2001 Agreement in the face of Valve's extortionate threats premised upon express repudiations of the parties' existing agreements, and in reliance on Valve's fraudulent misrepresentations.

132.    Sierra and VUG nevertheless retained certain intellectual property rights in Half-Life under the 2001 Agreement.  Specifically, Section 3.1.1 of the 2001 Agreement provides that notwithstanding the transfer of ownership of intellectual property embodied in Half-Life to Valve, "Sierra shall retain the exclusive (even as to Valve, except for bundles as described in Section 3.1.2) worldwide, license to reproduce, use, distribute (directly or indirectly), and license Retail Packaged Product versions of Half-Life in object code form . . . ."

133.    Beginning at a date unknown to Sierra or VUG but sometime within the past two years, Valve began to reproduce, use, distribute and/or license Half-Life to consumers through Steam.  This conduct exceeds the scope of Valve's license (which, according to the foregoing language, gives Sierra and VUG the exclusive worldwide license to reproduce and distribute the game in object code form) and violates Section 3.11 of the 2001 Agreement.

**H.    Valve's Continuing Extortionate And Fraudulent Conduct After The 2001 Agreement.**

134.    Even after signing the 2001 Agreement, Valve continues to use threats to extract concessions from Sierra and VUG.  For example, in or about May of 2001, during

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 27 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

the parties' negotiations over Addenda to the 2001 Agreement and in accordance with Counterclaim Defendant Lynch's suggestion on March 9, Sierra and VUG proposed to designate CSCZ as the as yet unspecified "Game 3" under the 2001 Agreement. Counterclaim Defendant Newell responded by demanding that Sierra and VUG make multimillion dollar advance payments for the game and agree to waive the revenue protection provisions that would otherwise apply to CSCZ under the 2001 Agreement. Despite the fact that Valve was obligated to provide CSCZ to Sierra and VUG, Valve threatened to seek another publisher for CSCZ if Sierra and VUG did not accede to these demands.

135.    Similarly, on February 5, 2003, in a meeting between Sierra, VUG and Valve, Counterclaim Defendant Newell demanded that unless Sierra and VUG paid millions of dollars in cash advances not contemplated by the 2001 Agreement, Valve would divert resources away from Half-Life 2 to the development of Counterstrike 2 for another publisher, thus repudiating Valve's obligations to continuously develop Half Life 2.

136.    Finally, on about October 9, 2003, after the theft of the source code for the yet-to-be-released Half-Life 2, CSCZ, CounterStrike 2, and Team Fortress 2 had been widely reported in the press, Counterclaim Defendant Newell stated to the press that CSCZ was completed, or "gold," and would be "available via Steam and at retail on November 18th." Counterclaim Defendant Newell made this statement knowing that Valve had not yet delivered a release-candidate version ("Final Milestone") of CSCZ to Sierra or VUG, that Section 4 of the 2001 Agreement permits Sierra and VUG a six-month period of exclusive rights after the delivery of a Final Milestone within which to appropriately time the commercial release of products to the market, that Sierra and VUG had planned a worldwide simultaneous release of CSCZ that was impossible within this time frame even if a Final Milestone had been delivered, and that Section 3.11 of the 2001 Agreement prohibits Valve from releasing any product until Sierra and VUG have released it into the retail channel. When questioned by Sierra and VUG about these statements, Counterclaim Defendant

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Lombardi wrote to Adam Fossa acknowledging that these statements were knowingly false and explaining that Counterclaim Defendant Newell "was simply trying to get the attention off the leak and onto [CS]CZ."  By publicly announcing that CSCZ was "gold" and ready for release when in fact it was not, Counterclaim Defendants were once again attempting to coerce Sierra and VUG into relinquishing its rights under the parties' agreements—namely, to determine the timing of the release of this product.

    **I.**    **Valve Knew Of And Condoned The Sale, Licensing And Distribution Of The Valve Games By Sierra and VUG To Cyber-Cafés.**

137.    Although cyber-cafés vary greatly, a common feature is that all rent computer time and software access on an hourly or pay-per-play basis.  Most, if not all, cyber-cafés with which Sierra, VUG and their affiliates distribute Valve Games sell some sort of product, including computer software or games and/or food and drink.  Additionally, given modern security measures, many cyber-cafés rent games to customers by having them "check out" a CD containing the game, which the customer then loads onto the computer.

138.    Since the execution of the 4/27/97 Agreement, Sierra and VUG have actively licensed Valve Games, including Half-Life and Counterstrike, to cyber-cafés.  Cyber-cafés are the principal source of revenue for Valve Games in the Asian-Pacific and Eastern European regions, and a lesser source of revenue in the United States and Western Europe.

139.    Consistent with its activities under the prior agreements and the language of the 2001 Agreement, Sierra and VUG have continued to distribute and license multiple Valve games (including, *inter alia*, Half-Life, Half-Life Opposing Force, Half-Life Blue Shift and Counterstrike) to cyber-cafés in multiple countries (including, *inter alia*, France, Germany, Italy, the United Kingdom, Malaysia, the Philippines, and Australia).

140.    Valve has always known of these cyber-café distributions—and has always accepted royalty payments for them.  After the parties amended the 4/27/97 Agreement in July of 1998 to provide that a category of revenues called Licensing Revenues would arise only from third-party licensing deals in which VUG was not the publisher and had not

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

funded marketing and distribution costs, Sierra and VUG submitted royalty reports to Valve under which revenues from cyber-café distributions were delineated as Net Revenues rather than Licensing Revenues.  Upon receipt of those reports, Valve objected—not to the cyber-café distribution, but rather based on its belief that cyber-café licensing revenue was Licensing Revenue and not Net Revenue.  After the 2001 Agreement, Sierra and VUG continued to submit such reports, and Valve continued to accept royalty payments for cyber-café distribution.  It was not until after Valve released Steam and began to see cyber-cafés as an excellent proving ground for Steam that Valve began to complain about Sierra's and VUG's exploitation of its cyber-café rights under the 2001 Agreement.

