Honorable Thomas S. Zilly
**Hearing Date: March 19, 2004**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALVE, L.L.C., a Washington Limited Liability Company,

Plaintiff,

v.

SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON-LINE, INC.), a Delaware Corporation; VIVENDI UNIVERSAL GAMES, INC., a Delaware Corporation; and VIVENDI UNIVERSAL, S.A., A French foreign corporation,

Defendants.

SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON LINE, INC., a Delaware corporation; and VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation,

Counter-Claimants,

v.

VALVE, LLC, a Washington limited liability company; GABE NEWELL and JANE DOE NEWELL, husband and wife, and the marital community composed thereof; and SCOTT LYNCH and JANE DOE LYNCH, husband and wife, and the marital community composed thereof,

Counterclaim Defendants.

No. C 02-1683Z

PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS FOR FAILURE TO STATE A CLAIM

**Hearing Date: March 19, 2004**



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## I. INTRODUCTION AND RELIEF REQUESTED

Pursuant to FED. R. CIV. P. 12(b)(6), Valve Corporation f/k/a Valve LLC ("Valve"), Gabe Newell, and Scott Lynch move to dismiss Counts 1-4 and 6-12 of Sierra Entertainment, Inc. ("Sierra") and Universal Games, Inc.'s ("VUG") (collectively "Vivendi") Amended Counterclaims ("Counterclaims"). Vivendi's Answer includes 16 separate counterclaims against Valve and three counterclaims for fraud and concealment against Gabe Newell, Valve's Managing Director, and Scott Lynch, Valve's Chief Operating Officer. This motion seeks dismissal of each of the Amended Counterclaims except Vivendi's Fifth Counterclaim for Breach of Contract and its Thirteenth through Sixteenth Counterclaims for declaratory relief.

All of Vivendi's counterclaims which are the subject of this motion, save for one which is immaterial, are based on alleged statements made before the execution of the Software Publishing Agreement ("SPA"), which was entered into on March 29, 2001. Counterclaim Ex. A. The SPA is an integrated agreement, entered into between sophisticated parties, which "constitute[s] the entire agreement… [and] supercedes and cancels all prior and contemporaneous understandings, whether written or by oral agreement." SPA § 9.1.3. All of the Counterclaims attack the validity of the SPA, allege that Valve has failed to comply with terms not found in that agreement, or allege that Vivendi was laboring under some misconception about the SPA. None of these claims were asserted in answer to Valve's original complaint.

Vivendi's claims of Fraudulent Misrepresentation (Count 1) and Promissory Fraud (Count 2) are based on allegations that misrepresentations were made by Valve during the negotiation of the SPA. These allegations are insufficient as a matter of law because the SPA, a comprehensive contract between sophisticated commercial parties, contains an integration clause which makes any claimed reliance by Vivendi on pre-agreement statements unjustified





PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

and irrelevant. Were the law otherwise, no contract would be safe from post-hoc attack by a disappointed party such as Vivendi. Additionally, as pled, the alleged statements on which these fraud claims are based are opinions, predictions of future events, or promises of future performance. Actionable fraud, however, requires a misrepresentation of existing fact.

Vivendi's claim of "concealment" (Count 3) is based on allegations that Valve had a duty during the negotiations with Vivendi to disclose its plans regarding online distribution technologies (an effort that ultimately resulted in the Valve service known as "Steam"). By law, there is no affirmative duty to make such disclosures in an arm's length transaction, and thus no duty to disclose existed. Vivendi's "concealment" claim should be dismissed.

Vivendi further claims that it entered into the SPA only as a result of "business compulsion" (Count 4). Under Washington law, compulsion is a form of duress, which is a defense to a breach of contract claim, and not an affirmative cause of action. There is no cause of action for "business compulsion" and Vivendi's fourth counterclaim should be dismissed.

Vivendi's claims based on the breach of the duty of good faith and fair dealing (Count 6), failure of consideration (Count 7), frustration of purpose (Count 8), mutual mistake (Count 9), and unilateral mistake (Count 10) all fail to state a claim. These claims are not recognized affirmative causes of action but are simply duplicative defenses to Valve's breach of contract claims dressed up as affirmative claims. These claims should be dismissed.

Vivendi's claim for tortious interference (Count 11) should also be dismissed because Valve is a party to the SPA—it cannot, therefore, as a matter of law, tortiously interfere with the SPA. Vivendi's tortious interference claim is merely an attempt to recharacterize elements of its breach claim as torts. This is impermissible under Washington law and the claim should be dismissed.

Vivendi's claim that Valve violated the Washington Consumer Protection Act (Count



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

12) should be dismissed because the Act requires an unfair or deceptive practice that affects the public interest. Vivendi's claim that Valve violated the CPA by allegedly announcing and then missing the release dates for Half-Life 2 and Counter-Strike: Condition Zero ("CSCZ") does not state a claim because not hitting an expected date is not deceptive or unfair nor could it in any way affect the public interest. Vivendi's claim should be dismissed.

## II. STATEMENT OF FACTS

Valve and Vivendi first entered a software publishing agreement in April of 1997 (the "4/27/97 Agreement"). Counterclaims ¶ 70. The subject matter of the agreement was the computer game that would eventually become Valve's "Half-Life" game. The 4/27/97 Agreement granted most of the intellectual property rights in Half Life to Vivendi and allowed Vivendi to distribute Half-Life in any channel, to any end-user, and on any medium. Id. ¶ 71. The 4/27/97 Agreement was amended twice, once on September 3, 1997 and then again on July 24, 1998 (collectively the "1997 Agreement"). Id. ¶¶ 73-74. Although certain games were added to the agreement and the royalty rates were renegotiated, Vivendi's distribution rights to the Valve products did not materially change. Id.

