1      UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WASHINGTON

3             AT SEATTLE

4
VALVE,                          )
5                               )
                  Plaintiff,    )
6                               )
          -vs-                  )CASE NO. C02-1683Z
7                               )
SIERRA ENTERTAINMENT,           )
8                               )
                  Defendant,    )
9  _____

10            Verbatim of Proceedings
                    before
11        THE HONORABLE THOMAS S. ZILLY

12  _____
               Seattle, Washington
13

14

15

16

17

18

19

20

21  Date:  Friday, June 4, 2004
    Reported By:   Susan A. Zielie, CCR, RPR
22

23

24

25

                    A P P E A R A N C E S

For the Plaintiff:          KARL QUACKENBUSH, ESQ.
                            JASON P. HOLTMAN, ESQ.
                            KRISTIN J. BORAAS, ESQ.
                            Preston, Gates, Ellis
                            925 Fourth Avenue
                            Suite 2900
                            Seattle, WA 98104-1158

For the Defendant:          ANNETTE L. HURST, ESQ.
                            LINDA Q. FOY, ESQ.
                            Howard, Rice, Nemerovski,
                                Canady, Falk & Rabkin
                            Three Embarcadero Center
                            San Francisco, CA 94111-4024

                            MICHAEL R. SCOTT, ESQ.
                            Hillis, Clark, Martin
                                & Peterson
                            500 Galland Building
                            1221 Second Avenue
                            Seattle, WA 98101-2925

1          SEATTLE, WASHINGTON; FRIDAY, JUNE 4, 2004

2                    10:00 A.M.

3                    --oo0oo--

4

5          THE CLERK:  Case No. C02-1683Z, Valve vs. Sierra

6    Entertainment.  Counsel, please stand and make your

7    appearances.

8          MR. QUACKENBUSH:  Karl Quackenbush representing

9    Valve Corporation, Mr. and Mrs. Newell and Mr. and Mrs.

10   Lynch.  With me at counsel table are my colleagues, Jason

11   Holtman and Kristin Boris.

12         MS. HURST:  Good morning, Your Honor.  Annette

13   Hurst of Howard Rice representing Sierra, Vivendi Universal

14   Games and Vivendi Sales.  With me are Mr. Scott from the

15   Hillis Law Firm and Linda Foy from Howard Rice, and also Mr.

16   Roeder who is the general counsel for Vivendi Universal.

17         THE COURT:  It appears both sides are

18   well-represented this morning.

19         The motion comes on before the Court for

20   Plaintiff's counterclaim for failure to state a claim, Docket

21   No. 110.  I have set this time for oral argument, and I'm

22   going to permit oral argument, but I'd like to give you some

23   direction and tell you generally where my uncertainty is with

24   respect to these issues.

25         First, my law clerk gave you a chart which attempts

to, on the left-hand column, list every claim that we think
the counter-claimant is making with respect to
misrepresentations.  In the middle column, we've attempted to
quote that portion of the contract if the contract deals with
the subject.  And, on the right side, we've given at least a
tentative, "this is opinion or this is fact."  Obviously, if
it's fact and all the other elements of fraud can be proved,
it goes forward.  If it's opinion, it can't be the basis for
a fraud claim.

Now, I'm not asking you to accept my tentative
conclusions on what's a fact and what's an opinion; but,
because I'm going to want you to address specifically the
specific representations, I thought it would be helpful if we
all had the same list, and hopefully we've got all of the
alleged misrepresentations of fact that counsel wants to talk
about.

The second and frankly more challenging issue is to
try and make some sense, I guess that's the only way I could
describe it, between the line of cases that are best shown by
the *Gole vs. Jain* case, Judge Lasnick's case found at 259
F.Sup.2d 1128.  That case relies heavily on another case of
*One-O-One Enterprises, Inc. vs. Caruso*, but basically saying
that contracts would not be worth the paper they're written
on if we can't rely on these integration clauses.

So we've got that line of cases, which I think has

a lot going for them.  Then we have what appears to be

Washington cases, which seem to be in conflict.  A good

example is the *Coson vs. Roehl* case, 63 WA.2d 384, which

deals with the proposition that if you have fraud in the

inducement of a contract, that fraud would vitiate the entire

contract notwithstanding a provision in the contract that

there are no understandings or agreements not contained in

the writing.  Those two and Coson have many other cases that

stand for the same general proposition.  They seem to be

somewhat in conflict.  Hopefully, the lawyers will be able to

assist me in understanding how we can reconcile those two

lines of cases, if it can.

        My tentative view would be that if the terms -- let

me put it this way.  The parol evidence, in light of the

integration clause, should probably not be admitted to

contradict or vary a term in the contract.  Because, if it

could, I think the Judge Lasnick line of cases is a more

appropriate resolution.  On the other hand, if the contract

is silent on a term or condition, then it's not all together

clear to me that -- well, I think that parol evidence can

come in if the defendant counter-claimant believes that or

alleges that representation, if it was a fact.  And, of

course, we've got all the other ingredients of fraud, which

really aren't relevant here, this is a motion to dismiss, not

a motion for summary judgment, but if it's not in the

1  contract and if the defendant alleges but for this

2  representation they wouldn't have entered into it, in other

3  words, fraud and inducement, then that seems to me the Coson

4  line of cases is more relevant.  And, of course, underlying

5  all of this is the question of whether or not any of these

6  things can be decided as a matter of law, or ultimately

7  whether something was a representation that induced the

8  defendant to do something is for a jury at a later date.

9       Well, I don't know if that helps or confuses you,

10  but we've spent a great deal of time, I've spent a great deal

11  of time reading all of these cases, studying the agreements,

12  and it's less than clear, and I hope you'll be able to clear

13  it up.  With that, we have the moving party, we might as well

14  hear from Mr. Quackenbush or one of the plaintiff's lawyers

15  first.  And let's see if we can limit our argument to 20

16  minutes per side.  I do want to spend some time on the

17  Motions to Compel, the Motion to Compel as well.

18       MR. QUACKENBUSH:  Thank you, Your Honor.

19       The 2001 agreement that we're really talking about

20  here is a comprehensive road map to the relationship between

21  these two parties with regards to the development, payment

22  for, timing of, distribution of Valve's games.  All of the

23  subject matters that are alleged not to be the subject of

24  fraudulent misrepresentations are in the contract.  All of

25  those subject matters are dealt with in the contract.  And,

1  I'd like to, if I might, I tried to simplify things and do my

2  own chart, which has what I think are the relevant contract

3  provisions.  And then I also set out a list of the alleged

4  misrepresentations -- of course, you've already done that,

5  thank you -- and then the amended counterclaim.  With the

6  Court's permission, I'd like to hand this up to illustrate my

7  argument.

