FILED —— ENTERED
LODGED —— RECEIVED

SA     AUG 1 2 2004

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

1      UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON

2

3    VALVE LLC,                          )
                                          )
4                      Plaintiff,  )   No. C 02-1683
                                          )
5               v.                        )   Seattle, Washington
                                          )
6    SIERRA ENTERTAINMENT,                )
                                          )
7                      Defendant.  )
                                          )

8

9      BEFORE THE HONORABLE THOMAS S. ZILLY, DISTRICT JUDGE

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                      JULY 30, 2004

12

13

14   APPEARANCES:

15   For Plaintiffs and counterclaim defendants:   KARL QUACKENBUSH

16

17   For Defendants and counterclaimants:          ANNETTE HURST
                                                     LINDA FOY

18   ‖ ‖‖‖‖‖ ‖‖‖‖‖ ‖‖‖‖ ‖‖‖‖‖ ‖‖‖‖‖ ‖‖‖‖‖ ‖‖‖‖‖ ‖‖‖ ‖‖‖‖

19   ‖ ‖‖‖‖‖‖ ‖‖‖ ‖‖‖‖‖‖‖‖ ‖‖‖‖‖ ‖‖ ‖‖‖‖

20   **02-CV-01683-TN**

21

22   Court Reporter:                    Laurene Kelly, RDR, CRR
                                          1010 Fifth Avenue, Room 600
23                                        Seattle, WA  98104
                                          (206) 553-1899
24                                        Laurene_Kelly@wawd.uscourts.gov

25   Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.

# ORIGINAL

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   SEATTLE, WASHINGTON                    FRIDAY, JULY 30, 2004

2   HON. THOMAS S. ZILLY, DISTRICT JUDGE                11:00 A.M.

3                          **PROCEEDINGS**:

4        (The following proceedings were held in chambers:)

5             THE COURT:  This is Judge Zilly.  Good morning.

6             VOICE ON SPEAKERPHONE:  Good morning, Your Honor.

7             VOICE ON SPEAKERPHONE:  Good morning, Your Honor.

8             THE COURT:  Why don't we make our appearances for the

9   record.  We do have a court reporter this morning.

10            Mr. Quackenbush, why don't you start off and tell us

11  in connection with Valve Corporation versus Sierra

12  Entertainment, cause number 02-1683 Z, who you represent, sir.

13            MALE VOICE ON SPEAKERPHONE:  Karl Quackenbush

14  representing Valve Corporation, Mr. and Mrs. Newell, and

15  Mr. and Mrs. Lynch.

16            THE COURT:  That's all the plaintiffs, is it not?

17            MALE VOICE ON SPEAKERPHONE:  That's the plaintiffs

18  Valve and the counterclaim defendants.

19            THE COURT:  Okay.

20            FEMALE VOICE ON SPEAKERPHONE:  Good morning, Your

21  Honor.  We have Annette Hurst and Linda Foy of Howard, Rice

22  representing the defendants and the counterclaimants.

23            THE COURT:  All right.  Good morning to you as well.

24            And if you all are -- I know Mr. Quackenbush's voice

25  and he appears to be the only plaintiff's lawyer, but if one of

1   the defense lawyers is speaking would you each time tell us for
2   the benefit of me and the court reporter who's speaking.
3              FEMALE VOICE ON SPEAKERPHONE:  Certainly, Your Honor.
4              THE COURT:  All right.  Thank you.
5              I have two letters.  Let's just go -- they were both
6   faxed to me, both dated July 30.  I assume you have -- each
7   side has the other person's letter as well.
8              MALE VOICE ON SPEAKERPHONE:  Right.
9              THE COURT:  All right.  So why don't we start with
10  Mr. Quackenbush's list.  There are four issues.  Let's just
11  start with issue number one.
12             MALE VOICE ON SPEAKERPHONE:  Sure.
13             THE COURT:  And let me give you kind of my initial
14  read on these things or tell you that I need some more facts.
15  But with respect to the first one it seems to me that the
16  defense can serve a 30 B 6 notice listing 57 separate topics.
17  I mean -- and I don't think I have a limit on depositions in
18  this case.  Do I?
19             In other words, it seems to me that -- what
20  difference does it make whether it's -- whether it takes you
21  three witnesses or ten witnesses to respond to the notice?
22  Don't you have to provide the witnesses on a 30 B 6 on the
23  issues they designate?
24             MALE VOICE ON SPEAKERPHONE:  Well, that's right.  The
25  deposition limit in Rule 30 would be presumptively be ten

1    and --

2           THE COURT:  This is not -- let's just do away with

3    our limitation on depositions in this case.  If someone abuses

4    it on either side, I expect you'll pick up the phone -- you

5    know our telephone number -- and deal with it.  But this is not

6    a case that lends itself to saying that we ought to have a

7    10-deposition limitation.  Any problem with that?

8           MALE VOICE ON SPEAKERPHONE:  I think that's a

9    solution.

10          FEMALE VOICE ON SPEAKERPHONE:  This is Miss Hurst,

11   Your Honor, and that's fine with us.

12          THE COURT:  Does that solve item number one, then,

13   Mr. Quackenbush?

14          MALE VOICE ON SPEAKERPHONE:  I guess it does.  I mean

15   I think the fact that there are so many topics, it's going to

16   inevitably lead to the parties saying, you know, this guy

17   wasn't prepared on 33 and he wasn't prepared on 70 or 57; but I

18   think we have to work through those as they come.

