```
 1            IN THE UNITED STATES DISTRICT COURT FOR
              THE WESTERN DISTRICT OF WASHINGTON
 2                         AT SEATTLE

 3   VALVE CORPORATION,              )
                                     )    Case No. C02-1683Z
 4                  Plaintiff,       )
                                     )    Seattle, Washington
 5            v.                     )    September 16, 2004
                                     )
 6   SIERRA ENTERTAINMENT, INC. (AKA )
     SIERRA ON LINE, INC.), et al.,  )
 7                                   )
                    Defendants       )
 8   _____)
     SIERRA ENTERTAINMENT, INC. (AKA )
 9   SIERRA ON LINE, INC.), et al.,  )
                                     )
10        Counter-Claimants,         )
                                     )
11            v.                     )
                                     )
12   VALVE CORPORATION, et al.,      )
                                     )
13        Counterclaim Defendants.   )
     _____)
14
                  TRANSCRIPT OF PROCEEDINGS
15        BEFORE THE HONORABLE THOMAS S. ZILLY
                UNITED STATES DISTRICT JUDGE
16

17   For the Plaintiff:    Karl Quackenbush
                           Jason Holtman
18                         Preston Gates Ellis
                           925 Fourth Avenue, Suite 2900
19                         Seattle, Washington  98104-1158

20   For the Defendants:   Linda Q. Foy
                           Howard, Rice, Nemerovski, Canady, Falk &
21                         Rabkin
                           Three Embarcadero Center
22                         Seventh Floor
                           San Francisco, California  94111-4065
23
                           Michael R. Scott
24                         Hillis, Clark, Martin & Peterson
                           500 Galland Building
25                         1221 Second Avenue
                           Seattle, Washington 98101-2925
```

1    And the defense has given me -- Ms. Foy I think is the author

2    of the letter -- a letter, a two-page letter outlining from the

3    defendants' standpoint issues for discussion.

4    We've got basically an hour.  So let's proceed first with

5    plaintiff and then we'll go to the defendants.  So I guess -- and

6    I know that there are some motions to -- pending motions for

7    summary judgment, partial summary judgment, that are pending, but

8    they're not yet ripe for consideration.  And I know that there is

9    a Valve -- there's a motion to compel discovery, which was

10    renoted till the 24th, I believe --

11    MR. QUACKENBUSH:  Yes.

12    THE COURT:  -- as a result of a stipulation of the

13    parties.  So I really haven't looked at that either.

14    MR. QUACKENBUSH:  Yes.

15    THE COURT:  So, Mr. Quackenbush, what can we do to

16    assist the parties today in the time we have?

17    MR. QUACKENBUSH:  Well, the issue we wanted to talk

18    about -- I think this was -- this session was organized primarily

19    by the defense, but the real time critical issue is the

20    destruction of these documents in Korea.  The defendants produced

21    some documents to us in the original Korean language.  It just so

22    happened that we had a summer clerk, a fellow by the name of

23    Eugene Kim, from the University of Washington law school, who's

24    Korean.  So we asked Eugene what these documents said, and the

25    translation is set out there.

4

1    When we first notified counsel about this their first

2    response was, no, you're all wrong, there wasn't any document

3    destruction, don't worry about it.  And then a week later the

4    message was we know that's what we said before, that was wrong,

5    and now we're looking into this.  We're going to do an

6    investigation.  And when our investigation is done we'll provide

7    this investigator to you and you can take his deposition.  And

8    that's just not satisfactory to us.  We want the two individuals

9    involved brought here at Vivendi's expense.

10        THE COURT:  The two people being the one who sent the

11    email and the one who received it?

12        MR. QUACKENBUSH:  Right.  Mr. -- I'm sorry, Jason.

13    Thanks.  Mr. Kwon and Mr. Jungwon Hahn, H-a-h-n.  And, you know,

14    our feeling is that when something happens and you want to find

15    out what happened, you talk to the people who know, rather than,

16    you know, getting some filtered version of the official story.

17    We think we need to get this resolved right away.

18        THE COURT:  What's your position?

19        MS. FOY:  Your Honor, to an extent Mr. Quackenbush's

20    account of the incident is accurate.  We were informed of the

21    belief there had been a destruction of some emails.

22        THE COURT:  Sorry.

23        MS. FOY:  We informed Valve's counsel we would conduct

24    an immediate investigation.  We conducted an internal

25    investigation, a preliminary investigation, and believed that

5

1   there was an issue of deletion of some emails, but that they were

2   backed up and the copies existed.

