```
 1          IN THE UNITED STATES DISTRICT COURT FOR
               THE WESTERN DISTRICT OF WASHINGTON
 2                         AT SEATTLE

 3  VALVE CORPORATION,                )
                                      )        Case No. C02-1683Z
 4                  Plaintiff,        )
                                      )        Seattle, Washington
 5           v.                       )        September 16, 2004
                                      )
 6  SIERRA ENTERTAINMENT, INC. (AKA   )
    SIERRA ON LINE, INC.), et al.,    )
 7                                    )
                    Defendants        )
 8  _____)
    SIERRA ENTERTAINMENT, INC. (AKA   )
 9  SIERRA ON LINE, INC.), et al.,    )
                                      )
10        Counter-Claimants,          )
                                      )
11           v.                       )
                                      )
12  VALVE CORPORATION, et al.,        )
                                      )
13        Counterclaim Defendants. )
    _____)
14
                  TRANSCRIPT OF PROCEEDINGS
15        BEFORE THE HONORABLE THOMAS S. ZILLY
               UNITED STATES DISTRICT JUDGE
16

17  For the Plaintiff:     Karl Quackenbush
                           Jason Holtman
18                         Preston Gates Ellis
                           925 Fourth Avenue, Suite 2900
19                         Seattle, Washington  98104-1158

20  For the Defendants:    Linda Q. Foy
                           Howard, Rice, Nemerovski, Canady, Falk &
21                         Rabkin
                           Three Embarcadero Center
22                         Seventh Floor
                           San Francisco, California  94111-4065
23
                           Michael R. Scott
24                         Hillis, Clark, Martin & Peterson
                           500 Galland Building
25                         1221 Second Avenue
                           Seattle, Washington 98101-2925
```

1 Joseph F. Roth
Official Court Reporter
2 600 U.S. Courthouse
Seattle, Washington 98104
3 (206) 553-1899

4 Proceedings recorded by computer-aided stenography.

5      (In-chambers conference.)

6      THE COURT:  Let's go on the record.  The defendants'

7 letter -- I gather you've traded letters with one another, but

8 one side -- I think the defense -- wanted a court reporter, so we

9 have a court reporter.  And so the court reporter has the

10 caption, but why don't you make your appearances for the record.

11      MR. QUACKENBUSH:  Karl Quackenbush representing

12 plaintiff Valve Corporation, Mr. and Mrs. Lynch and Mr. and Mrs.

13 Newell.

14      MR. HOLTMAN:  Jason Holtman representing plaintiff Valve

15 Corporation, Mr. and Mrs. Lynch, Mr. and Mrs. Newell.

16      MS. FOY:  Linda Foy representing the defendants and

17 cross-complainant Sierra, Vivendi Universal and Vivendi

18 Universal, S.A., International.

19      MR. SCOTT:  Mike Scott, local counsel for defendants.

20      THE COURT:  All right.  This is a status conference

21 requested by the parties.  Prior to the status conference

22 obviously I received from Mr. Quackenbush a letter dated

23 September 15th indicating why he wanted the meeting.  And at my

24 request my law clerk asked that there be something provided to

25 us, so we would have some -- be alerted on what the issues were.

1    And the defense has given me -- Ms. Foy I think is the author

2  of the letter -- a letter, a two-page letter outlining from the

3  defendants' standpoint issues for discussion.

4    We've got basically an hour.  So let's proceed first with

5  plaintiff and then we'll go to the defendants.  So I guess -- and

6  I know that there are some motions to -- pending motions for

7  summary judgment, partial summary judgment, that are pending, but

8  they're not yet ripe for consideration.  And I know that there is

9  a Valve -- there's a motion to compel discovery, which was

10  renoted till the 24th, I believe --

11    MR. QUACKENBUSH:  Yes.

12    THE COURT:  -- as a result of a stipulation of the

13  parties.  So I really haven't looked at that either.

14    MR. QUACKENBUSH:  Yes.

15    THE COURT:  So, Mr. Quackenbush, what can we do to

16  assist the parties today in the time we have?

17    MR. QUACKENBUSH:  Well, the issue we wanted to talk

18  about -- I think this was -- this session was organized primarily

19  by the defense, but the real time critical issue is the

20  destruction of these documents in Korea.  The defendants produced

21  some documents to us in the original Korean language.  It just so

22  happened that we had a summer clerk, a fellow by the name of

23  Eugene Kim, from the University of Washington law school, who's

24  Korean.  So we asked Eugene what these documents said, and the

25  translation is set out there.

1    When we first notified counsel about this their first

2    response was, no, you're all wrong, there wasn't any document

3    destruction, don't worry about it.  And then a week later the

4    message was we know that's what we said before, that was wrong,

5    and now we're looking into this.  We're going to do an

6    investigation.  And when our investigation is done we'll provide

7    this investigator to you and you can take his deposition.  And

8    that's just not satisfactory to us.  We want the two individuals

9    involved brought here at Vivendi's expense.

10    THE COURT:  The two people being the one who sent the

11    email and the one who received it?

12    MR. QUACKENBUSH:  Right.  Mr. -- I'm sorry, Jason.

13    Thanks.  Mr. Kwon and Mr. Jungwon Hahn, H-a-h-n.  And, you know,

14    our feeling is that when something happens and you want to find

15    out what happened, you talk to the people who know, rather than,

16    you know, getting some filtered version of the official story.

17    We think we need to get this resolved right away.

18    THE COURT:  What's your position?

19    MS. FOY:  Your Honor, to an extent Mr. Quackenbush's

20    account of the incident is accurate.  We were informed of the

21    belief there had been a destruction of some emails.

22    THE COURT:  Sorry.

23    MS. FOY:  We informed Valve's counsel we would conduct

24    an immediate investigation.  We conducted an internal

25    investigation, a preliminary investigation, and believed that

1  there was an issue of deletion of some emails, but that they were

2  backed up and the copies existed.

3     On further investigation, we believe that the problem might

4  be more significant, and we decided at that point to retain an

5  independent investigator.  We informed them that we would upon

6  the completion of the investigation provide either a 30(b)(6)

7  witness or a percipient witness, but that that would await the

8  completion of the investigation.

9     That's where things stood, and then we found ourselves

10  confronted with a motion to compel, which was premature, in that

11  the issue had never been brought to the Court.  We have

12  repeatedly informed counsel that the investigation is under way,

13  it is not yet complete, and when it is complete, we will know the

14  scope of the potential witnesses.

15     We're also conducting a forensic analysis of the hard drives

16  to determine what, if anything, was deleted and whether it can be

17  recovered.  But all of that awaits the findings of our

18  independent investigator.

19        THE COURT:  Give me some idea of what -- who is the

20  independent investigator?

21        MS. FOY:  They are counsel we've retained in Korea.

22        THE COURT:  They're Korean counsel?

23        MS. FOY:  Yes, they are.  And we expect that --

24        THE COURT:  And you say they're independent.  Have they

25  been employed on some written basis, so there's sort of a letter

1  directing what they do and how they do it?

2          MS. FOY:  There is an engagement letter.

3          THE COURT:  And has that been produced?

4          MS. FOY:  No, we -- again, Your Honor, we just received

5  this motion to compel from Valve.

6          THE COURT:  Well, is there any reason why that should

7  not be produced to plaintiffs' counsel?

8          MS. FOY:  No, there is no reason it can't be.

9          THE COURT:  All right.  Let's produce the letter.  So

10  the letter of engagement, or letters, or agreements of engagement

11  should be produced.

12     Now, it's not satisfactory that you just tell me that when

13  the investigation is complete something further will happen.

14  First, timingwise, what are we talking about?

15          MS. FOY:  They're conducting investigations and

16  interviews of the key witnesses who've been identified to date.

17  We don't know what further employees will have to be interviewed

18  and we don't know the scope of the forensic analysis that will

19  have to be done.

20     We expect that -- we informed them that we would like the

21  investigation done promptly and efficiently.  And they began, I

22  believe, on September 8th, and we expect that if there are no

23  further interviews to be conducted, they should be completed

24  within the next two to three weeks.

25          THE COURT:  Well, we're steaming up on -- this is a

1    pretty serious issue, if indeed evidence was destroyed.  I can't

2    imagine that I would not permit Mr. Quackenbush to take the

3    depositions of the percipient -- in other words, the person who

4    sent the email, the person who received it, at the very least,

5    together with a 30(b)(6) witness.

6        Can a corporation designate as a 30(b)(6) witness someone who

7    is an independent lawyer that's been hired?  Normally the

8    corporation identifies a person in the corporation who is the

9    speaking agent.  I suppose that the corporation could designate

10   someone else as a speaking agent, but I've never seen it.

11       Have you even thought about that problem?

12           MR. QUACKENBUSH:  I haven't seen it, and the problem

13   with that is that this is a lawyer who's employed by Vivendi.

