Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION, a Washington corporation,<br><br>　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON-LINE, INC.), a Delaware corporation; VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; and VIVENDI UNIVERSAL, S.A., a French foreign corporation,<br><br>　　　　　　　　　　Defendants.<br>_____<br>SIERRA ENTERTAINMENT, INC. (AKA SIERRA ON LINE, INC., a Delaware corporation; and VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation,<br><br>　　　　　　　　　　Counter-Claimants,<br><br>　v.<br><br>VALVE CORPORATION, a Washington Corporation; GABE NEWELL and LISA MENNET NEWELL, husband and wife, and the marital community composed thereof; and SCOTT LYNCH and JULIE LYNCH, husband and wife, and the marital community composed thereof,<br><br>　　　　　　　　　　Counterclaim Defendants. | No. C 02-1683Z<br><br>DECLARATION OF KARL J. QUACKENBUSH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR PROTECTIVE ORDER<br><br>**Noted for: October 1, 2004** |

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 1
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

I, Karl J. Quackenbush, declare the following on personal knowledge:

1. I am lead counsel for Plaintiff Valve Corporation ("Valve") and Counterclaim Defendants Newell and Lynch.

2. My practice is primarily intellectual property litigation. Over the last 20 years I have represented clients in many matters which involved discovery of source code belonging to a party. Each of those cases included a protective order designed to ensure that the source code produced was handled appropriately and consistently with the protective order.

3. The source code of a computer program consists of the programming language incarnation of the program. It is, in essence, the complete specification of the program, including the instructions, structure, and design of the program. The source code file in its native state can be thought of as a complete book of programming logic and instructions contained in text files. Source code is ordinarily held in the strictest confidence by its owners and is not publicly distributed. That is certainly the case with Valve's source code which is the subject of defendants' (hereinafter "Vivendi") motion to compel.

4. In order to run a program on a personal computer, the source code must be translated into object code. Object code is the program in a form that is readable by the computer but indecipherable to humans. The object code version of the program is what is distributed to end users to run on their computers. To transform source code into object code, it is necessary to run the source code through a software tool called a "compiler." Another software tool called a "linker" creates required connections between the executable program and any library of other files needed to complete the program, such as sound files or graphics files. A diagram of the compilation process is set out below.

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 2
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

```
Source code → Compiler → Object code → Linker → Executable program
                             ↑
                         Library
```

5.  Vivendi has asked Valve to produce source code for several of its games, including Half-Life, Counter-Strike: Condition Zero, Half-Life 2, Half-Life 2 Xbox, and Team Fortress 2 as well as source code for Steam, Valve's online registration, administration, anti-piracy, and distribution system. Vivendi has asked that the source code be produced in digital as opposed to printed form. Vivendi has also demanded production of pre-released development version of the source code for these games. With the exception of Half Life 2, all of the source code Valve seeks is for games that have already been released. Further, Valve has recently delivered a release candidate version of Half-Life 2 to Vivendi and the game is anticipated to be one of the greatest computer games ever produced.

6.  We have discussed the production of source code with opposing counsel on more than one occasion. As we understand it, Vivendi believes that the requested source code is somehow relevant to its claim that Valve did not work diligently to develop these games, notwithstanding the fact that all of the referenced games (except Half Life 2) have already been released for retail distribution by Vivendi and Vivendi is earning substantial revenue by that distribution.[1] Attached at p. 8 is a true and correct copy of Jason Holtman's letter of June 18, 2004

7.  Valve agreed to produce the requested source code but asked Vivendi to agree

---

[1] The agreement between the parties provides that Valve controls the schedule for development of its games. There is no due date or delivery schedule in the Software Publishing Agreement. This is discussed in the Court's June 16, 2004 Order granting Valve's motion to dismiss Vivendi's fraud claims (p. 15). Docket No. 136. A true and correct copy of this Order is attached at pp. 9-24.

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 3
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  to modifications to the Protective Order to provide additional security for this valuable
2  intellectual property. Vivendi refused to agree to such modifications.

