02-CV-01683-ORD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION, a Washington corporation, | |
| Plaintiff, | No.  C02-1683Z |
| v. | ORDER |
| SIERRA ENTERTAINMENT INC., (AKA SIERRA ON LINE INC.), a Delaware corporation; VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; and VIVENDI UNIVERSAL, S.A., a French foreign corporation, | |
| Defendants. | |
| SIERRA ENTERTAINMENT INC., (AKA SIERRA ON LINE INC.), a Delaware corporation; and VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; | |
| Counter-Claimants, | |
| v. | |
| VALVE CORPORATION, a Washington corporation; GABE NEWELL and LISA MENNET NEWELL, husband and wife and the marital community composed thereof; and SCOTT LYNCH and JULIE LYNCH, husband and wife and the marital community composed thereof, | |
| Counterclaim Defendants. | |

ORDER  1–

## BACKGROUND

Plaintiff Valve Corporation ("Valve") brings this motion objecting to the Order by Judge Theiler, entered on October 25, 2004. Defendants Sierra Entertainment, Inc., and Vivendi Universal Games, Inc. (collectively "Vivendi") inadvertently produced the three documents which are now at issue. The documents were produced on September 24, 2004. Quackenbush Decl., docket no. 215, at ¶ 8. The documents reflect ongoing internal discussions among Vivendi's Asia and U.S. executives concerning Vivendi's distribution of Valve games to cyber-cafés in Asia, and the business impacts of giving up cyber-café rights in Asia.

Vivendi contends the documents are attorney-client privileged and attorney work product. When Vivendi realized the documents had been produced, and was unable to secure their return, it brought the matter before Judge Theiler. This Court previously referred all pretrial discovery matters to Judge Theiler pursuant to 28 U.S.C. § 636(b)(1)(A). See Minute Order, docket no. 176.

Vivendi requested that Judge Theiler order the return of the documents under the terms of the Stipulated Protective Order, docket no. 137. The Protective Order provides for the return of inadvertently produced privileged or work-product documents. Judge Theiler granted Vivendi's request, and ruled, in relevant part, that:

(1) The documents at issue constitute work product prepared in anticipation of litigation and at the behest of counsel, and/or contain privileged attorney-client communications. The inadvertent production of these documents by defendants did not constitute a waiver of the attorney-client privilege or of work product protection.

(2) Plaintiff shall immediately return the documents at issue to counsel for defendants. The documents may not be used or relied upon in this litigation or for any other purpose.

Magistrate Judge's Order, docket no. 210, at 1-2. Plaintiff objects to Judge Theiler's Order pursuant to Fed.R.Civ.P. 72(a). The Court must consider the Objections, and modify or set aside any portion of the Order that is clearly erroneous or contrary to law.

ORDER  2–

# DISCUSSION

## 1.    Waiver by Inadvertent Production

Ordinarily, production of a document subject to the attorney-client privilege or work product protection operates as a waiver. E.g. Underwater Storage, Inc. v. United States Rubber Co., 314 F. Supp. 546, 549 (D.D.C. 1970). However, the Protective Order provides that inadvertent production of information subject to a claim of attorney-client privilege, attorney work product, or other privilege or immunity, shall not operate as a waiver of the privilege or protection. See Stipulated Protective Order, docket no. 137, at ¶ 20.

This provision operates where the producing party believes information is subject to privilege or protection, and makes a timely request for its return. Judge Theiler properly concluded that inadvertent production of these documents did not operate as a waiver of any privilege or protection. However, the Court must determine whether the asserted privileges or protections are applicable.

## 2.    Attorney-Client Privilege

The attorney-client privilege attaches to (1) communications; (2) made in confidence; (3) by the client; (4) in the course of seeking legal advice; (5) from a lawyer in his capacity as such. See Admiral Ins. Co. v. U.S. Dist. Ct., 881 F.2d 1486, 1492 (9th Cir. 1989). Specifically, "[t]he privilege protects the giving of professional advice by the lawyer and the giving of information to the lawyer to enable him to give sound and informed advice." Kintera, Inc. v. Convio, Inc., 219 F.R.D. 503, 508 (S.D. Cal. 2003). Further, the privilege may protect communications within a corporation that are made for the purpose of securing legal advice. In order for the privilege to apply to communications within a corporation, (1) the communication should have been made for the purpose of securing legal advice; (2) the employee making the communication should have done so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication should have been within the scope of the

ORDER   3–

1    employee's duties; and (5) the communication should not have been disseminated beyond
2    those persons who need to know the information. Cuno, Inc. v. Pall Corp., 121 F.R.D. 198,
3    203 (E.D.N.Y. 1988).