### FIRST CAUSE OF ACTION
### (Fraudulent Misrepresentation Against All Counterclaim Defendants)

141.    Paragraphs 1 through 140 are hereby incorporated by reference.

142.    In 2000, Valve threatened to halt development of Half-Life 2 unless Sierra and VUG relinquished some of their rights under the 1997 Agreement.  During the parties' negotiations concerning the 2001 Agreement, Counterclaim Defendants repeatedly and falsely assured Sierra and VUG that retail sales would remain "the key to their strategy" and that Valve did not plan to engage in anything other than *de minimis* distribution of games online.

143.    For example, in September 2000, Counterclaim Defendant Newell told Mr. Joly that "online is a way to nurture the retail business."  In mid-January 2001, Counterclaim Defendant Lynch represented to Sierra and VUG that the population of on-line gamers was just 3 million and that "only a fraction of them will be downloading Half-Life 2."  In late April 2001, when the parties were negotiating Addendum 2 to the 2001 Agreement, Counterclaim Defendants Lynch and Newell falsely told Sierra in-house counsel Eric Roeder that Valve had no plans to release a non-retail version of CSCZ.  Similarly, in July 2001, Counterclaim Defendant Lynch told William Dugan that electronic distribution of

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 30 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

CSCZ "should not have a material effect on retail sales."   In January 2002, after numerous delays in the release of Half-Life 2, Sierra and VUG asked Valve directly whether it intended to exploit direct download opportunities.  In response to these questions, Douglas Lombardi falsely represented to Sierra and VUG that Valve "[didn't] have anything going." All of these representations were false.

144.     Similarly, during the parties' negotiations over the 2001 Agreement, Counterclaim Defendants also falsely represented that Half-Life 2 and CSCZ were near completion.  In a meeting with Mr. Joly in mid-February 2001, for example, Counterclaim Defendant Newell represented that Half-Life 2 could be released *that year*, "depending on a number of choices."  In addition, Valve exchanged spreadsheets with Sierra and VUG projecting royalties for the sale of the Half-Life 2 game during the 2001 through 2003 period.  On March 9, 2001, Counterclaim Defendant Lynch represented to Mr. Joly that Valve was developing CSCZ, that the game could be added to the new agreement, and that it would be ready for release on October 31, 2001.  Neither Half-Life 2 nor CSCZ were near completion at the time these statements were made.  In fact, nearly three years after the execution of the 2001 Agreement, Valve has yet to deliver a build of Half-Life 2.

145.     Sierra and VUG did not know that Counterclaim Defendants' misrepresentations were false.

146.     The status of the development of Half-Life 2 and CSCZ and Valve's development of Steam were material facts to the 2001 Agreement.  Had Sierra or VUG known of the true status of the development of these games or that Valve was developing a technology that would steal revenue from sales in the Retail Channel, Sierra and VUG would not have agreed to relinquish its rights under the 1997 Agreements.

147.     Counterclaim Defendants either knew that Half-Life 2 and CSCZ were not near completion at the time of the 2001 Agreement or knew that they had an insufficient basis for their representations regarding the status of development of Half-Life 2.  Similarly, Counterclaim Defendants either knew that Valve was developing Steam during the

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

negotiations for the 2001 Agreement and in January 2002, or knew that they had insufficient knowledge to support their statements that Valve did not plan to engage in anything other than *de minimis* distribution of games online.  In making all of these representations, Counterclaim Defendants intended to induce Sierra's and VUG's reliance to enter into the 2001 Agreement and the Addenda thereto.

148.    Sierra and VUG did, in fact, rely on the Counterclaim Defendants' misrepresentations in entering into the 2001 Agreement and its Addenda.  Sierra's and VUG's reliance on Valve's affirmative misrepresentations of fact was justifiable.

149.    As a consequence of Counterclaim Defendants' misrepresentations, Sierra and VUG have suffered and will suffer significant injury.


### SECOND CAUSE OF ACTION
### (Promissory Fraud Against All Counterclaim Defendants)

150.    Paragraphs 1 through 149 are hereby incorporated by reference.

151.    In negotiating and entering into the 2001 Agreement, Counterclaim Defendants represented that they would use diligent efforts to continuously develop Half-Life 2 and other games governed by that contract to completion.

152.    Counterclaim Defendants made these representations without any intention of doing so.  For example, although Half-Life 2 was originally scheduled for release in 2001, Valve has yet to complete this game.  Instead, Counterclaim Defendants secretly and intentionally delayed the development of Half-Life 2 until Steam could be completed.  In addition, although Counterclaim Defendants represented that CSCZ would be complete by October 31, 2001, they did not provide any builds of this game as candidates for a Final Milestone under the Agreement until nearly two years later.

153.    Sierra and VUG did not know that Counterclaim Defendants made these promises without any intention of continuously developing CSCZ and Half-Life 2 for

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 32 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

prompt completion and release, and instead to divert resources to Steam and to intentionally delay the release of these games until Steam could be completed.

154.    Valve's promise to use diligent efforts to continuously develop Half-Life 2 and CSCZ to completion was material to the 2001 Agreement and its Addenda.  Had Sierra or VUG known that Valve did not intend to use diligent efforts to develop Half-Life 2 and CSCZ to completion, Sierra and VUG would not have agreed to relinquish their rights under the 1997 Agreements or to enter into the Addenda to the 2001 Agreement.

155.    Counterclaim Defendants did not intend to use diligent efforts to continuously develop Half-Life 2 and CSCZ to completion and had no reasonable basis for their representations in this regard.   Instead, they intended to delay development of these games at least until the completion of Steam.  In making these false promises, Counterclaim Defendants intended to induce Sierra's and VUG's reliance.

156.    Sierra and VUG did, in fact, rely on the Counterclaim Defendants' misrepresentations in entering into the 2001 Agreement and its Addenda.  Sierra's and VUG's reliance on Valve's promises was justifiable.

157.    As a consequence of Counterclaim Defendants' misrepresentations, Sierra and VUG have suffered and continue to suffer significant injury.

### THIRD CAUSE OF ACTION
#### (Concealment Against All Counterclaim Defendants)

158.    Paragraphs 1 through 157 are hereby incorporated by reference.

159.    In 2000, Valve threatened to halt development of Half-Life 2 unless Sierra and VUG relinquished some of their rights under the 1997 Agreement.  During the parties' discussions over this issue, Newell told VUG's CEO that Valve required three concessions in order to continue development of Half-Life 2:  (a) the transfer of intellectual property rights to all games, as this issue was emotionally important to Counterclaim Defendant Newell; (b) higher royalty rates for Valve; and (c) transfer of the "ancillary right" to

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 33 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

distribute the games in non-retail channels, such as direct download over the Internet. Newell represented that Valve was principally interested in obtaining the intellectual property rights to its games.