In November 1998, Half-Life was released and became an enormous worldwide success, quickly becoming one of the best-selling computer software games of all time and winning numerous awards. Id. ¶ 79. Vivendi alleges that Valve then set out to "leverage the success" of Half-Life and force Vivendi to renegotiate the 1997 Agreement. This leverage was allegedly exerted by Valve breaching and/or threatening to breach various parts of the 1997 Agreement (i.e. threatening to discontinue work on games, threatening to shop the games to other publishers, etc.). Id. ¶¶ 80-84.

Even though Vivendi could have attempted to enforce whatever rights it believed it had under the 1997 Agreement, it claims that it "found itself with little choice but to acquiesce



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

[to Valve's] demands to renegotiate the parties' business relationship." Id. ¶ 85.

According to Vivendi's claims, Valve told Vivendi that it wanted the renegotiation of the 1997 Agreement to accomplish: "(a) the transfer of intellectual property rights to all games, as this issue was emotionally important to Newell; (b) higher royalty rates for Valve; and (c) transfer of the ancillary right to distribute the games in non-retail channels, such as direct download over the Internet." Counterclaims ¶ 86.

Over the next two years, the parties renegotiated the 1997 Agreement.

Vivendi claims that during these negotiations, Valve made various misrepresentations about its intent to pursue online distribution. Counterclaims ¶¶ 87-92. Additionally, Vivendi claims that Valve concealed its research and development efforts regarding the service that would ultimately be called "Steam." Id. ¶¶ 90, 93. Vivendi claims that, on account of Valve's statements or concealment of its on-line distribution endeavors, Vivendi was justified in giving up its non-retail channel rights because it believed "there would be no significant impact to its retail distribution rights." Id. ¶ 92. Vivendi also alleges that Valve made statements about the development and anticipated delivery dates of Valve's games and Half-Life 2. Id. ¶¶ 96-99. Vivendi claims that it relied upon these statements and assumed that the games would "shortly be ready for publication." Id. ¶ 98.

In the end, Vivendi alleges that it "buckled and entered into the 2001 Agreement." Id. ¶ 99. The SPA returns any intellectual property rights in Valve games held by Vivendi to Valve. SPA § 3.1.1. It provides that Vivendi's distribution of future Valve games is limited to "Retail Packaged Product" in the "Retail Channel." See, e.g., SPA § 3.5.1.

There is no dispute that the SPA was thoroughly negotiated over a long period of time and that it contains an integration clause, which reads:

> The terms set forth in this Agreement (including exhibits), along with the surviving terms of the 4/27/97 Agreement and those certain bridge letter agreements governing distribution of Counter-Strike and Gunman prior to the execution of this Agreement, together constitute the entire agreement of the



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

> parties with respect to the subject matter described herein and shall supersede and cancel all prior and contemporaneous understandings, whether written or by oral agreement.

SPA § 9.1.3. The parties have operated under the SPA since its execution. Under the SPA, the timetable for delivery of Valve's games CSCZ and Half Life 2 is solely within Valve's discretion. *Id.* § 2.1 – 2.3. The SPA contains no deadlines for delivery of these games to Vivendi.

On Aug 8, 2002, Valve sued Sierra for copyright infringement on the grounds that Sierra had acted outside the scope of its license by distributing Valve products to cyber cafes . See Complaint for Copyright Infringement, passim.

Sierra answered Valve's Complaint on November 25, 2002. In its Answer, Sierra did not raise any claims or defenses based upon fraud, mistake, misrepresentation or compulsion, nor did it seek rescission of the SPA. See Answer, Counterclaim, and Jury Demand, passim. Indeed, far from asserting fraud, Sierra asked the court to adjudicate, declare, and enforce its rights under the SPA. Notably, according to Vivendi's allegations, Gabe Newell had made a formal announcement regarding the launch of Steam eight months before Sierra answered Valve's complaint. Counterclaim ¶ 95. Now, over one year after first answering Valve's complaint grounded in the SPA, Vivendi claims that the SPA was induced by fraud, concealment, and signed under duress.[1]

## III. STANDARD OF REVIEW

Motions to dismiss are granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). Allegations of fact in

---

[1] "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. . ." FED. R. CIV. P. 13(a). It is telling that only now, faced with the possibility that the question regarding the scope of its license grant may be decided against it, does Vivendi claim fraud, duress, and concealment in entering into the bargain.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the complaint are accepted as true and construed in the light most favorable to the nonmoving party. No. 84 Employee-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 931 (9th Cir. 2003). Complaints "should be dismissed for failure to state a claim only if plaintiffs can prove no set of facts which would entitle them to relief." Association of Washington Public Hospital Districts v. Philip Morris, Inc., 79 F.Supp.2d 1219, 1222 (W.D. Wash. 1999). In making this determination, the Court need not accept as true unreasonable inferences, unwarranted deductions, or conclusory legal allegations cast in the form of factual allegations. Robertson v. Dean Witter Reyonds, Inc., 749 F.2d 530, 534 (9th Cir. 1984); Western Min. Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

## IV. ARGUMENT

### A. VIVENDI'S CLAIMS BASED ON ALLEGED MISREPRESENTATIONS MADE DURING NEGOTIATIONS (COUNTS ONE, TWO AND THREE) SHOULD BE DISMISSED