8         THE COURT:  All right.

9         MR. QUACKENBUSH:  So, just briefly, I think you

10  have to look at all the four agreements that are attached to

11  the defense counterclaim and are fair game on a Motion to

12  Dismiss.  And I just want to highlight sort of the chief

13  subject matters that govern here.

14         The products covered, we started with one product,

15  which was Half-Life.  And then we had a new agreement for

16  three other products.  Then we had a modification of the

17  original agreement.  And then we had the 2001 agreement that

18  we're talking about now, which covers many, many products,

19  future products, options on future products, rights of first

20  refusal on the first products.  Included among the products

21  covered by this agreement is the product that's referred to

22  as Game 3, which was delivered last year and shipped earlier

23  this year under the name Counterstrike Condition Zero.  And

24  the other product, another product it dealt with is Half-Life

25  2, which is the sequel to the famous Half-Life game, which is

1  going to be completed this summer.

2  So what you can see here is that the agreement

3  signed in March 2001, that Vivendi has enjoyed the benefits

4  in the agreement.  I think they're going quite nicely, thank

5  you, since 2001, over three years.  Now comes back and tries

6  to collaterally attack the agreement with allegations that

7  things were said to me before I signed.  As I was about to

8  sign this paper, I was thinking about these things that were

9  said to me that are inconsistent with the agreement, that I

10  raise over three years later, having enjoyed the benefits of

11  the agreement during those three years.  If this agreement

12  can be collaterally attacked by after-the-fact recollections

13  about something somebody told me in a sophisticated

14  negotiation between this game outfit in Bellevue and one of

15  the largest media conglomerates on the planet, then you can't

16  integrate any contract.  You can't rely on any contract.

17  The ownership of intellectual property is --

18  THE COURT:  Let me ask you whether you agree or

19  disagree with my tentative view that, if it's a fact that's

20  represented which is -- and assuming all of the other

21  ingredients of fraud, that it was material, et cetera, et

22  cetera, if the subject is not covered by the agreement, don't

23  I have to deny your Motion to Dismiss?

24  MR. QUACKENBUSH:  Well, if the agreement is silent

25  about it.  So, for example, let's say the allegation was,

1  Valve, you're going to move your headquarters to Los Angeles

2  because we want all your developers in our shop, you promised

3  us that you would do that.  Theoretically, if that was

4  material, and that was a lie, and that was said with intent,

5  and all the other things --

6          THE COURT:  And, it was a fact, which it may or may

7  not be.

8          MR. QUACKENBUSH:  Right.  -- I suppose you could

9  stay a cause of action for fraud.

10         Here, all the subject matters or the statements are

11  negotiated and got resolved in this agreement.  So look at

12  the ownership of intellectual property.  We start out with

13  Sierra, sort of a classic -- it's the second row -- sort of

14  the classic publisher -- artist, publisher or author record

15  company, musician arrangement where --

16         THE COURT:  Let's go to specifics.  On my chart on

17  15, the middle one is, in mid-January 2001, Mr. Lynch had

18  allegedly told the defendants that the population of on-line

19  gamers was just 3 million.

20         MR. QUACKENBUSH:  All right.

21         THE COURT:  Now, is that a fact?

22         MR. QUACKENBUSH:  I suppose it is.

23         THE COURT:  All right.  Is it covered in the

24  agreement?

25         MR. QUACKENBUSH:  Well, the subject of on-line

1   distribution is definitely covered.

2        THE COURT:  Well, is the population of on-line

3   gamers covered?

4        MR. QUACKENBUSH:  Not to my knowledge.  I'm not

5   sure that this specific allegation is what's being alleged as

6   an inducement to enter into the agreement.  I think it's the

7   next part of that sentence.  But I agree, if I say there's --

8   I know for a fact there's 3 million people on-line, sure,

9   that sounds like a fact.

10       THE COURT:  Let's go to the next page, the top one.

11  The ones that are highlighted on the left-hand are what I

12  think are facts.  It's alleged that your clients falsely

13  represented that Half-Life 2 and CSCZ were near completion.

14  Is that a fact?

15       MR. QUACKENBUSH:  I'm sorry, this is page 60?

16       THE COURT:  You've got a different page.

17       MR. QUACKENBUSH:  I'm with you.

18       That strikes me as, given the fact that these were

19  games out into the -- that were under development, strikes me

20  as a statement of opinion by a developer.

21       THE COURT:  But isn't it a fact?  If we say it's

22  near completion, it might be vague as to how soon it's going

23  to be -- what if they said it was going to be completed next

24  week?

25       MR. QUACKENBUSH:  There was an allegation that it

1   was going to be done by October 31.  Then you have to look at

2   the contract and say is that specifically dealt with.  And

3   you look at paragraph -- you look at the delivery schedule,

4   paragraph 2.2, and you see there's no deadlines for delivery

5   of these games.  As opposed to the prior agreements where

6   each milestone for delivery of the game including the final

7   one had a date-certain and a payment associated with it.  In

8   this contract, it's up to Valve when to deliver.  And there's

9   no payments.  They don't have any skin in the game under this

10  contract because they're not making any interim payments to

11  get the game done.  Valve controls the -- has artistic

12  control over a game.  And it's a little bit unusual of a

13  contract in this context to say, I'll tell you when the game

14  is done because I'm not going to be satisfied with it until

15  it's perfect and I'll tell you when it's done; I don't want

16  you breathing down my neck.  So, in light of that, I don't

17  think you can sustain a fraud allegation by saying, They told

18  me specifically when it would be done.  Because, in fact, if

19  you look in the context, Valve is specifically saying, We

20  won't tell you that it's going to be done on a specific date;

21  if you ask us what our schedule is like, we have an

22  obligation to tell you, but that's it.  And then Vivendi --

23          THE COURT:  Let me go to another specific.  I think

24  I now do have your same page paginations.  Go to page 17, the

25  top one, where Mr. Newell is alleged to have, and Mr. Lynch,

1    falsely told the Sierra in-house counsel, Mr. Roeder, that

2    Valve had no plans to release a nonretail version of the

3    CSCZ.  Let's assume that that was -- is that a fact?  They

4    had no plans to release that nonretail version of that?

5          MR. QUACKENBUSH:  Well, just to be clear, this CSCZ

6    refers to the product that was released earlier this year.

7    So we're talking about a product that's way out in the

8    future.

9          THE COURT:  But that's not the point.  The point is

10   that, prior to entering into apparently addendum 2,

11   defendants contend that they were told that your client had

12   no plans.  Now let's assume that in your shop was a memo

13   saying, The moment they sign this addendum 2, we're going to

14   release a nonretail version.  Let's assume that's material.