19          THE COURT:  But don't you need to tee up your

20   witnesses and say, this witness is prepared to talk about

21   topics 1, 6, 8, 10, and 57 and this next person is ready to

22   talk on whatever other issues?  In other words, I think you

23   need to respond when you designate the witnesses and indicate

24   which topics they're going to be prepared to testify about.

25          MALE VOICE ON SPEAKERPHONE:  That's right.  And we've

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    done that, subject to our objections.  A sort of Hobson's

2    choice you get into is do you proffer 20 guys to cover, you

3    know, the topics that they know the most about or do you try to

4    get three guys, you know, your three more senior guys to cover

5    the ones they know and get educated on the other ones?

6            I just think, you know, these kind of notices

7    inevitably are going to lend themselves to -- probably nothing

8    we can do about that in the abstract.

9            THE COURT:  All right.  Item two says that Valve

10   served document requests on April 10th and April 30th and

11   there's not been a complete production.  Valve believes it

12   should be completed by the end of August.  There are also

13   issues regarding timing of Mr. Roeder's documents and whether

14   Vivendi will produce the information; so it looks like there's

15   actually three subtopics there.

16           First I don't know the complexity of the document

17   production that has been requested or why it can't be done by

18   the end of August, but let's -- so why don't we tender that one

19   to the defense and see first can you produce these documents by

20   the end of August and, if not, why not.

21           FEMALE VOICE ON SPEAKERPHONE:  No, Your Honor, we

22   can't.

23           And this is Miss Hurst again.

24           And what we've said is that we'll produce them by the

25   end of September at the latest.  The scope of the document

1    requests are very significant.  We have interviewed more than
2    200 people already worldwide and collected documents from them.
3    We have a massive number of documents that we have collected.
4    It's in excess of several hundred thousand.  Many of them are
5    in foreign languages that require us to seek in some cases the
6    assistance of translators in assessing the responsiveness of
7    the documents.

8            This has been a massive undertaking.  We're working
9    very diligently to do it, but we cannot do it by the end of
10   August.

11           I would just say in contrast that when we were with
12   the Court in June the Court ordered the plaintiff to produce --
13   go back and interview its 20 employees that they hadn't talked
14   to and to produce some additional documents, and they said that
15   it would take them 60 days and they were given 60 days to do
16   that.

17           In contrast what we're doing is orders of magnitude
18   larger and we're working very hard.  We have many people
19   working on this and we just think, realistically speaking, the
20   end of September is when we can get done with it.

21           THE COURT:  But let me just -- Mr. Quackenbush no
22   doubt would note that these document requests were served on
23   you in April, so we've already gone by May, June, and July.

24           I don't -- why can't it be done by the end of
25   August or mid September?

1      FEMALE VOICE ON SPEAKERPHONE:  Your Honor, 200 people

2  generating hundreds of thousands of documents for our review is

3  just -- it's a huge undertaking and it takes them time to get

4  things to us.  In many instances then we have it in numerous

5  different electronic file formats, and it could often take two

6  weeks for our vendors to put those in file formats for review

7  and production.

8      Mr. Quackenbush's firm has had similar issues,

9  particularly with the production of spreadsheets.  We've all

10  had issues with taking time to deal with the electronic format

11  of documents.

12      We were diligent in starting to collect documents

13  even before we were served our responses to these requests in

14  June, but they're very broad requests.  They ask for all

15  documents related to most of the major business activities of

16  three corporate entities, and it's just -- it's just a huge

17  undertaking.  It's just -- we have, I think, a discovery cutoff

18  of mid November.

19      It's not like we're waiting in the meantime.  We're

20  doing this on a rolling basis.  We're producing documents as

21  soon as we've reviewed them for production, identifying the

22  custodians with them, and we've told the client,

23  Mr. Quackenbush, and his colleagues that if they want to

24  identify people they think are more important rather than

25  others in order for us to get those done to try to assist in

1    the scheduling of depositions, that we're willing to do that

2    and we have done it --

3              THE COURT:  All right.  I think I've heard enough.

4              FEMALE VOICE ON SPEAKERPHONE:  -- diligently and as

5    quickly as we possibly can.  You know, it's costing hundreds of

6    thousands of dollars a month at this point just for this

7    document production.

8              THE COURT:  All right.  Mr. Quackenbush, what do you

9    think?

10             MALE VOICE ON SPEAKERPHONE:  Well, I know it's

11   complicated, Your Honor.  I'm not saying it's not complicated.

12   I'm not saying it's Miss Hurst's fault or anybody's fault.

13             You know, what I'm saying is we served the first set

14   of requests about cyber cafes must have been 16, 17 months ago,

15   and, you know, we're still -- last week we're still getting

16   those documents.  It seems like the earlier ones ought to have

17   been done.