3        On further investigation, we believe that the problem might

4   be more significant, and we decided at that point to retain an

5   independent investigator.  We informed them that we would upon

6   the completion of the investigation provide either a 30(b)(6)

7   witness or a percipient witness, but that that would await the

8   completion of the investigation.

9        That's where things stood, and then we found ourselves

10  confronted with a motion to compel, which was premature, in that

11  the issue had never been brought to the Court.  We have

12  repeatedly informed counsel that the investigation is under way,

13  it is not yet complete, and when it is complete, we will know the

14  scope of the potential witnesses.

15       We're also conducting a forensic analysis of the hard drives

16  to determine what, if anything, was deleted and whether it can be

17  recovered.  But all of that awaits the findings of our

18  independent investigator.

19            THE COURT:  Give me some idea of what -- who is the

20  independent investigator?

21            MS. FOY:  They are counsel we've retained in Korea.

22            THE COURT:  They're Korean counsel?

23            MS. FOY:  Yes, they are.  And we expect that --

24            THE COURT:  And you say they're independent.  Have they

25  been employed on some written basis, so there's sort of a letter

1    directing what they do and how they do it?

2          MS. FOY:  There is an engagement letter.

3          THE COURT:  And has that been produced?

4          MS. FOY:  No, we -- again, Your Honor, we just received

5    this motion to compel from Valve.

6          THE COURT:  Well, is there any reason why that should

7    not be produced to plaintiffs' counsel?

8          MS. FOY:  No, there is no reason it can't be.

9          THE COURT:  All right.  Let's produce the letter.  So

10   the letter of engagement, or letters, or agreements of engagement

11   should be produced.

12       Now, it's not satisfactory that you just tell me that when

13   the investigation is complete something further will happen.

14   First, timingwise, what are we talking about?

15         MS. FOY:  They're conducting investigations and

16   interviews of the key witnesses who've been identified to date.

17   We don't know what further employees will have to be interviewed

18   and we don't know the scope of the forensic analysis that will

19   have to be done.

20       We expect that -- we informed them that we would like the

21   investigation done promptly and efficiently.  And they began, I

22   believe, on September 8th, and we expect that if there are no

23   further interviews to be conducted, they should be completed

24   within the next two to three weeks.

25         THE COURT:  Well, we're steaming up on -- this is a

1    pretty serious issue, if indeed evidence was destroyed.  I can't

2    imagine that I would not permit Mr. Quackenbush to take the

3    depositions of the percipient -- in other words, the person who

4    sent the email, the person who received it, at the very least,

5    together with a 30(b)(6) witness.

6         Can a corporation designate as a 30(b)(6) witness someone who

7    is an independent lawyer that's been hired?  Normally the

8    corporation identifies a person in the corporation who is the

9    speaking agent.  I suppose that the corporation could designate

10   someone else as a speaking agent, but I've never seen it.

11        Have you even thought about that problem?

12             MR. QUACKENBUSH:  I haven't seen it, and the problem

13   with that is that this is a lawyer who's employed by Vivendi.

14             THE COURT:  I understand.

15             MR. QUACKENBUSH:  And I don't know who these folks are,

16   and I assume they're honorable folks, but their client is

17   Vivendi.  I assume if this person shows up to testify, and I'm

18   asking about who said what to whom, they're going to have the

19   same problem we had with Mr. Tan, which is the subject of one of

20   our motions to compel.

21             THE COURT:  These people are lawyers that your company

22   has hired?

23             MS. FOY:  Yes, Your Honor.  It's precisely the opposite.

24   We felt it was extremely important to hire an independent

25   investigator outside the company who would not be an interested

1    party with respect to the --

2         THE COURT:  Well, but would there be any later claim of

3    a privilege between the investigator attorney and the company?

4         MS. FOY:  No, that's precisely what we contemplated.

5    They're conducting an independent investigation.  Their

6    communications with the witnesses will not be protected by

7    privilege or work product.

8         MR. QUACKENBUSH:  One other point, Your Honor, about

9    these two fellows.  They're also percipient witnesses on our

10   claims.  I mean, these are the country manager for Korea.  Korea

11   is the biggest market in the world, biggest cyber-cafe market in

12   the world.  So these guys have a lot of other information that --

13   we had asked for their depositions separately, you know, and --

14        THE COURT:  Is there any reason why that shouldn't

15   proceed?