14           THE COURT:  I understand.

15           MR. QUACKENBUSH:  And I don't know who these folks are,

16   and I assume they're honorable folks, but their client is

17   Vivendi.  I assume if this person shows up to testify, and I'm

18   asking about who said what to whom, they're going to have the

19   same problem we had with Mr. Tan, which is the subject of one of

20   our motions to compel.

21           THE COURT:  These people are lawyers that your company

22   has hired?

23           MS. FOY:  Yes, Your Honor.  It's precisely the opposite.

24   We felt it was extremely important to hire an independent

25   investigator outside the company who would not be an interested

1  party with respect to the --

2          THE COURT:  Well, but would there be any later claim of

3  a privilege between the investigator attorney and the company?

4          MS. FOY:  No, that's precisely what we contemplated.

5  They're conducting an independent investigation.  Their

6  communications with the witnesses will not be protected by

7  privilege or work product.

8          MR. QUACKENBUSH:  One other point, Your Honor, about

9  these two fellows.  They're also percipient witnesses on our

10  claims.  I mean, these are the country manager for Korea.  Korea

11  is the biggest market in the world, biggest cyber-cafe market in

12  the world.  So these guys have a lot of other information that --

13  we had asked for their depositions separately, you know, and --

14          THE COURT:  Is there any reason why that shouldn't

15  proceed?

16          MS. FOY:  Well, we're not willing to fly them to Seattle

17  for their individual witness depositions, and we've informed

18  counsel --

19          THE COURT:  Well, it seems to me that one possibility is

20  that you get on a plane and go to Korea.

21          MR. QUACKENBUSH:  That's one possibility.

22          THE COURT:  And if you learn through that discovery that

23  documents have been destroyed, one of the possible sanctions --

24  and I don't mean to limit it to this -- but would be your cost of

25  travel.

1    MR. QUACKENBUSH:  That's right.

2    THE COURT:  And time to take the deposition.  Another

3  alternative is to bring these people to Seattle, permit the

4  deposition, and reserve on who's going to pay for it until we

5  sort out what's going on.

6      But it seems to me that if documents have been destroyed,

7  it's likely the Court is going to order some sort of sanctions,

8  and one of the sanctions, but not the only sanction, would be the

9  costs of getting to the bottom of the problem.

10     If that means the cost of taking people involved, if that

11  means a 30(b)(6), or the investigator, or both -- is it cheaper

12  for him to fly to Korea or for the witness to come here?  I mean,

13  what are the pros and cons of where we take the deposition?  I

14  think other than --

15    MR. QUACKENBUSH:  Yes.

16    THE COURT:  -- other than this problem, I take it you

17  were expecting you'd have to go to Korea, you'd probably have to

18  go anyway.

19    MR. QUACKENBUSH:  Well, we have several witnesses from

20  the Vivendi's Asia division that we'd like to talk to.  We

21  suggested -- we approached counsel -- why don't we bring them

22  here.  It's much cheaper to bring them here than have all of us

23  troop over there.  That's just -- that was unrelated to this

24  problem.  It's just me trying to be practical.

25    THE COURT:  Have you sorted through that yet?

1    MR. QUACKENBUSH:  They didn't like that, so --

2    THE COURT:  How about Hawaii?

3    MR. QUACKENBUSH:  That would be good, too.

4    THE COURT:  Or some intermediate place.  Then everybody

5    has to travel.

6    MR. QUACKENBUSH:  This is getting better.  That's even a

7    better suggestion.

8    MS. FOY:  They intend to note depositions from witnesses

9    around the world, not just from Asia.

10   THE COURT:  I understand.

11   MS. FOY:  But with respect to Your Honor's initial

12   suggestion, I think it's premature to make a decision about who

13   should be flown where, because we don't know who the witnesses

14   are, who the percipient witnesses might be, and that is precisely

15   the scope of the investigation.

16   THE COURT:  All right.  I understand there's an ongoing

17   investigation.  Have you committed to providing the report --

18   does the engagement letter require this outside independent

19   investigator to provide a written report?

20   MS. FOY:  We haven't specified a written report, but

21   what we have offered to do is to produce the investigator as a

22   30(b)(6) witness on the subject of the alleged document

23   destruction by Korean employees.

24   Again, the scope is not known.  As far as we know,

25   destruction, if it occurred, is limited to lower-level employees.

1  The country manager did not give a directive and did not himself

2  destroy documents.

3      THE COURT:  But I think Mr. Quackenbush is entitled to

4  do his own investigation of this issue.  And I'm not sure that he

5  has to wait until your person gets done doing whatever they're

6  doing.

7      I mean, I can conceive of those people doing an

8  investigation, maybe issuing an oral report, not even a written

9  report, and then you produce him, and he maybe has or doesn't

10  have notes of people he's talked to, Mr. Quackenbush may or may

11  not be satisfied with the scope of the investigation, or who they

12  talked to.

13      I mean, I just think we're -- I think it's unlikely, frankly,

14  that -- particularly with this all occurring in a foreign

15  country, with -- and we don't know the relationship between your

16  client and this other firm.  You tell me it's independent.  I'll

17  take that at face value.  But, nevertheless, it may be less than

18  satisfactory to the plaintiffs.

19      I'm inclined -- and it's an important issue, and it involves

20  a lot of expense, so I want to get your reaction.  But I'm

21  inclined to say to Mr. Quackenbush and to the defense that he can

22  go to Korea and he can take those depositions now.

23      And if in the discovery process we learn that there was

24  meaningful destruction of documents or other bad things that

25  occurred that shouldn't have occurred, that all or a portion of

1    his expenses will be assessed against the defendants.

2        If he comes up with nothing, then -- I assume in the normal

3    course I probably wouldn't be in a position to order their

4    witnesses from Korea to come here.  I mean, it might be a nice

5    thing to do in terms of all the lawyers being here, but I think

6    that if you're going to sue people who do business in Korea, you

7    probably have to go to Korea, don't you, to take their

8    depositions?

9            MR. QUACKENBUSH:  I think that's right.  And certainly

10   we'll do that.  I was just trying to save everybody some expense.

11   I mean, we're going to troop a bunch of lawyers and a court

12   reporter and a translator and everybody else over there.

13       But, you know, on the document destruction issue, though, it

14   seems to me like we're not really -- there isn't really any

15   dispute the documents were destroyed, and it seems to me like one

16   of the -- one of the appropriate sanctions would be that the two

17   actors that we know about come here and give their depositions

18   here in the near time, because we're kind of running out of time.

19           THE COURT:  Well, but you tell me that both these people

20   are key witnesses that you're going to have a lot of other things

21   to discuss with of them.

22           MR. QUACKENBUSH:  That's right.

23           THE COURT:  Are there other things that you would be --

24   or could do in Korea at the same time.  I know one of the issues

25   is should discovery on some of these things go forward in light

1  of the pending motions for partial summary judgment.  And maybe

2  we should move to that, just to get a flavor for the problem and

3  the issues.

4      MR. QUACKENBUSH:  To answer your question, sure, there

5  are -- if we're going to go, I would want to get everybody done

6  that we need to do.

7      THE COURT:  Sure.

8      MR. QUACKENBUSH:  Sure.  That's absolutely true.

9      THE COURT:  And are you in a position now to do that, or

10  are you needing to get document production and the like before

11  you take the depositions?

12      MR. QUACKENBUSH:  Well, that's a whole other question.

13  I have a lot to talk about with regard to Vivendi's document

14  production either today or some other time, when it's more

15  convenient.

16    But we'll go now, because we're running out of time.  And I'm

17  worried that we're going to -- you know, we're getting pushed

18  back up against our discovery cutoff.  This is the biggest --

19  this is where the most infringer profits were earned.  And I can

20  see why these fellows -- I don't know, but I'm going to speculate

21  these fellows would have a motive to destroy documents, because I

22  think they know that they weren't supposed to be doing what they

23  were doing, and that there's big money involved.

24    Now, that's just me talking.  Maybe I can prove that, maybe I

25  can't, but I can't -- I don't have the opportunity unless I go,

1    and so we need to go as soon as possible.

2         THE COURT:  Do you want to talk about -- the other

3    motions, I think, are noted for October 8th, or October 1st,

4    perhaps.  Are they all noted for October 1st?

5         THE LAW CLERK:  I think the 8th.

6         THE COURT:  The 8th.

7         MR. QUACKENBUSH:  The 8th are the summary judgment.

8         THE COURT:  Defendants' motion for partial summary

9    judgment noted October 8th.  Defendants' motion for partial

10   summary judgment re contractual rights, October 8th.  And then

11   the plaintiffs' cross-motions are also noted for the same date.

12   So everything is noted for the 8th.

13        MR. QUACKENBUSH:  Right.

14        THE COURT:  As a practical matter, I'm going to be out

15   of the district for two weeks in the middle of October.  I'm

16   probably not going to get to those motions and resolve them until

17   early November.  You've got a discovery cutoff of November 18, I

18   think.