3      8. On July 30, 2004, the parties discussed this issue with Judge Zilly in a
4  telephone conference. Judge Zilly directed the parties to work out a protective order that
5  would provide Valve with sufficient protection. Attached at pp. 25-8 are true and correct
6  copies of relevant excerpts of the transcript of the discovery hearing before this Court on July
7  30, 2004.

8      9. On August 12, Valve transmitted a proposed form of modified protective order
9  to counsel for Vivendi. A true and correct copy of the proposed Amendment to Stipulated
10 Protective Order with Kristin Boraas' transmittal email is attached at pp. 29-35.

11     10. Counsel for Vivendi did not respond to Valve's proposed protective order until
12 its letter dated September 7, 2004. Attached at pp. 36-39 is a true and correct copy of Sarah
13 King's letter of September 7, 2004.

14     11. During a telephone call with Vivendi's counsel on September 8, 2004, I
15 inquired about Vivendi's objections to the proposed protective order. Counsel for Vivendi
16 indicated that there were two objections: (1) Vivendi objected to the provision requiring that
17 the source code remain secured at counsel's offices; and (2) Vivendi objected to the provision
18 prohibiting compilation of the source code into executable form.

19     12. I indicated that, in my experience, such restrictions were common and asked
20 why they were unacceptable to Vivendi. Counsel indicated that it might be necessary for
21 Vivendi's expert to bring the source code to his "laboratory" to examine it with special
22 "tools." I responded that the only tools I was aware of for examining source code were
23 software tools which the expert would typically load on his laptop and would not require
24 moving the source code to a "laboratory." When I asked for further specification, Vivendi's
25 counsel indicated that they did not know what "tools" might be needed, nor why such tools
26 could not simply be loaded on the expert's laptop computer and brought to counsel's office.

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 4
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

13. I indicated that we would be willing to discuss this issue further with Vivendi if they could simply explain the reason why the proposed restriction was impractical. Counsel indicated that she would check with Vivendi's expert and determine what additional information could be disclosed. To date, we have heard nothing further from Vivendi's counsel.

14. I also asked Vivendi's counsel to explain why it would be necessary to compile the source code, since examining the source code would provide Vivendi with the information it claimed to need regarding the progress of development. I explained that, especially with regard to Half Life 2—which has not yet been released—compiling the source code into an executable file was especially dangerous. Half Life 2 is one of the most eagerly anticipated computer games of all time. There is intense interest in Half Life 2 in the gaming community. In 2003, a hacker invaded Valve's network and stole a version of the Half Life 2 code then under development. Portions of this code were posted on the Internet by the hacker, and Valve subsequently incurred substantial expense in its efforts to halt the proliferation of the code and have the source code removed from various Internet sites. I explained to counsel that, while a leak of source code would be harmful, any leak of a compiled, playable version of the program would result in wide dissemination over the Internet which would be harmful to Valve. I indicated we would be willing to discuss the compilation restriction further if we just could understand why it would be necessary, or why compiled source code would provide relevant otherwise unascertainable from uncompiled source code. Counsel offered no

)
)
)
)
)
)

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 5
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

explanation, and—until Vivendi filed the instant motion—we have heard nothing further from counsel on this subject.

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

DATED this 23rd day of September, 2004 at Seattle, Washington.

                              s/Karl J. Quackenbush
                              WSBA # 9602
                              RESTON GATES & ELLIS LLP
                              925 Fourth Avenue, Suite 2900
                              Seattle, WA 98104
                              Tel: (206) 623-7580
                              Fax: (206) 623-7022
                              karlq@prestongates.com

                              Attorneys for Plaintiff
                              Valve Corporation

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 6
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2004, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Annette L. Hurst**

**Linda Q. Foy**

**Sarah M. King**

**Michael R. Scott**

s/Karl J. Quackenbush
WSBA #9602
PRESTON GATES & ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Tel: (206) 623-7580
Fax: (206) 623-7022
karlq@prestongates.com

DECLARATION OF KARL J. QUACKENBUSH IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR PROTECTIVE ORDER - 7
Case No. C02-1683Z

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**Preston|Gates|Ellis** LLP

Jason P Holtman
jasonh@prestongates.com
direct tel: (206) 370-8397
direct fax: (206) 370-6087

June 18, 2004

**VIA FACSIMILE**
Linda Q. Foy, Esq.
Howard, Rice, Nemerovski, Canady, Falk & Rabkin, P.C.
Three Embarcadero Center
7th Floor
San Francisco, CA 94111

Re:  *Valve Corporation v. Vivendi Universal.*, et. al.