4        Vivendi's claim of attorney-client privilege for these documents is without merit. In
5    order to be subject to the attorney-client privilege, the communication must have been made
6    *for the purpose of securing legal advice.* See Admiral Ins., 881 F.2d at 1492. None of the
7    documents at issue indicate preparation for the purposes of securing legal advice. Rather, the
8    documents are sales forecasts, prepared to evaluate the impact of losing the right to license
9    Valve products in Asian cyber-cafés. While a loss of the license may be related to the Valve
10   litigation, these documents address solely the business impacts of losing Valve games in
11   Asian cyber-cafés. Further, all of the documents are directly between executives, although
12   portions are copied to Vivendi's Senior Vice President and General Counsel.

13       The first document, dated November 15, 2002, is from Mark Warburton, Marketing
14   Director (Asia-Pacific), to Mike Ryder, former President of Sierra. See Quackenbush Decl.,
15   docket no. 215, at 8 (document no. 1). The email is copied to Franck Villet, Vivendi's Chief
16   Financial Officer (Asia-Pacific). The substance of this email is entirely devoted to the
17   business impacts of losing the right to license Valve products in Asian cyber-cafés. The
18   document does not suggest that it was sent for the purpose of securing legal advice, and was
19   not sent to Vivendi's Senior Vice President and General Counsel.

20       The second document, dated January 22, 2003, confirms the business nature of the
21   discussions. Franck Villet, Vivendi's Chief Financial Officer (Asia-Pacific), sent this email
22   to Mark Warburton, Marketing Director (Asia-Pacific). See Quackenbush Decl., docket no.
23   215, at 9-10 (document no. 2). Like the first document, this email message contains no
24   indication that it is for the purposes of securing legal advice, and was not sent to Vivendi's
25   Senior Vice President and General Counsel.

26

ORDER  4--

1    The third document, dated February 24, 2003, is also not attorney-client privileged,

2 because it was not sent for the purposes of legal advice. <u>See</u> Quackenbush Decl., docket no.

3 215, at 11-12 (document no. 3).  Hubert Larenaudie, President of Vivendi Asia-Pacific,

4 "wanted to share with [Christophe Ramboz, Director and President, Chief Operating Officer,

5 for Vivendi International] ... why it is essential that our company secures [Valve netcafe

6 rights for Asia].  Like the first two emails, this email was not sent for the purposes of legal

7 advice; rather, it was sent to inform Mr. Ramboz why Valve cyber-café rights are "essential."

8    Further, although the third document was copied to Vivendi's Senior V.P. & General

9 Counsel, it was also copied to numerous other executives and contains no indication of

10 privilege.  Business advice is not protected merely because a copy is sent to in-house counsel.

11 Only if the attorney is "acting as a lawyer," and giving advice with respect to the legal

12 implications of a proposed course of conduct, may the attorney-client privilege be properly

13 invoked.  <u>Union Carbide Corp. v. Dow Chemical Co.</u>, 619 F. Supp. 1036, 1046 (D. Del.

14 1985).  Nothing in these communications indicates that Mr. Roeder was acting outside his

15 role as Senior Vice President.  Moreover, related documents supporting these sales forecasts

16 appear to have been generated for business purposes, and bear no relation to this litigation, or

17 to any request for legal advice.  <u>See, e.g.</u>, Quackenbush Decl., docket no. 215, at 125-33 (HL

18 CZ AP SALES FORECAST.xls).

19    Vivendi's primary argument for invoking the attorney-client privilege is Mr. Roeder's

20 prior requests for sales revenue information.  <u>See</u> Roeder Decl., docket no. 223, at pp. 4-22

21 (*in camera* document nos. 4-8).  Vivendi claims that all communications (even those not

22 directed to Mr. Roeder) were pursuant to his request, and generated in the course of seeking

23 legal advice.  However, Vivendi's claim is not supported by the facts.  The documents at

24 issue contain no indication that they were submitted for the purposes of seeking legal advice.