160.    During the parties' negotiations over these issues, Sierra and VUG also received assurances from the Counterclaim Defendants that Half-Life 2 was near completion.  In a meeting with Mr. Joly in mid-February 2001, for example, Counterclaim Defendant Newell represented that Half-Life 2 could be released *that year* "depending on a number of choices."  Consistent with these representations, Valve, Sierra and VUG exchanged projected royalties for the Half-Life 2 game for the 2001 through 2003 period.

161.    During this time, Counterclaim Defendants concealed the fact that Valve was already in the process of developing Steam, a new technology that could significantly affect the retail rights retained by Sierra and VUG.  Steam would allow consumers who would normally purchase Half-Life 2 and other games from Sierra and VUG in tangible media form to purchase those products directly from Valve online.

162.    In January 2002, after the 2001 Agreement was signed and after numerous delays in the release of Half-Life 2, Sierra and VUG asked Valve directly whether it intended to exploit direct download opportunities.   In response to these questions, Counterclaim Defendant Lombardi not only failed to reveal Valve's development of Steam, but affirmatively and falsely represented to Lee Rossini, a Director of Marketing for VUG, that it "[didn't] have anything going."

163.    Valve's development and/or plans to develop Steam during the negotiations for the 2001 Agreement was a material fact that was peculiarly within Valve's knowledge and not discoverable by Sierra and VUG with the exercise of ordinary diligence.  Sierra and VUG did not, in fact, discover that Valve had developed Steam until March 2002, when Valve announced the new technology at the San Jose Game Developers' Conference.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 34 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

164.    Had Sierra and VUG known about Valve's intended development of Steam during the negotiations, they would not have entered into the 2001 Agreement or its Addenda.

165.    The status of Valve's development of CSCZ and Half-Life 2 also was a material fact that was peculiarly within Valve's knowledge and not discoverable by Sierra or VUG with the exercise of ordinary diligence.  Had Sierra or VUG known that the games would not be released for another two years, they would not have entered into the 2001 Agreement or its Addenda.

166.    As a consequence of Counterclaim Defendants' concealment, Sierra and VUG have suffered and continues to suffer significant injury.

### FOURTH CAUSE OF ACTION
#### (Business Compulsion Against Valve)

167.    Paragraphs 1 through 166 are hereby incorporated by reference.

168.    Beginning in late 1999 and continuing through the parties' negotiations for the 2001 Agreement, Valve repeatedly threatened to halt or indefinitely delay development of Half-Life 2 and other games unless Sierra and VUG agreed to relinquish many of their rights under the 1997 Agreements.

169.    As the developer of Half-Life, Counterstrike, and other Half-Life sequels, add-ons and modifications, Valve had gained unique knowledge and experience that made it uniquely qualified to develop Half-Life 2.  In making its threats, Valve improperly wielded its power as the developer of a unique product.

170.    By late 2000, Sierra and VUG had expended considerable resources to fund and market the Valve games and believed that any further delay in the development of Half-Life 2 and other games would vitiate the benefits of the 1997 Agreements.  By making its threats, Valve therefore created immediate pressure to enter into the 2001 Agreement.

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 35 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

171.    Under the 2001 Agreement, among other concessions, Sierra and VUG relinquished certain intellectual property rights to Valve games, agreed to pay higher royalties for these games, and agreed to limit its exclusive, undivided distribution rights under the 1997 Agreements to retail distribution rights under the 2001 Agreement.   Had Valve not threatened nonperformance of the 1997 Agreements, Sierra and VUG would not have entered into the 2001 Agreement or its Addenda on those terms.  Therefore, as a result of Valve's business compulsion, Sierra and VUG were forced to incur a serious business loss and was required to make payments to which Valve was not legally entitled.

172.    By entering into the 1997 Agreements, Valve had impliedly or expressly agreed to use diligent and good faith efforts to timely develop Half-Life 2 and other games. By 2000, Sierra and VUG had expended significant resources in marketing Half-Life and other Valve games in reliance on Valve's undertakings.  Sierra and VUG had also refrained from finding a new developer for the Half-Life 2 sequel, as it would otherwise have been entitled to do under the 4/23/97 Agreement, with the understanding the Valve had obligated itself to complete these games in a timely and satisfactory manner.  Valve's own conduct, therefore, contributed to Sierra's and VUG's vulnerability to Valve's business compulsion.

173.    Consequently, Sierra and VUG are entitled to void the 2001 Agreement, leaving the parties in their respective positions under the 1997 Agreements and 1998 Amendment, and to recover restitution of involuntary payments made under Valve's business compulsion.

### FIFTH CAUSE OF ACTION
#### (Breach of Contract Against Valve)

174.    Paragraphs 1 through 173 are hereby incorporated by reference.

175.    Valve, Sierra and VUG entered into the 2001 Agreement on March 29, 2001, Addendum 1 to the 2001 Agreement on March 30, 2001, and Addendum 3 to the 2001 Agreement on December 28, 2001.

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

176.     Pursuant to the terms of the 2001 Agreement and Addenda 1 and  3, Valve was obligated to "use diligent efforts to continuously develop [Half-Life 2, Team Fortress 2, and CSCZ] to completion."  2001 Agreement §§2.1-2.3.  Valve has breached this obligation by repeatedly delaying the development of these games and failing to achieve final milestones for these games within a commercially reasonable period of time.

177.     In accordance with industry practice, the 2001 Agreement imposes upon Valve the obligation to provide current development schedules upon request.  2001 Agreement §§2.1-2.3.  Valve's refusal to provide development schedules for Half-Life 2, Team Fortress 2, and CSCZ violates these provisions of the 2001 Agreement.