Vivendi's fraud-based claims: Fraudulent Misrepresentation (First Cause of Action), Promissory Fraud (Second Cause of Action), and Concealment (Third Cause of Action) are insufficient as a matter of law. First, the SPA is a thoroughly negotiated, arm's length deal that contains an integration clause. Second, where a written agreement is finally entered, a sophisticated party such as Vivendi cannot justifiably rely upon any statements about the subject matter of the agreement that are not contained in the agreement. Third, most of the alleged statements were opinions of future events or (at best) promises of future performance, neither of which support a fraud claim because they fail to be statements of existing fact (and are not reflected in the SPA). Lastly, Valve had no duty to disclose detailed information about its research and development of a nascent system for on-line distribution in an arm's length negotiation. Allegations regarding concealment of this matter, therefore, fail to state a claim. Although the analysis of the fraud claims overlaps somewhat, the reasons why each of



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the three individual causes of action should be dismissed are discussed separately below.

### 1. Vivendi's Claim for Fraudulent Misrepresentation (First Cause of Action) Should Be Dismissed.

#### *a. The Alleged Fraudulent Misrepresentations*

In support of its claim of fraudulent misrepresentation, Vivendi alleges that Valve, Newell, and Lynch made the following statements during the negotiation of the March 21, 2001 agreement:

A. During the parties' negotiations concerning the 2001 Agreement, Counterclaim Defendants repeatedly and falsely assured Sierra and VUG that retail sales would remain the "key to their strategy" and that Valve did not plan to engage in anything other than *de minimis* distribution of games online. [I]n September 2000, Counterclaim Defendant Newell told Mr. Joly that "online is a way to nurture the retail business." Counterclaims ¶ 142-43

B. In mid-January 2001, Counterclaim Defendant Lynch represented to Sierra and VUG that the population of on-line gamers was just 3 million and that "only a fraction of them will be downloading Half-Life 2." Id. ¶ 143

C. In a meeting with Mr. Joly in mid-February 2001, for example, Counterclaim Defendant Newel1 represented that Half-Life 2 could be released that year, "depending on a number of choices." In addition, Valve exchanged spreadsheets with Sierra and VUG projecting royalties for the sale of the Half-Life 2 game during the 2001 through 2003 period. Id. ¶ 144

D. On March 9, 2001, Counterclaim Defendant Lynch represented to Mr. Joly that Valve was developing CSCZ, that the game could be added to the new agreement, and that it would be ready for release on October 31, 2001. Id. ¶ 144

After the SPA was executed, Vivendi claims that the following statements were made:

E. In late April 2001, when the parties were negotiating Addendum 2 to the 2001 Agreement, Counterclaim Defendants Lynch and Newel1 falsely told Sierra in-house counsel Eric Roeder that Valve had no plans to release a non-retail version of CSCZ. Id. ¶ 143.

F. Similarly, in July 2001, Counterclaim Defendant Lynch told William Dugan that electronic distribution of CSCZ "should not have a material effect on retail sales." Id. ¶ 143.

G. In January 2002, after numerous delays in the release of Half-Life 2, Sierra and VUG asked Valve directly whether it intended to exploit direct download opportunities. In response to these questions, Douglas Lombardi falsely represented to Sierra and VUG



K:\36063\00014\JPH\JPH_P22DB

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

that Valve "[didn't] have anything going."

Counterclaims ¶ 143. For the reasons set forth below, none of these alleged statements constitute fraudulent misrepresentations as a matter of law.

***b. The SPA Is an Integrated Agreement, Therefore Vivendi Cannot Justifiably Rely Upon the Alleged Statements Made During Negotiations***

There is no dispute that the SPA was heavily negotiated and that it contains an integration clause, which reads:

> The terms set forth in this Agreement (including exhibits), along with the surviving terms of the 4/27/97 Agreement and those certain bridge letter agreements governing distribution of Counter-Strike and Gunman prior to the execution of this Agreement, together ***constitute the entire agreement of the parties with respect to the subject matter described herein and shall supersede and cancel all prior and contemporaneous understandings, whether written or by oral agreement.***

SPA § 9.1.3 (emphasis added). The parties defined their relationship in thoroughly negotiated software licensing relationships beginning with the "1997 Agreements" and culminating in the March 2001 Agreement with its addenda (the "SPA" that is the subject of this lawsuit). See Counterclaim *passim*. Given the sophistication of the parties and the fact that comprehensive written contracts were entered into, the integration clause should be enforced as a matter of law and Vivendi's fraud claims should be dismissed.

In One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283, 1286-87 (D.C.Cir. 1988), the Court held that plaintiffs' reliance upon representations of future behavior in regard to a written contract with an integration clause was unreasonable as a matter of law and thus could not form the basis of a securities fraud claim. During the course of negotiations regarding the securities agreement at issue (a deal involving the sale and operation of steakhouses), Defendants represented that they intended to run the businesses for "the long-term future" and did not intend "to sell or dispose of their ownership . . . in the near or foreseeable future. Id. at 1284. The final agreement, however, did not include any such representations. Like the



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

SPA, though, the One-O-One agreement included a provision that "any and all previous understandings and agreements" were superseded. Id. at 1285. When defendants eventually sold several steakhouses, plaintiffs claimed fraudulent inducement, basing their claims on the oral and written representations defendants made prior to the final agreement. Id. at 1286. Judge Ruth Bader Ginsburg, writing for the panel, stated:

> Were we to permit plaintiffs' use of the defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, "contracts would not be worth the paper on which they are written." On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause -- in the face of prior explicit representations -- must be deemed an abandonment or excision of those earlier representations. . . .
>
> Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who "has been induced by a fraudulent misrepresentation to enter the contract," must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." We need not belabor the point. We have here the case of "a party with the capacity and opportunity to read a written contract, who execute it, not under any emergency, and whose signature was not obtained by trick or artifice";[2] such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

Id. at 1287 (citations omitted). In reaching this conclusion, the Court noted that "[a]fter eight months of negotiations, the parties reached a final agreement that was lengthy, detailed and comprehensive." Id. at 1286. The SPA is exactly this type of agreement. In Goel v. Jain, 259 F. Supp.2d 1128, 1138 (W.D. Wa. 2003) (Lasnik J.), the Court applied Washington law, looked to the One-O-One opinion, and likewise dismissed fraud claims related to pre-contractual statements on summary judgment due to the existence of a release and an integration clause.