15   Is there anything in the contract that deals with that

16   subject?

17        MR. QUACKENBUSH:  Yes, there is.

18        THE COURT:  And we've quoted 3.11.  But, I don't

19   know, would that representation conflict with a term in the

20   contract?

21        MR. QUACKENBUSH:  Well, the contract gives Valve

22   all the ownership of all the intellectual property rights and

23   all the distribution rights, including on-line, say for this

24   retail package product in the retail channel; okay?  Clearly,

25   on-line distribution was contemplated, and it's alleged in

1   the counterclaim that Vivendi was concerned about it.  So

2   what they did is they insisted on and got an insurance policy

3   against on-line distribution impacting the retail channel.

4   And that's section 5.3, which is at the bottom right corner

5   of my chart.  And what that says is that, Valve, if you go --

6           THE COURT:  Just a moment.  Where is it on your

7   chart?

8           MR. QUACKENBUSH:  Bottom right corner.

9           THE COURT:  Of the face sheet?

10          MR. QUACKENBUSH:  Yeah.

11          THE COURT:  Go ahead.  And it's 5.3?

12          MR. QUACKENBUSH:  That's right.

13          THE COURT:  Is it section 5.3 of the agreement of

14  March 29, or the addendum?

15          MR. QUACKENBUSH:  It's the agreement, Exhibit D to

16  the counterclaim, the March 2001.  It's the one that starts

17  out Revenue Protection.  In a nutshell, what that says is

18  that Vivendi will do a projection of how much they're going

19  to sell into the retail channel, they'll do an advance six

20  months' projection in advance.  If their actual sales don't

21  meet that, then they come back to Valve and say, You need to

22  pay us for the difference between what we thought we'd sell

23  and what we didn't sell.  And this is a good insurance

24  policy, they don't have to prove that it was Valve's fault,

25  they have to prove it wasn't Vivendi's fault.  They just send

1 a bill for the difference.  It may be that the product wasn't

2 popular, it may be that the projection was wrong.  But that's

3 the insurance policy that they get.  So, for the fellow to

4 sign this agreement to say, Well, I really thought there was

5 only going to be only diminimus distribution or I really

6 thought they weren't going to distribute on-line strikes me

7 with inconsistent --

8 THE COURT:  What if they had said, We will not

9 distribute on-line, is that contrary to this?

10 MR. QUACKENBUSH:  Absolutely contrary to this.  In

11 fact, they insured against it.  They insured that, if it

12 impacted them and cost them money, they'd get a rebate.  So

13 it's hard for me to see how you can weave a fraud allegation

14 into that by saying, We thought it was just going to be a

15 minor deal, or we didn't think it was going to happen very

16 soon, or we really didn't think you were going to do it.

17 Because the contract provides for it.

18 And, specifically with regard to the delivery,

19 going back to the delivery schedule, how can you attack this

20 contract with a fraud allegation, You promised me you'd be

21 ready by the fall, or you promised me you'd be ready by a

22 certain date, when you know that you're taking the delivery

23 schedule completely out of the agreement?

24 And there's another insurance policy on delivery in

25 this agreement.  The agreement says, Valve, you should just

continuously use diligent efforts to continuously develop
these products, period.  That's what you should do.  No date,
no timetable.  When it's ready, it's ready.  But the
insurance policy is, if you don't diligently pursue
development, our remedy under this contract, which we
contemplated and which we bargained for, is we're going to
take the intellectual property back.

THE COURT:  I want to move away from the specifics
to a general.  If I were to conclude that there were one or
more representations of fact which the Court was unclear of
as a matter of law as to whether or not I could dismiss, in
other words, whether it's induced the contract or not, is
that a jury question?  And, if any material issue of fact
resulted in ultimately the trier of fact or the court on
summary judgment concluding that it had been made, et cetera,
what does it mean to vitiate the contract?  I mean, would
we -- would this agreement fly out the window?

MR. QUACKENBUSH:  Apparently so.

THE COURT:  That doesn't make much sense; does it?

MR. QUACKENBUSH:  It doesn't make much sense for a
variety of reasons.  One, we've been doing business under
it, earning very nice profits for Vivendi, for three or four
years.  Number two, there's some 16, 18, how many number of
counterclaims of those saying you've breached the contract
and we want damages and we want some recovery, and we want

1  this insurance policy that we spoke about, we want the

2  intellectual property back because you breached the

3  agreement.  I guess you have to get rid of all those.  I

4  mean, you either have to have the contract, or you don't.

5  Either you want the contract or you don't.

6       But it strikes me, going back to your original

7  question, it's not a jury issue, because here you have the

8  parties agreeing -- and this isn't a contract teaching, this

9  isn't a house siding -- you have the parties agreeing this

10 contract supersedes and cancels any prior understanding.

11      THE COURT:  Is it your position that there could

12 not be a prior oral representation that was made that, my

13 hypothetical, one, it was material, it was made, and it

14 induced them to enter into the contract?  You're saying that

15 it doesn't matter.  You're saying it doesn't matter, there

16 could not be -- there's no statement of fact, no material

17 representation that induced them to enter into the contract,

18 that they could now claim fraud and inducement?

19      MR. QUACKENBUSH:  If it's dealt with in the

20 agreement.  Let me give you an example, a very simple

21 example.  Contract calls for royalty rate of 37 percent.

22 They're various permutations, but it's basically 37 percent.

23 What if Valve were standing here, what if we were standing

24 here, we know it said 37 percent, we know there's no prior

25 understandings, you promised us as we were writing this thing

1    you're going to pay us 40; right?  I don't think you can

2    bring that claim.  I think you'd lose that claim.

3         THE COURT:  I think that's the Judge Lasnik's case.

4    That's what -- I think that's where I see the distinction of

5    these cases, is, if it's in the contract, I don't think you

6    can bring the claim.  The question, it's not entirely clear

7    in some of these alleged facts, what I think are facts, are

8    or are not in the contract.

9         MR. QUACKENBUSH:  They really break down into

10   there's really two categories.  There's these alleged

11   representations about on-line distribution, are you going to

12   do it, when are you going to do it, how much are you going to

13   do it.  On-line distribution is definitely dealt with in the

14   contract.  And, as I said, there's an insurance policy in

15   case Valve is successful.  And then there's the allegations

16   about delivery dates, due dates.  Well, there just aren't any

17   due dates in the contract.  And what is in the contract is

18   Valve having control over when this product is delivered.  As

19   opposed to the other three --

20        THE COURT:  Does Valve having control over when the

21   product is delivered set forth somewhere?