18             The other issue is, you know, I think we're making it

19   a little harder than it has to be.  I took a deposition a week

20   ago or so of the guy that knows how they keep records and such,

21   and I think I figured out part of the problem, and part of the

22   problem is that when Vivendi ships games out they record the

23   type of transaction in their database in either one of two

24   buckets.  It's either a licensing transaction or it's a retail

25   transaction.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   And anything that involves a tangible thing, any

2   tangible thing regards to what it is is listed as a retail

3   transaction, is if you go in the database and you say, well,

4   what is this -- did you sell any nonretail products, you don't

5   see any, so they send a spindle of one case, there's a spindle

6   of 10,000 naked CDs they sent to Asia.  That shows up as the

7   same kind of transaction as a pallet of boxed products to Wal

8   Mart.

9   So what I suggested is, gee, why don't we just, you

10  know, run your database and just show us all the shipments of

11  Valve stuff.  You know, what we're getting instead is just they

12  must have produced 3,000 individual spreadsheets to us already,

13  you know, little slice of this and a little slice of that, and,

14  yeah, that's hard.  We could make it a lot -- we could just

15  sort of work together on this, we could make it a lot simpler.

16  THE COURT:  Miss Hurst, what do you think?

17  FEMALE VOICE ON SPEAKERPHONE:  Your Honor, we have

18  agreed to produce the information from our database, and we

19  asked the plaintiff to serve us with an interrogatory.  We

20  agreed it wouldn't count toward the 25 limit just so we could

21  have it in a form where when we get to trial we have it in a

22  proper form for a trial exhibit and admissible evidence.

23  But they never offered to limit their request to the

24  information from the database.  To the contrary, we've got a

25  big correspondence file folder full of letters where they say

1   they don't just want information from the database but they

2   want all the back-up data, they want the invoices, they want

3   the purchase orders, they want the shipping documents for

4   every, single transaction worldwide, and that was related to

5   just their own games.

6         And now the Court can see that in this letter one of

7   the things they're trying to do is expand that to every, single

8   game the company has published where it's ever licensed to a

9   cyber cafe.  We're talking about massive numbers of documents

10   here.

11         You know, if they wanted to offer to limit their

12   request to the information in the database, sure, that's true,

13   that would shortcut things.  But there's never been any kind of

14   an offer like that.  And instead it's been give us everything

15   in a database but also give us all of this other stuff.

16         THE COURT:  All right.  I'm satisfied that, frankly,

17   without spending several days with you folks I'm not going to

18   have a better fix on the reasonableness of the end of

19   September, but I will grant the defendant's request and will

20   permit, assuming that it's on a rolling basis as you get it,

21   but that all document requests referenced in this paragraph 2

22   of Mr. Quackenbush's letter be provided not later than the end

23   of September.

24         Now, you know, if we get to a point where you're

25   going to have to extend the discovery cutoff or the trial as a

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    result of these problems, then we'll have to deal with that at
2    a later date.

3          MALE VOICE ON SPEAKERPHONE:  We're -- this is Karl
4    Quackenbush.

5          We're definitely trying hard to avoid -- from the
6    plaintiff's standpoint trying to avoid extending the dates.
7    We've already extended once and this is --

8          THE COURT:  I understand.

9          MALE VOICE ON SPEAKERPHONE:  You know, this is
10   Valve's money we need to get back.

11         THE COURT:  All right.  Let's --

12         VOICE ON SPEAKERPHONE:  One other issue is, just in
13   terms of prioritizing, Mr. Roeder's a pretty key guy, and we've
14   been waiting and waiting for his documents and seems like it's
15   taken a ton of time to get 'm.  Maybe we could have an earlier
16   date for his.

17         THE COURT:  What about end of August for Roeder?

18         FEMALE VOICE ON SPEAKERPHONE:  I think we can do it
19   before that, Your Honor.  I was hoping we'd get it done by the
20   end of next week, so --

21         This is Miss Hurst again.  Sorry.

22         And, you know, Mr. Roeder is a lawyer, and he has
23   thousands of emails that are responsive to the request, and
24   every, single one of those has to be carefully reviewed.  Many
25   of them contain multiple communications, some of which are

1   privileged and should be redacted and some of which are not; so
2   that's been a very high-level review that's been required of
3   his documents.
4        But we have agreed to prioritize them and I'm, you
5   know -- certainly we can make it by the end of August and I'm
6   optimistic that we'll do it sooner.
7        THE COURT:  All right.  Well, then, I'll modify the
8   order with respect to Roeder's -- that's R-O-E-D-E-R apostrophe
9   S -- documents, and they will be produced not later than the
10  end of -- as soon as possible, not later than the end of
11  August.
12       All right.  Let's go to paragraph 3.  Plaintiff's
13  document requests seek production of documents relating to
14  distribution of non-Valve games?
15       MALE VOICE ON SPEAKERPHONE:  Yeah.
16       THE COURT:  And the defense objects to production?  I
17  guess the question is what are the objections to production.
18       FEMALE VOICE ON SPEAKERPHONE:  Your Honor, this is
19  Miss Hurst again.
20       We -- there's a number of objections.  The principal
21  objection is that proportionality here between any relevance
22  and the burden associated with this is completely out of whack
23  here, and what we're talking about is these documents -- well,
24  first of all, plaintiff has never clearly articulated the
25  relevance of these documents.