16        MS. FOY:  Well, we're not willing to fly them to Seattle

17   for their individual witness depositions, and we've informed

18   counsel --

19        THE COURT:  Well, it seems to me that one possibility is

20   that you get on a plane and go to Korea.

21        MR. QUACKENBUSH:  That's one possibility.

22        THE COURT:  And if you learn through that discovery that

23   documents have been destroyed, one of the possible sanctions --

24   and I don't mean to limit it to this -- but would be your cost of

25   travel.

1    MR. QUACKENBUSH:  That's right.

2    THE COURT:  And time to take the deposition.  Another

3  alternative is to bring these people to Seattle, permit the

4  deposition, and reserve on who's going to pay for it until we

5  sort out what's going on.

6    But it seems to me that if documents have been destroyed,

7  it's likely the Court is going to order some sort of sanctions,

8  and one of the sanctions, but not the only sanction, would be the

9  costs of getting to the bottom of the problem.

10    If that means the cost of taking people involved, if that

11  means a 30(b)(6), or the investigator, or both -- is it cheaper

12  for him to fly to Korea or for the witness to come here?  I mean,

13  what are the pros and cons of where we take the deposition?  I

14  think other than --

15    MR. QUACKENBUSH:  Yes.

16    THE COURT:  -- other than this problem, I take it you

17  were expecting you'd have to go to Korea, you'd probably have to

18  go anyway.

19    MR. QUACKENBUSH:  Well, we have several witnesses from

20  the Vivendi's Asia division that we'd like to talk to.  We

21  suggested -- we approached counsel -- why don't we bring them

22  here.  It's much cheaper to bring them here than have all of us

23  troop over there.  That's just -- that was unrelated to this

24  problem.  It's just me trying to be practical.

25    THE COURT:  Have you sorted through that yet?

10

1          MR. QUACKENBUSH:  They didn't like that, so --

2          THE COURT:  How about Hawaii?

3          MR. QUACKENBUSH:  That would be good, too.

4          THE COURT:  Or some intermediate place.  Then everybody

5     has to travel.

6          MR. QUACKENBUSH:  This is getting better.  That's even a

7     better suggestion.

8          MS. FOY:  They intend to note depositions from witnesses

9     around the world, not just from Asia.

10         THE COURT:  I understand.

11         MS. FOY:  But with respect to Your Honor's initial

12    suggestion, I think it's premature to make a decision about who

13    should be flown where, because we don't know who the witnesses

14    are, who the percipient witnesses might be, and that is precisely

15    the scope of the investigation.

16         THE COURT:  All right.  I understand there's an ongoing

17    investigation.  Have you committed to providing the report --

18    does the engagement letter require this outside independent

19    investigator to provide a written report?

20         MS. FOY:  We haven't specified a written report, but

21    what we have offered to do is to produce the investigator as a

22    30(b)(6) witness on the subject of the alleged document

23    destruction by Korean employees.

24       Again, the scope is not known.  As far as we know,

25    destruction, if it occurred, is limited to lower-level employees.

1  The country manager did not give a directive and did not himself

2  destroy documents.

3          THE COURT:  But I think Mr. Quackenbush is entitled to

4  do his own investigation of this issue.  And I'm not sure that he

5  has to wait until your person gets done doing whatever they're

6  doing.

7      I mean, I can conceive of those people doing an

8  investigation, maybe issuing an oral report, not even a written

9  report, and then you produce him, and he maybe has or doesn't

10  have notes of people he's talked to, Mr. Quackenbush may or may

11  not be satisfied with the scope of the investigation, or who they

12  talked to.

13      I mean, I just think we're -- I think it's unlikely, frankly,

14  that -- particularly with this all occurring in a foreign

15  country, with -- and we don't know the relationship between your

16  client and this other firm.  You tell me it's independent.  I'll

17  take that at face value.  But, nevertheless, it may be less than

18  satisfactory to the plaintiffs.

19      I'm inclined -- and it's an important issue, and it involves

20  a lot of expense, so I want to get your reaction.  But I'm

21  inclined to say to Mr. Quackenbush and to the defense that he can

22  go to Korea and he can take those depositions now.

23      And if in the discovery process we learn that there was

24  meaningful destruction of documents or other bad things that

25  occurred that shouldn't have occurred, that all or a portion of

1    his expenses will be assessed against the defendants.