19        MR. QUACKENBUSH:  Correct.

20        THE COURT:  We may have to adjust that.  We may have to

21   adjust the trial date.  But I think that discovery has to go

22   forward.  The fact that -- I mean, I haven't seen -- I haven't

23   looked at, because you've got a noting date of October 8th --

24   presumably they were just recently filed.  But we looked at that

25   issue, didn't we?  Was it a motion for a preliminary injunction,

1  or was there a motion to dismiss.

2          MS. FOY:  A motion to dismiss.

3          MR. QUACKENBUSH:  A motion to dismiss.

4          THE COURT:  Motion to dismiss.

5          MS. FOY:  And at that time the motion was denied, but

6  the Court instructed defendants that this issue should be

7  addressed on a motion for summary judgment and resolved earlier

8  rather than later.

9          THE COURT:  Well --

10          MS. FOY:  And that it is an issue of law and that the

11  parties --

12          THE COURT:  Has all the discovery been done with respect

13  to the cyber-cafe rights?

14          MR. QUACKENBUSH:  We think it has.  Not with regard to

15  the damages and the revenues.  That's a more problematic issue.

16          THE COURT:  And have we ever talked about bifurcation?

17          MR. QUACKENBUSH:  (Shakes head.)

18          THE COURT:  And is that a good thing or a bad thing?  I

19  mean, I'm just wondering if we bifurcated damages by a couple of

20  months and tried the liability, would there be such a -- and I'm

21  not going to decide this today.  I'm just thinking out loud,

22  trying to see what's the best way to manage this case and how to

23  proceed.

24      But are a lot of those witnesses on damages going to be the

25  same as liability?

1    MS. FOY:  Your Honor, I think that this issue dovetails

2    with many of the other scheduling issues that we wanted to raise

3    today, the timing of these motions.  If I could go into our

4    topics and --

5        THE COURT:  Well --

6        MS. FOY:  I think bifurcation could be absolutely

7    appropriate given the stage of discovery and the fact that the

8    vast majority of pending depositions that Valve apparently

9    intends to take in October deal with lost profits and damages

10   issues, which are certainly premature in view of the pending

11   motions.  I believe the cross-motions should be decided before

12   any further discovery on damages goes forward.  It would be

13   extremely burdensome and expensive for both sides.

14       THE COURT:  Well, let me ask you this.  I know

15   plaintiffs never like bifurcation and they don't like to think

16   that their trial date is in jeopardy.  But another way to maybe

17   look at the problem of everything that has to be done and how you

18   do it in some orderly fashion, what about deferring discovery on

19   the damages and saying -- and moving that deadline, in other

20   words, do everything but the damages, and move that discovery

21   deadline to the end of January, or the middle of February?  There

22   are not going to presumably be dispositive motion problems

23   dealing with damages.  Now, maybe there will be.  I don't know.

24       MR. QUACKENBUSH:  Well, there is one pending.  There's

25   cross-motions pending on whether the plaintiffs' copyright

1  remedies are eliminated by the contract limitation.  So that's --

2  that's a --

3          THE COURT:  All right.

4          MR. QUACKENBUSH:  But there would be -- there would

5  still be other damages issues --

6          THE COURT:  Right.

7          MR. QUACKENBUSH:  -- regardless of how that motion is

8  decided.

9          THE COURT:  In fact, that is kind of a legal issue.

10          MR. QUACKENBUSH:  Yes, it is.

11          MS. FOY:  Yes.

12          THE COURT:  But having in mind that it's unlikely you're

13  going to have, under the best of scenarios, going to have a

14  ruling on these motions before early November, would an

15  opportunity to take damage discovery until the middle or the end

16  of -- let's say the end of January, would that help everybody in

17  terms of preparing this case, or would that be something that you

18  don't want to entertain?

19          MR. QUACKENBUSH:  Could we keep our trial date?

20          THE COURT:  Well, I'm not -- this would be -- I'm not

21  saying the trial date is moving.  I'm just trying to

22  understand -- I mean, one of the issues, and I gather a lot of

23  what your concerns are, is the plaintiff wants to do a lot of

24  damage discovery, which may become not relevant if you win on

25  your partial motions.

1    MS. FOY:  That's right.

2    THE COURT:  Let me ask, Mr. Quackenbush:  Do you agree

3    that if I were to rule in their favor -- and I'm not suggesting

4    that in any way, but on their interpretation of what the

5    agreement means, would that affect a lot of the damage discovery

6    that you'd otherwise be doing?

7    MR. QUACKENBUSH:  I'm not sure that a lot would be a

8    good way to state it.  Some, probably.  But even under the

9    scenario where you grant both motions, both of defendants'

10   motions, which we're -- we don't think will happen.  We think you

11   should grant our motions.

12   THE COURT:  I understand.

13   MR. QUACKENBUSH:  It probably goes without saying.  But

14   there would still be damage discovery left to do.  I mean, the

15   contract doesn't say you get a completely free pass on breaches

16   of contract.  You don't.  So we would have direct damages

17   discovery.

18   So I think the answer is it would make it less, sure, but I

19   can't -- I can't quantify that right now.  I'd have to go back

20   and really work through that.

21   THE COURT:  Well --

22   MS. FOY:  Your Honor, I think the --

23   THE COURT:  Well, let me ask you this:  Can we put him

24   on time out and let him just sit there maybe?  You asked for a

25   court reporter.  Do you want all this reported?

MS. FOY:  I would like it all reported so there's no
disagreement.  Is there a problem with continuing --

THE COURT:  No, I just -- this is -- we're just
exploring various possibilities.  If we get to a point where I
tell you that I'm going to rule on something, I'd let you make
your arguments on the record.  But we'll stay on the record.  Go
ahead.

MS. FOY:  I think the proposal to defer discovery on
the -- on damages until after the -- until the beginning of the
year, and specifically after the ruling on the cross-motions, is
far more efficient case management for this case.

In fact, the vast majority of the discovery during the last
several months has been on lost profits, witnesses on lost
profits, cyber-cafe profits, multiple, hundreds of thousands of
spreadsheets and other financial documents, and we're continuing
to try to locate and produce those documents, all of which would
be moot if the Court --

THE COURT:  Let me just clarify, Ms. Foy.  Nothing I've
said would impact or affect the defendants' obligations to
produce written discovery.

MS. FOY:  I understand.

THE COURT:  Documents that have been ordered or
requested, or for which there has been no objection.  What I'm
doing is limiting my -- what about this proposal to the actual
taking of depositions dealing with damages?

1    MS. FOY:  Only the depositions?

2    THE COURT:  Only the depositions.  Because if we did

3    delay damage discovery and deposition discovery, you've still got

4    to get the documents and all of the -- and I don't want to let

5    two more months go by before we do that, frankly.

6    MS. FOY:  In that event, one of the other issues we've

7    raised, and it would still be on the table, is a desire to avoid

8    having to search for and produce documents such as invoices and

9    letters of credit, all of the information on which is already

10   reproduced in summary documents that we have and are producing.

11   And, again, this is related to --

12   THE COURT:  Let's just walk through your letter.

13   MS. FOY:  I'd like to start with Mr. Newell's issues, if

14   I might.

15   THE COURT:  That's the destruction of documents.

16   MS. FOY:  Yes.  This is an issue of, I think, far

17   greater potential seriousness than the Korean documents issue.

18   This is an issue of potential spoliation by the founder and CEO

19   of Valve, who is a defendant in the case, a cross-defendant, who

20   has been -- is a defendant with respect to the fraud claim, and

21   who apparently wiped his computer clean in the fall of 2002 -- or

22   '3, I'm sorry, one year into this litigation.

23   And in October of 2003 we requested an explanation from

24   plaintiffs' counsel, what happened to the hard drive, was it

25   mirrored, were copies kept, what happened to these documents, and

1    we were given no explanation.  And repeatedly requested an

2    explanation.  It's been almost a year and we've still got no

3    explanation of what happened to those documents.

4        Finally, with Mr. Newell's production we discovered that

5    almost no electronic documents were produced for the entirety of

6    2000 or 2001.  This is a critical period.  This is the period

7    during which the parties were negotiating the software publishing

8    agreement, the period during which we believed that Valve engaged

9    in a fraudulent concealment of its development of Steam.  Not a

10   single electronic document was produced to Mr. -- sourced to Mr.

11   Newell for that entire two-year period.

12           THE COURT:  Has his deposition been taken?

13           MS. FOY:  It has not yet been taken.  We took the

14   deposition of the 30(b)(6) witness, the technical expert, who

15   purportedly was in a position to testify as to what happened with

16   Mr. Newell's hard drive.

17       We don't assume that Mr. Newell would know what happened or

18   whether it was mirrored, but certainly this expert witness should

19   have, the 30(b)(6) witness, and they were unable to give us an

20   adequate explanation.

21       We were told that Mr. Newell reformatted his hard drive in

22   late 2003, but it appears that all of the electronic documents

23   and emails from 2000, 2001 were deleted.

24           THE COURT:  Have you made a motion in regard to this

25   matter?