Dear Linda:

This is in response to your letter of June 16, 2004. Valve will have completed production of all documents that were in process as of the June 4, 2004 hearing by today. There is one exception for some documents that are still being held until we can clear a final third party non-disclosure agreement.

Your letter demands immediate production of Valve's source code. Please let us know why VUG requires production of Valve's source code. Valve's source code is proprietary and valuable, and does not appear to us to be relevant to any issue in the case. In our recent conversation with Ms Hurst, she was unable to articulate any reason beyond a vague assertion that it would prove or disprove continuous development of the products. Given that Valve has produced the VSS databases showing development and changes to the code, we fail to see how production of the code itself will further clarify the issues in the case, but we would be happy to discuss this with your in an effort to understand your position.

Very truly yours,

PRESTON GATES & ELLIS LLP

By
Jason P. Holtman

JPH:jph

cc:  Valve

K:\36063\00014\JPH\JPH_L22KF

A LAW FIRM | A LIMITED LIABILITY PARTNERSHIP INCLUDING OTHER LIMITED LIABILITY ENTITIES

925 FOURTH AVENUE. SUITE 2900  SEATTLE. WA 98104-1158  TEL: (206) 623-7580  FAX: (206) 623-7022  www.prestongates.com
Anchorage  Coeur d'Alene  Hong Kong  Orange County  Portland  San Francisco  Seattle  Spokane  Washington. DC

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALVE, L.L.C., a Washington limited liability company,

    Plaintiff,

v.

SIERRA ENTERTAINMENT INC., (AKA SIERRA ON LINE INC.), a Delaware corporation; et al.,

    Defendants.

No. C02-1683Z

ORDER

This matter comes before the Court on Plaintiff's motion to dismiss Defendants' counterclaims, docket no. 110. On May 6, 2004, this Court entered an Order granting in part and denying in part the motion, but deferred ruling on the counterclaim for fraudulent misrepresentation. Minute Order, docket no. 134. The Court held oral argument on this issue on June 4, 2004, and took the matter under advisement. The Court now being fully advised enters the following Order.

## BACKGROUND

Defendants Sierra Entertainment, Inc. ("Sierra") and Vivendi Universal Games, Inc. ("VUG") have asserted sixteen (16) counterclaims against Valve, LLC ("Valve"), Gabe Newell and Jane Doe Newell ("Newell"), and Scott Lynch and Jane Doe Lynch ("Lynch"). Amended Answer, docket no. 79, pg. 7, 30-51.

ORDER 1–

**Prior Negotiations**

On April 27, 1997, Valve and Sierra entered into a Software Publishing Agreement (the "April Agreement") for the development of computer software games. Amended Answer, docket no. 79, pg. 10, ¶ 70; Ex. A. VUG did not sign the April Agreement; VUG participated in the negotiations and, as Sierra's affiliate, shares in the same rights and obligations as Sierra. Amended Answer, docket no. 79, pg. 10, ¶ 70. Under the terms of the April Agreement, Sierra and VUG were granted most of the intellectual property rights in one of Valve's computer games, which was eventually called Half-Life. Id., pg. 10, ¶ 71; Ex. A, ¶ 2.4. The April Agreement permitted Sierra and VUG to distribute the game in any channel, to any user, and on any medium. Id., pg. 10, ¶ 71. The April Agreement also granted Sierra and VUG the right to sell all sequels of Half-Life. Id., Ex. A, ¶ 2.5. The April Agreement was amended twice; once on September 3, 1997, and the other on July 24, 1998 (collectively "the 1997 Agreements"). Amended Answer, docket no. 79, pg. 10-11, ¶¶ 73-74.