25 Moreover, although the *in camera* documents submitted by Vivendi do show several requests

26

ORDER  5–

1  by Mr. Roeder for sales and revenue information, there is no connection between these

2  requests and the sales forecasting documents prepared by Vivendi employees.

3     Vivendi's argument that these messages are privileged because they are related in

4  scope, context, and temporal proximity, must also be rejected. The facts simply do not

5  support such a finding, and the attorney-client privilege is narrow and may not be extended

6  wholesale to an entire class of "related" documents.

7     The three documents in question are not subject to the attorney-client privilege

8  because the communications were not made for the purposes of securing legal advice.

9  **3.    Work Product**

10     **a.    Eligibility**

11     The work product doctrine protects "from discovery documents and tangible things

12  prepared by a party or his representative in anticipation of litigation." Fed.R.Civ.P. 26(b)(3);

13  United States v. Torf (In re Grand Jury Subpoena), 357 F.3d 900, 906 (9th Cir. 2004) (citing

14  Admiral Ins., 881 F.2d at 1494). The proper test for determining whether a document was

15  prepared "in anticipation of litigation," is whether it can fairly be said that the "document

16  was created because of anticipated litigation, and would not have been created in

17  substantially similar form but for the prospect of that litigation. Torf, 357 F.3d at 907-08

18  (citing United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)).

19     There is substantial evidence that these documents were created as part of the ordinary

20  course of Vivendi's business. See, e.g., Quackenbush Decl., docket no. 215, at 125-33.

21  However, the Ninth Circuit has adopted a broad test for eligibility for work-product

22  protection. See Torf, 357 F.3d at 908. Here, the pending Valve litigation, and the

23  prospective impacts of settlement, were factors in the preparation of these documents,

24  separate and apart from their business purposes. As such, the Court concludes that

25

26

ORDER  6–

1  Magistrate Judge Theiler's decision that these documents were eligible for work-product

2  protection was not clearly erroneous.[1]

3        However, the determination that these documents are eligible for work-product

4  protection does not end the Court's inquiry.  A finding that a document is prepared because

5  of the prospect of litigation warrants application of Fed.R.Civ.P. 26(b)(3), but does not

6  necessarily mean that the document will be protected against discovery.  Adlman, 134 F.3d at

7  1202.  Rather, it means that the document is *eligible* for work-product privilege.  Id. at 1202-

8  03.  The Court must assess whether the party seeking discovery has made an adequate

9  showing of substantial need for the document, and an inability to obtain its contents

10 elsewhere without undue hardship.  Thus, Valve may still obtain these documents upon a

11 showing of substantial need, and undue hardship in obtaining the information through other

12 means.

13        **b.    Discovery**

14        Discovery of materials eligible for work-product protection is proper where the Court

15 determines the party seeking discovery has demonstrated (1) an adequate showing of

16 substantial need for the information; and (2) an inability to obtain its contents elsewhere

17 without undue hardship.  Torf, 357 F.3d at 906 (citing Fed.R.Civ.P. 26(b)(3)).  The work-

18 product doctrine is intended to protect trial preparation materials that "reveal an attorney's

19 strategy, intended lines of proof, evaluation of strengths and weaknesses, and inferences

20 drawn from interviews."  Heath v. F/V Zolotoi, 221 F.R.D. 545, 549 (W.D. Wash. 2004)

21 (citing Hickman v. Taylor, 329 U.S. 495, 511 (1947)).  The less the lawyer's mental

22 processes are involved, the less will be the burden to show good cause for disclosure.  Harper

23 & Row Publishers Inc. v. Decker, 423 F.2d 487, 492 (7th Cir. 1970).  The documents at issue

24

25        [1] A finding is "clearly erroneous when the reviewing court on the entire evidence is left
   with a definite and firm conviction that a mistake has been committed."  In re Life USA
26 Holding, Inc., 242 F.3d 136, 143 (3d Cir. 2001) (citing United States v. Igbonwa, 120 F.3d 437,
   440 (3d Cir. 1997)).

ORDER  7–

1 in this case do not evidence the lawyer's mental process; rather, they present factual sales
2 forecast information compiled by non-lawyers.