178.     Section 2.3 of the 2001 Agreement sets out the mechanism by which the parties are to determine which game is to constitute Game 3.  Although Valve had the right to negotiate with third parties for the development of proposed games if Sierra and VUG refused the proposal, it had no right to do so once the proposal was accepted.  By repeatedly threatening to develop CSCZ for other publishers, threatening to stop shipment of CSCZ, and coercing Sierra and VUG into dropping the revenue protection provisions of the 2001 Agreement after Sierra and VUG had accepted the proposal to include it as Game 3 under the 2001 Agreement, Valve breached its obligations under Section 2.3.

179.     Section 2.3, Exhibits A and B and Addenda 3 require Valve to develop CSCZ as a game of AAA quality.   Valve has breached this obligation by providing builds of CSCZ that do not meet this requirement.

180.     Sections 2.3, 4.1.1 and Addendum 3 require Valve to deliver a Final Milestone of CSCZ to Sierra and VUG .  Final Milestone is defined in the 2001 Agreement as the "completion and delivery to Sierra of a release-candidate version of a Product."  In addition, Section 2.6 of the 2001 Agreement requires Valve to perform quality assurance and other error testing on the games that it delivers to Sierra and VUG.  Valve has breached these provisions of the agreement by failing to conduct adequate quality assurance and error testing to the builds of CSCZ that it delivered to Sierra and VUG, refusing to correct dozens

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 37 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

of bugs identified  by Sierra and VUG, and declaring publicly that the inferior builds of CSCZ that it had delivered to Sierra and VUG were Final Milestones triggering Sierra's and VUG's manufacturing, promotion, and distribution obligations.

181.     Section 2.5 of the 2001 Agreement requires Valve to protect against the unauthorized dissemination and use of Sierra's and VUG's tools.  Valve breached this agreement when it failed to take adequate precautions to prevent hackers from stealing the source code for Half-Life 2 and  CSCZ.

182.     Section 2.6 of the 2001 Agreement requires Valve to perform quality assurance and other error testing on the games that it delivers to Sierra and VUG.  Valve breached this provision by failing to conduct adequate quality assurance testing on Half-Life for PlayStation 2 and on CSCZ for PCs and by delivering inferior product to Sierra.

183.     Section 2.7 of the 2001 Agreement and Addenda 3 imposes upon Valve the obligation to provide English, French, German, Spanish and Italian translations and localizations of CSCZ.  Valve breached these obligations by providing localized builds with numerous bugs preventing shipment and by refusing to allow Sierra and VUG to conduct any testing on the multi-player functionality of localizations.

184.     Section 2.9 requires Valve, within one year of the commercial release of a game, to correct all errors in any game within a commercially reasonable time.  Valve breached this obligation by failing to provide reasonable assurances that it will patch the numerous bugs in CSCZ and its translations after it is released.

185.     Section 2.13 of the 2001 Agreement provides that "Valve shall be solely responsible for any and all bandwidth and hosting services involved in Valve's distribution of patches . . . ."  Valve breached this obligation by failing to provide adequate bandwidth for patch distribution, resulting in an increased customer service burden for Sierra and VUG.

186.     Section 2.14.1 of the 2001 Agreement prohibits Valve from releasing sequels, including Half-Life 2 and CSCZ, prior to 18 months after Valve's delivery and Sierra's and VUG's acceptance of the Final Milestone for that product.  Valve expressly repudiated (and

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 38 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

therefore breached) this obligation by threatening to give CSCZ to another publisher for release prior to the deadlines set forth in this provision.

187.    Section 3.1 of the 2001 Agreement retains for Sierra and VUG the exclusive worldwide license to reproduce, use, and distribute (directly or indirectly) Half-Life in object code form.  Valve breached this agreement by selling Half-Life via Steam.  Valve also breached this provision by asserting to this Court and to others that Sierra and VUG do not have the right to distribute Half-Life to cyber-cafés.

188.    Section 3.11 of the 2001 Agreement prohibits Valve from selling games, directly or indirectly, prior to the time that such game is released by Sierra and VUG.  Valve breached this agreement by permitting ATI to distribute coupons for Half-Life 2 prior to Sierra's and VUG's release of this game.

189.    Section 3.17, as amended by Addenda 1, requires Valve to consult with Sierra and VUG regarding its contemplated marketing of products, non-retail products, platform extensions and associated foreign translations.  Valve breached this obligation by failing and refusing to consult with Sierra and VUG regarding marketing, and failing and refusing to provide marketing plans.

190.    Section 4.5 of the 2001 Agreement makes Valve responsible for technical support for any non-retail software product and traditional OEM product that Valve distributes itself or through a third party.  Valve breached this obligation by failing to provide reasonable assurances of a patch for CSCZ and failing to provide adequate technical support for Steam.

191.    Pursuant to Section 7.1(e) of the 2001 Agreement , Valve warranted and represented that it would not grant any rights in any product to any third party that are inconsistent with the rights granted or transferred to Sierra and VUG under the 2001 Agreement.  Valve breached these warranties and representations by granting ATI the right to provide coupons for Half-Life 2 games to consumers who purchase ATI graphics cards in violation of Sierra's and VUG's rights under the 2001 Agreement.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 39 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

192.    The 2001 Agreement also imposes upon Valve good faith obligations, including the duty not to engage in conduct that would harm the other entity's good will and/or reputation.  2001 Agreement §9.2.  In addition, the 2001 Agreement prohibits Valve from conducting any business directly or indirectly that results in such party avoiding, bypassing or otherwise altering the intent or terms or conditions of the 2001 Agreement. 2001 Agreement §9.11.  By delaying the development of CSCZ and Half-Life 2 to coincide with the release of Steam and by concealing its development of Steam, Valve breached its good faith obligations and conducted business resulting in such a manner as to avoid, bypass, and otherwise alter the intent or terms and conditions of the 2001 Agreement.

193.    Valve also breached Sections 9.2, 9.11 and 9.12 by refusing to provide adequate assurances regarding the security of Half-Life 2, refusing to allow Sierra and VUG to test the multi-player functionality of CSCZ in a real world environment, refusing to provide adequate customer support for its Steam technology, and failing to take adequate measures to prevent source code for Half-Life 2 and CSCZ from being released to the public.