[2] Here, Vivendi had the capacity (and did) negotiate, read, and sign the SPA. There is no allegation that the signature was somehow obtained by trick or artifice (*i.e.* switching documents, penciling in additional terms post signature, etc.). Such "fraud in the execution" provides an exception to the parol evidence rule. See, e.g., Coson v. Roehl, 63 Wn.2d 384, 387-89, 387 P.2d 541 (1963) (contractual terms inserted via "trickery"). Vivendi, by contrast, does not (and cannot) claim fraud in the *execution* of the agreement.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Moreover, "reliance upon oral representations or prior documents, even if false, is unreasonable if the party enters into a subsequent agreement." Cook v. Little Caesar Ent. Inc., 210 F.3d 653, 658 (6th Cir. 2000); see Williams v. Joslin, 65 Wn.2d 696, 698 (1965), 399 P.2d 308 (justifiable reliance is a required element of fraud). The statements alleged in the counterclaims, all of which relate to the subject matter of the SPA, cannot form the basis of actionable fraud. In essence, Vivendi claims that, during negotiations, discussions took place about on-line distribution and the development status of Half-Life 2 and CSCZ, and that based on these discussions Vivendi formed certain opinions (Half-Life and CSCZ would ship by a certain date, or that Valve would not exercise its rights and pursue online distribution). If, as Vivendi alleges, these discussions actually occurred and were material to Vivendi's decision to enter into the SPA, they would have been reflected in the agreement. First, there is no requirement that Half-Life 2 and CSCZ be delivered by a certain date—the development scheduling is left to Valve. SPA § 2.1 – 2.3. Second, the SPA recognizes that Valve has the right to distribute games on-line.[3] See e.g., id. §§ 3.16, 3.11 ("Timing of Commercial and On-Line Release"). Indeed, Vivendi successfully obtained certain revenue protections in the SPA for certain versions of products that Valve would exploit in competition with Vivendi's rights to distribute Retail Packaged Product in the Retail Channel. See SPA § 5.3, et seq.

Vivendi is a multi-billion dollar enterprise which was advised by counsel during the negotiation of the SPA. Vivendi's "fraud" claims amount to an attempt to escape the SPA based on unexpressed intentions or claimed representations not reflected in the integrated agreement. As Judge Easterbrook noted:

---

[3] Furthermore, it is basic copyright law that any right not expressly granted by the copyright owner to a licensee is reserved by the licensor. S.O.S., Inc., v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989) ("Copyright licenses are assumed to prohibit any use not authorized."); see also, Cohen v. Paramount Pictures Corp., 845 F.2d 851, 853 (9th Cir. 1988) (license analyzed to determine what uses it affirmatively permits). Valve granted limited rights to Sierra and its Affiliates, the boundaries of which were drawn by the agreed upon definition of Retail Packaged Product and Retail Channel.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

> Memory plays tricks. Acting in the best of faith, people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning. Express or implied qualifications may be lost in the folds of time. A statement such as "I won't sell at current prices" may be recalled years later as "I won't sell." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and promoting the primacy of the written word is a principal function of the federal securities laws.

Rissman v. Rissman, 213 F.3d 381 (7th. Cir. 2000). The Court should not permit the SPA to be rendered meaningless by the oral revisionist claims of Vivendi who, at the end of the game, does not care for the result. Vivendi's fraud claims should be dismissed.

***c. Vivendi Fails to Allege Representations of Existing Fact.***

It is a required element of fraud that "[i]n order to state a claim for relief, plaintiffs must assert that an existing fact was misrepresented by defendant." Segal Co. v. Amazon, 280 F. Supp. 2d 1229, 1232 (W.D. Wash. 2003)). Promises about future performance are not representations of existing fact. See Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, 110 Wash. App. 412, 436, 40 P.3d 1206 (2002).

Valve and the Counterclaim Defendants' alleged statements that "online is a way to nurture the retail business," See A.1.a supra, Statement A, retail sales would remain "the key to [Valve's] strategy," id. the population of online gamers was just 3 million and that "only a fraction of [the 3 million person online gamer community] will be downloading Half-Life 2," id., Statement B, Half-Life 2 could be released later that year [2001], "depending on a number of choices," id., Statement C, and electronic distribution of CSCZ "should not have a material effect on retail sales" id., Statement F, all fail to meet this requirement. They are statements of opinion about potential future events. The fulfillment of *each* of these statements depends upon the performance of a future act, or upon the occurrence of a future event. This important requirement of pleading ensures that a failure to meet a promise or a condition will not



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

provide a basis for a fraud claim. Segal Co., 280 F. Supp. 2d at 1232.[4] Recently, the Washington Supreme Court has reinforced the importance of the "existing fact" requirement, finding the absence of fraud even in the case of a demonstrable misrepresentation made by a lawyer in a fiduciary relationship because the misrepresentation was not one of existing fact. See Stiley v. Block, 130 Wn.2d 486, 505-06, 925 P.2d 194 (en banc) (holding that a letter from an attorney stating "upon clearing title, we will record [the] Deed of Trust. . .which will give him a first lien position against this property" contained a promise of future performance and not a representation of existing fact).