22        MR. QUACKENBUSH:  The language is in each provision

23   about each game; but look at section 2.2.  the section is

24   Development and Delivery, section 2.  And then the language

25   is the same for basically for each game, but 2.2 is the

1    simplest one, Delivery and Development and delivery of

2    Half-Life 2.  And the obligation Valve has to it is to

3    develop, make and deliver and continuously develop.

4         Again, just for context, contrast that with the

5    prior three agreements, each one with an exhibit with

6    specific delivery dates, the milestones you have to meet,

7    final product has to be done by a particular date.  How can

8    you come back later and say, Well, what you told me was that

9    there'd be a specific delivery date, when you specifically

10   took it out and rearranged your relationship?

11        THE COURT:  Let me ask you this.  Can I even look

12   at the prior agreements to decide?  You want to hide behind

13   this -- perhaps hide behind is a little strong -- but you

14   want to take advantage of the benefit of this integration

15   clause.  Can you even look at those prior agreements?

16        MR. QUACKENBUSH:  Yes.  Because one of the elements

17   of fraud is that it needs to be proved in order to maintain a

18   claim was there a right to rely, was the reliance reasonable,

19   the alleged reliance, how can you say I relied on a specific

20   allegation?  Again, these are part of the counterclaim, these

21   were attached on the counterclaim, so you can consider them

22   on the Rule 12.  Now, how can you say you promised me a

23   specific -- it's really no different than my hypothetical, I

24   know the agreement says 37 percent but you promised me you'd

25   pay 40.

1          THE COURT:  Let's go back to paragraph 2.2 again.

2     It talks about Valve will inform Sierra of its then current

3     development schedule and review and discuss and use diligent

4     efforts to develop to completion.  Let's assume, as part of

5     the negotiations, your clients told the defendants that it

6     will be done in 30 days.  I'm not sure that's a fact, but

7     let's assume it's a fact.  And they wouldn't enter it unless

8     it was going to be done in 30 days.

9          MR. QUACKENBUSH:  Assume it's absolutely essential.

10         THE COURT:  Yes.  Is that precluded by this

11    delivery clause?

12         MR. QUACKENBUSH:  Yes, it is, because the delivery

13    and development is specifically dealt with.  The integration

14    clause says no other agreements, no other -- any other

15    understandings you may have are canceled whether you have

16    some subjective -- maybe you thought I said this, may you

17    subjectively believed it, those are canceled, and you

18    provided some safety net for yourself if you didn't get the

19    game in what you thought was a timely way.

20         THE COURT:  I want to go back to that safety net in

21    just a moment, because I'm not entirely sure I fully

22    understand it.

23         MR. QUACKENBUSH:  Sure.

24         THE COURT:  But let's assume that -- this is a

25    complicated agreement -- but let's assume that the only

1   product was Half-Life 2, and the agreement was to, under

2   Development and Delivery, was, just as provided in 2.2, that

3   Valve will inform of its then current development schedule

4   upon request and review and discuss the schedule and use

5   diligent efforts to develop to completion.  Let's assume,

6   prior to signing the agreement, they said, Well, how are you

7   doing on HL, on the Half-Life 2, and you produced a schedule

8   and said, Here's where we are, we'll be done next week, it's

9   a certainty.  Now, why wouldn't that be -- and the only

10  reason they entered into it was that you were going to be

11  done next week.  Isn't that fraud inducement?

12          MR. QUACKENBUSH:  I don't think so.  It may be a

13  lie.

14          THE COURT:  It would be without the integration

15  clause.  The real question is whether you can rely on the

16  integration clause; isn't it?

17          MR. QUACKENBUSH:  It's whether you could rely on

18  the integration clause, whether there's a right to rely when

19  the contract says something different.  And there are lots

20  of --

21          THE COURT:  What does it say when it will be ready?

22  It doesn't say something different.  It says that you'll

23  inform them if they request it.

24          MR. QUACKENBUSH:  Yeah.

25          THE COURT:  Does a representation that says -- my

1  hypothetical really is that, the day before they signed it,

2  they said, Well, how are you doing, and you made this

3  positive statement, It will be done next week.

4       MR. QUACKENBUSH:  Then you can't explain why you

5  have 2.2.  it makes no sense.  You're going to inform us

6  about your schedule in the future.  If the representation is,

7  You promised us it's going to be done next week, why don't

8  you have that promise in the agreement?  There are a whole

9  scad of representations that Valve makes in this agreement

10  and in section 7.1, representations and warranties by Valve.

11       THE COURT:  Just a moment.

12       MR. QUACKENBUSH:  Which is on page 25 of the

13  agreement.  So, if that representation was material, in other

14  words, if there was -- you're not signing the agreement

15  without it, and you have a right to rely on -- there must be

16  10 or 11 representations that Valve makes here in section

17  3.1.  why isn't it on the list?

18       THE COURT:  Now explain to me this insurance or

19  guarantee or whatever that backed up this Half-Life 2.

20       MR. QUACKENBUSH:  Sure.  If you look at -- it's on

21  page 17 of the agreement, 3.12, Revision of Intellectual

22  Property.

23       THE COURT:  What portion of that is important?

24       MR. QUACKENBUSH:  It starts out, and I'm kind of

25  paraphrasing here, but, in other words, there's notice from

1   Sierra that you're not continuously developing these games in

2   accordance with section 2.2, which is the one that says you

3   will continuously develop them, and I give you notice, and if

4   you don't cure it, then I get all the intellectual property

5   back, I get the crown jewels back of this agreement.

6          Now, interestingly, that's one of the things that

7   Vivendi is suing Valve for, is failure to continuously

8   develop.  It strikes me as odd that you're going to sue on

9   this promise to continuously develop while saying, I'm going

10  to rescind the agreement and void it because you promised a

11  date-certain.  I don't see how you can have that both ways.

12         THE COURT:  Well, lawyers frequently plead in the

13  alternative.

14         MR. QUACKENBUSH:  They do.  But at some point you

15  have to sort to fish or cut bait, it seems to me.  The point

16  here is, as you've observed, this is a complicated agreement.

17  I've tried to set out the important pieces here.  All of the

18  subject matters are covered.  All the subject matters are

19  covered.  And, if you can come back later and say, I know the

20  subject matter is covered but you told me something

21  different, and I know I said there wasn't any different

22  understanding but you told me something different, what

23  agreement is going to be worth -- how can you sustain a

24  contract against an after-the-fact, three years later?  After

25  you've been doing business under the contract for three

1    years, and you decide you don't like it because Valve sues

2    you to enforce its right, you answer back with 19 fraud

3    allegations or 20 fraud allegations that there never was a

4    contract in the first place?