1          But to the extent that we understand their argument
2     they think that it's related to damages on the claim that we
3     don't have cyber cafe licensing rights and that somehow the
4     distribution of these other games affected the distribution of
5     their games in some way that's related to a damages claim.  But
6     so -- but that's not really clear, what that is.
7          On the other hand what we're talking about in terms
8     of the volume of material here is tremendous.  We've got to go
9     back to all of the 200 people that we've already talked to, to
10    get all of their documents about non-Valve games and cyber
11    cafes.
12         And we're not just talking about give us the
13    contracts here.  We're talking about the invoices, the purchase
14    orders, the shipping documents.  These are in warehouses that
15    are located around the world.  They're in Europe.  They're in
16    Asia.  They're in the United States.  It's a massive number of
17    documents --
18         THE COURT:  Let me interrupt you, because I got a
19    couple questions that may help us focus -- help me focus.
20    First can you give me any idea of the number of non-Valve games
21    that we're talking about and the number of cyber cafes?
22         FEMALE VOICE ON SPEAKERPHONE:  Yes.  The number of
23    non-Valve games is very substantial.  Vivendi Universal Games
24    is a game publisher for numerous developers, so over the period
25    of time for which they have requested we are talking about

1   dozens or perhaps even hundreds of games.

2           THE COURT:  And how many cyber cafes are we talking

3   about?

4           FEMALE VOICE ON SPEAKERPHONE:  Thousands of them

5   worldwide.  Thousands in Europe and Asia primarily.

6           THE COURT:  And what is the time frame that we're

7   talking about?

8           FEMALE VOICE ON SPEAKERPHONE:  In order to get this

9   stuff?

10          THE COURT:  No, no, no, no, no, no, no.  You

11  referenced the request apparently wanted all of this stuff for

12  some period of time.  What is that time frame?

13          FEMALE VOICE ON SPEAKERPHONE:  I believe it is at

14  least as far back as 2001 and maybe earlier than that.

15          MALE VOICE ON SPEAKERPHONE:  2001.  That's when the

16  contract was signed.

17          THE COURT:  And, Mr. Quackenbush, it may be,

18  Miss Hurst, that what I'm going to suggest would not eliminate

19  all of the same effort.  I don't know.  But let me just think

20  outside the box for a moment.

21          If we were to do a sampling of five games and, you

22  know, ten cafes and a six-month period or something that would

23  give us a sampling to see whether this stuff really is going to

24  give us any information at all, would that make it a lot easier

25  for you?  Then Mr. Quackenbush can tell us whether a sampling

1    would give him anything that he really wants.

2                FEMALE VOICE ON SPEAKERPHONE:  I'm thinking, Your

3    Honor.  I mean I think, if we limited it in a way that we could

4    just get the contracts themselves in a particular region along

5    the lines that you suggest, that that may work.

6                Your Honor, the other thing I would suggest is that

7    we're preparing some partial motions for summary judgment that

8    go to the issue of, on one hand, the contract issue here, the

9    contract interpretation issue that would completely eliminate

10   the need for these documents and, on the other hand, that go to

11   the limitation of liability clause in the contract, which would

12   exclude the whole damages theory that Valve is proffering as

13   relevant for these documents, and we think these are plain

14   meaning motions and, particularly given Valve's recent stance

15   in the fraud context regarding the parol evidence rule and the

16   integration clause, that there's not going to be any extrinsic

17   evidence here that's going to need to be considered on these

18   and that this would eliminate the whole need for discovery at

19   all.

20               And frankly, Your Honor, we'd like an opportunity to

21   bring those motions and have them be heard, and we're willing

22   to pursue this sampling idea in the meantime; but if they're

23   granted it would completely obviate the need for discovery if

24   either one of them is granted.

25               THE COURT:  Mr. Quackenbush.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1       MALE VOICE ON SPEAKERPHONE:  I don't know what the

2   motions are about.  I don't think they're going to be granted,

3   and they sound a little premature, so I don't think you can say

4   don't do discovery because we're going to bring some motions

5   that might be granted.

6       I mean the relevance of this information -- and this

7   goes back to what we talked about when we visited with you in

8   chambers a few months ago -- the thing that's really important

9   here for Valve is called Counterstrike.  It's the most

10  widely-played multiplayer game in the world.  This is what the

11  cyber cafes want.

12      So we look at -- I'm looking at a document we just

13  got a little while ago where this fellow in the Philippines is

14  saying, why don't we sell Counterstrike for a buck apiece, one

15  dollar, and then sell some of our other games for a hundred

16  dollars apiece or $50 apiece or something like that.

17      So what you're doing here, what we think the evidence

18  shows, what we're going to be able to prove is two things.

19  Artificially -- selling these games into cyber cafes convoyed

20  by the infringing game -- in other words, there's no right to

21  sell Counterstrike into cyber cafes for commercial use.  Had

22  they not been doing that, none of these other games would have

23  sold, so that's why we need to know about these other games.

24      THE COURT:  Well, what about a sampling?

25      MALE VOICE ON SPEAKERPHONE:  I'm sorry.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1          THE COURT:  What about a sampling?

2          MALE VOICE ON SPEAKERPHONE:  I don't think that

3     really works.  I think I have actually an easier solution.

4          THE COURT:  All right.  I like easy solutions.

5          MALE VOICE ON SPEAKERPHONE:  And it's really what I

6     suggested about the Valve games.

7          Just take whatever information is in the database,

8     don't create anything new, you know, and just send us a report

9     that says, here's the other games we sold into cyber cafes.

10    Just report those out, and then we can have a discussion

11    about -- we can look at that and we can have a discussion about

12    where we go from there.