2        If he comes up with nothing, then -- I assume in the normal

3    course I probably wouldn't be in a position to order their

4    witnesses from Korea to come here.  I mean, it might be a nice

5    thing to do in terms of all the lawyers being here, but I think

6    that if you're going to sue people who do business in Korea, you

7    probably have to go to Korea, don't you, to take their

8    depositions?

9        MR. QUACKENBUSH:  I think that's right.  And certainly

10   we'll do that.  I was just trying to save everybody some expense.

11   I mean, we're going to troop a bunch of lawyers and a court

12   reporter and a translator and everybody else over there.

13       But, you know, on the document destruction issue, though, it

14   seems to me like we're not really -- there isn't really any

15   dispute the documents were destroyed, and it seems to me like one

16   of the -- one of the appropriate sanctions would be that the two

17   actors that we know about come here and give their depositions

18   here in the near time, because we're kind of running out of time.

19       THE COURT:  Well, but you tell me that both these people

20   are key witnesses that you're going to have a lot of other things

21   to discuss with of them.

22       MR. QUACKENBUSH:  That's right.

23       THE COURT:  Are there other things that you would be --

24   or could do in Korea at the same time.  I know one of the issues

25   is should discovery on some of these things go forward in light

1      MS. FOY:  Only the depositions?

2      THE COURT:  Only the depositions.  Because if we did

3 delay damage discovery and deposition discovery, you've still got

4 to get the documents and all of the -- and I don't want to let

5 two more months go by before we do that, frankly.

6      MS. FOY:  In that event, one of the other issues we've

7 raised, and it would still be on the table, is a desire to avoid

8 having to search for and produce documents such as invoices and

9 letters of credit, all of the information on which is already

10 reproduced in summary documents that we have and are producing.

11    And, again, this is related to --

12      THE COURT:  Let's just walk through your letter.

13      MS. FOY:  I'd like to start with Mr. Newell's issues, if

14 I might.

15      THE COURT:  That's the destruction of documents.

16      MS. FOY:  Yes.  This is an issue of, I think, far

17 greater potential seriousness than the Korean documents issue.

18 This is an issue of potential spoliation by the founder and CEO

19 of Valve, who is a defendant in the case, a cross-defendant, who

20 has been -- is a defendant with respect to the fraud claim, and

21 who apparently wiped his computer clean in the fall of 2002 -- or

22 '3, I'm sorry, one year into this litigation.

23    And in October of 2003 we requested an explanation from

24 plaintiffs' counsel, what happened to the hard drive, was it

25 mirrored, were copies kept, what happened to these documents, and

1  we were given no explanation.  And repeatedly requested an

2  explanation.  It's been almost a year and we've still got no

3  explanation of what happened to those documents.

4      Finally, with Mr. Newell's production we discovered that

5  almost no electronic documents were produced for the entirety of

6  2000 or 2001.  This is a critical period.  This is the period

7  during which the parties were negotiating the software publishing

8  agreement, the period during which we believed that Valve engaged

9  in a fraudulent concealment of its development of Steam.  Not a

10  single electronic document was produced to Mr. -- sourced to Mr.

11  Newell for that entire two-year period.

12          THE COURT:  Has his deposition been taken?

13          MS. FOY:  It has not yet been taken.  We took the

14  deposition of the 30(b)(6) witness, the technical expert, who

15  purportedly was in a position to testify as to what happened with

16  Mr. Newell's hard drive.

17      We don't assume that Mr. Newell would know what happened or

18  whether it was mirrored, but certainly this expert witness should

19  have, the 30(b)(6) witness, and they were unable to give us an

20  adequate explanation.

21      We were told that Mr. Newell reformatted his hard drive in

22  late 2003, but it appears that all of the electronic documents

23  and emails from 2000, 2001 were deleted.

24          THE COURT:  Have you made a motion in regard to this

25  matter?

1          MS. FOY:  We are seeking leave at this conference to

2    bring such a motion pursuant to the Court's instruction that we

3    raise such issues in a discovery conference before filing.

4          THE COURT:  Mr. Quackenbush, it seems to me it's a

5    legitimate issue for a motion.

6          MR. QUACKENBUSH:  It's not actually when you understand

7    what really happened, and I would like to explain that.

8          THE COURT:  All right.  Equal time, but not greater.

9          MR. QUACKENBUSH:  I'll do my best.  Yes, Your Honor.

10          THE COURT:  All right.

11          MR. QUACKENBUSH:  This issue -- and all these issues in

12    this letter are sort of an example of a good defense is a good

13    offense.  We've explained this more than once.  What happened,

14    Mr. Newell's hard drive got a virus.  They found a program

15    running in the background called backdoor.exe.  So they did what

16    everybody would do in that situation, they reformatted the hard

17    drive.