1    MS. FOY:  We are seeking leave at this conference to

2  bring such a motion pursuant to the Court's instruction that we

3  raise such issues in a discovery conference before filing.

4    THE COURT:  Mr. Quackenbush, it seems to me it's a

5  legitimate issue for a motion.

6    MR. QUACKENBUSH:  It's not actually when you understand

7  what really happened, and I would like to explain that.

8    THE COURT:  All right.  Equal time, but not greater.

9    MR. QUACKENBUSH:  I'll do my best.  Yes, Your Honor.

10    THE COURT:  All right.

11    MR. QUACKENBUSH:  This issue -- and all these issues in

12  this letter are sort of an example of a good defense is a good

13  offense.  We've explained this more than once.  What happened,

14  Mr. Newell's hard drive got a virus.  They found a program

15  running in the background called backdoor.exe.  So they did what

16  everybody would do in that situation, they reformatted the hard

17  drive.

18    What Ms. Foy didn't mention and which we've explained, and

19  which produced a 30(b)(6) witness to explain in detail, was that

20  Mr. Newell's hard drive was backed up.  And that so after they

21  reformatted they reinstalled all the documents onto his hard

22  drive, and his hard drive has been searched.  So there weren't

23  any documents destroyed.

24    THE COURT:  His hard drive has been searched by your

25  people?

1      MR. QUACKENBUSH:  Yes.

2      THE COURT:  And are you saying that there were no

3  documents for -- she says they didn't produce any documents for

4  some period of time.

5      MS. FOY:  For two years.

6      THE COURT:  Two years, one year, two years.  Is that

7  possible that there's nothing to produce?

8      MR. QUACKENBUSH:  Well, we actually, you know, talked

9  about this issue last Thursday.  We had a big discovery

10  conference with opposing counsel.  We talked about this issue.

11  They asked more questions.  I said, look, I'll go back and check

12  again.  I think the story that we've been giving you is correct,

13  but I'll go back and check again just to make sure.

14      But we already produced a 30(b)(6) witness who testified

15  about this.  And I'm happy to go back and check again.  I'll

16  check a third time.  And Mr. Newell will give a deposition about

17  it, but the story isn't going to change.  That's what happened.

18  If counsel wants to bring a motion about this, this will be the

19  response.

20      THE COURT:  It doesn't seem like -- I mean, it seems to

21  me that what defendants ought to do is go take this guy's

22  deposition and take anyone else's deposition you want.  And then

23  your motion is for sanctions, or if you find that things were

24  erased or not produced or -- what are we going to accomplish in a

25  motion?  I get your argument.  I get his argument.  What would I

1  decide?  Wouldn't I say I need more information?  And it's a

2  factual issue, isn't it?

3       MS. FOY:  We noticed and took what we thought was the

4  appropriate deposition.  Mr. Newell may not know whether his hard

5  drive was mirrored.

6       THE COURT:  You will not know that until you talk to

7  him.

8       MS. FOY:  No, but we did ask for the deposition of a

9  30(b)(6) witness who did have that information.  What he told us

10  was Mr. Newell's hard drive was reformatted, but that if Mr.

11  Newell or anyone else had deleted files or deleted documents,

12  those documents or files would not have been backed up and would

13  now have been reformatted.

14       THE COURT:  So what you're saying is the 30(b)(6) person

15  couldn't tell you whether something had been deleted or not?

16       MS. FOY:  That's correct.  And we would like a further

17  30(b)(6) deposition on this issue.  Mr. Newell may be the

18  appropriate person or the technical expert --

19       THE COURT:  Well, it seems to me that Mr. Newell is

20  certainly a good place to start.  What are you waiting for?

21       MS. FOY:  Well, we'd like to wait and complete the

22  document production to take his individual deposition.  So that

23  if we would be permitted to take his deposition on this limited

24  issue and go back to him again --

25       THE COURT:  Is Mr. Newell here in the United States?

1    MR. QUACKENBUSH:  Sure.

2    THE COURT:  What's wrong with letting them do a limited

3  deposition on this issue?

4    MR. QUACKENBUSH:  Well, I mean they're going to take his

5  deposition anyway.  It seems like -- our document production is

6  going to be done a week from tomorrow.

7    THE COURT:  So why not wait until after that?

8    MS. FOY:  Because what we believe is the case is that

9  there must be electronic documents.

10    THE COURT:  Well, I understand, but you're not going to

11  get to the bottom of it until you talk to him and perhaps other

12  people.  It seems to me that you should go ahead and do more

13  discovery and then come back to the Court.

14   I mean, I don't know how I could possibly sort out this issue

15  based on what you know or believe, or don't know at the present

16  time.  I mean, I think it would be a motion that would be --

17    MS. FOY:  The motion would be for a further 30(b)(6)

18  deposition of someone who has done a proper investigation to

19  determine whether there was a mirrored --

20    THE COURT:  But how am I going to decide whether the

21  first guy did or did not do a proper investigation?  You've got

22  to talk to Mr. Newell.

23    MS. FOY:  We don't believe Mr. Newell conducted the

24  investigation.

25    THE COURT:  Well, he's the guy that you say deleted

1  something.

2      MS. FOY:  We believe that documents were deleted because

3  no documents were produced for a two-year period during which

4  there were critical negotiations.

5      THE COURT:  Well, then what you're really saying is that

6  you've taken the 30(b)(6) that they've tendered up and that

7  30(b)(6) person was not the right person and didn't have the

8  information?

9      MS. FOY:  That's right.

10      THE COURT:  Well, then maybe you make a motion to -- for

11  sanctions and whatever else you want based on that fact.  We can

12  at least look at the 30(b)(6) record that we've got, and we can

13  decide if this guy was or was not proper -- was a proper

14  30(b)(6).  But if we conclude that he was, then I'm not going to

15  order another 30(b)(6).  So I think that's the risk that you

16  take.

17      If you want to make the motion, you can make the motion.  But

18  I think that's the motion, that the 30(b)(6) guy wasn't the

19  proper -- you can make any motion you want related to this issue.

20  All I'm saying, my initial reaction is that if you make the

21  motion in the abstract that he's deleted stuff and this is all

22  terrible, and he comes back and says what he says, and we've got

23  a 30(b)(6) guy that's told them what we know, we're going to have

24  to look at that 30(b)(6) testimony.  And I'm not hopeful that I'm

25  going to be able to get to the bottom of it based on where you

1    are today.

2           MS. FOY:  I think where we are today is that we would

3    like to take a limited deposition of Mr. Newell, specifically on

4    the issue of his erasure of his hard drive, and take a further

5    30(b)(6) witness deposition with respect to the issue of any

6    investigation that was done, what happened to the -- whether his

7    hard drive was mirrored.

8           THE COURT:  Did you note up a request for a 30(b)(6) on

9    what investigation was done and the like?

10          MS. FOY:  Yes, we did.

11          THE COURT:  And they produced someone?

12          MS. FOY:  They produced someone who could not give

13   answers.

14          THE COURT:  Well, I'm not going to -- Mr. Quackenbush,

15   are you willing to produce another 30(b)(6) witness?

16          MR. QUACKENBUSH:  Well, Your Honor, we'll produce

17   another witness if you order us to.  We produced the guy who

18   knows what happened.  He gave the testimony.  Counsel didn't like

19   the testimony.  But it's what happened.

20          THE COURT:  Where is Mr. Newell?  Is he in Seattle?

21          MR. QUACKENBUSH:  Yeah, he's the CEO of the company.

22          THE COURT:  All right.  I'll permit a limited deposition

23   of Mr. Newell on the subject of the hard drive and any deletions,

24   et cetera, one not to exceed one day, seven hours, on that

25   subject, without -- but I'm not going to order another 30(b)(6)

1   person to be designated at this time.

2       But I will permit you to make a motion teeing up that whole

3   issue.  In which event I'd have to look at the 30(b)(6) that was

4   tendered and what the person said, and make a decision whether

5   they need to do something more, or whether any sanctions are

6   appropriate, or whether this is a non-issue.  I certainly can't

7   decide it today.

8       All right.  So a one-day limited deposition, deny your

9   request for another 30(b)(6) without prejudice, authorize you to

10  file a motion relating to the Newell issue.  Are you clear on

11  that?

12      MS. FOY:  Yes.  I also wanted to ask Mr. Quackenbush to

13  follow up on the -- in the interval to follow up on his offer to

14  actually find out the answer to the question about the hard

15  drive, so we can save a great deal of time.

16      MR. QUACKENBUSH:  You know, the funny thing about this

17  -- I'm happy to do that, which is what I said in our meet and

18  confer on Thursday.  And then the next thing I got was this.  And

19  then last night filed a motion.

20      So, you know, I'm happy to proceed as counsel are supposed to

21  proceed and work these things out without bringing them to the

22  Court.  I'm happy to provide whatever information I have.  I've

23  already done it.  I'll do it again.