Under the first amendment, Valve was obligated to develop three additional games, including Half-Life 2. Id., ¶ 73. The first amendment granted Sierra and VUG similar rights as the April Agreement and did not limit distribution of these games to any particular channel, type of end user, or medium. Id. The second amendment changed the name of the games to be developed to Half-Life, changed the royalty fees, and extended the development schedule of Half-Life by nine months. Id., ¶ 74. Half-Life was released in November 1998, becoming an enormous success and a best seller. Amended Answer, docket no. 79, pg. 12, ¶ 79.

Sierra and VUG allege that Valve attempted to leverage its sudden success by demanding that Sierra and VUG "relinquish [Sierra's] rights under the 1997 Agreements." Id., pg. 12, ¶ 80. In or about September 2000, as Valve neared the completion of two games for Sierra and VUG, Valve allegedly threatened to delay the release of games "by diverting

ORDER 2–

resources from these games to the development of games for other publishers." Amended Answer, docket no. 79, pg. 12, ¶ 81. It is alleged that from September through November 2000, Valve refused to ship certain products until a new agreement was reached. Id., pg. 13, ¶¶ 82-83. It is further alleged that Valve would not agree to permit shipment of products through the holiday season until Sierra and VUG agreed to an increase in royalty rates. Id. Sierra and VUG state that "Sierra found itself with little choice but to acquiesce in Counterclaim Defendants' demands to renegotiate the parties' business relationship." Id., ¶ 85.

Allegedly, Valve sought three changes: (1) "the transfer of intellectual property rights to all games," (2) "higher royalty rates for Valve," and (3) "transfer of the ancillary right to distribute the games in non-retail channels, such as direct download over the Internet." Amended Answer, docket no. 79, pg. 14, ¶ 86. During the negotiations, Valve allegedly misrepresented its intent to pursue online distribution of its games. Id., pg. 14-16, ¶¶ 87-92. Mr. Newell allegedly told Sierra and VUG that "retail sales would remain the 'key to [their] strategy' and that 'online is a way to nurture the retail business.'" Id., pg. 14, ¶ 87. Sierra and VUG allege that Valve concealed its research and development efforts regarding the online distribution technology called "Steam." Id., pg. 14, ¶¶ 90, 93. Steam enables consumers to download only the portions of a game that they need, as opposed to downloading the entire game. Id., pg. 15, ¶ 89. Additionally, by using Steam, consumers, who would normally purchase games from Sierra and VUG at retail stores, are able to download games online directly from Valve. Id.

Sierra and VUG allege that Valve made other misrepresentations to induce them to enter into the 2001 Agreement by stating that Half-Life 2 and Counterstrike: Condition Zero ("CSCZ") were in the final stages of development. Amended Answer, docket no. 79, pg. 18, ¶ 96. Sierra and VUG allege that they "buckled and entered into the 2001 Agreement." Id., pg. 19, ¶ 99; docket no. 80, Ex. D. As a result of the negotiations, and under the 2001

ORDER 3–

Agreement, Sierra and VUG relinquished their rights to the online distribution of Half-Life 2 and other Valve games in reliance on the belief that "by changing the scope of its distribution rights to permit online distribution by Valve, there would be no significant impact to [Sierra's] retail distribution rights." Amended Answer, docket no. 79, pg. 16, ¶ 92.

**The 2001 Agreement**

On March 29, 2001, Valve entered into an agreement ("the 2001 Agreement") with Sierra and VUG. Amended Answer, docket no. 80, Ex. D (2001 Agreement, pg. 1). Under the terms of the 2001 Agreement, Sierra and VUG transferred all intellectual property rights in Valve games to Valve. Id. (2001 Agreement, pg. 11, ¶ 3.1.1). The 2001 Agreement also granted Sierra and VUG a license "to reproduce, use, distribute, and license" the Valve Games in retail channels as "Retail Packaged Products." Id. (2001 Agreement, pg. 3, 15, ¶ 3.5.1).