3          *(1)    Substantial Need*

4       Valve has demonstrated a substantial need for these documents, and the information
5 they contain. The documents provide sales forecast information for Valve games in Asian
6 cyber-cafés, which Valve has been otherwise unable to obtain. <u>See</u> Quackenbush Decl.,
7 docket no. 215, at 8-12 (document nos. 1-3). This information is the crux of Valve's case
8 against Vivendi, and is critically important to Valve in proving its damages at trial. Valve
9 has been unable to obtain this sales forecast information through other discovery methods. In
10 addition, the information is highly relevant because it contradicts prior statements by Vivendi
11 during discovery and in depositions. This information may be used for impeachment at trial.
12 The Court concludes that Valve's substantial need for these documents is clearly established.

13       Vivendi does not seriously dispute that Valve has a substantial need for these
14 documents. Rather, it asserts that Valve may obtain the information elsewhere, without
15 undue hardship.

16          *(2)    Undue Hardship*

17       Valve has demonstrated that it cannot obtain the information in these documents
18 elsewhere, or by other means, without substantial and undue hardship. Valve has attempted
19 to obtain the factual information in these documents through discovery, and has been
20 unsuccessful. For example, Valve's interrogatories requested the following sales
21 information:

22       <u>Interrogatory No. 8:</u> For the period from March 29, 2001 to the present identify
      the total revenues received by any Defendant resulting from the exploitation of
23       Valve products in connection with cybercafés.

24 Quackenbush Decl., docket no. 215, at 14. Vivendi responded that "[i]n Asia and the Middle
25 East, the Defendants' total revenues from the sale, licensing or distribution of Valve games
26 to cybercafés from March 2001 through 2003 was approximately $1,237,681." <u>Id.</u> at 15.

ORDER  8--

1    Thus, for an almost three year period, Vivendi claimed revenues of approximately $1.2

2    million. However, Mr. Warburton estimated that the value of Valve games to Vivendi was

3    $9.7 million for 2003 alone. See Quackenbush Decl., docket no. 215, at 8 (document no. 1).

4    Two months later Mr. Warburton reiterated his view that the impact to Vivendi's Asia-

5    Pacific business would be $9.7 million for 2003, if Vivendi lost cyber-café rights for the

6    Valve games. See Quackenbush Decl., docket no. 215, at 9-10 (document no. 2).

7            While there is certainly a difference between sales forecasts and actual revenues,

8    Valve is entitled to both types of information. Further, Vivendi's discovery responses show

9    revenues substantially different from its own projections, and demonstrate Valve's inability

10   to obtain this information through appropriate discovery methods. Vivendi's suggestion that

11   Valve can obtain this discovery through other means of discovery cannot be taken seriously

12   in light of Vivendi's apparent failure to provide requested information in discovery. Another

13   example counters Vivendi's assertion that Valve may obtain this information through other

14   discovery means. The following exchange took place during Mr. Warburton's (Marketing

15   Director (Asia Pacific)) deposition:

16        Q:   Have you ever done any analysis of bundling of Valve products with other
               Vivendi Universal Games titles?

17        A.   No.

18        ...

19        Q.   Have you ever attempted to analyze the value of the leverage Counter-Strike:
               Condition Zero had over other titles in the Vivendi Universal Games
20             Catalogue?

          MR. O'CONNOR: Vague, ambiguous, overbroad.

21        A.   No.

22   See Quackenbush Decl., docket no. 215, at 19, 27 (Warburton Dep.). Mr. Warburton's

23   testimony directly contradicts his written statements in the documents at issue. For example,

24   in document no. 1, Mr. Warburton stated, with regard to Sierra titles in Asian cyber-cafés,

25   "[w]e leverage sales of less popular Sierra PC games into the channel by packaging them up

26   with Counterstrike (sic)." See Quackenbush Decl., docket no 215, at 8. Mr. Warburton

     ORDER  9–

further stated, with regard to Vivendi titles in Asian cyber-cafés, "this is where we would leverage sales of less popular VUG singles (sic) player PC games into the channel by packaging them up with Countrerstrike (sic)." Id. Valve has demonstrated that it cannot obtain this information by other means without undue hardship. Valve is entitled to this information, and Vivendi has prevented Valve from obtaining it.

**CONCLUSION**

The Court SUSTAINS Plaintiff's objections to Magistrate Judge Theiler's October 25, 2004, and ORDERS that Valve is entitled to retain and use these documents, subject to the applicable provisions in the Stipulated Protective Order, docket no. 137.

IT IS SO ORDERED.

DATED this 6th day of December, 2004.

THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE

ORDER  10—