194.    Valve has further breached Section 9.2 by publicly announcing on or about October 9, 2003, following the theft of the Half-Life 2 and CSCZ source code, that CSCZ would be released at retail and via Steam on November 18, 2003.  Valve knew at the time that it made these statements that it had not yet delivered a Final Milestone of CSCZ to Sierra or VUG, that Section 4 of the 2001 Agreement permits Sierra and VUG a six-month period of exclusive rights within which to appropriately time the commercial release of products to the market, that Sierra and VUG had planned a worldwide simultaneous release of CSCZ, and that Section 3.11 of the 2001 Agreement prohibits Valve from releasing any product until Sierra and VUG have released it into the retail channel.  By making knowingly making false statements to the public regarding the release date for CSCZ, Valve brought Sierra's and VUG's reputation into disrepute in violation of Section 9.2.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 40 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

195.    Section 2 of Addendum 1 to the 2001 Agreement obligate Valve to "consult with Sierra regarding its contemplated marketing of Products, Non-Retail Products, Platform Extensions and associated Foreign Translations."  Valve has repeatedly violated this provision, including by entering into the bundling deal with ATI concerning Half-Life 2 without consulting Sierra or VUG and by making or permitting  repeated public statements concerning that deal and the product release dates associated with that deal.

196.    Valve has also violated Section 2 of Addendum 1 by making numerous public statements about the expected retail release date of CSCZ and Half-Life 2 following release of the news of the theft of the source code for these games without consulting Sierra or VUG.

197.    Sierra and VUG have fully performed, or are excused from performing, all of their obligations under the 2001 Agreement and its Addenda.

198.    As a result of Valve's breaches of the 2001 Agreement and its Addenda, Sierra and VUG have suffered significant damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing Against Valve)

199.    Paragraphs 1 through 198 are hereby incorporated by reference.

200.    As in every contract, the 1997 Agreements and the 2001 Agreement carried an implied duty of good faith and fair dealing that obligated Valve to cooperate with Sierra and VUG so that they could obtain the full benefit of performance.

201.    Among other actions, during the course of the parties' relationship, Valve has exerted duress to exact unwarranted concessions under the 2001 Agreement and its Addenda, concealed its development of Steam, delayed the development of Half-Life 2 to coincide with its  release of Steam, imbedded Steam on a game that Sierra and VUG are contractually obligated to distribute through their marketing and distribution chain, delayed the development of CSCZ and Team Fortress 2, refused to provide adequate development

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 41 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

schedules, and provided flawed and inferior product.  Each of these actions violates Valve's duty of good faith and fair dealing because each represents an evasion of the spirit of the 1997 Agreements as well as the 2001 Agreement, a lack of diligence and slacking off, willful rendering of imperfect performance, an abuse of power to specify terms, and/or interference with or failure to cooperate in Sierra's and VUG's performance.

202.    In particular, Valve's insertion of Steam into CSCZ violates the duty of good faith and fair dealing because it significantly dilutes the basis for Sierra's and VUG's compensation under the 2001 Agreement and directly affects Sierra's and VUG's ability to distribute other products.

203.    As a result of Valve's actions, Sierra and VUG have suffered and continue to suffer significant and irreparable injury.

**SEVENTH CAUSE OF ACTION**
**(Failure of Consideration Against Valve)**

204.    Paragraphs 1 through 203 are hereby incorporated by reference.

205.    As set out in detail above, Valve has breached nearly every operative provision of the 2001 Agreement, including the key provisions to continuously develop the games.  As also set out above, Valve has frustrated the purpose of the 2001 Agreement through its activities with Steam.  Accordingly, Valve has deprived Sierra and VUG of substantially all of the consideration it sought to receive under the 2001 Agreement.

206.    The loss of consideration caused by Valve's breaches is not slight in comparison with the consideration for the whole contract; in fact, it is significant.

207.    Sierra's and VUG's damages are not easily ascertainable.

208.    Rescission would not be inequitable to Valve, since Valve purposely delayed the development of CSCZ and Half-Life 2.  Valve also concealed its development of Steam during the parties' negotiations over the 2001 Agreement and its Addenda.  By making these misrepresentations and/or omissions, Valve concealed the failure of consideration.

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 42 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Moreover, under the 1997 Agreements, the parties are required to negotiate an agreement to develop and distribute Half-Life 2 in good faith.

## EIGHTH CAUSE OF ACTION
### (Frustration of Purpose Against Valve)

209.    Paragraphs 1 through 208 are hereby incorporated by reference.

210.    Sierra's and VUG's primary purpose in executing the 2001 Agreement and Addenda was to ensure the timely and satisfactory development of CSCZ and Half-Life 2 so that Sierra and VUG could capitalize on the popularity of the original Half-Life game and meet the existing demand for sequels.  The 2001 Agreement and Addenda were made upon the basic assumption (and the affirmative assurances of the Counterclaim Defendants) that this demand would be met through distribution of the game in the retail channel.

211.    The development of CSCZ and Half-Life 2 were significantly delayed to coincide with the release of Steam, a new technology that will divert distribution away from the retail channel and substantially impair the value of the rights for which Sierra and VUG received under the 2001 Agreement.  Due to the delay in the development of CSCZ and Half-Life 2, and the concurrent development and release of Steam, the primary purpose of the 2001 Agreement has been frustrated.

212.    Sierra and VUG are not responsible for the delay in the development of CSCZ and Half-Life 2 nor the development of Steam.

## NINTH CAUSE OF ACTION
### (Mutual Mistake Against Valve)

213.    Paragraphs 1 through 212 are hereby incorporated by reference.

214.    The 2001 Agreement is voidable due to mutual mistake because Sierra, VUG and Valve were independently mistaken at the time of contracting regarding basic assumptions of the contract and because Sierra and VUG did not bear the risk of this mistake.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 43 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

215.     First, Sierra and VUG were mistaken as to the development status of Half-Life 2 and the other games referenced in the 2001 Agreement and its Addenda due to the Counterclaim Defendants' representations that the games were near completion.  To the extent that Valve did not intentionally misrepresent the status of the development of these games at the time of contracting, Valve was also mistaken as to the development status of these games.  The parties' assumptions regarding the development status of the games was a basic assumption of the 2001 Agreement that materially affected the basis of the parties' contract.  Had Sierra and VUG known that Half-Life 2 and CSCZ were not near completion, or that release of those games would be deliberately delayed by Valve for a substantial period of time, Sierra and VUG would not have entered into the 2001 Agreement or its Addenda.