Vivendi's fraud allegations on their face do not rise to the level of actionable fraud and ought to be dismissed.

**2. Vivendi's Claim for Promissory Fraud (Second Cause of Action) Should Be Dismissed.**

Vivendi claims "promissory fraud," alleging that Valve never intended to follow through with its promises to use diligent efforts to continuously develop Half-Life 2 and other games to completion. Counterclaim ¶¶ 151-57. This fraud claim is nothing more than the recasting of the SPA's provisions obligating Valve to use diligent efforts to continuously develop, but leaving the schedule to Valve. See SPA ¶¶ 2.1, 2.2, and 2.3. In support of this claim, Vivendi merely alleges that the obligation was not met because (1) Half-Life 2 was not delivered in 2001 because it was being delayed until Steam could be completed and (2) CSCZ was not completed by October 31.[5] Counterclaim ¶ 152. While it is unlikely that these examples even amount to evidence of a breach (because it is undisputed that the SPA does not require either the delivery of Half-Life 2 by the end of 2001 or the delivery of CSCZ by

---

[4] The counterclaim also alleges that Doug Lombardi of Valve stated in January 2002, after the SPA was executed, that Valve "[didn't] have anything going" with respect to online distribution. See A.1.a supra, Statement A. Vivendi could not have justifiably relied upon Lombardi's statement for any material reason since it was made ten months after the agreement was signed.

[5] Notably, this alleged misrepresentation is immaterial because Vivendi signed Addendum #3 (which addressed CSCZ) on December 28, 2001, two months after the projected release date had already passed.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

October 31, 2001), they cannot provide basis for a promissory fraud claim. Other than the unsupported, conclusory allegation that "Counterclaim Defendants made these representations without any intention of doing so," Vivendi does not (and cannot) provide any specific allegation that could support a fraud claim. Vivendi cannot magnify its breach claim into a fraud claim simply by asserting that Valve had no intention of performing at the time of contracting. The Court need not accept as true unreasonable inferences, unwarranted deductions, or conclusory legal allegations cast in the form of factual allegations. Robertson v. Dean Witter Reyonds, Inc., 749 F.2d 530, 534 (9th Cir. 1984); Western Min. Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981). That standard is even more applicable under the heightened requirements of pleading fraud. Vivendi's promissory fraud claim should be dismissed.

**3. Vivendi's Claim for Concealment (Third Cause of Action) Should Be Dismissed Because the Parties Bargained at Arm's Length and Valve Had No Duty to Disclose Information Related to Its Research and Development Efforts.**

Vivendi alleges that, during negotiations for the 2001 Agreement, Valve concealed its development of its plans for online distribution. Counterclaims ¶¶ 161, 163. Absent Valve's alleged concealment, Vivendi claims that "they would not have entered into the 2001 Agreement or its Addenda." Id. ¶ 164. Not only does the SPA clearly contemplate that Valve has the rights to pursue online distribution, see Section A.1.b n.4 supra, but the law does not impose on Valve a duty to affirmatively disclose any such research and development plans in the first instance. "Absent an affirmative duty to disclose material facts, a defendant's silence does not constitute fraudulent concealment." Crisman v. Crisman, 85 Wn. App. 15, 22 (1997). Fraud by concealment requires more than a mere failure to disclose known facts—there must be a fiduciary duty or a "special relationship" of trust and confidence existing between the parties. In other words, a party has no particular duty to disclose facts to the other party with whom he transacts at arm's length. Reyes v. Atlantic Richfield, 12 F.3d



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1464, 1472 (9th Cir. 1993) ("Parties engaged in an arm's length business transaction do not have a duty to disclose absent a "fiduciary or other similar relationship of trust and confidence"); see Liebergesell v. Evans, 93 Wn.2d 881, 889, 613 P.2d 1170 (Wash. 1980).

Valve's alleged silence during negotiations, therefore cannot support a claim of "fraudulent concealment" because Valve had no duty to disclose such information in an arm's length negotiation between sophisticated parties.

**4. Newell and Lynch Should Be Dismissed from the Lawsuit Because All of the Alleged Statements They Made Cannot Support an Action for Fraud.**

Vivendi has alleged its fraud claims (Counts 1-3) against Newell and Lynch in their individual capacities. As demonstrated above, every statement that Vivendi alleges Newell and Lynch made fails to support these claims. Particularly, the pleaded statements are all opinions or predictions of future events.[6] Even assuming these claims were made, none can support a fraud claim as a matter of law. These individuals cannot be liable for "concealment" because they, like Valve, had no legal duty to disclose the early research and development of on line administration and distribution services either. Newell and Lynch should be dismissed from the lawsuit.