5              THE COURT:  I think I understand.  Thank you.

6              MS. HURST:  Good morning, Your Honor.

7              THE COURT:  Good morning again.

8              MS. HURST:  I think there are two, at least two

9    potential ways of reconciling the two lines of cases that the

10   Court has identified, the Coson case and the *Goel vs. Jain*

11   case.  The first way to reconcile them is that the discussion

12   in *Goel vs. Jain* is clearly dicta, the discussion of the

13   integration clause.  There was a separate release agreement

14   entered into in *Goel vs. Jain* after the fully integrated

15   agreement was signed.  And the majority of the discussion in

16   Goel in dismissing the fraud claim, and I believe that was on

17   summary judgment, Your Honor, not on a 12(b)(6) motion,

18   relates to that separate and independent release, full

19   release agreement.

20             THE COURT:  Just a moment.  It does appear to be a

21   summary judgment, you're right.  Go ahead.

22             MS. HURST:  So there was a separate and independent

23   release agreement that was signed by the plaintiff in this

24   case after the main agreement.  And the Court almost

25   exclusively relies, and then at the end of its discussions,

1    it sort of says -- and it actually literally says, Not to the

2    mention the integration clause, and then it cites this

3    out-of-Washington authority, the One-O-One Enterprises case.

4            So one way to reconcile Coson and Goel, Your Honor,

5    is that the discussion of the integration clause in Goel is

6    dicta.  And Coson is the last pronouncement of the Washington

7    Supreme Court on this issue, and it makes the very broad

8    statement reiterating the statement made by the court in

9    seven prior cases that fraud in the inducement vitiates an

10    exculpatory clause like the one that Mr. Quackenbush is

11    relying on here this morning.  So that's one way to reconcile

12    these two lines of authority.

13            THE COURT:  Let me ask you this.  Dealing with

14    Coson and all of the other cases, can you have a

15    representation of fact that's material before you enter into

16    a contract that varies a term in the contract, and yet you

17    can make the claim in the face of an integration clause?

18            MS. HURST:  Under Coson, yes, Your Honor.  I

19    believe so.

20            THE COURT:  Coson is a factually fairly easy case

21    in the sense that they agreed on a $3,500 price, and then,

22    unbeknownst to one side, the other side writes in -- I think

23    both the $3,500 is typed in or printed in, and then

24    handwritten in is the financing charges.  It seems to me

25    that's an easy case.

1          MS. HURST:  Although, Your Honor, in that case, the

2     number of monthly payments and the monthly payment amount was

3     included in the typewritten or inked portion.  So, had the

4     plaintiff simply multiplied, as the court pointed out and as

5     the defendant tried to defend on that ground in the Coson

6     case, had they simply multiplied, this was an inconsistency

7     on the face of the agreement.

8          THE COURT:  Let's just go to -- let's go to 2.2 of

9     this agreement.

10          MS. HURST:  Yes, Your Honor.

11          THE COURT:  I'm troubled.  What you're saying is

12     that, even in the presence of an integration clause, for a

13     release that comes after the fact, that release is

14     everything, covers everything, that you can have a

15     representation that someone can come and say, Well, they're

16     really telling me that, I know that the contract says that

17     it's going to be a one-year contract but they promised me

18     they were going to be a five-year contract, I never would

19     have entered into it unless it was going to be a five-year

20     contract because of the start-up costs.  Given the

21     integration clause, do you think Washington law would permit

22     them to come in and say, We were induced into this because it

23     was a five-year promise?

24          MS. HURST:  What we're talking about is the right

25     to rely, whether there is a justifiable reliance.

1          THE COURT:  Answer my question.

2          MS. HURST:  Yes.

3          THE COURT:  In my hypothetical.

4          MS. HURST:  Yes.

5          THE COURT:  So, in other words, fraud in the

6     inducement, parol evidence can be brought to bear to try and

7     challenge any contract regardless of the integration clause?

8          MS. HURST:  Well, Your Honor, presuming that you

9     need the other elements of the fraud claim, certainly.

10          THE COURT:  What good is the integration clause?

11          MS. HURST:  The integration clause is good for

12     breach of contract claims and interpretation of the contract

13     in the context of breach of contract claims.

14          THE COURT:  I don't understand why it would be good

15     for breach of contract.  You don't have a breach of contract

16     until after the contract is signed.  It can't relate to a

17     breach of contract.

18          MS. HURST:  Well, it does in the sense of what

19     evidence, what parol evidence can be considered in

20     interpreting the contract to determine whether there was a

21     breach or not.  So, for example, the integration clause would

22     still bar a statement of purely subjective understanding on

23     one parties' part as to what the contract meant at the time

24     it was entered into, an unexpressed intension.  The parol

25     evidence rule and the integration clause would still bar that

1  kind of evidence.  It may well bar other kinds of evidence

2  depending on the circumstances.

3         But I would point out, Your Honor, that under the

4  Berg case, the parol evidence rule in Washington state isn't

5  perhaps one of the more robust parol evidence rules among the

6  states.  In fact, a great deal of evidence is ordinarily

7  admissible even to interpret a contract; and that, if the

8  question is found ambiguous, then that is a question of fact

9  under Washington law.

10        THE COURT:  Walk down the path with me.  If I found

11 that there was some representation out there that

12 fraudulently induced and prior fact concluded that, what

13 would be the effect?  The contract would be voided?

14        MS. HURST:  Yes.  In this case, that's what the

15 contract says.  The contract is voidable at the election of

16 either party.

17        THE COURT:  When do you make that election?

18        MS. HURST:  We pled both theories, and we would

19 have been entitled, if the Court decided it wanted a jury to

20 advise it on the equitable remedies, it could do so.  And

21 then we could wait and see.

22        THE COURT:  Do you agree with Mr. Quackenbush that

23 the subject matters that you allege were these

24 representations, the subject matters were covered in the

25 contract?

1          MS. HURST:  No.

2          THE COURT:  Let's go to my chart.  Page 14.  And

3    perhaps we can just walk down these alleged statements.  The

4    first one on the fact is that the sales would remain the key

5    of the strategy.  Isn't that a future statement?  Is that an

6    existing fact?

7          MS. HURST:  Your Honor, it's there's an implication

8    of a distinction of fact there which is what is Valve's

9    existing plan for the distribution of its games.  What

10   they're saying is retail sales are going to remain key to

11   their strategy.  What they're saying is we currently have no

12   plan to destroy your distribution rights, which was the big

13   lie in this case.

14         THE COURT:  All right.  I'm just not with you on

15   that one.  So let's go to the next one.