13         But, you know, a sampling -- essentially what we need

14    to do to prove up our damages case -- and it's hard -- is we

15    got to reconstruct this business so that we can show what

16    profits were earned by Vivendi from selling the infringing

17    games.

18         So that's my suggestion.  I think that's pretty easy

19    and pretty doable in the near term.

20         THE COURT:  Here's what I'm going to suggest on item

21    3, is that you all meet and confer and see if you can work out

22    some interim sampling or limiting vehicle without prejudice.  I

23    will permit some motions to be brought, and then if the motions

24    are denied and the sampling suggests that we're going to get

25    valuable information, then maybe we do some more.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    So what I ask you to do is this:  Meet and confer

2    within the next two weeks.  Let's say the 15th of August.  If

3    you haven't been successful, then I think the person, the

4    defendant in this case, objecting to the requests should file a

5    motion and tell me in a more formal way why they're not

6    relevant, why they're onerous, basically make your pitch and

7    we'll -- and you can note it up and brief it and maybe even

8    have oral argument on it.  I don't want to decide the issue

9    today.

10    Any questions on that?

11    FEMALE VOICE ON SPEAKERPHONE:  No, Your Honor.  Thank

12    you.

13    THE COURT:  All right.  Let's go to 4, then.  A M D G

14    is the -- Vivendi's distributor in the Philippines.  I guess

15    there was a deposition of a Mr. Tan and plaintiff says he did

16    not -- he didn't have enough information or evaded the

17    questions.  Of course, based on attorney-client privilege.

18    A couple of just initial reactions is first obviously

19    it's going to be difficult, if not impossible, for me to know

20    to what extent he did not have information within the scope of

21    the notice, but it does appear to me kind of as a reaction that

22    if you're going to tee up as a 30 B 6 witness a lawyer I'm

23    hard-pressed to understand how the lawyer can then claim the

24    attorney-client privilege and not answer questions.

25    I mean I suppose even a fact witness who's not a

1    lawyer could say, well, it's attorney-client privilege.  I mean

2    you can't ask the witness, the fact witness what did you talk

3    to your lawyer about on this subject, but to the extent -- to

4    the extent that the lawyer is the witness it does seem to

5    confuse things; doesn't it?

6         So, Miss Hurst, how do you respond to this concern of

7    Mr. Quackenbush?

8         FEMALE VOICE ON SPEAKERPHONE:  Well, Your Honor, at

9    first I respond by saying that we've never had any kind of a

10   letter from Mr. Quackenbush or his colleague specifying which

11   questions they think there was an improper assertion of

12   privilege.

13        THE COURT:  I assume that you kind of dealt with that

14   as the deposition went along.  Did he not object on the record

15   at the time?

16        FEMALE VOICE ON SPEAKERPHONE:  Not always, no.

17   But --

18        VOICE ON SPEAKERPHONE:  Well, this was our

19   deposition, so it was Miss Hurst was the one doing the

20   objecting.

21        FEMALE VOICE ON SPEAKERPHONE:  Putting that aside,

22   Your Honor, Mr. Tan -- we weren't instructing Mr. Tan not to

23   answer with respect to -- first of all, there are 11 topics in

24   the notice and they cover a broad range of things, some of

25   which are not just purely business things and distribution

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1  oriented but some of which are legally oriented like Sierra's

2  participation in government hearings, piracy enforcement, and

3  some other things that are quite appropriate for a lawyer to be

4  designated on.

5      Now, he interviewed other people where he didn't have

6  personal knowledge of the information in order to gather the

7  information reasonably available to the company, and he

8  testified about all of those interviews where he conducted them

9  for the purpose of preparing himself to testify.  We didn't

10  assert privilege as to anything like that.

11      So the only thing we asserted privilege was to

12  historical stuff that was not within the scope of the topic in

13  the sense that he was testifying -- we certainly allowed him to

14  testify factually but not about historical legal advice that he

15  had given where, you know, that would be inappropriate, no

16  matter who the witness was.  The business person, you wouldn't

17  be able to know what the advice was if it had been given from

18  the lawyer.

19      So it was just those specific kind of historical,

20  attorney-client communications was, you know, the scope of

21  instructions not to answer.

22      And with respect to his, you know, gathering

23  information to testify as a 30 B 6 witness, all of that stuff

24  was disclosed.

25      MALE VOICE ON SPEAKERPHONE:  Your Honor, just if I

1  might have a moment, this is what happened.  This notice was

2  about this A M D G outfit.  I don't know if you remember these

3  guys, but these are -- the Vivendi licensee was distributing to

4  cyber cafes in the Philippines, and we didn't get these

5  documents from Vivendi.  We got them through our own

6  investigation.  You know, we talked to Vivendi about that; then

7  we sent 'm this notice and said, what the heck's going on with

8  A M D G.

9          So Mr. Tan is the guy who did -- sort of investigated

10  what was going on with A M D G, and then as a result of that

11  investigation he wrote him a letter on behalf of something

12  called Vivendi Universal Publishing, kind of a self-serve

13  letter, said, now, remember, you know you weren't supposed to

14  be distributing cyber cafe -- distributing to cyber cafes, and

15  that's what we said, and you shouldn't be doing this.