18      What Ms. Foy didn't mention and which we've explained, and

19    which produced a 30(b)(6) witness to explain in detail, was that

20    Mr. Newell's hard drive was backed up.  And that so after they

21    reformatted they reinstalled all the documents onto his hard

22    drive, and his hard drive has been searched.  So there weren't

23    any documents destroyed.

24          THE COURT:  His hard drive has been searched by your

25    people?

1          MR. QUACKENBUSH:  Yes.

2          THE COURT:  And are you saying that there were no

3    documents for -- she says they didn't produce any documents for

4    some period of time.

5          MS. FOY:  For two years.

6          THE COURT:  Two years, one year, two years.  Is that

7    possible that there's nothing to produce?

8          MR. QUACKENBUSH:  Well, we actually, you know, talked

9    about this issue last Thursday.  We had a big discovery

10   conference with opposing counsel.  We talked about this issue.

11   They asked more questions.  I said, look, I'll go back and check

12   again.  I think the story that we've been giving you is correct,

13   but I'll go back and check again just to make sure.

14       But we already produced a 30(b)(6) witness who testified

15   about this.  And I'm happy to go back and check again.  I'll

16   check a third time.  And Mr. Newell will give a deposition about

17   it, but the story isn't going to change.  That's what happened.

18   If counsel wants to bring a motion about this, this will be the

19   response.

20         THE COURT:  It doesn't seem like -- I mean, it seems to

21   me that what defendants ought to do is go take this guy's

22   deposition and take anyone else's deposition you want.  And then

23   your motion is for sanctions, or if you find that things were

24   erased or not produced or -- what are we going to accomplish in a

25   motion?  I get your argument.  I get his argument.  What would I

**38**

24

1    decide?  Wouldn't I say I need more information?  And it's a

2    factual issue, isn't it?

3         MS. FOY:  We noticed and took what we thought was the

4    appropriate deposition.  Mr. Newell may not know whether his hard

5    drive was mirrored.

6         THE COURT:  You will not know that until you talk to

7    him.

8         MS. FOY:  No, but we did ask for the deposition of a

9    30(b)(6) witness who did have that information.  What he told us

10   was Mr. Newell's hard drive was reformatted, but that if Mr.

11   Newell or anyone else had deleted files or deleted documents,

12   those documents or files would not have been backed up and would

13   now have been reformatted.

14        THE COURT:  So what you're saying is the 30(b)(6) person

15   couldn't tell you whether something had been deleted or not?

16        MS. FOY:  That's correct.  And we would like a further

17   30(b)(6) deposition on this issue.  Mr. Newell may be the

18   appropriate person or the technical expert --

19        THE COURT:  Well, it seems to me that Mr. Newell is

20   certainly a good place to start.  What are you waiting for?

21        MS. FOY:  Well, we'd like to wait and complete the

22   document production to take his individual deposition.  So that

23   if we would be permitted to take his deposition on this limited

24   issue and go back to him again --

25        THE COURT:  Is Mr. Newell here in the United States?

25

1          MR. QUACKENBUSH:  Sure.

2          THE COURT:  What's wrong with letting them do a limited

3    deposition on this issue?

4          MR. QUACKENBUSH:  Well, I mean they're going to take his

5    deposition anyway.  It seems like -- our document production is

6    going to be done a week from tomorrow.

7          THE COURT:  So why not wait until after that?

8          MS. FOY:  Because what we believe is the case is that

9    there must be electronic documents.

10         THE COURT:  Well, I understand, but you're not going to

11   get to the bottom of it until you talk to him and perhaps other

12   people.  It seems to me that you should go ahead and do more

13   discovery and then come back to the Court.

14       I mean, I don't know how I could possibly sort out this issue

15   based on what you know or believe, or don't know at the present

16   time.  I mean, I think it would be a motion that would be --

17         MS. FOY:  The motion would be for a further 30(b)(6)

18   deposition of someone who has done a proper investigation to

19   determine whether there was a mirrored --

20         THE COURT:  But how am I going to decide whether the

21   first guy did or did not do a proper investigation?  You've got

22   to talk to Mr. Newell.

23         MS. FOY:  We don't believe Mr. Newell conducted the

24   investigation.