24      THE COURT:  Well, I mean, one of the problems, Ms. Foy,

25  is that once you bring the motion, then it seems to me it takes

1    it off the informal --

2            MS. FOY:  We have not brought a motion on this issue.

3            MR. QUACKENBUSH:  Well, what are we doing here?

4            MS. FOY:  We have not brought a motion on Mr. Newell's.

5            THE COURT:  All right.  Let's go on.  The stay of the

6    cyber-cafe discovery pending resolution, 16 depositions requested

7    by Valve.  Are these liability or damage?

8            MR. QUACKENBUSH:  Well, they're really both.

9            THE COURT:  Both.

10           MR. QUACKENBUSH:  They're what happened witnesses and

11   what did it cause witnesses.

12           THE COURT:  And --

13           MS. FOY:  They are cyber-cafe discovery.  I think the

14   issue is the resolution -- the issue is the resolution of the

15   cross-motions, which are not simply limited to damages, but the

16   broader issue of rights to cyber-cafe distribution.  And if that

17   issue is decided in defendants' favor, all of these -- 13 of the

18   16 depositions and 23 of the 25 30(b)(6) topics will be moot.

19       So we're asking for a stay pending the Court's resolution of

20   motions.  And this is an additional reason from the scheduling

21   perspective, particularly if the Court will not be available to

22   rule on these motions until November 1st.  But it is extremely

23   inefficient to go forward on those depositions.

24           THE COURT:  Don't get locked in on November 1st.  I'm

25   out of district for two weeks.  I'm sitting in another district

1  trying a criminal case.  I'm going to be occupied.  And no doubt

2  when I get back my law clerks will have piled up a whole bunch of

3  work for me, one of which will be this one.

4      But, Mr. Quackenbush, let's just talk practicalities.

5          MR. QUACKENBUSH:  Okay.

6          THE COURT:  I would imagine that your client probably

7  doesn't want to spend the money to take a whole bunch of

8  depositions which may not be necessary if you lose the motions.

9  So is there a solution around this?  From your vantage point, you

10  want to go ahead and take -- she says 13 of the 16 wouldn't be

11  taken if she wins.  Now, I don't know if she's going to win or

12  not.

13          MR. QUACKENBUSH:  Your Honor, we want to go forward with

14  the discovery, because we feel very confident about the motions.

15  We have a very -- we're running out of time.  We want to keep our

16  trial date.  I'm perfectly willing to be practical, but, I mean,

17  we're out of time to be talking about this.  The time to have

18  been talking about this was, you know, months ago.

19      And, you know, we've had a really difficult time getting the

20  discovery we need.  You know, we're working on it every day.

21  It's not going to get any easier by if we postpone these guys.

22  We've got to just work through this and get it done.

23          THE COURT:  Well, let me ask you this.  I'm always

24  looking for kind of compromises that -- if I were to continue the

25  discovery cutoff until the end of the year, not change the trial

1   date, and not tell you what you could do or not do before I

2   decide those motions, would there be some of this discovery that

3   just from a practical standpoint you would set -- you would wait

4   until you got the answer to this before you spent the money?

5   Would that make sense?

6           MR. QUACKENBUSH:  Well, certainly we have to go forward

7   with -- it seems to me certainly we would have to go forward with

8   the documents, otherwise you get the documents in January and

9   your pretrial order is due.

10          THE COURT:  I'm talking about depositions.

11          MR. QUACKENBUSH:  Yeah, I think there are probably

12  witnesses we could defer.  I would have to go through them

13  one-by-one.

14          THE COURT:  Some of the witnesses, I gather, would be

15  both damages -- would have information -- potential information

16  on all sorts of subjects, so you're going to have to talk to them

17  anyway.

18          MR. QUACKENBUSH:  Yeah.  I mean, I don't think there

19  would be any reason to defer any of the depositions of people who

20  are here.  I don't think it would be fair to defer depositions of

21  the guys in Korea, because we really need to understand what's

22  going on there.  And that's the -- you know, that's the biggest

23  single sore spot in this whole deal, is Korea.

24          THE COURT:  So when you take the guys that are here and

25  the guys that are in Korea, how many of the 16 are left?

1    MR. QUACKENBUSH:  Probably -- I'm not sure.  I have the

2   list.  Probably eight.  Not counting Mr. Hahn and Mr. Kwon, one,

3   two, three, four, five, six, six -- six.  Let me just

4   double-check that.  Yeah, that's right.

5        THE COURT:  What would be your kind of reaction to that

6   kind of proposal?  Not limit what either side could do, but give

7   you more times in hopes, in hopes that you would sit down and try

8   and organize your calendars and what you needed to do, so that

9   you could do what you thought you wanted to do without my

10   arbitrarily saying you can or can't do something.  But

11   hopefully -- and I say this hopeful over and over, but hope that

12   you would be able to look at the money you're spending and what

13   you're doing, and maybe some of this discovery could be deferred.

14        MS. FOY:  I think the principal that should dictate how

15   the case is managed and how discovery should go is not where

16   people are located, but what the orderly treatment of issues is

17   going to be.  And the extent to which these witnesses -- and it

18   is to my count 13 of the 16 individual witnesses and 23 of the

19   30(b)(6) topics deal with cyber-cafes or damages.

20        THE COURT:  Have these depositions been noted at the

21   present time?

22        MR. QUACKENBUSH:  No.

23        THE COURT:  Not scheduled.

24        MR. QUACKENBUSH:  No.  We sent a letter asking for dates

25   on August 27th, and we haven't heard anything.

1    MS. FOY:  The 30(b)(6) has been noticed.  This just came

2    up within the past couple of weeks.  It has not been pending for

3    weeks or months.

4    MR. QUACKENBUSH:  I just -- Your Honor, it's hard for me

5    to see how we -- we defer the discovery in the case pending

6    resolution of the motions, which will be presumably decided

7    sometime in November, even if you say we're going to kind of

8    stage this.

9    You're still right up against pretrial disclosure, pretrial

10   order, exhibit exchanges, deposition designations.  Boy, really

11   -- you're really jamming up the plaintiffs in that situation.

12   MS. FOY:  Certainly less so if the case is bifurcated.

13   THE COURT:  Let me ask you this:  Would your position be

14   the same if I let you go ahead and do whatever you want to do,

15   but if I ruled in their favor and dismissed I would reserve the

16   right to come back at you then and say you really didn't need or

17   shouldn't have taken these depositions and impose some terms

18   against you?

19   I mean, I don't know -- I haven't read your motions.

20   MR. QUACKENBUSH:  I understand.

21   THE COURT:  I don't know how strong -- but I'm just

22   trying -- she says she's got a strong motion and you're not ever

23   going to see this stuff or do this stuff, because she's going to

24   win.

25   And if ultimately -- you know, I wouldn't -- I wouldn't do it

1  unless I ultimately concluded that there was no really good,

2  legitimate arguments that you were raising.  And I suspect that

3  there will be some legitimate arguments.  Whether they're enough

4  to avoid summary judgment, I don't have a clue.  I'm just trying

5  to see how confident you are about going forward with all this

6  discovery.

7  MR. QUACKENBUSH:  Well, we're very confident about those

8  two issues that are noted for cross-motion.  We would definitely

9  go forward and spend that money, because we think we're going to

10  be trying the case.

11  THE COURT:  All right.

12  MR. QUACKENBUSH:  Now, you know, the issue of

13  bifurcation -- by that I assume we're talking about bifurcation

14  of the trial?

15  THE COURT:  Well, that's a possibility also.  I mean,

16  I'm not going to rule on that today.

17  MR. QUACKENBUSH:  Okay.

18  THE COURT:  I'm just trying to see is there a way to

19  manage the case in a way that your companies don't both spend

20  zillions of dollars, one of the parties doing it needlessly, if

21  in fact a good portion of it can be removed from the case as a

22  result of a motion.

23  MR. QUACKENBUSH:  Yes, the problem with the

24  bifurcation--

25  MS. FOY:  Would it not be both parties doing it

1  needlessly?

2        THE COURT:  Well, the one who --

3        MR. QUACKENBUSH:  The problem with the bifurcation in

4  this kind of -- if the motions are decided in our favor, as we

5  think they should be, and the unauthorized -- the cyber-cafe

6  distribution is outside the scope of the license, as we think it

7  is, then really what you're left with is a damages case.  You

8  know, you're either an infringer or you're not, you either have a

9  license or you don't.  And then you're left with, you know,

10  damages --

11        THE COURT:  But you've got, as I recall, breach of

12  contract, you've got other issues, other theories.

13        MR. QUACKENBUSH:  Right.

14        THE COURT:  And, of course, they've got counterclaims.

15        MS. FOY:  Counterclaims.

16        MR. QUACKENBUSH:  Yes, that's right.

17        THE COURT:  All right.  Here's what I'm going to do.

18  Not perhaps a -- nobody is probably going to like this, but I'm

19  not going to stay discovery.  I am going to extend the discovery

20  cutoff till December 31st.  And I'm going to urge the parties to

21  go back and look at what they think they really want to do, need

22  to do, before we resolve these pending motions.