The Agreement granted Sierra

> a worldwide, perpetual license to manufacture or cause to be manufactured, reproduce or cause to be reproduced, use, distribute (directly or indirectly), or have distributed, market, advertise, publicly display and perform in connection with such marketing and advertising, rent, lease and license ... [various games] and Foreign Translations thereof (developed by or for Valve) in object code form on an exclusive basis (even as to Valve and is Affiliates) as Retail Package Product.[1] Amended Answer, docket no. 80, Ex. D (2001 Agreement ¶¶ 3.2.1 and 3.2.4(a)).

Under the subsection entitled "Timing of Commercial and On-Line Release," Valve agreed

> to in no way, directly or indirectly, commercially release or otherwise make available any full version or substantially full version of any Non-Retail Software Product or Traditional OEM version of a Product prior to the date such Product is released by Sierra and available for purchase

---

[1] ¶¶ 3.3.1, 3.5.1, 3.5.3, and 3.5.4 of the 2001 Agreement uses the term "solely as Retail Packaged Product." Exhibit 1, docket no. 57 (The Agreement ¶¶ 3.3.1, 3.5.1, 3.5.3, and 3.5.4).

ORDER 4–

by end users in the Retail Packaged Product channel. Amended Answer, docket no. 80, Ex. D (2001 Agreement ¶ 3.11).

With respect to the "Half-Life" game, the Agreement provided that

Sierra shall retain the exclusive (even as to Valve, except for bundles as described in 3.1.2) worldwide, license to reproduce, use, distribute (directly or indirectly), and license Retail Packaged Product versions of Half-Life in object code form. Amended Answer, docket no. 80, Ex. D (2001 Agreement ¶ 3.1.1).

The Agreement defines Retail Package as

a version of a Product, Add-On Product, Foreign Translation or Platform Extension that: (a) is distributed on only tangible media (e.g. on a CD-ROM); (b) includes as part of the purchase price, the right to receive Sierra product support for a limited period of time (however, and Sierra may mutually agree to include applications thereon which are not so supported); (c) is distributed in packaging of the type typical of game software in the Retail Channel; and (d) is distributed in the Retail Channel. Amended Answer, docket no. 80, Ex. D (2001 Agreement pg. 4).

Retail Channel is defined as

brick and mortar retail outlets; Internet retailers that carry any of electronics, software, games, toys and/or gifts, Internet auction sites; and all other channels now or during the term hereof commonly referred to in the retail trade as "retail outlets" and distributors and resellers to such "retail outlets".[2] Amended Answer, docket no. 80, Ex. D (2001 Agreement pg. 3).

The 2001 Agreement also contained an integration clause stating:

The terms set forth in this Agreement (including exhibits), along with the surviving terms of the 4/27/97 Agreement and those certain bridge letter agreements governing distribution of Counter-Strike and Gunman prior to the execution of this Agreement, together constitute the entire agreement of the parties with respect to the subject matter described herein and shall supersede and cancel all prior and contemporaneous understandings, whether written or by oral agreement.

---

[2] The 2001 Agreement does not define "retail outlets."

ORDER 5–

Amended Answer, docket no. 80, Ex. D (2001 Agreement, pg. 27, ¶ 9.1.3). The 2001 Agreement further provides that it "shall be interpreted, construed and enforced in accordance with the laws of the State of Washington." Id. (2001 Agreement, pg. 28, ¶ 9.10).

The 2001 Agreement provides that "[u]pon Sierra's reasonable request," Valve is obligated to inform Sierra of its current development timetable for Valve games. Id., Ex. D (2001 Agreement, pg. 5-6, ¶¶ 2.1-2.3). The 2001 Agreement also obligates Valve to "use diligent efforts to continuously develop [the games] to completion." Id. The 2001 Agreement does not contain any specific deadlines for completion of the games.

Sierra and VUG allege that Valve continued to conceal the development of Steam after the 2001 Agreement. Amended Answer, docket no. 79, pg. 16, ¶ 93. In or about April 2001, Vivendi exercised its option under the 2001 Agreement to acquire the rights to another Valve game, Counterstrike: Condition Zero ("CSCZ"). Id. Pursuant to the terms of the 2001 Agreement, CSCZ would have been subject to revenue protection for Valve's non-retail distribution of the game. Id. Vivendi waived this provision after Mr. Lynch and Mr. Newell informed Vivendi that "Valve had no plans to release a non-retail version of CSCZ, and that waiver of the revenue protection provisions therefore would not ... materially affect the agreement." Id.