216.     Second, Sierra, VUG and Valve were mistaken as to the scope of the intellectual property rights conferred under the 2001 Agreement.  Sierra and VUG believed that they were retaining the right to distribute games developed by Valve to cyber-cafés; in its First Amended Complaint, Valve claims that it believed that it was acquiring that right.  The parties' assumptions regarding the scope of rights conferred was a basic assumption of the 2001 Agreement that materially affected the basis of the parties' contract.  Had Sierra or VUG known that they would be giving up the right to distribute and/or license to cyber-cafés, they would not have entered into the 2001 Agreement.

217.     Sierra and VUG did not bear the risk of these mistakes.  The 2001 Agreement does not allocate the risk of these mistakes to Sierra or VUG.  In addition, Sierra and VUG were unaware of any limitations on their knowledge.  In fact, with respect to the development status, Valve affirmatively represented that the games, including Half-Life 2, were near completion and undertook the obligation under the 2001 Agreement to use diligent efforts to continuously develop these games to completion.  Valve also concealed its development of Steam, despite its duty to negotiate in good faith.

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 44 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

218.    As a result of the mutual mistakes of Sierra, VUG and Valve, Sierra and VUG have been and continue to be injured and have failed to receive the material consideration to which they were entitled to expect and receive under the 2001 Agreement.

### TENTH CAUSE OF ACTION
### (Unilateral Mistake Against Valve)

219.    Paragraphs 1 through 218 are hereby incorporated by reference.

220.    The 2001 Agreement is voidable due to unilateral mistake because Sierra and VUG were mistaken at the time of contracting as to basic assumptions that have a material and adverse effect on the exchange of performances.

221.    First, Sierra and VUG were mistaken as to the development status of Half-Life 2 and the other games referenced in the 2001 Agreement due to Valve's representation at the time of contracting that the games were near completion.  Sierra's and VUG's assumption regarding the development status of these games vitally affected the basis of the 2001 Agreement, as delay in the development of a game can greatly affect the ability to exploit market demand, particularly where, as here, two of the games were sequels.

222.    Second, Sierra and VUG were mistaken as to the scope of the intellectual property rights conferred under the 2001 Agreement.  Sierra and VUG believed that they were retaining the right to distribute games developed by Valve to cyber-cafés.  Sierra's and VUG's assumption regarding the scope of rights conferred was basic to the 2001 Agreement and their mistake materially affected the basis of the parties' contract.

223.    Sierra and VUG did not bear the risk of these mistakes.  The 2001 Agreement does not allocate the risk of these mistakes to Sierra or VUG.  In addition, Sierra and VUG were unaware of any limitations on their knowledge.  In fact, with respect to the development status, Valve affirmatively represented that the games, including Half-Life 2, were near completion and undertook the obligation under the 2001 Agreement to use diligent efforts to continuously develop these games to completion.  Valve also concealed its

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 45 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

development of Steam, despite its duty to negotiate in good faith. Valve therefore was aware of Sierra and VUG's mistakes, and capitalized upon those mistakes in inducing Sierra and VUG to enter into the 2001 Agreement.

224.    The effect of each of these mistakes is to render enforcement of the contract procedurally and substantively unconscionable. First, Valve's threats to halt or indefinitely delay the development of Half-Life 2 if Sierra and VUG did not sign the 2001 Agreement left Sierra and VUG without any meaningful choice with respect to this Agreement. Sierra and VUG agreed to relinquish rights under the 2001 Agreement with the understanding that this would hasten the development of Half-Life 2, a game that was represented to be nearly complete. Had Sierra and VUG known that Half-Life 2 was not near completion (and, in fact, would still not be completed nearly three years later), they would never have relinquished their rights under the 1997 Agreements.

225.    Similarly, cyber-cafés are and have always been the principal source of revenue for Valve games in the Asian-Pacific and Eastern European regions, as well as a source of revenue in the United States and Western Europe. By eliminating the right to distribute Valve games to cyber-cafés, Sierra and VUG would be left with virtually no source of revenue in the Asian-Pacific and Eastern European regions and would suffer a significant reduction in revenues in the United States and Western Europe. Had Sierra or VUG known that Valve intended to acquire the right to distribute Valve games to cyber-cafés, they would not have entered into the 2001 Agreement.

226.    Moreover, Valve caused or had reason to know of Sierra's and VUG's mistakes. Valve knew or should have known that its devotion of resources to the development of Steam would cause the development of Half-Life 2 and CSCZ to be delayed. Valve also knew or had reason to know that Sierra and VUG had historically distributed Valve games to cyber-cafés and that this distribution would be a significant source of revenue, without which Sierra and VUG would not have signed the 2001 Agreement.

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

227.    As a result of its unilateral mistakes, Sierra and VUG have been and continue to be injured and have failed to receive the material consideration to which they were entitled to expect and receive under the 2001 Agreement.

### ELEVENTH CAUSE OF ACTION
#### (Tortious Interference with Business Expectancy Against Valve)

228.    Paragraphs 1 through 227 are hereby incorporated by reference.

229.    Pursuant to the terms of the parties' various agreements, Sierra and VUG expect to manufacture, reproduce, use, distribute, rent, lease, license and sell Valve games. Sierra's and VUG's business expectancy is reasonable, given their extensive success in the industry and their experience with publishing other Valve games.

230.    As a party to the 2001 Agreement, Valve is and at all relevant times was aware of Sierra's and VUG's business expectancy.

231.    By inserting the new Steam technology into CSCZ, Valve has intentionally interfered with Sierra's and VUG's business expectancy, since Steam will enable Valve to piggyback on Sierra's and VUG's marketing efforts and retail distribution chain and to bypass Sierra and VUG by offering games directly to Sierra's and VUG's own customers. Valve acted with the purpose of interfering with Sierra's and VUG's business expectancy or with the knowledge that such interference would result.

232.    Valve had a duty of non-interference in that it:  (a) interfered with Sierra's and VUG's business expectancy for the improper purpose of vitiating the benefits to Sierra and VUG of the 2001 Agreement; and (b) used the improper means of coercing Sierra and VUG into entering into the 2001 Agreement and its Addenda, concealing its development of Steam, and secretly imbedding Steam on CSCZ in order to usurp the benefits of Sierra's and VUG's efforts in marketing and distribution.