## B. VIVENDI'S CLAIM OF BUSINESS COMPULSION (FOURTH CAUSE OF ACTION) FAILS TO STATE AN ACTIONABLE CLAIM.

Vivendi's business compulsion claim should be dismissed because there is no such cause of action. Rather, it is merely a defense to contract enforcement. See Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982) (defining business compulsion as "a *defense*… to escape liability") (emphasis added). Washington adheres to the majority view that business compulsion, or what is also sometimes

[6] The particular statements were that retail sales will remain "the key to [Valve's] strategy"; "online is a way to nurture the retail business"; "only a fraction of [the on-line population] will be downloading Half-Life 2"; Half-Life 2 could be released by the end of 2001 "depending on a number of choices"; CSCZ would be ready for release October 31, 2001; there were no plans to release CSCZ on-line; and electronic distribution of CSCZ should not effect retail sales. See A.1.a supra.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

referred to as "economic duress," is not an affirmative claim for relief. See e.g., Cho v. First Heritage Bank, No. 48252-1-I, 2002 Wash. App. LEXIS 487 (March 25, 2002) (unpublished) ("We note that duress is a defense to an action to enforce a contract."); Bank Leumi Trust Co. v. D'Evori Int'l, Inc., 163 A.D.2d 26, 31, 558 N.Y.S.2d 909 (N.Y. App. Div. 1990) (economic duress is not a cause of action); Lawless v. Central Prod. Credit Ass'n, 228 Ill. App. 3d 500, 512, 592 N.E.2d 1210 (Ill. Ct. App. 1992) ("Duress has been available to avoid obligations, but not as an independent cause of action for damages."). Vivendi apparently acknowledges this fact and includes "business compulsion" as its Sixteenth Affirmative Defense as well. Counterclaim ¶ 56. This claim should be dismissed.[7]

## C. VIVENDI'S GOOD FAITH AND FAIR DEALING CLAIM SHOULD BE DISMISSED.

Vivendi's good faith and fair dealing claim (Count 6) must be dismissed because it is not a cause of action. Counterclaims ¶¶ 200-203. As this Court has recognized, "[t]he covenant of good faith does not create independent substantive contractual rights. Rather, the implied obligation is in aid and furtherance of the terms of the agreement." McGowan v. The Pillsbury Co., 723 F. Supp. 530, 539 (W.D. Wash. 1989). Vivendi's breach of contract claim alleges, in part, that Valve has breached "good faith obligations" contained in the SPA. Counterclaims ¶ 192. "The duty of good faith implied in every contract does not exist apart from the terms of the agreement." Badgett v. Security State Bank, 116 Wn.2d 563, 572 807

[7] Even if business compulsion were a cause of action, Vivendi's allegations could not support such a claim. "The mere fact that a contract is entered into under stress or pecuniary necessity is insufficient" to show business compulsion. Puget Sound Power & Light Co. v. Shulman, 84 Wn.2d 433, 443,526 P.2d 1210 (1974); Puget Sound Production Credit Assoc. v. O. S. Sablefish, 575 F. Supp. 56, 57 (W.D. Wash. 1983) (holding that circumstances must have permitted "no alternative"). Vivendi alleges that it agreed to renegotiate the 1997 Agreement and sign the 2001 Agreement because Valve threatened to halt or indefinitely delay the development of Half-Life 2 and other games. Counterclaim ¶¶168-70. Vivendi's alleged anxiety, however, could not have reached the level necessary to constitute business compulsion because, as a multi-billion dollar enterprise, it could have chosen to stand on and enforce the rights that it had under the 1997 Agreement; instead, Vivendi simply chose to renegotiate. Valve's alleged threats thus could never have deprived Vivendi of its free will as would be necessary to sustain a compulsion defense.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

P. 2d 356 (1991). Vivendi's claim is simply another attempt to repackage its breach claims. Because it is not an affirmative cause of action under Washington law and is contained in Vivendi's breach claim, Vivendi's good faith and fair dealing cause of action should be dismissed.

**D. VIVENDI'S FAILURE OF CONSIDERATION CLAIM AND FRUSTRATION OF PURPOSE CLAIM ARE AFFIRMATIVE DEFENSES AND NOT CAUSES OF ACTION.**

Vivendi improperly cast two affirmative defenses as causes of action, Failure of Consideration (Count 7) and Frustration of Purpose (Count 8). These claims are defenses, not separate causes of action, and both should be dismissed.

Washington case law demonstrates that failure of consideration is an affirmative defense, not a cause of action. See, e.g., Felt v. McCarthy, 130 Wn.2d 203, 212 (1996) (asserting failure of consideration as a defense). Indeed, Vivendi recognizes this as well because it has raised failure of consideration as its Fourteenth Affirmative Defense. Counterclaims ¶ 54. This claim is particularly inappropriate here where the alleged failure of consideration is not a *formation* issue but rather results from an alleged *breach* of the SPA.

The Ninth Circuit has recognized that "[f]rustration of purpose is an excuse for non-performance, not a cause of action." Far West Fed. Bank, S.B. v. Office of Thrift Supervisions, 119 F.3d 1358, 1364 (9th Cir. 1997). Vivendi cannot make frustration of purpose an affirmative claim. Like its failure of consideration defense, Vivendi has also pleaded frustration of purpose as its Eleventh Affirmative Defense. Counterclaims ¶ 51.

Moreover, as explicitly stated by Vivendi, the alleged facts that form the basis of Vivendi's failure of consideration and frustration of purpose claims (that Valve failed to continuously develop and delayed development of the games) are also the same alleged facts that form the basis for its breach of contract claims. Counterclaims, ¶¶ 205, 210, 211. Vivendi's attempt to restate its breach claim in unrecognized causes of action is duplicative



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

and unnecessary. Both claims should be dismissed.