16         This one is that Valve did not plan to engage in

17   anything other than diminimus distribution.  Doesn't

18   paragraph 3.11 deal with that subject?

19         MS. HURST:  Your Honor, generally, paragraph 3.11

20   deals with the subject of the timing of release of an on-line

21   game.  It does not deal with the degree to which Valve would

22   exploit or limitations on the degree to which it would

23   exploit any on-line distribution rights.  And there's nothing

24   in the contract that does deal with that.  There's nothing in

25   the contract which expressly deals with any discussion of how

1    much will Valve engage in this activity.

2            THE COURT:  Was the agreement not clear that Valve

3    had a right to distribute games on-line?  Did they have that

4    right under the agreement?

5            MS. HURST:  The agreement includes an on-line

6    distribution right for Valve.

7            THE COURT:  So what you're saying is it doesn't --

8    you knew they had the right to distribute on-line, but you

9    feel that the representation that they didn't plan to engage

10   in anything is contrary to that?

11           MS. HURST:  It's not contrary to the existing

12   provision in the agreement.  It doesn't contradict, it

13   doesn't vary it.  It's independent of it.  It's a statement

14   about the present plan of Valve regarding the degree to which

15   it will exploit that right.

16           THE COURT:  Do you think that the last thing on

17   page 14 is anything other than opinion?

18           MS. HURST:  No, Your Honor.  I would agree that

19   that's opinion.  And I think under the -- I believe it's the

20   Holwhits -- Horowitz case in Washington, when the statements

21   of fact are so intermingled with matters of opinion and

22   promises regarding future matters, they all come in as the

23   sort of I guess res gestae of the fraud, Your Honor.  That's

24   the Horowitz case.

25           THE COURT:  All right.  Let's talk about the one on

1    page 15.   In January, Mr. Lynch alleged, as I said, that the

2    population of on-line gamers was just 3 million.

3             MS. HURST:   Certainly.   That's a fact.

4             THE COURT:   It's also a fact that you probably

5    could -- I mean, is that something that's public knowledge?

6    I mean, would they have any -- are they saying that on-line

7    gamers that use their products, or is that -- I don't quite

8    understand how that could be the basis of a counterclaim for

9    fraudulent inducement.

10            MS. HURST:   Your Honor, I don't think that

11   statement alone would be.   It's part of the body of

12   statements that were made here, and it goes to the issue of

13   their plan to exploit on-line rights.   And this was a way for

14   them to reassure Vivendi that they had no such plan.   It was

15   a statement of reassurance that there was no plan.   It goes

16   to the fact, relates to and is intermingled with the fact of

17   there being no plan.

18            The implication reasonably to be inferred from the

19   statement, and this is a 12(b)(6) motion, and we're entitled

20   to that inference, the implication reasonably to be inferred

21   from the statement is we're not going to be, either be able

22   to or we don't plan to exploit this in any material way.   And

23   so these statements all go to that issue of what their plan

24   was and reassurances about the fact that they didn't have a

25   plan.

1       THE COURT:  Let's go to the allegation of Half-Life

2  2 and CSCZ were near completion.  Is that covered in the

3  agreement or the addendum?

4       MS. HURST:  It's not, Your Honor.  Certainly, it's

5  a statement of fact about the current status of development

6  of the game.  It absolutely is.  It's a statement of

7  nonexisting fact.  It does not contradict or vary section 2.2

8  in any way.  In fact, as Mr. Quackenbush went to lengths to

9  point out, there is no deadline in this agreement.  So it

10 doesn't contradict or vary.  Why would we include 2.2, that

11 they have to continuously develop, if it was true that it was

12 almost done?  Because, if it was almost done, and we signed

13 the agreement, and then they stopped developing, then that

14 would be silly.  Of course we'd want them to keep developing,

15 and we want to impose on them an obligation to do so.  It

16 wasn't done yet at the time of the agreement was fine, but

17 they told us it was almost done, and that was a then existing

18 fact.  And, not only was it a then existing fact, but it was

19 one of which they had unique and peculiar knowledge.  They

20 were the only ones in a position to know that.

21      THE COURT:  All right.  Let's go to the page 16, on

22 March 18, Plaintiffs represented Valve was developing CSCZ.

23 So is that subject matter dealt with in the development and

24 delivery section of the agreement?

25      MS. HURST:  It's not, Your Honor.  There's no

representation or operative provision in the agreement

discussing what the current status of game development was at

the time of the agreement.

THE COURT:  Are you alleging that that was false,

that they were not developing CSCZ at the time?

MS. HURST:  Your Honor, we're alleging that their

representation about the status of how far it had been

developed at the time was false.

THE COURT:  So then this agreement was -- you're

not alleging that they weren't developing it at some stage?

Is that what I heard you say?

MS. HURST:  Your Honor, I don't think that we have

alleged this fragment of the sentence that's been extracted

from the counterclaim as a separate fraudulent statement.

THE COURT:  I think you alleged in all of the facts

that, on March 8th, they were developing a game can be added

and it would be ready and released by October 31st.  But what

you're telling me is that it is true they were developing it,

and I think the rest of it is all opinion?

MS. HURST:  Actually, I don't know whether we know

whether they were developing or not, Your Honor.  I certainly

wouldn't say that it was true.  We believed that they weren't

developing, and we've alleged facts that would give rise if

an inference that they stopped developing to get their

on-line distribution scheme done first and then release the

1    game.

2            THE COURT:  Did I misunderstand?  I thought you

3    told me just a couple minutes ago that you believed they were

4    developing.

5            MS. HURST:  No.  I'm sorry if I misspoke, Your

6    Honor.  I think what I said was that we don't rely on that

7    fragment of the sentence as a separate misrepresentation.

8            THE COURT:  All right.  Let's go to the top of page

9    17.  You allege that Mr. Lynch, Mr. Newell falsely told

10   Sierra's in-house counsel that Valve had no plans to release

11   a nonretail version of CSCZ.  Is that subject matter -- I

12   think that's a fact.

13           MS. HURST:  This is a fact, Your Honor.

14           THE COURT:  Is it covered in the paragraph 3.11 of

15   the agreement?

16           MS. HURST:  It's not, Your Honor.  Again, that does

17   not address Valve's then current plans with respect to any

18   exploitation of the on-line rights or the degree to which

19   they might do so.

20           With respect to this provision, Your Honor, when

21   Mr. Quackenbush was up here, he argued vociferously that what

22   he calls the insurance policy in section 5.3 was part of the

23   subject matter that was relevant to this particular

24   representation of existing fact.  Your Honor, the point about

25   this part of the fraud claim is that they induced a deletion

1   of that provision in this addendum in connection with this

2   particular representation.  In other words, if the Court

3   looks at addendum 3 --

4         THE COURT:  Is it 2 or 3?

5         MS. HURST:  I believe it's 3, Your Honor.

6   Paragraph 4 of addendum 3, which is page 142 of the materials

7   that Mr. Quackenbush handed up.