16          And the folks at A M D G wrote back saying, hey, you

17  know you want -- they say, I know you want this letter.  I

18  fully understand your need for leverage versus Valve, and this

19  is my only reason for consenting to sign.

20          He had asked them to sign and return it.  But they

21  wanted a side letter to -- quote, intended to place the

22  truthful perspective to our entering a commercial site license

23  of B U G's game titles for both cyber cafe and retail, and he

24  encloses this side letter he wants Vivendi to sign.

25          So the inquiry that really got stopped by the

1    privilege assertion is what did you find out in your

2    investigation and, number two, is the -- are the facts

3    portrayed in this side letter, which Vivendi didn't sign but

4    which are substantially different than the letter they sent

5    these A M D G guys -- are those the facts?  Is that true?  And

6    we didn't get past that.

7            So it does seem to me that, if a lawyer does the

8    investigation and then is proffered up to talk about about what

9    the situation is with A M D G, then he ought to testify about

10   it.

11           THE COURT:  Well, Miss Hurst, that sounds reasonable.

12   It's hard to -- you know, obviously this is complicated

13   factually, but if the lawyer is tendered up as the 30 B 6

14   witness and he goes out and talks to people, I'm having trouble

15   understanding how even historical stuff would be covered by an

16   attorney-client privilege.

17           FEMALE VOICE ON SPEAKERPHONE:  Well, Your Honor, I

18   think that we are not placing his advice at issue in any way in

19   response to the notice.  He's there to testify about facts

20   within the scope of the topics.

21           I have to confess I don't have the transcript in

22   front of me so I don't know exactly what questions and answers

23   Mr. Quackenbush is referring to that he feels should have been

24   answered, but, Your Honor, I would say this.  There is a

25   difference between a historical investigation and an

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    investigation that's conducted for the purpose of testifying,
2    because in that case it's clear that you've made a decision
3    that you're going to put the witness at issue to testify
4    regarding the information that he's gathered.

5         Normally, however, in case -- employment cases and
6    other kinds of cases if a lawyer conducts an investigation
7    there's no waiver of privilege on that unless and until the
8    party puts the results of the investigation at issue in the
9    case in some way.  And it was not in any way our intention to
10   do that with respect to historical attorney-client information
11   by designating Mr. Tan.  We designated him because he was the
12   proper witness.

13        THE COURT:  All right.

14        FEMALE VOICE ON SPEAKERPHONE:  And I don't think that
15   you're at penalty, anytime you designate a lawyer, of having
16   that person disclose all the prior attorney-client advice that
17   they have given.  That's why he conducted a separate
18   investigation for purposes of responding to this notice, and
19   with respect to that there was nothing at all that was
20   withheld.

21        THE COURT:  All right.  Here's what we're going to do
22   on this one.  I'm not going to be able to decide it as well,
23   but what I am going to do is start you down a road that
24   hopefully will get it resolved.

25        I'm going to -- in your meet and confer within the

1    next two weeks I'm going to add this issue to the discussion,
2    but I am going to require Mr. Quackenbush to identify on the
3    transcript both the issues that or the -- the issues of the
4    scope in the notice you feel were evaded or not answered based
5    on either the witness didn't know or based on an attorney-
6    client privilege so that the other side, defense knows kind of
7    what you're really talking about specifically.  You can tee
8    that up in a letter form.  Then when you meet and confer see if
9    you can work it out.

10           My reaction is this:  that either -- much of this
11   perhaps we would have to go -- well, my reaction is this, that
12   the defense has to produce somebody who factually can answer
13   the things that are within the scope of the notice, and if the
14   person Mr. Tan is an attorney and he's going to claim the
15   attorney-client privilege we could try and sort through that
16   privilege, but an easier way would be perhaps to tee up another
17   witness who would be able to respond to those issues which were
18   not covered in the first deposition.

19           But, having said that, you know, even a factual
20   witness not an attorney might necessarily be asked a question
21   which the other side would legitimately think there's an
22   attorney-client privilege.

23           See if you can work it out.  If you can't work it
24   out, make your motion and we'll deal with it.  Any questions on
25   that one?

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    MALE VOICE ON SPEAKERPHONE:  Not from me.

2    FEMALE VOICE ON SPEAKERPHONE:  No.  Thank you, Your

3    Honor.

4    THE COURT:  I don't know that there's anything

5    further I can do today.  I mean, you know, if I had the

6    questions and the answers and the deposition notice in front of

7    me and we could spend another hour on it, I might have a pretty

8    good fix for you, but I'm not there.

9    So let's go to the letter from Miss Foy.  Item one is

10   the production of the source codes re the Valve games.  Let me

11   ask the question.

12   As I understand it Valve -- I've ordered production

13   of the source codes.  Valve has refused to produce the source

14   code in electronic form.  I gather you've produced it in

15   written form but not electronic form.  Is that right?

16   MALE VOICE ON SPEAKERPHONE:  Well, we haven't

17   produced it at all, and we haven't refused to produce it.

18   We've had some conversations --

19   THE COURT:  Let me interrupt, then.  Do you have it

20   in electronic form?

21   MALE VOICE ON SPEAKERPHONE:  Yes.

22   THE COURT:  Why not produce it in that form if that's

23   the way they want it?