25         THE COURT:  Well, he's the guy that you say deleted

**40**

1    something.

2          MS. FOY:  We believe that documents were deleted because

3    no documents were produced for a two-year period during which

4    there were critical negotiations.

5          THE COURT:  Well, then what you're really saying is that

6    you've taken the 30(b)(6) that they've tendered up and that

7    30(b)(6) person was not the right person and didn't have the

8    information?

9          MS. FOY:  That's right.

10          THE COURT:  Well, then maybe you make a motion to -- for

11    sanctions and whatever else you want based on that fact.  We can

12    at least look at the 30(b)(6) record that we've got, and we can

13    decide if this guy was or was not proper -- was a proper

14    30(b)(6).  But if we conclude that he was, then I'm not going to

15    order another 30(b)(6).  So I think that's the risk that you

16    take.

17          If you want to make the motion, you can make the motion.  But

18    I think that's the motion, that the 30(b)(6) guy wasn't the

19    proper -- you can make any motion you want related to this issue.

20    All I'm saying, my initial reaction is that if you make the

21    motion in the abstract that he's deleted stuff and this is all

22    terrible, and he comes back and says what he says, and we've got

23    a 30(b)(6) guy that's told them what we know, we're going to have

24    to look at that 30(b)(6) testimony.  And I'm not hopeful that I'm

25    going to be able to get to the bottom of it based on where you

 1   are today.

 2        MS. FOY:  I think where we are today is that we would

 3   like to take a limited deposition of Mr. Newell, specifically on

 4   the issue of his erasure of his hard drive, and take a further

 5   30(b)(6) witness deposition with respect to the issue of any

 6   investigation that was done, what happened to the -- whether his

 7   hard drive was mirrored.

 8        THE COURT:  Did you note up a request for a 30(b)(6) on

 9   what investigation was done and the like?

10        MS. FOY:  Yes, we did.

11        THE COURT:  And they produced someone?

12        MS. FOY:  They produced someone who could not give

13   answers.

14        THE COURT:  Well, I'm not going to -- Mr. Quackenbush,

15   are you willing to produce another 30(b)(6) witness?

16        MR. QUACKENBUSH:  Well, Your Honor, we'll produce

17   another witness if you order us to.  We produced the guy who

18   knows what happened.  He gave the testimony.  Counsel didn't like

19   the testimony.  But it's what happened.

20        THE COURT:  Where is Mr. Newell?  Is he in Seattle?

21        MR. QUACKENBUSH:  Yeah, he's the CEO of the company.

22        THE COURT:  All right.  I'll permit a limited deposition

23   of Mr. Newell on the subject of the hard drive and any deletions,

24   et cetera, one not to exceed one day, seven hours, on that

25   subject, without -- but I'm not going to order another 30(b)(6)

28

1    person to be designated at this time.

2        But I will permit you to make a motion teeing up that whole

3    issue.  In which event I'd have to look at the 30(b)(6) that was

4    tendered and what the person said, and make a decision whether

5    they need to do something more, or whether any sanctions are

6    appropriate, or whether this is a non-issue.  I certainly can't

7    decide it today.

8        All right.  So a one-day limited deposition, deny your

9    request for another 30(b)(6) without prejudice, authorize you to

10   file a motion relating to the Newell issue.  Are you clear on

11   that?

12       MS. FOY:  Yes.  I also wanted to ask Mr. Quackenbush to

13   follow up on the -- in the interval to follow up on his offer to

14   actually find out the answer to the question about the hard

15   drive, so we can save a great deal of time.

16       MR. QUACKENBUSH:  You know, the funny thing about this

17   -- I'm happy to do that, which is what I said in our meet and

18   confer on Thursday.  And then the next thing I got was this.  And

19   then last night filed a motion.

20       So, you know, I'm happy to proceed as counsel are supposed to

21   proceed and work these things out without bringing them to the

22   Court.  I'm happy to provide whatever information I have.  I've

23   already done it.  I'll do it again.

24       THE COURT:  Well, I mean, one of the problems, Ms. Foy,

25   is that once you bring the motion, then it seems to me it takes

```
 1                            CERTIFICATE
 2
 3
 4
 5
 6
 7
 8
 9          I, Joseph F. Roth, Official Court Reporter, do hereby
    certify that the foregoing transcript is correct.
10
11                            S/Joseph F. Roth
12                            _____
                             Joseph F. Roth
13
14
15
16
17
18
19
20
21
22
23
24
25
```