23      And, again, I use the word "hope" that you will schedule your

24  discovery that you're going to decide before I decide those

25  motions, having in mind that maybe some of them could be

1  deferred.

2      But I'm not going to second-guess you if you decide you're

3  going to take a deposition.  I'm not going to tell you that you

4  can't do it.  So it's kind of up to you.  But it will take a

5  little bit of the pressure off hopefully by extending the

6  discovery cutoff and give you an opportunity to maybe reevaluate

7  where you are.

8          MS. FOY:  Your Honor?

9          THE COURT:  Now --

10         MS. FOY:  Your Honor?

11         THE COURT:  Yes.

12         MS. FOY:  Would it be possible to set the hearing on the

13  cross-motions at this time?

14         THE COURT:  Oral argument?

15         MS. FOY:  Yes.

16         THE COURT:  Well, no, I'm not going to do that until I

17  read the motions.  I may be able to decide it on the paper.

18  We've got -- your item three is production of source codes.

19         MS. FOY:  Yes.  I regret that we have to bring this

20  issue to the Court the third time.  We still have not received

21  source codes.  Valve has imposed unreasonable conditions on a

22  protective order before producing source code.  The two

23  conditions specifically are they refuse to let the source code to

24  leave the offices of outside counsel for analysis by our forensic

25  consultant.

1    And our consultant tells us that they absolutely need to use

2    the facilities of their laboratories, specialized equipment and

3    specialized software, and it would be extremely burdensome and

4    impractical for them to move their laboratory to our offices.

5        The second condition that Valve wishes to impose is a

6    prohibition on compiling any of the source code.  Again, our

7    expert tells us that he must do that in order to run the games to

8    see how they work, to determine how, as they say, buggy the games

9    are at various stages, and to determine the pace and scope of

10   development.

11       So we've objected that these restrictions aren't reasonable.

12   They're certainly beyond anything that the Court suggested at the

13   July 30th telephonic conference.  And we appear to be at an

14   impasse on this.

15       We need the source code immediately, and we've just been

16   unable to reach an agreement as to how they should be produced.

17       THE COURT:  Mr. Quackenbush, do you think she has

18   accurately described where you guys are?

19       MR. QUACKENBUSH:  No.  Let me tell you, I'm glad that

20   this -- we're talking about this issue.  Here 's what happened.

21   We had a hearing -- telephonic hearing with Your Honor on the

22   30th.  We said we would produce the source code in any form.  And

23   Your Honor said work out an agreed protective order that would

24   give you adequate protection on your source code.

25       We sent over a proposed form of order on August 12th.  We

1 transmitted a proposed form of order on August 12th. On

2 September 7th -- we didn't hear anything until September 7th,

3 last Tuesday, when we got a letter saying we don't like your

4 order.

5 Then we had a call about it on Thursday, last Thursday. I

6 said what don't you like. They said we don't like the fact that

7 you have to look at the source code on premises. I said help me

8 understand that, because I've never had anybody push back on

9 this. I mean, these guys know a lot about software, but, you

10 know, I know something about it. I've been involved in some

11 software cases over the years. I've never had anybody push back

12 on this.

13 I said what special tools would you need. What would you be

14 talking about? Because what you're talking about is looking at

15 this stuff on a computer, which your expert can load up with

16 whatever software tools he wants and come over to your office.

17 But this is the most valuable asset of the company, and we

18 don't want it out flying around in who knows where. Just explain

19 to me, all I said is explain to me why that's a problem, and all

20 I get is, well, our expert says it would be a problem. And I

21 said but why, you know, practically why is it a problem? No

22 explanation.

23 On the compiling thing, they said, well, we need to compile

24 this. This is a complete mystery to me, why anybody would need

25 to compile our source code. As I'm sure you know, you take the

1  source code, which is the work product that the developers do,

2  the text, you run it through a software program called a

3  compiler, which gives you what's called an executable program,

4  which is the thing you buy at the store, all right?  It's the

5  game, right?

6      But it's unreadable.  It's unusable other than to try to run

7  it.  So if what they're saying is we want to take all these

8  developmental versions of the game, which aren't -- are not

9  complete, compile it, and determine they don't run, I say, well,

10 what does that prove?  What in the world would that prove?

11     The danger is -- the most dangerous thing that could happen

12 is that the code gets compiled into an executable file and that

13 finds its way onto the Internet.

14     You know, this is -- so you understand, these games are the

15 most popular PC games ever.  Half-Life is the most popular PC

16 game ever.  Valve got hacked last year.  Somebody stole the

17 source code, posted some of it to the web.  A horrible problem.

18 Had to get the FBI involved, tracked the kid down in Germany who

19 hacked in, arrested him.  There's a lot of interest with these

20 game guys in getting this stuff.

21     Now, I'm not saying these guys are going to be careless.  I

22 don't think they are going to be careless.  I think the

23 protective order -- I think they'll honor the protective order.

24 But I just wanted to find what's the practical reason that these

25 things which seem pro forma to me don't work.

1          THE COURT:  I need more information before any decision.

2    Why don't you tee up in some fashion by next Monday or Tuesday,

3    give us a copy of the proposed protective order, you tell us why

4    you don't like it.

5          MS. FOY:  Your Honor, we have.

6          THE COURT:  Well, then you have.  Is it in writing?

7          MS. FOY:  Yeah.  We just yesterday filed a motion on

8    this issue because the issue has been pending.

9          THE COURT:  I see.  How soon can you respond to the

10   motion?  Can you respond on an expedited basis, and can we get a

11   response by --

12         MR. QUACKENBUSH:  We can respond in a week.

13         THE COURT:  Okay.

14         MR. QUACKENBUSH:  Again, though, I just want to make

15   sure that I've been clear about the context here.  I was trying

16   to understand what the disagreement was.

17         THE COURT:  Why if you're talking about it and he's

18   asking you what the problem is, why should you be filing the

19   motion before you tell him what the problem is?

20         MS. FOY:  We've explained what the problem is, and he

21   doesn't seem to agree that it is an issue.

22         THE COURT:  All right.  When was this motion filed?

23         MS. FOY:  Yesterday.

24         THE COURT:  Yesterday.  Is that on our list, Brian?

25         THE LAW CLERK:  It's not on the list I gave you

1  yesterday before it was filed.

2  　　　　THE COURT:  Say that again.

3  　　　　THE LAW CLERK:  The list I made for you was made before

4  it was filed.

5  　　　　THE COURT:  We have a new defendant motion.  Do we have

6  it on the docket?  Have you got a number?

7  　　　　THE LAW CLERK:  I do.  It is -- is it 166?

8  　　　　THE COURT:  I don't know.

9  　　　　THE LAW CLERK:  Motion to compel production of source

10 code and for entry of amendment to stipulated protective order;

11 is that right?

12 　　　　MS. FOY:  Yes.

13 　　　　THE LAW CLERK:  Okay.

14 　　　　THE COURT:  Okay.

15 　　　　THE LAW CLERK:  166.

16 　　　　THE COURT:  So you'll respond in a week.

17 　　　　MR. QUACKENBUSH:  Okay.

18 　　　　THE COURT:  Okay.  Preparation of Valve's 30(b)(6)

19 witnesses.

20 　　　　MS. FOY:  Low-level documents was the next issue.

21 　　　　THE COURT:  Item four on your letter is preparation of

22 Valve's 30(b)(6) witnesses.  Valve failed to properly prepare.

23 Refused to answer or produce additional witnesses.  Is this the

24 subject we're talking about -- we're dealing with Newell and his

25 hard drive, or is this something else?

1          MS. FOY:  No, these are other 30(b)(6) witnesses on the

2    topics, including Newell's hard drive, but others as well.

3          THE COURT:  Exclude the hard drive.  What else have we

4    got to talk about?

5          MS. FOY:  Actually we sent a meet and confer letter.

6          THE COURT:  Have you met and conferred?

7          MS. FOY:  We have.

8          THE COURT:  Have you made a motion?

9          MS. FOY:  No.

10          THE COURT:  What do we do to tee this up?  I'm not going

11    to decide it today.  In fact, I'm not going to decide it.  But

12    how are we going to tee it up so somebody can decide it?

13          MS. FOY:  Well, we asked for it to be on the agenda

14    today in order to specifically ask to bring a motion for a

15    further witness on specific topics from the 30(b)(6) depositions.

16          THE COURT:  How many are there?

17          MS. FOY:  I believe it's two that we'd like.

18          THE COURT:  And how fast can you tee it up?  How fast

19    can you file it?  How long will it take to file the motion?  I

20    want to do it on an expedited basis.  I want to get all this

21    stuff on the table.