In January 2002, Vivendi asked Valve "whether it intended to exploit direct download opportunities." Amended Answer, docket no. 79, pg. 17, ¶ 94. Valve responded that it "'[didn't] have anything going' in this regard." Id. In March 2002, Valve announced the new Steam technology and that CSCZ would be available via Steam and retail outlets. Id., ¶ 95. Valve had allegedly approached a third-party about Steam a year prior to its release. Id., pg. 15, ¶ 90.

**Litigation**

On August 14, 2002, Valve filed a complaint in this court against Vivendi for copyright infringement, alleging that Sierra and VUG exceeded the scope of the license

ORDER 6–

granted by the 2001 Agreement and infringed the copyright by "reproducing, using, distributing, and/or licensing the Valve Games" to cyber-cafés. Amended Complaint, docket no. 40, pg. 3, ¶ 11. Valve seeks dismissal of Sierra and VUG's Amended Counterclaim ("counterclaim") for fraudulent misrepresentation under Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1990). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Associated Gen. Contractors v. Metro. Water Dist., 159 F.3d 1178, 1181 (9th Cir. 1998). Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. Id.

### A. Fraudulent Misrepresentation

Sierra and VUG's first counterclaim asserts a claim of fraudulent misrepresentation. Amended Answer, docket no. 79, pg. 30-35. In order to prove fraud, the following elements must be established: (1) a representation of an existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the defendant's intent that it should be acted on by the recipient, (6) the ignorance of its falsity on the part of the recipient, (7) the recipient's reliance on the truth of the representation, (8) the recipient's right to rely upon it, and (9) consequential damages. Farrell v. Score, 67 Wash. 2d 957, 958-59 (1966). As support for the fraudulent misrepresentation claim, Sierra and VUG rely on the following statements allegedly made by Valve, Mr. Newell, and Mr. Lynch:

(a) During the negotiation of the 2001 Agreement, Counterclaim Defendants "repeatedly and falsely assured Sierra and VUG that retail sales would remain 'the key to their strategy' and that Valve did not plan to engage in anything other than de minimis distribution of games online." Amended Answer, docket no. 79, ¶ 142. In September 2000, Mr. Newell allegedly told Sierra and VUG that "online is a way to nurture retail business." Id., ¶ 143.

ORDER 7–

15

(b) In mid-January 2001, Mr. Lynch allegedly told Sierra and VUG "that the population of on-line gamers was just 3 million and that 'only a fraction of them will be downloading Half-Life 2.'" Amended Answer, docket no. 79, ¶ 143.

(c) Defendants allegedly "falsely represented that Half-Life 2 and CSCZ were near completion." Amended Answer, docket no. 79, ¶ 144. Mr. Newell allegedly told Sierra and VUG that "Half-Life 2 could be released that year, 'depending on a number of choices.'" Id. "Valve also exchanged spreadsheets with Sierra and VUG "projecting royalties for the sale of the Half-Life 2 game during the 2001 through 2003 period." Id.

(d) On March 8, 2001, Mr. Lynch represented that "Valve was developing CSCZ, that the game could be added to the new agreement, and that it would be ready for release on October 31, 2001." Amended Answer, docket no. 79, pg. 31, ¶ 144.

(e) In late April 2001, the parties were negotiating Addendum 2 to the 2001 Agreement, and Mr. Lynch and Mr. Newell "falsely told Sierra in-house counsel Eric Roeder that Valve had no plans to release a non-retail version of CSCZ." Amended Answer, docket no. 79, pg. 30, ¶ 143.

(f) In July 2001, Mr. Lynch allegedly "told William Dugan that electronic distribution of CSCZ 'should not have a material effect on retail sales.'" Id., pg. 30, ¶ 143.