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 47 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

233.    As a result of Valve's tortious interference with Sierra's and VUG's business expectancy, Sierra and VUG have suffered and will continue to suffer significant and irreparable injury for which there is no adequate remedy at law.

### TWELFTH CAUSE OF ACTION
### (Unfair Business Practices Under RCW Chapter 19.86 Against Valve)

234.    Paragraphs 1 through 233 are hereby incorporated by reference.

235.    Both prior to and after the execution of the 2001 Agreement, Valve falsely represented to Sierra, VUG, and the public that Half-Life 2 and CSCZ were near completion and would soon be released.

236.    Valve's practice of falsely representing the status of the development of its games constitutes unfair or deceptive acts or practices in the conduct of trade or commerce.

237.    Valve's unfair or deceptive acts or practices impact the public interest and have the potential for repetition.

238.    Sierra and VUG have been injured by Valve's unfair or deceptive acts or practices and those unfair or deceptive acts or practices are the proximate cause of Sierra's and VUG's injuries.  The amount of Sierra's and VUG's damages will be proven at trial. Sierra's and VUG's damages associated with each unfair and deceptive act should be trebled pursuant to RCW 19.86.090.

### THIRTEENTH CAUSE OF ACTION
### (Declaration of Lack of Contract Formation Against Valve)

239.    Paragraphs 1 through 238 are hereby incorporated by reference.

240.    There exists an actual case or controversy as to whether there was a meeting of the minds as to the scope of the rights transferred under the 2001 Agreement.

241.    Cyber-cafés are the principal source of revenue for Valve games in the Asian-Pacific and Eastern European regions, as well as a source of revenue in the United

*Sierra's & VUG's Answer, Affirmative Defenses &
Counterclaims  (CV02-01683)
 -Page 48 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

States and Western Europe.  As such, Cyber-café rights were an essential term of the 2001 Agreement.

242.    In entering into the 2001 Agreement, Sierra and VUG intended to retain the right to market Valve games to cyber-cafés, whereas Valve claims that it intended to acquire that right.  The 2001 Agreement therefore does not reflect a common understanding of the essential terms of the contract.

243.    Wherefore, Sierra and VUG are entitled to the Court's declaratory judgment that the 2001 Agreement is void for lack of contract formation.

## FOURTEENTH CAUSE OF ACTION
### (Declaration of Cyber-Café Rights Against Valve)

244.    Paragraphs 1 through 243 are hereby incorporated by reference.

245.    There exists an actual case or controversy as to Sierra's and VUG's right to manufacture, distribute, rent, lease or license the Valve games, including Half-Life 2, Team Fortress 2 and CSCZ, to cyber-cafés within the United States as Retail Packaged Product.

246.    If the Court determines that it has subject matter jurisdiction over the playing of Valve Games in cyber-cafés outside the United States, then an actual case or controversy exists as to whether Sierra and VUG have the right to manufacture, distribute, rent, lease and license the Valve games to cyber-cafés outside the United States, as Retail Packaged Product.

247.    All of the activities undertaken by Sierra and VUG with respect to the licensing, sale and distribution of Valve games to cyber-cafés, both inside and outside the United States, are within the scope of the license rights granted to Sierra and VUG  under the 2001 Agreement.

248.    All of the activities undertaken by Sierra and VUG with respect to the licensing, sale and distribution of Valve Games to cyber-cafés, both inside and outside the

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 49 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

United States, are within the scope of other express and implied license rights granted to Sierra and VUG by Valve.

249.    Both before and after the execution of the 2001 Agreement, Valve had actual and constructive knowledge that Sierra and VUG were licensing the Valve Games to cyber-cafés both inside and outside the United States.  This licensing activity was undertaken by Sierra and VUG with the express or implied approval of Valve agents who had actual or apparent authority to do so.  In reliance on Valve's approval, Sierra and VUG entered into contractual licenses with cyber-cafés both before and after execution of the 2001 Agreement.

250.    By its conduct, Valve has waived any right to object to the Counter-Claimants' activities concerning cyber-cafés.

251.    In the alternative, Valve is estopped by its conduct from claiming that the license rights that it granted to Sierra and VUG do not permit the Counter-Claimants' activities concerning cyber-cafés.

252.    Wherefore, Sierra and VUG are entitled to the Court's declaratory judgment that they have, and in the past had, the right to license the Valve Games to cyber-cafés.

## FIFTEENTH CAUSE OF ACTION
### (Declaration of Reversion of Intellectual Property Against Valve)

253.    Paragraphs 1 through 252 are hereby incorporated by reference.

254.    There exists an actual case or controversy as to whether Valve's intellectual property interest in Half-Life, Team Fortress and the platform extensions and add-ons to these games, including the Half-Life and Team Fortress trademarks, have reverted to Sierra and VUG as a result of Valve's failure to continuously develop Half-Life 2 and Team Fortress 2 in accordance with Sections 2.1 and 2.2 of the 2001 Agreement and Valve's failure thereafter to cure this deficiency within 30 days of Sierra's and VUG's written notice.

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

255.     Sections 3.12.1 and 3.12.2 provide that if Sierra or VUG provide written notice to Valve that Valve has not continuously developed Half-Life 2 and Team Fortress 2 in accordance with Sections 2.1 and 2.2 and Valve does not cure this deficiency within 30 days, then Valve shall be deemed to immediately and without the necessity of further action on the part of either party grant Sierra and VUG an exclusive, transferable, worldwide, royalty-free license as to the intellectual property in Half-Life and Team Fortress and their platform extensions and add-ons, including the Half-Life and Team Fortress trademarks.

256.     On April 14, 2003, Sierra and VUG provided written notice to Valve that Valve has not continuously developed Half-Life 2 and Team Fortress 2 in accordance with Sections 2.1 and 2.2.  Valve did not cure this deficiency within 30 days of this notice.

257.     Wherefore, Sierra and VUG are entitled to the Court's declaratory judgment that Valve's intellectual property interest in Half-Life, Team Fortress and their platform extensions and add-ons, including the Half-Life and Team Fortress trademarks, have reverted to Sierra and VUG pursuant to Section 3.12.1 and 3.12.2 of the 2001 Agreement.