**E. VIVENDI'S CLAIMS FOR MUTUAL MISTAKE (NINTH CAUSE OF ACTION) AND UNILATERAL MISTAKE (TENTH CAUSE OF ACTION) SHOULD BE DISMISSED.**

Vivendi no longer wants the 2001 Agreement enforced because it does not find the contract as beneficial as it would have liked. In its mistake claims, Vivendi essentially alleges that if its interpretation of the SPA is not adopted, then it must have been mistaken when it entered into the agreement -- this is not a sufficient basis to plead legal mistake. As stated in Valaer v. Campbell, mistake does not occur in favor of a party who had read the agreement, was represented by counsel, participated in preparing the documents, and "thought he was making a good bargain, [but] later developments proved that he was wrong." 49 Wn.2d 835, 842, 307 P.2d 256 (1957). Vivendi does not state a valid cause of action for either mutual or unilateral mistake, and these claims should be dismissed.

***1. Vivendi's Alleged "Mistake" As To the Development Status of the Games Does Not Support a Cause of Action for Either Mutual or Unilateral Mistake.***

Vivendi alleges that either it or Valve (or both) were mistaken as to the "development status" of Valve games; that is, the alleged mistake is that the games were expected to be completed more quickly. Counterclaims ¶¶ 215, 221. Even if taken as true, a flawed, unilateral expectation about a future event does not amount to a mistake. See Super Valu Stores, Inc. v. Loveless, 5 Wn. App. 551, 554, 489 P.2d 368 (1971) ("an expectation…which failed to materialize" is not a mistake). Misperceptions about what is contained (or not contained) in a written agreement do not support a claim of mistake. In re Marriage of Schweitzer, 132 Wn.2d 318, 329, 937 P.2d 1062 (1997).

Moreover, "there is no mutual mistake when one party relies on the other for mistaken information." Thomas v. Ruddell Lease Sales, Inc., 43 Wn. App. 208, 212-13, 716 P.2d 911 (1986) (holding that mutual mistake must be "independently made by both parties"). Since



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Vivendi alleges no source other than statements *by Valve*, cannot show mutual mistake. Counterclaims, ¶¶ 96-98.

***2. Vivendi's Alleged "Mistake" As To Which Party Received Cyber Café Rights Under the SPA Does Not Support a Cause of Action for Either Mutual or Unilateral Mistake.***

Vivendi's second basis for mistake is that one or both parties were mistaken about which party had the rights to distribute to cyber cafés under the SPA. Counterclaims, ¶ 216. It is clear that before the parties entered into the SPA, Vivendi had rights to distribute the Valve games, including to cyber cafés. It is also agreed that the SPA changed the allocation of these rights, with Valve receiving and retaining all distribution rights to the Valve games but granting Vivendi's rights to distribute "retail packaged product" in the "retail channel," among other rights. See, SPA § 3.5. Indeed, a "mistake" as to the meaning of a contract provision is not a mistake at all but merely a dispute about the legal meaning of the contract that can be addressed through the parties' breach of contract claims.

Further, Vivendi's claim of mutual mistake with regard to cyber café distribution also fails, because mutual mistake requires the parties share "an identical intent when they formed [the contract, yet] did not express that intent in the document." Halbert v. Forney, 88 Wn. App. 669, 674, 945 P.2d 1137 (1997). Here, Vivendi alleges that each party thought it was acquiring the right to distribute to cyber cafés. Counterclaims, ¶ 216. As there is no identical intent, mutual mistake must fail. "A mistake on the part of one party alone is not relievable." Kiniski v. Archway Motel, Inc., 21 Wn. App. 555, 564 (1978).

Where a party to a contract "has made himself acquainted with the words of the document and his mistake concerns its interpretation or legal effect, his unilateral error affords no more grounds for relief than does ignorance of the words." 13 *Williston on Contracts*, § 1577 (3rd ed. 1970). Claims of unilateral mistake are rare and questionable. Unless the effect of the mistake is so great that enforcement of the contract would be



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

unconscionable, a contract is voidable under unilateral mistake only if the other party had reason to know of the mistake. See, Gill v. Waggoner, 65 Wn. App. 272, 276 (1992). Vivendi's counterclaims do not show that enforcement of the contract would be unconscionable or that Valve had reason to know of Vivendi's alleged misperceptions about the SPA.

### F. VIVENDI'S CLAIM OF TORTIOUS INTERFERENCE (ELEVENTH CAUSE OF ACTION) SHOULD BE DISMISSED.

Vivendi's alleges that Valve committed tortious interference with a business expectancy by "coercing" Vivendi into entering the 2001 Agreement, concealing the development of Steam, and "secretly imbedding Steam on CSCZ." Counterclaims ¶ 216. This claim must be dismissed because tortious interference lies only against an "intermeddling third party." Houser v. Redmond, 91 Wn.2d 36, 39, 586 P.2d 482 (1978). "A party to a contract cannot be liable in tort for inducing its own breach." Olympic Fish Products, Inc. v. Lloyd, 93 Wn.2d 596, 598 (Wash. 1980). By duplicating its breach of contract claim and failing to specifically identify a third party, Vivendi has not plead facts that could sustain a tortious interference claim. See Intervisual Communs. v. Volkert, 975 F. Supp. 1092, 1103 (N.D. Ill. 1997) ("If a plaintiff were not required to specifically identify parties who actually contemplated entering into a business relationship, liability under a theory of tortious interference… would be virtually without limit and impossible to calculate."). Vivendi's attempt to recast its breach claim as a tortious interference claim should be dismissed.