8         THE COURT:  I've got it in my own version here.

9   But it says, paragraph 4, Valve and Sierra agree that

10  provisions of section 5.3 will have no application entry.

11        MS. HURST:  That's right, Your Honor.  So they tell

12  us they're not going to release a nonretail version, and as a

13  result we agree to delete the insurance provision.

14        THE COURT:  Let's just focus on that, because I'm

15  still trying to understand how that all played out.  Does

16  that mean -- let's assume it was false, and you relied upon

17  it, and they induced you to enter into this addendum 3,

18  what's the legal -- what's the legal effect of that?  I mean,

19  does the whole contract go out?  Does that little agreement,

20  paragraph 4 of addendum 3, does that go out?  What's the

21  legal effect of that?

22        MS. HURST:  Well, certainly, Your Honor, if it's

23  material to the addendum -- and obviously we allege that it

24  is -- the entire addendum would be gone.  Then the -- if we

25  elected remedy of recision.

1          Now, the Court will perhaps recall, from the first

2     time we were here, the reason that the Vivendi Universal

3     Games is interested in the remedy of rescission is that it

4     believes that it had a better situation under the prior

5     agreement.  That it owned all the intellectual property, that

6     it had an output deal with Valve which would have entitled it

7     to all of the same games, and at a lower interest rate.  So

8     it makes absolutely no sense that they would be seeking

9     rescission here; but, in the event that they're unable to

10    prove this, fraud, in order to obtain the rescission, there

11    are also some contract claims which provide some similar or

12    alternative remedies.  And so these are -- this is an

13    absolutely consistent position to take if what you consider

14    that the goal to achieve here is to regain the intellectual

15    property and to avoid this monstrous on-line distribution

16    scheme that they've come up with, which vitiates the entire

17    purpose of this agreement.  But, certainly, Your Honor, it

18    would be premature in terms of trying to determine questions

19    of materiality of these and other factual questions at this

20    point on a 12(b)(6) motion.

21         THE COURT:  You make, if you'd turn to page 18, you

22    do make the contention, I believe that in January of 2002,

23    after numerous delays, that it was falsely represented to

24    Sierra and VUG that Valve didn't have anything going.  I'm

25    not entirely sure what that means.  But is that fact or is

1    that statement?

2              MS. HURST:  It's a fact, Your Honor.  It's a

3    statement of existing fact, Your Honor.  And it was only two

4    months later that they announced the release of Steam.

5              THE COURT:  And was that before or after addendum

6    4?

7              MS. HURST:  I believe it was before addendum 4.

8    But this is also relevant to the concealment claim which the

9    Court has already sustained that it was a pattern of

10   continuing concealment of their intentions.  And I think

11   that's relevant here to -- as part of a deceit theory,

12   because they were asked a direct question, and they lied

13   about it.  And it shows a continuing pattern of deceit with

14   respect to this issue of the on-line distribution.

15             THE COURT:  Help me understand.  Let's assume that

16   one or more of these statements survives this Motion to

17   Dismiss, but I believe that some of the statements are not

18   factual statements, they're opinions, they're future

19   promises, they're something going out into the future.  Now

20   we're at trial.  Would you be permitted under the parol

21   evidence rule or under this, as a result of this integration

22   clause, from getting into evidence these opinions and matters

23   which are not factual?  In other words, to put the whole

24   package in context?

25             MS. HURST:  I believe so, Your Honor, under both --

1    certainly, under the fraud line of cases, Coson and that line

2    of cases.  The Weller case in particular says that, when you

3    have opinions by someone who has peculiar knowledge -- which

4    is what a lot of this is -- that that's even an exception to

5    the representation of existing fact requirements.  So it

6    would be that those would be not only admissible to show body

7    of fraud but they would be actionable in and of themselves.

8            THE COURT:  The result, the bottom line is, under

9    your view, that the parol evidence rule and the integration

10   clause would have no effect?

11           MS. HURST:  Not in the context of the fraud claim,

12   Your Honor.  The court would be, under those circumstances,

13   required to give instructions to the jury about what evidence

14   it should consider for which claims.  And the jury would be

15   instructed that, with respect to the fraud claims, it can

16   consider a certain a body of evidence; and, with respect to

17   the contract claims, it should disregard certain things, if

18   it comes to that.  If there are -- because, certainly, with

19   respect to the contract claims under the Berg case, the

20   Washington Supreme Court case in Berg, a whole lot of stuff

21   is admissible to go to the question of ambiguity and

22   interpretation, and therefore to breach of contract to the

23   extent that the provisions that are at issue in the breach,

24   various brief claims of both parties are ambiguous.  If it

25   turns out that the court finds on Summary Judgment that

1   certain of the provisions that are subject of the breach

2   claim aren't ambiguous, then that evidence won't go to those

3   provisions, and the jury would be instructed to disregard

4   that evidence with respect to those provisions.  But,

5   certainly, the parol evidence rule -- so it has both a

6   substantive effect as the Court has been exploring here this

7   morning, and then an evidentiary effect, which is elucidated

8   through jury instructions at that time.

9            THE COURT:  I can just hardly wait to craft those

10  jury instructions.

11           MS. HURST:  We'll be doing the work, Your Honor.

12  The least in the first instance.

13           THE COURT:  You may be doing the first drafts.

14           MS. HURST:  Yes, in the first instance.

15           THE COURT:  I think I understand your position.

16  Anything further?  I've been asking you -- anything else you

17  want to add to the argument?

18           MS. HURST:  Your Honor, I would just add this.

19  There's another way to sort of look at these potentially

20  inconsistent line of cases and the issues that the Court's

21  been exploring this morning, which is there's a difference

22  between contradicting or varying a substantive term of the

23  agreement and contradicting an exculpatory clause such as the

24  merger or integration clause.  And the tendency of the courts

25  has been to really draw the line in allowing fraud cases

where the only thing that somebody can point to as being

contradicted is the merger or the integration clause.  What

the courts have said under those circumstances is that what

you consider the right to rely, when somebody commits a

deliberate fraud, that will not vitiate even the negligence

of the other party in signing the agreement.  And these cases

are rife with negligence on the other party in signing the

agreement.  In other words, we're not going to let an

integration clause defeat a fraud claim.  And, when you see

there being more of a direct contradiction between a

substantive term, then you see more struggling with the

courts, although even in the Coson case you had a

multiplication there and it was revealed right on the face of

agreement that it was inconsistent with the oral

representations, and then a substantive term, not just the

merger clause or the integration clause.