24   MALE VOICE ON SPEAKERPHONE:  Well, we are going to

25   produce it in electronic form, but we've tried to confer with

1  them -- I mean this is -- as I'm sure you can understand, this

2  is the most sensitive thing in the company, and we tried to

3  talk to counsel about is there some added protection we could

4  have against disclosure of this, is there some way we could

5  make it, you know, available only to certain people.

6           THE COURT:  You know, I think a protective order, a

7  very strict protective order, is probably appropriate for the

8  source code.

9           Miss Hurst or Foy, don't you agree with that?

10          FEMALE VOICE ON SPEAKERPHONE:  Your Honor, this is

11 Miss Hurst.

12          I do agree.  In fact, we told Mr. Quackenbush that we

13 would agree to disclose the people in advance to whom the

14 source code would be disclosed and to, you know, limit the

15 number of people who can have access to it.

16          MALE VOICE ON SPEAKERPHONE:  Uh-huh.

17          FEMALE VOICE ON SPEAKERPHONE:  The issue here is that

18 they want to give it to us in a form other than its native

19 form, and that substantially hampers our ability to analyze it

20 for purposes of a number of issues in the case.

21          What they have said is -- well, first they said they

22 wouldn't give it to us in electronic form at all.  Then they

23 said they'd give it to us in some kind of read-only form, and

24 our consultation with our people causes us to believe that that

25 would not allow us to analyze and compile the source code to

1  understand what the different pieces of it do and when they

2  were developed.

3      And so the security measures we have no problem with,

4  but we need them to agree to give it to us in its native format

5  so we can conduct analysis on it.

6      MALE VOICE ON SPEAKERPHONE:  We don't have a problem

7  giving it in native format.  I'm not really sure -- I think

8  we've already discussed this.  But, you know, the problem is

9  just making sure it stays -- you know, it stays put.  It's --

10     THE COURT:  All right.  Well, work out a protective

11 order that's very narrow and identify specifically who gets to

12 see it.  And, you know, it seems to me we're talking the

13 attorneys, one or two people in the company, and maybe one

14 expert witness who are all identified.  And you guys know how

15 to do protective orders.  See if you can't work that out.

16     But it sounds like plaintiff is willing to produce it

17 in electronic form, in its original, native form or whatever

18 you call it.

19     So let's move on to item 2, the privilege log issue

20 and these email chains.

21     How difficult, Mr. Quackenbush, is it to take apart

22 the chains and give 'm the individual emails, which is what

23 they apparently want?

24     MALE VOICE ON SPEAKERPHONE:  I don't think that's

25 what they really want.  I'm not sure why we're arguing about it

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   here.  I mean the typical -- both sides have this issue is, you
2   know, you've got an email chain that might be five or six
3   emails in a row, so you redact the ones that are privileged,
4   you know, you leave the to, from, and who got it and what it
5   was about, and you leave that in there, so you produce it in
6   redacted form, and then you list in your privileged log the
7   email.  That's the -- sort of what I guess I would call the
8   parent email, and I think what they want is they want the log.

9         I mean so they have the information.  I think what
10  they want is the log to have every, separate email.  I mean it
11  just seems like kind of busywork to me.  I don't know why it's
12  important if you can go look and see who was on the mail and
13  what they were talking about.

14        THE COURT:  Let me just -- it sounds to me like some
15  of these issues really you guys have not sat down and tried to
16  work out before you get me involved.  I'm available at your
17  request, but I really want you to go the extra mile to try and
18  resolve these things or discuss them and understand what it is
19  there's a difficulty with and that you've reached a point where
20  you can't resolve it yourself before you get me involved.  I'm
21  getting the impression that some of these things you really
22  haven't sorted out yourselves.

23        All right.  Having said that, let me hear from
24  Miss Hurst or Miss Foy on this issue.

25        FEMALE VOICE ON SPEAKERPHONE:  Miss Foy,

1        We have in fact met and conferred on this issue, and

2    I think we have reached -- would like a detailed privileged

3    log --

4        THE COURT:  Ma'am, you cut out.  You've met and

5    conferred, and you have reached an impasse.  Is that what you

6    said?

7        FEMALE VOICE ON SPEAKERPHONE:  -- basically the

8    plaintiffs have refused to comply with our request to break out

9    each individual email in the privileged log.

10       And this isn't just a matter of busywork.  Understand

11   with respect to each link in this chain was a purported basis

12   for the privilege and why the information is being withheld.

13   This is the proper practice, and this is what we've done in our

14   own privileged log.

15       MALE VOICE ON SPEAKERPHONE:  Well, it's what they're

16   doing now.  It's not what they did originally.  I think they're

17   doing it now because they want us to do it.

18       I think we ought to be able to work this out.  It

19   just seems like -- I don't know.  I don't know why if you have

20   the information what additional -- if you have the email that

21   shows who got it, why listing each one is important, but I'm

22   happy to understand why that's important.

23       THE COURT:  I don't understand.  If you get the chain

24   and you see every email in the chain, why do you need to have

25   the emails produced separately?

1    FEMALE VOICE ON SPEAKERPHONE:   It's not to be

2    produced separately, but we need to understand the basis for

3    each privilege of each of the email chain separately.