22          MS. FOY:  I would say within a week.

23          THE COURT:  Well, he's going to want a week to respond.

24          MR. QUACKENBUSH:  Yes.

25          THE COURT:  Is it something we can talk through?  I

1    mean, once again it doesn't seem to me to be something we can

2    talk through, because if these witnesses have been taken, someone

3    is going to have to read the deposition of the 30(b)(6) witness

4    and see if there's a reason why -- what are you unhappy about?

5         MS. FOY:  We have done what Your Honor requested.  We

6    sent a very long, detailed letter identifying specific questions

7    and subject matter areas to which these 30(b)(6) witnesses were

8    noticed and were unable to provide responses.

9      So that letter is our meet and confer, and we've not gotten

10   any satisfactory response.  I think we would either need to have

11   these people properly prepared, or have other witnesses offered.

12        THE COURT:  Can we assume that your letter is your

13   motion, treat it as the motion, let him respond in a week, so

14   that we have it on the table in a week?

15        MS. FOY:  That would be adequate.

16        MR. QUACKENBUSH:  Well, Your Honor, just again, a little

17   context here, and I'm probably just being old fashioned about

18   this, we were talking about this on Thursday, and counsel said we

19   want you to produce some additional 30(b)(6) witnesses.  I said

20   okay.  You know, what topics are you concerned about?

21     Okay.  They were going to send me a letter telling me

22   specifically what they're concerned about.  And I said, you know,

23   we'd defer -- we stipulated we would defer our motion for a

24   protective order and give you the three witnesses, which we flew

25   down to San Francisco for their convenience from Bellevue,

1   Washington, and then we'll figure out if we still need a motion.

2          THE COURT:  Are these the witnesses that you have flown

3   down?

4          MR. QUACKENBUSH:  Yes, have already flown down.  Three

5   witnesses for three full days of deposition.  If they're -- you

6   know, again, maybe I'm not doing this right, but we were talking

7   about it on Thursday.  My understanding was we were going to try

8   to work this out.

9          THE COURT:  I'm still not understanding you.  When you

10  talked about it Thursday, these depositions had already been

11  taken?

12         MR. QUACKENBUSH:  They happened in July.

13         THE COURT:  Okay.  And what I hear her saying is that

14  she's not satisfied --

15         MR. QUACKENBUSH:  That's right.

16         THE COURT:  -- that those witnesses were properly

17  designated 30(b)(6).

18         MR. QUACKENBUSH:  That's right.

19         MS. FOY:  We sent a detailed letter explaining by

20  example.  It's by no means exhaustive.

21         THE COURT:  Have you got the letter?

22         MR. QUACKENBUSH:  I've got the letter.

23         THE COURT:  Can it be essentially teed up so somebody

24  can make a resolution of this thing by a responsive letter that

25  would respond?  I mean, we don't need to go through a formal

1   motion and all that paperwork if the letter is your position on

2   the subject.

3         MS. FOY:  It's not complete, Your Honor.  It's by way of

4   example of numerous answers that were not provided by subject

5   matter.

6         THE COURT:  But here's my problem, Ms. Foy.  I don't

7   know how -- he presents a 30(b)(6) witness.  You say, well, the

8   30(b)(6) couldn't answer some questions.  So this could go on

9   forever.

10     How is it that we -- I mean, and how is it that a Judge can

11   even read the transcript?  I mean, if the person -- if you said,

12   okay, we want someone who knows about product X and the 30(b)(6)

13   guy says I never heard of product X, I don't know anything about

14   it -- well, obviously that's bad.

15         MS. FOY:  That's exactly what happened in these cases.

16         THE COURT:  We're going to get a lot of nuances.  My

17   concern is that my reading that 30(b)(6) deposition, it's going

18   to be very difficult for any Judge to know whether this person

19   has covered the waterfront or not.  I mean, were there

20   instructions not to answer?  Was there attorney/client privilege?

21         MS. FOY:  No, this is a -- I would remind the Court also

22   that there is a pending motion that Valve has brought with

23   respect to Sierra's 30(b)(6) witness on the same kinds of

24   grounds, that he was purportedly not able to answer questions.

25     The fundamental issue is a party is obligated to produce a

1   30(b)(6) witness who's prepared to answer questions on the

2   designated topics, and their 30(b)(6) witnesses could not do

3   that.  They could not answer questions.  They were ignorant of

4   certain subject matters.  They were purported to have had

5   discussions with appropriate employees and purported not to

6   remember what the employees told them.

7       Our letter points out examples of precisely those kinds of

8   problems with their witnesses.  But it was not complete.  It was

9   by way of example.  And we'd be happy to supplement.

10      THE COURT:  And so you bring a motion.  I mean, you're

11  going to inundate the Court with motions, I mean both sides.  I'm

12  not just saying it's the defendants.  Both sides.  Just bogging

13  us all down so that we're not making as much progress as I'd

14  like.

15      You want to make a motion.  Do we have a motion -- is there a

16  motion by you on 30(b)(6) issues?

17      MR. QUACKENBUSH:  On the Tan deposition that we

18  discussed last time.

19      THE COURT:  And is that plaintiffs' third motion to

20  compel?

21      MS. FOY:  Yes.

22      MR. QUACKENBUSH:  Yes.

23      THE COURT:  Have I got the third motion to compel?

24      THE LAW CLERK:  I think you do.

25      THE COURT:  The second or the third motion to compel?

1   There are so many motions --

2          MR. HOLTMAN:  The third.

3          THE COURT:  Hmm?

4          MR. HOLTMAN:  The third.

5          MR. QUACKENBUSH:  Your Honor --

6          THE COURT:  And that's the one that's been renoted till

7   the 24th.

8          MR. QUACKENBUSH:  That's right.  Your Honor, maybe I'm

9   not approaching this in the right way.  I don't think we need all

10  these motions either.  Some are unavoidable.  But my

11  understanding is that when we talked on Thursday they were going

12  to say we'll send you all the things we're concerned about.  You

13  tell me if you're going to produce new witnesses.  And next --

14  before we have -- before I get the letter, before we talk about

15  it again, we find ourselves here with a --

16     Maybe I'm not doing it the right way.  I think you're

17  supposed to try to work these things out.  We never said we

18  wouldn't produce another witness.  We just said tell us

19  specifically what it is you're unhappy about.  Not examples.  The

20  whole list.

21         THE COURT:  All right.  Here's what I'm going to want

22  you to do, is to meet and confer again face-to-face.  And if you

23  can't reach agreement, file a motion on an expedited basis.  Or

24  do it in a letter form, here's why it's not satisfactory.  Attach

25  a copy of the deposition that was taken.  In letter form you can

1    respond and tell us why it was.

2        In other words, see if you can work out a procedure for -- I

3    use the word teeing it up.  I mean, I think we can do it less

4    formally than the motion practice that takes some time to get it

5    on the table.

6        I mean, what I want to try and do is in a couple of weeks

7    have an opportunity for someone who has all the disputes that

8    you've got and get them resolved, and have something meaningful

9    from each side in a way that we can do that.

10       So we'll just put this on the -- I'm going to defer, you're

11   going to meet and confer on both the production of the source --

12   the protective order and how that works, but also get your

13   responses in, and this witness business.

14       We have one more issue, production of low-level documents.

15           MR. QUACKENBUSH:  This is my favorite one on the list,

16   so I'd be happy to address this.  Again, we were talking about

17   this Thursday.  They say, you know, a lot of these low-level

18   documents, you can get the same information by summary documents

19   and reports.  We sent you a whole bunch of samples we'd like you

20   to look at, which I didn't happen to have at that time.  I said,

21   okay, I'll be happy to look at them, and I'll get back to you.

22       The next thing I know is here we are.  I'm happy to look --

23   I'm happy to be practical, and if there are easier ways to get

24   this that still gets us what we need, I'll be happy to look at

25   it.  But I just need a chance to do it.  I think the meet and

1  confer process is designed to sort of work through that, rather

2  than running over here every time.

3       THE COURT:  Well, I agree.  On the other hand -- I agree

4  with exactly what you're saying.  On the other hand, I've kind of

5  committed to make myself available when you ask, either side

6  asks.

7       MS. FOY:  Your Honor, our concern was the imminent close

8  of discovery and the fact that these low-level documents are

9  voluminous and would require hundreds and hundreds of employee

10 hours trying to search through boxes.

11     If we in fact are going to have to produce these documents,

12 we need to get that process under way now.  We were asking for

13 cooperation from opposing counseling.  If all of this information

14 is duplicative of something that appears in summary spreadsheets

15 or other database ones that we've offered to produce, we would

16 like to spare our employees the hundreds of hours of having to go

17 through boxes looking for invoices.  And we felt that it was

18 important to get this before the Court so that we could bring a

19 motion for a protective order, if necessary.

20     THE COURT:  All right.  Well, I'm going to table this

21 one.  I think we've got to see if you can reach agreement on it.

22 It seems to me that -- going back to recap then on this letter of

23 September 15th from Ms. Foy -- I've kind of lost track what we

24 decided to do on the destruction of documents.

25     MR. QUACKENBUSH:  I think we're going to have a -- you

1 order a limited dep, Your Honor.

2         THE COURT:  A limited dep with Mr. Newell.

3         MR. QUACKENBUSH:  Right.

4         THE COURT:  And see where we are.  Thank you.  And with

5 respect to two, I've denied the stay of discovery, but I've

6 extended the discovery deadline to 12/31.  And I've deferred on

7 this source code of Valve and the 30(b)(6) witnesses, and ask you

8 to either -- on the source code business, you're going to respond

9 in a week, as I recall.  And on the preparation of the witnesses,

10 you're going to discuss it and tee it up in some way so that it

11 can be resolved quickly.  We're going to table item five.

12         MS. FOY:  Your Honor, with respect to item five, we do

13 have --

14         THE COURT:  The low-level documents.

15         MS. FOY:  That's right.  We do have a concern about

16 having to produce all these invoices and purchase orders by the

17 end of September, and would ask for an extension on our deadline

18 for production.  This is just many countries, as many as 10

19 different foreign languages.  It is exceedingly difficult to try

20 to compile these documents if we can't reach agreement.

21         THE COURT:  I don't have a -- you haven't given me

22 enough to rule on a deferral.  If you've got a deadline, it seems

23 to me you've got to meet it.  Can't you -- give me an example.

24         MS. FOY:  The example of letters of credit securing the

25 purchase of various Sierra products.  This information is all

1    captured on sales and royalty documents that we've already

2    produced and on transaction documents that we are running

3    database searches and will produce.

4        The information is completely duplicated, but it will require

5    many, many person hours to try to go through files to pull

6    letters of credit relevant to Valve's documents.  Purchase

7    orders--

8            THE COURT:  I'm not going to -- I can't, I don't have

9    the time to resolve it today.  How can we get the information we

10   need so that someone can resolve it?

11           MS. FOY:  I would ask that counsel review our proposal

12   and give us an immediate response.

13           THE COURT:  He's already said that he was going to do

14   that.

15           MS. FOY:  If we can have a date certain by which we'll--

16           THE COURT:  All right.  That's fair, a date certain.

17           MS. FOY:  -- we can proceed, otherwise we'll have to

18   bring a protective order.

19           THE COURT:  All right.  When are you going to be able to

20   respond?

21           MR. QUACKENBUSH:  Wednesday.

22           THE COURT:  Next Wednesday?

23           MR. QUACKENBUSH:  Yes.

24           THE COURT:  That would be the 22nd.  Okay.  And if you

25   don't, if you're not satisfied with the response, then I guess

1  you have a right to bring a motion.  And if you bring a motion,

2  let's do it on an expedited basis, where you make your motion,

3  with a week to respond.  No replies.  And then we just have -- we

4  get it up there.

5          MR. QUACKENBUSH:  Yeah, that's great.

6          MS. FOY:  Yes, that's fine.

7          MR. QUACKENBUSH:  If we could get everything off the

8  table that would be great.

9          THE COURT:  Just let me just look.

10   (Brief Pause.)

11          THE COURT:  All right.  I'll tell you what I'm going to

12  do:  I'm going to refer these three issues that appear to be

13  headed towards having to be resolved and any other discovery

14  issues to Judge Theiler.

15    I'm hoping that she can give you more time and on a more

16  expedited basis resolve these things.  I just -- I will discuss

17  with her my views on how things ought to proceed, and she will

18  have the benefit of the transcript from July and this transcript,

19  so it's good that we have a transcript.

20    We'll enter a minute order that refers the pending and any

21  future discovery disputes to her.  And to the extent there are

22  hearings, if I'm available, I'll sit in, but I want it to keep

23  moving.

24          MR. QUACKENBUSH:   Mm-hmm.

25          THE COURT:  And I just think that a lot of these are

1  important issues, and it's just not possible to do it on

2  shortened time and with limited information.  And I'm getting

3  different views, of course.

4        MR. QUACKENBUSH:  Your Honor, one -- I'm sorry.

5        THE COURT:  No, I'm all through with mine.

6        MS. FOY:  Will Judge Theiler rule on pending motions

7  then?

8        THE COURT:  Pending discovery motions.

9        MS. FOY:  Yes.

10       THE COURT:  Yes.

11       MR. QUACKENBUSH:  We want to bring the Court's attention

12  to some of the serious problems that we've had in the discovery,

13  and it's a story that takes a little bit of time to tell.  We

14  think we haven't been treated well, and we think it's

15  sanctionable.  I don't want to belabor the point.  But is that a

16  motion you would want to reserve, or is that a motion that Judge

17  Theiler should hear?

18       THE COURT:  Well, I haven't seen the -- if you need to

19  bring the motion, bring the motion.  It seems to me that Judge

20  Theiler is probably going to jump in more deeply into this thing.

21  And I am going to tell her that if she is not satisfied -- if

22  she's satisfied that these motions -- that one side or the other

23  is not proper, that there ought to be sanctions in every

24  situation.

25     In other words, if you bring the motion to compel for

1  whatever and if you lose out on the argument, there ought to be

2  -- you ought to be able to work most of this stuff out.  And you

3  ought to be able to do it in a professional way.

4     And, I mean, my fear is if you bring such a motion I would

5  have to revisit all the other discovery issues that she will have

6  been weighing in on.  Are you talking about things we've been

7  talking about today?

8          MR. QUACKENBUSH:  And many other things.  Again, I don't

9  want to belabor the point.  I don't ever talk about things like

10 this lightly, but I think it needs to be addressed.

11         THE COURT:  Is this something that you have talked with

12 counsel about?

13         MR. QUACKENBUSH:  Well, I've certainly complained about

14 it a lot.  And whenever I'm -- I'm sure they're tired of hearing

15 about it.  I don't think -- yeah, I haven't said, look, I think

16 you ought to pay us this amount of money, because we've been --

17 had to work so much harder than we should have.  You're right, I

18 haven't said that.  I haven't laid that out.

19         THE COURT:  I mean, is this a -- if we had an hour to

20 talk, just meet, talk about it, without any motion or ruling on

21 it, would that help clear the air, do you think?

22         MR. QUACKENBUSH:  Yeah, sure.  I don't want to -- again,

23 and I'm not -- I like to work these things out.  I think it's

24 better, it's more professional, and it's a lot less expensive.

25 My client, for once -- for once my client is the little guy here.

1    And, you know, this a 50 billion corporation over here.  And so,

2    you know, we're having to work harder than we should have had.

3              THE COURT:  Well, I think you ought to meet and confer,

4    and then if you're still inclined to -- if you think that a

5    meeting with a Judge or Judges would be appropriate -- it might

6    be something that Judge Theiler and I would both sit in on, try

7    and schedule something.

8              MR. QUACKENBUSH:  Okay.

9              THE COURT:  Not for the purpose of ruling on anything,

10   but for the purpose of understanding the problems, and, if

11   necessary, authorize you to file a formal motion, or do whatever

12   you need to do.

13             MR. QUACKENBUSH:  All right.  That's fair.

14             THE COURT:  If you think that that's not the way to

15   approach it and you would rather have him do it just in a formal

16   motion, then I guess he should do whatever he needs to do.

17             MS. FOY:  We're certainly willing to meet and confer.

18             THE COURT:  Keep your voice up.

19             MS. FOY:  I'm sorry, we're certainly willing to meet and

20   confer on what these remaining issues are.

21             THE COURT:  All right.

22             MS. FOY:  I had one final non-discovery issue, if I

23   could, Your Honor.  We have a September 22 deadline for the

24   parties to engage in settlement discussions and exchange demands,

25   and I've been talking to Mr. Quackenbush about the possibility

1  that those discussions should take place party to party, rather

2  than through counsel.  It would be more efficient.  They've

3  agreed, but the parties have not yet had an opportunity to have

4  that discussion.  We wanted to put over that deadline.

5          THE COURT:  What are you proposing?

6          MS. FOY:  I don't know.  We haven't yet scheduled any

7  kind of meeting between them -- between the principals.  Maybe

8  two weeks or so.  Would that be --

9          THE COURT:  Let's give it 30 days.

10          MR. QUACKENBUSH:  Sure.

11          THE COURT:  People are busy.

12          MS. FOY:  That would be great.  Thank you.

13          THE COURT:  And that is -- just for the minutes, that

14  would be -- it's not a mediation deadline.  It's a --

15          MR. SCOTT:  Rule 39.1 meet and confer settlement.

16          THE COURT:  Thank you.

17          MR. HOLTMAN:  Could I ask one quick question, Your

18  Honor?  With the extended deadline, is it pulling expert reports

19  along as well?

20          THE COURT:  You guys go back and talk, would you?

21          MR. HOLTMAN:  Okay.

22          THE COURT:  We'll be in recess.

23     (Recess.)

24

25

CERTIFICATE

        I, Joseph F. Roth, Official Court Reporter, do hereby
certify that the foregoing transcript is correct.


                                    S/Joseph F. Roth
                                    _____
                                    Joseph F. Roth