(g) In January 2002, "after numerous delays in the release of Half-Life 2, Sierra and VUG asked Valve directly whether it intended to exploit direct download opportunities. In response to these questions, Douglas Lombardi falsely represented to Sierra and VUG that Valve '[didn't] have anything going.'" Id.

### 1.     Integration Clause

Valve contends that because the 2001 Agreement contains an integration clause, Sierra and VUG cannot justifiably rely upon statements allegedly made during the negotiation of the agreement. The 2001 Agreement specifically states that it constitutes "the entire agreement of the parties" and cancels "all prior and contemporaneous understandings, whether written or by oral argument." Amended Answer, docket no. 80, Ex. D (2001 Agreement, pg. 27, ¶ 9.1.3). When a contract is intended to be a complete integration of the parties' agreement and there is no claim of fraud or mutual mistake, any prior negotiations and conversations merge into the final writing, and extrinsic evidence is not admissible to add to, subtract from, vary, or contradict the terms of the final agreement. Emrich v. Connell, 105 Wash. 2d 551, 556 (1986). Valve contends that in light of the sophistication of

ORDER  8–

the parties and the comprehensiveness of the written agreement, the integration clause should be enforced. Valve relies heavily on One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988), to support its position.

In Caruso, the parties had entered into a contract regarding the disposition of 39 restaurants. 848 F.2d at 1284. During the negotiation of the contract, defendants stated that they had no intention of selling or disposing of their ownership interest in the near or foreseeable future. Caruso, 848 F.2d at 1284. The final agreement did not include any statement regarding defendants' long-term commitment. Id. at 1285. The contract did contain an integration clause which stated that the "Final Agreement 'supercede[d] any and all previous understandings and agreements.'" Id. However, while the parties were negotiating the contract, defendants entered into negotiations to sell their ownership interest in their restaurants to a third party. Id. The sale was completed after the contract was executed. Id.

Plaintiffs filed suit against defendants, claiming that they had been fraudulently induced to enter into the contract based on representations made during the negotiation of the contract and defendants' failure to disclose their negotiations with the third party. Caruso, 848 F.2d at 1286. The court found that in light of the integration clause, plaintiffs' reliance on defendants' prior representations was unreasonable. Id. The final agreement was created after eight months of vigorous negotiations and was "lengthy, detailed and comprehensive." Id. Because the integration clause expressly superseded all prior representations, "there was no representation upon which plaintiffs could reasonably base a fraud claim." Id. at 1286-87.

The court concluded that if it were to ignore the clear and unambiguous terms of the integration clause

> "contracts would not be worth the paper on which they are written." ... Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a

ORDER 9–

> party who "has been induced by a fraudulent misrepresentation to enter the contract," must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." We need not belabor the point. We have here the case of "a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice"; such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

Caruso, 848 F.2d at 1287 (citations omitted). See also Goel v. Jain, 259 F. Supp. 2d 1128, 1138-39 (W.D. Wash. 2003).

In Goel, the contract contained a provision wherein plaintiff granted "a full release of any and all claims against Jain and InfoSpace, 'whether known or unknown,' which plaintiff had or would have arising out of events occurring on or before the effective date of the proposed merger." 259 F. Supp. at 1134. As part of the merger, plaintiff agreed to an "earn-out" provision, wherein plaintiff's payment of shares in InfoSpace stock was dependent upon the revenues plaintiff was able to generate over a period of eighteen months. Id. Plaintiff argued that the release he signed was unenforceable because it was obtained through fraud. Id. at 1136. Plaintiff contended that he was induced to agree to the "earn-out" provision based on defendants' misrepresentation that "the earnout concept was a company policy" that also applied to others, whose companies had been or would be acquired. Id. at 1137. The court found that the release was clear and unambiguous and that plaintiff's claims fell "squarely within the scope of the released claims." Id. at 1139. The court concluded that plaintiff could not invoke the fraud-in-the-inducement exception to the parol evidence rule and was contractually barred from proceeding. Id. at 1138-39 (citing Caruso, 848 F.2d at 1287).

Sierra and VUG argue that, under Washington law, a cause of action in fraud exists even if the contract contains an integration clause. Sierra and VUG rely heavily on Coson v. Roehl, 63 Wash. 2d 384, 386 (1963). In Coson, the parties negotiated the sale of materials and labor and agreed upon a price; however, in the absence of the buyers, the sellers inserted

ORDER 10–

a finance charge into the contract, which reflected a higher price than the one agreed upon. 63 Wash. 2d at 385. The buyers were lead to believe that the monthly installments totaled the price agreed upon, and they signed the contract. Coson, 63 Wash. 2d at 385. The contract contained an integration clause stating that it "constitute[d] the entire contract and [was] binding upon the parties hereto, as there are no covenants, promises or agreements, written or oral, except as herein set forth." Coson, 63 Wash. 2d at 386.

The court, citing Restatement, Contracts, § 573,[3] concluded that the seller's deliberate fraud vitiated the contract and that the buyers "were not foreclosed by the merger clause of the contract from placing reliance upon the fraudulent representations." Id. at 389. "A contract, the making of which was induced by deceitful methods or crafty device, is nothing more than a scrap of paper, and it makes no difference whether the fraud goes to the factum, or whether it is preliminary to the execution of the agreement itself." Id. at 388 (quoting Angerosa v. White Co., 290 N.Y.S. 204 (1936)).

In Nyquist v. Foster, 44 Wash. 2d 465, 467-68 (1954), the contract disclaimed all warranties, representations, and promises made by the seller. The buyer sought to introduce testimony regarding false representations made by the seller about the quality of the product. Nyquist, 44 Wash. 2d at 468 (seller had told the buyer that the sidewalls would not warp). The court concluded that if the oral testimony had been in reference to oral warranties, then it would not be admissible because it contradicted the terms of the contract. Id. However, "testimony tending to show fraud or false representations which were relied upon and which entered into the making of the contract of purchase" was admissible. Id. ("fraud vitiates

---

[3] Restatement, Contracts, § 573, uses the following example:

> A and B enter into a written bargain that contains a clause stating that no representations not therein contained have been made. Fraudulent misrepresentations not contained in the writing in fact induced its formation. The bargain is voidable and an action can be maintained for deceit, the clause intended to exclude the assertion of fraud being illegal.

ORDER 11–

everything it touches and is not merged in the contract"). See also McInnis & Co., Inc. v. Western Tractor & Equip. Co., 63 Wash. 2d 652, 656 (1964) (parol evidence admitted to show fraud may not be used to vary the terms of a written contract).

Similarly, in Weller v. Advance-Rumely Thresher Co., Inc., 160 Wash. 510, 511 (1931), the defendant seller had misrepresented to the buyer that a combine harvester, was appropriate for the buyer's needs. The court found that the suit was not one for breach of a condition, covenant, or warranty included in the contract, but was "an action to rescind the contract, based upon fraud entering into and inducing its execution." Weller, 160 Wash. at 512, 513 ("Fraud vitiates everything it touches and is not merged in the written contract"). In both Nyquist and Weller, the fraudulent misrepresentations were not included in the contracts.[4]

However, in Emrich, the plaintiffs claimed that the written lease could not be terminated in light of the parties' oral agreement that the lease cancellation clause would not be invoked until the property was developed. 105 Wash. 2d at 553. The Washington Supreme Court held that evidence of the oral agreement was not admissible because it directly conflicted with the terms of the written lease. 105 Wash. 2d at 557-58. The terms of the lease gave the lessor the right to cancel the lease any time after a specified date with four months' notice. Id. at 557. The lease also prevented the lessors from cancelling the lease for the purpose of leasing the property to another for use as an airport;[5] no other obligations or limitations were imposed. Id.

---

[4] The circumstances in Coson are much different from the case presented here. In Coson, the fraudulent misrepresentation pertained to a term in the contract, which was altered without the buyer's knowledge and did not represent the parties' agreed upon price. In this case, Sierra and VUG do not contest that the terms of the 2001 Agreement were changed without their knowledge.

[5] Plaintiffs had operated a recreational airport on the leased land. Emrich, 105 Wash. 2d at 553.

ORDER 12–