## SIXTEENTH CAUSE OF ACTION
### (Declaration of Right To Develop Fourth Game)

258.     Paragraphs 1 through 257 are hereby incorporated by reference.

259.     There exists an actual case or controversy as to whether Sierra and VUG have the right to use Valve's Half-Life 2 engine to develop a fourth game, along with applicable add-on products and other rights, as a result of Valve's failure to continuously develop CSCZ in accordance with Section 2.3 of the 2001 Agreement and its failure thereafter to cure this deficiency within 30 days of Sierra's and VUG's written notice.

260.     Section 3.13 provides that if Sierra or VUG provide written notice to Valve that Valve has not continuously developed CSCZ in accordance with Section 2.3 and Valve does not cure this deficiency within 30 days, then Valve shall be deemed to grant Sierra and

*Sierra's & VUG's Answer, Affirmative Defenses &*
*Counterclaims  (CV02-01683)*
*-Page 51 of 54*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

VUG the right to develop a fourth game, along with add-on products and other rights, as set forth in Exhibit F to the 2001 Agreement.

261.    On April 14, 2003, Sierra and VUG provided written notice to Valve that Valve has not continuously developed CSCZ in accordance with Sections 2.3.  Valve did not cure this deficiency within 30 days of this notice.

262.    Wherefore, Sierra and VUG are entitled to the Court's declaratory judgment that Sierra and VUG have the right to develop a fourth game pursuant to the terms of Section 3.13 and Exhibit F of the 2001 Agreement.

## PRAYER FOR RELIEF

Wherefore, Defendants and Counter-Claimants Sierra and VUG pray for the following relief:

A.      That Valve take nothing by its First Amended Complaint;

B.      For dismissal of Valve's First Amended Complaint in its entirety with prejudice;

C.      For rescission of the 2001 Agreement, returning the parties to their relative position under the 1997 and 1998 Agreements;

D.      For a declaration and judgment that the 2001 Agreement is void for lack of contract formation, lack of consideration, or frustration of purpose, and that the 1997 and 1998 Agreements govern the relationship of the parties;

E.      For a declaration and judgment that Sierra and VUG have and may exploit in the future, and have had, at all times relevant to the claims herein, the right to distribute and/or license Valve games, including Half-Life 2, Team Fortress 2, and CSCZ, to cyber-cafés;

F.      For a declaration that Valve's intellectual property interest in Half-Life, Team Fortress and their platform extensions and add-ons, including the Half-Life and Team Fortress trademarks, have reverted to or are otherwise owned by Sierra and VUG pursuant to

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
*-Page 52 of 54*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

Section 3.12.1 and 3.12.2 of the 2001 Agreement, and requiring Valve to transfer all right, title and interest therein to Sierra and VUG;

G.      If the 2001 Agreement is not rescinded, for a declaration that Sierra and VUG have the right to a fourth engine license pursuant to the terms of Exhibit F of the 2001 Agreement;

H.      For a preliminary and permanent injunction enjoining Counterclaim Defendants, their officers, employees, agents, subsidiaries, representatives and all persons active in concert and participation with any of them from (a) including any Steam object code in any Final Milestone delivered to Sierra for publication as Retail Packaged Product other than such code that is necessary to meet Valve's obligations to provide CD key authentication, multi-player matchmaking, and online patch/update functionality as specified in the 2001 Agreement; (b) using any Steam object code in any Final Milestone delivered to Sierra for publication as Retail Packaged Product other than such code that is strictly necessary to meet Valve's obligations to provide CD key authentication, multi-player matchmaking and online patch/update functionality as specified in the 2001 Agreement, and particularly, enjoining Valve from using such code to distribute games to any consumers who obtained the Steam code through purchase of such Retail Packaged Product; and (c) (if the 2001 Agreement is not rescinded) reproducing, using, distributing (directly or indirectly), and licensing Half-Life in object code form, including via Steam distribution; or (d) (if the 2001 Agreement is rescinded) reproducing, using, distributing (directly or indirectly), and licensing any of the Valve games which Sierra was entitled to publish in any form, including via Steam distribution.

I.      For damages in an amount to be proven at trial;

J.      For attorneys' fees pursuant to RCW 19.86.090, or as otherwise provided by law;

K.      For attorneys' fees incurred herein as provided by the 2001 Agreement;

L.      For treble damages pursuant to RCW 19.86.090;

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1        M.      For restitution in an amount to be proven at trial, including without limitation

2  the return of all royalty sums paid by Sierra and/or VUG to Valve in excess of those owed

3  under the 1997 and 1998 Agreements;

4        N.      For punitive damages in an amount to be proven at trial;

5        O.      For costs as provided by the 2001 Agreement or as otherwise provided by

6  law;

7        P.      For such other and further relief as the Court may deem just and proper.

8  **JURY DEMAND**

9        Sierra and VUG demand trial to the jury as to all issues so triable.

10        DATED this __**26th**__ day of **January, 2004**.

11

12        HILLIS CLARK MARTIN & PETERSON, P.S.

13        By____s/ Michael R. Scott_____

14          Michael R. Scott, WSBA #12822

15          500 Galland Building
      1221 Second Avenue

16          Seattle WA 98101-2925

17          Telephone:  (206) 623-1745
      Facsimile:  (206) 623-7789

18          e-mail:  mrs@hcmp.com

19        HOWARD RICE NEMEROVSKI CANADY FALK &
    RABKIN, A PROFESSIONAL CORPORATION

20          Annette L. Hurst (admitted *pro hac vice*)

21          Simon J. Frankel (admitted *pro hac vice*)
      Three Embarcadero Center, Seventh Floor

22          San Francisco, CA 94111-4024

23          Telephone:  (415) 434.1600
      Facsimile:  (415) 217.5910

24          e-mail:  sking@howardrice.com

25        Attorneys for Defendants Sierra Entertainment,

26        Inc, Vivendi Universal Games, Inc., and
    Vivendi Universal, S.A.

27  #264938 18133-002 5_f#01!.doc 1/26/2004

28

*Sierra's & VUG's Answer, Affirmative Defenses & Counterclaims  (CV02-01683)*
 *-Page 54 of 54*