### G. VIVENDI'S CONSUMER PROTECTION ACT CLAIM (TWELFTH CAUSE OF ACTION) SHOULD BE DISMISSED.

Vivendi alleges that Valve violated RCW 19.86, the Washington Consumer Protection Act ("CPA"), by misrepresenting the release date of Half-Life 2 and CSCZ to Vivendi and the public. Counterclaim ¶¶234-38. To prevail on a CPA claim, a plaintiff must establish five



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

elements: (1) an unfair or deceptive act or practice (2) occurring in trade or commerce; (3) an impact on public interest; (4) an injury to the plaintiff in his or her business or property; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn. 2d 778, 780, 719 P.2d 531 (1986). Each of the elements must be satisfied before a CPA claim will be sustained. Id. at 793. Vivendi's counterclaims fail to raise a triable issue concerning: (1) unfair or deceptive acts, and (2) impact on the public interest.

***1. The Acts Alleged by Vivendi Are Not Unfair or Deceptive***

For conduct to be an "unfair or deceptive practice under the CPA," it must have the "capacity to deceive a substantial portion of the public." Hangman Ridge, 105 Wn. 2d at 785. Valve's statements, as alleged, were directed at Vivendi alone. Even if Valve misrepresented the status of its games to Vivendi, misrepresentations directed only at Vivendi are not capable of deceiving a "substantial portion of the public." Henery v. Robinson, 67 Wash. App. 277, 291, 834 P.2d 1091 (1992) ("isolated communication" between the parties insufficient to show substantial portion of the public deceived); Micro Enhancement Int'l v. Coopers & Lybrand, 110 Wash. App. 412, 439, 40 P.3d 1206 (2002) (CPA claim meritless where statements did not have the capacity to "deceive anyone other than [the plaintiff]").

In its effort to implicate the CPA, Vivendi alleges that the misrepresentations made to it were also made to the public. Announcements to the public regarding the release date of a computer game are not acts of "material importance" that could merit protection under the CPA. See Hiner v. Bridgestone/Firestone, Inc., 91 Wash. App. 722, 730, 959 P.2d 1158 (1998) ("Implicit in the definition of 'deceptive' is the understanding that the actor misrepresented something of material importance."). Similar representations occur frequently in business and entertainment. A motion picture may not be released when it was originally scheduled, or the release date of a compact disc or hardback book may be pushed back for purely commercial reasons. These are not deceptive acts but merely the realities of



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

commercial practices and the unpredictability of developing a product. See RCW 19.86.920 ("[the CPA] shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business …"); see also Travis Horse Breeders, 111 Wn. 2d 396, 408, 759 P.2d 418 (1988). Absent an act that could deceive a substantial portion of the public, Vivendi's allegations cannot give rise to a CPA claim.

***2. The Acts Alleged by Vivendi Do Not Sufficiently Affect the Public Interest***

Vivendi's allegations also fail to allege a deceptive act that could sufficiently impact the public interest. The Washington Legislature specifically stated that the CPA "shall not be construed to prohibit acts or practices… which are not injurious to the public interest." RCW 19.86.920. Adhering to the Legislature's intent, Washington is among the minority of states that imposes a public interest requirement on all CPA claims. Hangman Ridge, 105 Wn. 2d at 787.

Valve's alleged announcements to the public regarding the release date of a computer game cannot injure the public interest; the purchasing public simply does not suffer damages from having to wait for the release of a game. Additionally, the alleged *private* representations made by Valve to Vivendi cannot injure the public interest. The statute does not provide extra protection for experienced business entities who, like Sierra and Vivendi, have "sufficient sophistication to remove them from the class of bargainers subject to exploitation." Pacific Northwest Life Insur. Co. v. Turnbull, 51 Wash. App. 692, 703, 754 P.2d 1262 (1988) (CPA claim properly dismissed as to parties with a "history of business experience"); Segal Co. v. Amazon, 280 F. Supp. 2d 1229, 1234 (W.D. Wash. 2003); Hangman Ridge, 105 Wn.2d at 794. Vivendi's dispute with Valve is thus not a CPA case but a purely private dispute that fails to implicate the *consumer* and *public* protections afforded by the CPA. Defendant's CPA claim should be dismissed.



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## V. CONCLUSION

Vivendi's Counterclaims present a cumbersome assortment of baseless causes of action that present no independent facts or basis for recovery, but instead are duplicative of Vivendi's breach of contract claim. Many of these alleged "causes of action" are in fact not causes of action at all, and instead are merely affirmative defenses. In addition, Vivendi's fraud and mistake claims attempt to provide Vivendi an "escape route" if it does not like the ultimate interpretation of the SPA. As counterclaims 1-4 and 6-14 fail to state a claim on the facts as alleged, Valve respectfully requests this Court dismiss these counterclaims pursuant to FED. R. CIV. P. 12(b)(6).

DATED this 27th day of February, 2004.

PRESTON GATES & ELLIS LLP

/s/ Jason P. Holtman
By ____________________________
Karl J. Quackenbush, WSBA #9602
Jason P. Holtman, WSBA # 28233
Kristin J. Boraas, WSBA #32015
Attorneys for Plaintiff
Valve Corporation





PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on February 27, 2004, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will send notification of such filing to the following,

Annette Hurst/Sarah King/Simon Frankel, Esq.
Howard Rice Nemerovski Canady Falk & Rabkin, P.C.
Three Embarcadero Center
7th Floor
San Francisco, CA 94111

Michael R. Scott
Hillis, Clark, Martin & Peterson
500 Galland Building
1221 Second Avenue
Seattle, WA 98101-2925

_____/s/ Jason P. Holtman__________
Karl J. Quackenbush, WSBA #9602
Jason P. Holtman, WSBA # 28233
Kristin J. Boraas, WSBA # 32015
Attorneys for Plaintiff
Valve Corporation
Tel: (206) 623-7580
Fax: (206) 623-7022
jasonh@prestongates.com



PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022