THE COURT:  The best I can tell you, you can get

anything you want out of these cases one way or another.  I

mean, it's just a very -- there's lot of tension between the

subjects we've been talking about this morning.

MS. HURST:  Your Honor, the Coson case does note

that Washington believes it was following the restatement,

which supports this idea that fraud is not vitiated by an

integration clause.  That there's a section, I believe

section 573 of the restatement cited in there reflecting

1  that, at least at the time the majority rule, which certainly

2  hasn't been since overruled in Coson.

3       THE COURT:  Thank you.

4       MS. HURST:  I'll submit, Your Honor.

5       MR. QUACKENBUSH:  Your Honor, might I have one

6  minute?  Two?

7       THE COURT:  Two.

8       MR. QUACKENBUSH:  Just, I want to make sure that I

9  made myself clear about these insurance policies that got

10 negotiated into this agreement.  It's just clear on the face

11 of the agreement that on-line distribution is insured against

12 here.  And, it's like saying, before the contract, You told

13 me you wouldn't take my car out and drive it around, and you

14 promised me that.  But, I don't believe you, so I get

15 insurance.  It's the same thing.  The allegation is, I had a

16 subjective belief that I knew you had on-line distribution

17 rights, I knew you were going to do it, but I just thought it

18 wouldn't be a big deal or wouldn't happen very soon.  And, if

19 it did, it would be bad for my business.  It would hurt my

20 retail channel, retail package product business.  So that's

21 why we say, in 5.3, to compensate Sierra for potential loss

22 of sales of retail packaged product, and there's a

23 parenthetical with a lot of the products listed, due to

24 Valve's exploitation of add-on products, products, flat-form

25 extensions, et cetera, et cetera.  In short, if you exploit

1    your products in a way -- and I'm sure that it would be

2    agreed that that exploitation would include on-line -- if you

3    go ahead and exploit, that hurts me, then there's a formula

4    here for paying me back, an insurance policy.  Now, it's very

5    hard for me to see how you could possibly say that the

6    contract doesn't deal with on-line distribution.  It

7    specifically does, and it had insurance against it.

8         The second point is, why would you have section 2.2

9    if you had a subjective belief and you were relying on it?

10   Section 2.2 that says, I'm going to check with you, and you

11   have an obligation to tell me where you are on this product.

12   So, the day after the contract was signed, you could call

13   Valve up and say, Okay, I need to talk to you about your

14   schedule, just give me a heads-up where you are.  And, if you

15   didn't like the answer, if you said, You're not working hard

16   enough on this, you're not far enough along, you've got an

17   insurance policy of the revision clause.  But there's no

18   deadline.  The deadline pieces were explicitly taken out of

19   the relationship with these parties.  And what the fraud

20   claim is, we've got to put them back in, we're adding that

21   term to this agreement.  That's what this is.  And that's

22   completely inconsistent with having a contract.  To me, it's

23   inconsistent with having a contract that means anything.

24        I was interested to hear their counsel say that the

25   problem here with all these -- the reason we have all these

1    claims is Vivendi thought it had a better deal under the old

2    contract.  Of course it had a better deal under the old

3    contract, and of course it wants it back.  But it has a deal,

4    a deal's a deal.  This is a really sophisticated party, knows

5    a lot about games, knows a lot about distribution.  We ought

6    to make this deal stick.  Thank you.

7            THE COURT:  What does the Court do with this

8    restatement of contract, section 5.3-A and B, enter into a

9    written agreement that contains a clause that states no oral

10   representations have been made, fraudulent representations,

11   if the agreement in fact induced the contract?

12           MR. QUACKENBUSH:  I think the key is a fraudulent

13   misrepresentations in the contract.  In other words, I say,

14   If you sign this agreement, I'll buy you a car.  As soon as

15   you sign, I'm going to give you the keys to this car.  That's

16   different, that's a different -- entirely different set of

17   facts than, I know you're going to distribute on-line, I know

18   it may hurt me, I know you have control over it, but you told

19   me that it would only be a minor deal and I'll insure against

20   it.  It strikes me, what the restatement is saying is my

21   hypothetical.  In other words, there's something outside the

22   contemplation or outside the explicit language of the

23   contract.

24           THE COURT:  Do you really think that the Court on a

25   Motion to Dismiss, giving every inference in favor of the

1    nonmoving party, can conclude that these alleged

2    misrepresentations pre-contract are not -- you're not only

3    asking me to determine what's in the contract and what's not

4    in the contract, and it's not entirely clear to me having

5    heard all of the arguments what's in the contract and what's

6    not in the contract.

7         MR. QUACKENBUSH:  Well, the decision, I think, is a

8    question of law to determine what's in the contact and what's

9    not.  And I'm happy to go through this and point out exactly

10   what we're talking about.  I've tried to point to the

11   provisions that we're talking about.  So, yes, I do think

12   it's an as a matter of law.  I think right to rely is an as a

13   matter of law.  When you say, on one hand, I know there's no

14   representations, I know you're going to pay me a dollar but

15   you promised me that you would pay me two, that to me is a

16   Rule 12 motion in this situation.

17        THE COURT:  All right.  I'm going to take the

18   matter under advisement.  I was hoping you all would make it

19   crystal clear to me, but I can see that it's not entirely

20   crystal clear, and I want to think about it some more.

21   Because, as I indicated, there seems to be good things for

22   each side from all of these cases, and I need to study it

23   further.

24        I want to proceed with this Motion to Compel,

25   but -- why don't we take about a two minute stretch, and then

1  I'm going to suggest the court reporter stay here but not

2  transcribe our discussions on the subject until we get to the

3  point where -- I don't know that you need or I need to let

4  you argue on the record.  So let's take a stretch, though.

5          (Proceedings held off the Record.)

6          (12:05 p.m., Proceedings Concluded.)

C E R T I F I C A T E

STATE OF WASHINGTON   )

                      ) ss.

COUNTY OF SNOHOMISH   )

         I, Susan A. Zielie, RPR, CSR, the undersigned
officer of the Court, hereby certify that the foregoing
verbatim transcript was transcribed under my direction;

         That I am neither attrorney for nor a relative or
employee of any of the parites to the action; further, that I
am not a relative or employee of attorney or counsel employed
by the parties hereto, nor financially interested in its
outcome.

                    /S/ Susan A. Zielie, RPR, CRR


                    SUSAN A. ZIELIE, RPR, CCR

                    Official Court Reporter

                    US District Court

                    Seattle, Washington