4    THE COURT:   I think that's legitimate.   If in a

5    six-email chain you've got redacted or privileged documents,

6    privileged portions on, you know, two or three portions of

7    the -- in the chain, I guess as to each portion you got to

8    state what the basis of the privilege is.   I mean --

9    FEMALE VOICE ON SPEAKERPHONE:   -- individual email

10   which does not specifically identify a lawyer as a sender or

11   receiver, so email between two business.

12   MALE VOICE ON SPEAKERPHONE:   I couldn't hear any of

13   that.

14   THE COURT:   Yeah.   You're cutting out.   But I think

15   what she said was that there are emails where it's between two

16   business people and there's no indication that a lawyer was

17   involved, and so they're having trouble understanding what the

18   basis of the privilege -- I think this is one you need to go

19   back to the drawing board, both of you, and see if you can't

20   work this out.   I'm going to defer on this one.

21   All right.   Item number 3, the document request,

22   Rule 30 B 6 depositions.   Defendants anticipate bringing motion

23   for protective order, cross-motions to compel.

24   What we got going here?

25   FEMALE VOICE ON SPEAKERPHONE:   I think we've already

1    addressed all of this, Your Honor, within the context of the

2    issues that were identified in Mr. Quackenbush's letter.   I

3    don't think we need to -- there's anything else subsumed within

4    this item that we need to discuss today.

5         THE COURT:  All right.  Let me ask you this.  I have

6    attempted to make myself available whenever you have issues.   I

7    know I've got a don't-file-motions-anymore-for-a-while order in

8    place, which is a really good order, but -- and I've indicated

9    you can file some motions, and I'm willing to meet and lift the

10   order when you think it's time to -- you need to file some

11   motions.

12        But do you -- I've never done this, I don't think, in

13   16 years as a judge -- yeah, I did it in one patent case -- but

14   I was going to say I've never had a special master.  Do you

15   need a special master, which you all would have to pay for?

16        FEMALE VOICE ON SPEAKERPHONE:  Your Honor, this is

17   Miss Hurst.

18        I think that the Court's orders have been very

19   salutary in helping us resolve issues.  Believe it or not,

20   there were a lot of other issues that have -- in dispute that

21   we have resolved and have not brought to the Court's attention

22   this morning.  We have instituted a practice of having a

23   regular, weekly conference call on discovery matters at which

24   lead counsel are present.

25        And so our feeling at this time, you know, subject,

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   of course, to the Court's frustration with us, is that this is

2   working and that over time it will continue to work better and

3   better and we'll have fewer and fewer issues to bring to the

4   Court's attention.

5          THE COURT:  Mr. Quackenbush, you need to weigh in on

6   my question?

7          MALE VOICE ON SPEAKERPHONE:  Yeah.  I'm hopeful that

8   we can decrease the frequency of disputes, but to be perfectly

9   honest, Your Honor, I'm not optimistic.  This is -- there have

10   been more disputes in this case than any other case I've ever

11   done, and I think the reason is in part because of the

12   complexity of the Vivendi financial systems, which is a burden

13   for those guys and it's a burden for us as well in trying to

14   reconstruct, you know, what they did with our products and how

15   much money we're owed.

16          I think we ought to not do that now, but we ought

17   to -- you know, it's -- it's a problem.  You know, we're

18   getting a lot of -- we're not getting a lot of things we think

19   we should get timely, and they probably feel the same way.

20          THE COURT:  Well, the other thing that I guess I

21   would have to say is that it's my practice and has been -- and

22   I can't remember a case where I have referred to a magistrate

23   judge discovery issues or pre-trial issues in a case, because I

24   like to be involved, thinking that if I stay involved actively

25   that we'll sort through these things perhaps more expeditiously

1   and I will be better informed about the nature of the case and

2   the problems.

3           MALE VOICE ON SPEAKERPHONE:  Sure.

4           THE COURT:  And I don't really think that I want to,

5   particularly now when we're a magistrate down because we've got

6   a vacancy with Judge Martinez going up to the district court --

7   that I would be interested in having one of the magistrates get

8   involved.

9           But, you know, these are all subjects that if, you

10   know, at some point after further discussions you all think,

11   gee, Judge, we really need to have someone we can call on a

12   weekly basis or whatever, you know, I probably could find you a

13   very expensive lawyer that would be very helpful to you.  And I

14   know there's a lot of money in this case and you all are

15   spending a ton of money, and so maybe a very expensive lawyer

16   to help you on a weekly basis sort through these problems would

17   be a good idea.

18           So, you know, if you find that you want to at least

19   discuss that subject with me again, you have our telephone

20   number.

21           MALE VOICE ON SPEAKERPHONE:  Yeah.  Have expensive

22   lawyers involved already.

23           THE COURT:  All right.  Is there anything else we can

24   do for you today?

25           MALE VOICE ON SPEAKERPHONE:  No.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1        FEMALE VOICE ON SPEAKERPHONE:  No.  Thank you, Your

2   Honor.

3        THE COURT:  All right.  Have a nice day, folks.

4        MALE VOICE ON SPEAKERPHONE:  Thank you, Your Honor.

5   Thank you for talking to us.

6        (At 11:53 a.m. proceedings were adjourned.)

7                         --o0o--

8        I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10  This excludes any matters heard via speakerphone, in which case

11  I do not certify the speaker's identity or the content.

12  _____

                    Laurene Kelly
13

14             This 11th day of AUGUST, 2004.

15

16

17

18

19

20

21

22

23

24

25

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED