02-CV-01683-ORD

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION, a Washington corporation, | No. C02-1683Z |
| Plaintiff, | |
| v. | ORDER |
| SIERRA ENTERTAINMENT INC., (AKA SIERRA ON LINE INC.), a Delaware corporation; VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; and VIVENDI UNIVERSAL, S.A., a French foreign corporation, | |
| Defendants. | |
| SIERRA ENTERTAINMENT INC., (AKA SIERRA ON LINE INC.), a Delaware corporation; and VIVENDI UNIVERSAL GAMES, INC., a Delaware corporation; | |
| Counter-Claimants, | |
| v. | |
| VALVE CORPORATION, a Washington corporation; GABE NEWELL and LISA MENNET NEWELL, husband and wife and the marital community composed thereof; and SCOTT LYNCH and JULIE LYNCH, husband and wife and the marital community composed thereof, | |
| Counterclaim Defendants. | |

ORDER 1–

1  This matter came before the Court on Defendants' Motion for Partial Summary
2  Judgment Re Cyber-Café Rights, docket no. 143, by Sierra Entertainment, Inc. ("Sierra") and
3  Vivendi Universal Games, Inc. ("VUG"), and Plaintiff's Cross-Motion for Partial Summary
4  Judgment Re Cyber-Café Rights, docket no. 165, by Valve Corporation ("Valve"); and
5  Defendants' Motion for Partial Summary Judgment Re Contractual Limitation of Liability,
6  docket no. 144, by Sierra/Vivendi, and Plaintiff's Cross-Motion for Partial Summary
7  Judgment Re Contractual Limitation of Liability, docket no. 162, by Valve.
8  The Court held oral argument on November 18, 2004, and took the matter under
9  advisement. The Court issued a brief Order on November 22, 2004, informing the parties of
10 its decision. See Order, docket no. 226. This Order sets forth the reasons for the Court's
11 prior Order of November 22, 2004, docket no. 226.

## BACKGROUND

Plaintiff Valve is in the business of developing computer games, including "Half-Life," "Counter-Strike," "Blue Shift," "Gunman," and "Team Fortress" (hereinafter "Valve games"). See First Am. Compl., docket no. 40, at 2, ¶ 4. Defendant Sierra publishes computer software and games, including several Valve titles. Id., at 2, ¶ 5. Sierra is a wholly owned subsidiary of VUG. Id., at 2, ¶ 5. VUG is a subsidiary of Vivendi Universal, SA, a French corporation. Id. at 2, ¶¶ 5-6.

On March 29, 2001, Valve entered into a Software Publishing Agreement (the "2001 Agreement") with Sierra and its affiliates ("Sierra/Vivendi"). Holtman Decl., docket no. 164, at 8-110. The 2001 Agreement granted Sierra/Vivendi a license "to reproduce, use, distribute, and license" Valve Games in the "Retail Channel" solely as "Retail Packaged Product." First Am. Compl., docket no. 40, pg. 3, ¶9; see Holtman Decl., docket no. 164, at 30. Valve is the copyright holder for Valve games published by Sierra/Vivendi, including Half-Life ("HL"), Counter-Strike ("CS"), Counter-Strike: Condition Zero ("CS:CZ"), Half-Life 2 ("HL2"), and Counter-Strike: Source ("CS:S").

ORDER 2–

### A.  2001 Agreement – License Granted to Sierra/Vivendi.

The parties' first cross-motions for partial summary judgment, docket nos. 143 and 165, raise the issue of cyber-café licensing. The parties dispute whether the 2001 Agreement allows Sierra/Vivendi to distribute Valve games to cyber-cafés. The 2001 Agreement grants:

> a worldwide, perpetual license to manufacture or cause to be manufactured, reproduce or cause to be reproduced, use, distribute (directly or indirectly), or have distributed, market, advertise, publicly display and perform in connection with such marketing and advertising, rent, lease and license such product and Foreign Translations thereof ... solely as Retail Packaged Product.

Holtman Decl., docket no. 164, at 30 (2001 Agreement, ¶ 3.5.1). The 2001 Agreement defines Retail Packaged Product as:

> a version of a Product, Add-On Product, Foreign Translation or Platform Extension that: (a) is distributed on only tangible media (e.g. on a CD-ROM); (b) includes as part of the purchase price, the right to receive Sierra product support for a limited period of time (however, Valve and Sierra may mutually agree to include applications thereon which are not so supported); (c) is distributed in packaging of the type typical of game software in the Retail Channel; and (d) is distributed in the Retail Channel.

Id. at 14 (2001 Agreement, pg. 4). The 2001 Agreement defines the Retail Channel as:

> "brick and mortar" retail outlets; Internet retailers that carry any of electronics, software, games, toys and/or gifts, Internet auction sites; and all other channels now or during the term hereof commonly referred to in the retail trade as "retail outlets" and distributors and resellers to such "retail outlets".

Id. at 12 (2001 Agreement, pg. 3). The 2001 Agreement does not define "retail outlets." The 2001 Agreement provides that the "parties retain all rights not expressly granted herein]," id. at 31 (2001 Agreement, ¶ 3.9.1), and for interpretation, construction, and enforcement under Washington law. Id. at 43 (2001 Agreement, ¶ 9.10).

Valve alleges that Sierra/Vivendi distributed Valve games to cyber-cafés in the United States and abroad. First Am. Compl., docket no. 40, pg. 3, ¶ 11. Cyber-cafés are "for-profit multi-player facilities" that provide the general public with access to computers and video games for a fee. Id. Cyber-cafés are also referred to as "net cafés" or "location based

ORDER  3 –

entertainment" centers, and are a popular place for playing computer games around the world. Dunkle Decl., docket no. 163, at ¶¶ 3-5; Holtman Decl., docket no. 164, at 227-228 (Roeder Dep. at 50-51).

Sierra/Vivendi does not dispute that it distributed Valve games to cyber-cafés, but argues that its distribution was within the scope of the 2001 Agreement. Valve contends Sierra/Vivendi exceeded the scope of its license and infringed Valve's copyrights by distributing Valve games to cyber-cafés. First Am. Compl., docket no. 40, pg. 3, ¶ 11.

### B. 2001 Agreement – Limitation of Liability.

The parties' second cross-motions for partial summary judgment, docket nos. 144 and 162, raise the issue of limitation on liability under the 2001 Agreement. The Agreement provides as follows:

> 8.2 <u>Limitation on Liability.</u> EXCEPT AS PROVIDED IN SECTION 8.1 AND EXCEPT FOR A BREACH OF THE EXCLUSIVITY PROVISIONS HEREOF, NEITHER PARTY WILL BE LIABLE TO THE OTHER UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY NATURE, FOR ANY REASON, INCLUDING WITHOUT LIMITATION, THE BREACH OF THIS AGREEMENT OR ANY TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT, OR OTHERWISE, EVEN IF THE OTHER PARTY HAS BEEN WARNED OF THE POSSIBILITY OF SUCH DAMAGES.

Holtman Decl., docket no. 164, at 41 (2001 Agreement, ¶ 8.2). Valve's Complaint seeks damages, including damages for lost profits and loss of good will, resulting from Vivendi's alleged copyright infringement and breach of contract. See First Am. Compl., docket no. 40, at 6-8, ¶¶ 23-40; see also Supp. Compl., docket no. 108, at 4, ¶ 15-21.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party

ORDER 4-

1 has met this burden, the opposing party must show that there is a genuine issue of fact for
2 trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
3 The opposing party must present significant and probative evidence to support its claim or
4 defense. Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).
5 For purposes of these motions, reasonable doubts as to the existence of material facts are
6 resolved against the moving party and inferences are drawn in the light most favorable to the
7 opposing party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

8       The interpretation of a contract is a matter of law properly decided on summary
9 judgment. United States v. King Features Entm't, Inc., 843 F.2d 394, 398 (9th Cir. 1988);
10 see also Syrovy v. Alpine Res., Inc., 68 Wash. App. 35, 39 (1992) ("Whether a contract is
11 ambiguous and the legal effect of a contract are, in general, questions of law."). In
12 interpreting an agreement between the parties, the Court should effectuate the intent of the
13 parties as expressed, and not "foist upon the parties a contract they never made." Seattle
14 Prof. Empl. Assoc. v. Boeing Co., 92 Wash. App. 214, 220 (1998).

## I. Cyber-Café Rights

16       The 2001 Agreement grants Sierra/Vivendi the right to rent, lease, or distribute
17 Valve Games as "Retail Packaged Product" in the "Retail Channel." Valve argues
18 Sierra/Vivendi exceeded the scope of its license by distributing to cyber-cafés because (1)
19 cyber-cafés are not part of the "retail channel," and (2) cyber-café distribution is not
20 distribution of "retail packaged product." Sierra/Vivendi counters that cyber-cafés are "retail
21 outlets" in the retail channel, and that it has a future plan for distribution of "retail packaged
22 product."

23     **A. Retail Channel.**

24       Sierra/Vivendi is authorized to distribute Valve games in the "retail channel." The
25 retail channel is defined as:

26         "brick and mortar" retail outlets; Internet retailers that carry any of
          electronics, software, games, toys and/or gifts, Internet auction

ORDER 5–

1         sites; and all other channels now or during the term hereof commonly referred to in the retail trade as "retail outlets" and distributors and resellers to such "retail outlets."

Holtman Decl., docket no. 164, at 12 (2001 Agreement, pg. 3). "Retail outlet" is undefined.

Courts look to the ordinary, plain meaning of words to construe the meaning of undefined contract terms. Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wash.2d 130, 139 (2001). English language dictionaries provide the ordinary meaning of an undefined term. Id.; see also City of Spokane v. United Nat'l Ins. Co., 190 F. Supp. 2d 1209, 1217 (E.D. Wash. 2002) ("If a contract term is undefined, courts should look to the 'plain, ordinary, and popular meaning' afforded in similar circumstances").

The plain meaning of "retail" is "the sale of goods or commodities in small quantities directly to consumers." American Heritage Dictionary of the English Language (4th ed. 2000). "Outlet" is defined as a "commercial market for goods or services" or as a "store that sells the goods of a particular manufacturer or wholesaler." Id. Read together, the plain meaning of "retail outlet" is a store that sells, or a commercial market for selling, goods to consumers. See, e.g., Foremost Dairies Inc v. Tax Comm'n, 75 Wash.2d 758, 762 (1969) (construing the plain, ordinary meaning of the words in a statute using a dictionary).

On its face, the cyber-café transaction does not appear to be a traditional "sale" of a good or commodity. No tangible item changes hands in a cyber-café transaction; the transaction resembles payment-for-entertainment rather than a retail sale. See Dunkle Decl., docket no. 163, at ¶ 4. Sierra/Vivendi urges the Court to rely on a statutory definition under Washington Sales Tax law, and find that a cyber-café transaction is a rental, and therefore retail, transaction. However, while legislative definitions control in construing the statutes in which they appear, common usage and context control when construing the same word or phrase elsewhere. See, e.g., Childers v. Childers, 89 Wash.2d 592, 598 (1978).

Sierra/Vivendi compares cyber-cafés with "rental" locations like video rental stores and car rental agencies, to support its argument that cyber-cafés are part of the retail channel.

ORDER 6–

1  However, this ignores substantial differences between these businesses. The primary
2  difference is that nothing tangible changes hands in a cyber-café transaction. See Dunkle
3  Decl., docket no. 163, at ¶ 4. Patrons pay for audiovisual entertainment, much like they
4  would at a theater or video arcade. Describing such a transaction as a "rental"[1] is simply
5  inaccurate, just as describing the purchase of a movie ticket as a "rental" would be
6  inaccurate.
7      Other courts have analyzed similar circumstances. One similar transaction is the "in-
8  store" exhibition of home videos. See Columbia Pictures Indus., Inc. v. Redd Horne, 749
9  F.2d 154, 160 (3d Cir. 1984). In Redd Horne, the Court reviewed an in-store "pay-for-
10  display" video system, characterized as an "in-store rental." Videos were displayed for a fee
11  in private booths located in the store. The Court found the exhibition of the videos was a
12  public performance of the copyrighted work, and found "in-store" displays were
13  "significantly different" from video rental for home use. Id.

> The facts do not permit [characterization of the in-store showing of videos as "in-store rental."] The record clearly demonstrates that showcasing a video cassette [in-store] is a significantly different transaction than leasing a tape for home use. [The video store] never disposed of the tapes in its showcasing operations, nor did the tapes ever leave the store. At all times, [the video store] maintained physical dominion and control over the tapes. Its employees actually played the cassettes on its machines. The charges or fees received for viewing the cassettes at [the video store's] facilities are analytically indistinguishable from admission fees paid by patrons to gain admission to any public theater. Plainly, in their showcasing operation, the appellants do not sell, rent, or otherwise dispose of the video cassette.

21  Redd Horne, 749 F.2d at 160. The description in Redd Horne is analogous to a cyber-café
22  transaction. A video store that charges patrons to watch movies in-store does not "sell, rent,
23  or otherwise dispose of the video cassette"; similarly, a cyber-café that charges for pay-for-
24  play entertainment does not "rent" game software.

---

[1] "Rent[al]" may be defined as "[p]ayment, usually of an amount fixed by contract, made by a tenant at specified intervals in return for the right to occupy or use the property of another." American Heritage Dictionary of the English Language (4th ed. 2000).

ORDER 7–

1    At oral argument, Sierra/Vivendi argued that playing video games in public is not a
2    public performance, and cited <u>Allen v. Academic Games League of America, Inc.</u>, 89 F.3d
3    614 (9th Cir. 1996), in support of its position. <u>Academic Games</u> held that a non-profit
4    academic board game tournament was not a public performance of the copyrighted board
5    game. <u>Id.</u> Defendants reliance on <u>Academic Games</u>, however, is misplaced. <u>Academic
6    Games</u> held that whether the performance is fee-based is an important factor in determining
7    whether the performance is public. <u>See id.</u> at 616 (citing <u>Red Baron-Franklin Park, Inc. v.
8    Taito Corp.</u>, 883 F.2d 275, 278-79 (4th Cir. 1989), <u>cert denied</u>, 493 U.S. 1058 (1990) (video
9    arcade owner's use of copyrighted circuit boards in coin-operated video machines available
10    to the public for a fee constituted public performance of the copyrighted work under 17
11    U.S.C. § 106(4)). <u>Red Baron</u> involved the same "pay-for-play" gaming transaction that is at
12    issue in this case.

13    Pay-for-play exploitation of Valve games is not distribution in the retail channel, and
14    is not a "rental" transaction. Notably, Sierra/Vivendi's distribution activities for non-Valve
15    games distinguishes between cyber-café and retail channels. <u>See</u> Holtman Decl., docket no.
16    164, at 188 (royalty statement separating retail and cyber-café revenues); <u>id.</u> at 189-90
17    (purchase orders separating retail and cyber-café items); <u>id.</u> at 194-95 (different retail and
18    cyber-café price points). For example, the Blizzard website explains:[2]

> To provide location-based-entertainment ("LBE") sites such as yours with a legally compliant way to charge your customers to play Blizzard games, we have established the LBE License program. The basic license that is provided with the **retail version of our software allows for personal and private use only**. In order to operate any of our titles for profit, you must purchase a commercial exploitation license. Once there is any kind of for-profit charge applied to the operation of one of our software titles, whether for time on the game, time on a computer, a club membership, a door charge, a tournament fee, or anything of like nature where our

---

[2] Blizzard Entertainment is a game studio owned by Vivendi that has developed such game titles such as "Diablo," "Diablo II," "Warcraft II," and "Starcraft." Holtman Decl., docket no. 164, at 221-30, 236 (Roeder Dep., Ex. 186).

ORDER 8–

> software is included, a **commercial exploitation license is required** for your site.

Holtman Decl., docket no. 164, at 219-20 (emphasis added). Licensing and distribution of non-Valve games to cyber-cafés takes place in the same commercial channels as Valve games. Sierra/Vivendi's treatment of the commercial channel and "location based entertainment centers" further demonstrates that cyber-cafés are not part of the "retail channel." Like a movie theater, the customer pays for entertainment; describing the cyber-café transaction as a "rental" is simply inaccurate.

### B. Cyber-café distribution as "retail packaged product."

The 2001 Agreement provides Sierra/Vivendi with a limited license to distribute Valve games "solely as retail packaged product." Holtman Decl., docket no. 164, at 29-30 (2001 Agreement, ¶¶ 3.3.1, 3.5.1).

"Retail Packaged Product" is defined in the 2001 Agreement:

> "**Retail Packaged Product**" means a version of a Product, Add-On Product, Foreign Translation or Platform Extension that: (a) is distributed on only tangible media (e.g. on a CD-ROM); (b) includes as part of the purchase price, the right to receive Sierra product support for a limited period of time (however, Valve and Sierra may mutually agree to include applications thereon which are not so supported); (c) is distributed in packaging of the type typical of game software in the Retail Channel; and (d) is distributed in the Retail Channel.

Id., at 14 (2001 Agreement, pg. 4).

#### 1. Sierra/Vivendi's cyber-café distribution

Distribution pursuant to the 2001 Agreement requires that the requirements for "retail packaged product" be met. Id. Sierra/Vivendi makes no argument that its cyber-café distribution met the requirements of the 2001 Agreement. The Court concludes that Sierra/Vivendi's cyber-café distribution exceeded the scope of its license under the 2001 Agreement and infringed Valve's copyrights in the Valve games.

ORDER 9–

## 2. Sierra/Vivendi's proposed cyber-café distribution

Sierra/Vivendi requests declaratory judgment that its *proposed* cyber-café licensing program meets the requirement of the 2001 Agreement for "retail packaged product." See Roeder Decl., docket no. 145, at ¶ 15 (proposed cyber-café licensing program); see also Ex. A to Roeder Decl., docket no. 145 (proposed Cyber-Café License Agreement). Sierra/Vivendi argues that there is an actual controversy regarding its proposed cyber-café plan, and that the Court's opinion would not merely be advisory.

At oral argument, Sierra/Vivendi argued that Societe de Conditionnement en Aluminium v. Hunter Engineering Co., Inc., 655 F.2d 938 (9th Cir. 1981), supports its position that the Court may issue declaratory judgment regarding the proposed cyber-café licensing program. However, Hunter Engineering resolved a different scenario, not based solely on hypothetical facts. The plaintiff in Hunter Engineering sought declaratory judgment of invalidity after a threatened patent infringement suit. Id. at 938. Declaratory judgment as to invalidity, in the face of threatened infringement litigation, is substantially different from a request for an advisory opinion on a proposed, and hypothetical, licensing program. This Court may not enter advisory opinions based on hypothetical facts. See Ashcroft v. Mattis, 431 U.S. 171, 172 (1977) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 242 (1937)). Defendants' proposed cyber-café licensing program is a "hypothetical" presented to the Court for its approval. Because there is no case or controversy regarding Defendants' proposed cyber-café licensing program, any opinion by this Court would be merely advisory. Therefore, the Court declines to issue an opinion as to Defendants' proposed cyber-café licensing program.

### C. Prior Agreements, Admissions, and Extrinsic Evidence.

Both Valve and Sierra/Vivendi ask the Court to consider extrinsic evidence related to the 2001 Agreement. See Def. Mot. for Partial Summ. J., docket no. 144, at 6 (Valve's admissions of Sierra/VUG's license rights for cyber-cafés); Pl. Cross-Mot. for Partial Summ.

ORDER 10—

J., docket no. 165, at 14 (negotiation history of the 2001 Agreement). The 2001 Agreement is governed by Washington law. Holtman Decl., docket no. 164, at 43 (2001 Agreement, ¶ 9.10). In Washington, parol evidence is not admissible for the purpose of adding to, modifying, or varying the terms of a written contract. Lynott v. National Union Fire Ins. Co. of Pittsburgh, Pa., 123 Wash.2d 678, 683 (1994) (citing Berg v. Hudesman, 115 Wash.2d 657, 669 (1990)). Proffered extrinsic evidence cannot assist the Court in interpreting the agreement *unless* offered to illuminate, rather than modify, its language. Hollis v. Garwall, Inc., 137 Wash.2d 683, 697 (1999).

Sierra/Vivendi offers various documents which purportedly show various admissions by Valve.[3] However, after reviewing Defendants' proffered documents the Court finds they cannot be characterized as "admissions," and are largely irrelevant to the cross-motions before the Court. Valve offers early drafts of the 2001 Agreement as evidence that Sierra/Vivendi negotiated away the right to license games in cyber-cafés. Early drafts of the 2001 Agreement explicitly licensed Sierra/Vivendi to distribute Valve games to cyber-cafés; those provisions were removed before the Agreement was signed. One early draft of the 2001 Agreement set forth cyber-cafés as distinct from video game rental:

> "Retail Packaged Product Channel" means distribution of a Product, Add-On Product, Foreign Translation or Platform Extension on CD-ROM or similar tangible medium packaged for sale to end users and sold either in person through "brick and mortar" retail stores or through direct mail, direct email, or on-line stores, video game rental, *location based entertainment centers,* and license for use on virtual game sessions running off a server and not resident on an end user's hard drive but not solely through Electronic Software Distribution (unless pre-approved by Valve in writing).

See Holtman Decl., docket no. 164, at 176-79 (draft Agreement) (emphasis added). Valve rejected the inclusion of "location based entertainment centers" in the license. Id. at

---

[3] See, e.g., Ex. I to Hurst Decl., docket no. 146 (royalty reports); Ex. K to Hurst Decl., docket no. 146 (email from D. Lombardi, Valve Director of Marketing); Ex. L to Hurst Decl., docket no. 146 (email from S. Lynch, Valve Chief Operating Officer); Ex. M to Hurst Decl., docket no. 146 (email from S. Lynch, Valve Chief Operating Officer).

ORDER 11–

180-83 (draft Agreement). The Court finds the early drafts of the 2001 Agreement "illuminate" the parties' actual, final agreement and assist the Court in construing the rights and responsibilities of the parties. Sierra/Vivendi should not be permitted to recapture through litigation the cyber-café rights it gave up in negotiation.

Valve also asks the Court to consider the "End User License Agreement" ("EULA") in effect at the time the 2001 Agreement was drafted. The EULA for Valve games prohibits cyber-café usage, and states "you are not entitled to ... exploit the Program or any of its parts for any commercial purpose including, but not limited to, use at a cyber café, computer gaming center or any other location-based site". See Holtman Decl., docket no. 164, at 215 (November 2000 Counter-Strike EULA); see also Ex. 1 to Sargent Decl., docket no. 192, at ¶ 3(C)(ii) (2004 Counter-Strike: Condition Zero EULA). The parties do not dispute that this language was in effect when the 2001 Agreement was signed. Sierra/Vivendi is required to distribute Valve games pursuant to an authorized EULA. Holtman Decl., docket no. 164, at 34 (2001 Agreement, ¶ 4.1.2). The EULA cannot be changed without Valve's approval. Sierra/Vivendi argues that cyber-café operators exploit Valve games for commercial purpose, but only end users are subject to the EULA. However, the EULA in effect at the time the 2001 Agreement prohibited cyber-café usage; that language directly supports Plaintiff's interpretation of the license as excluding cyber-café rights.

As set forth in the Court's Order of November 22, 2004, Defendants' Motion for Partial Summary Judgment Re Cyber-Café Rights, docket no. 143, is DENIED. Plaintiff's Cross Motion for Partial Summary Judgment Re Cyber-Café Rights, docket no. 165, is GRANTED.

## II. Contractual Limitation on Liability

The 2001 Agreement also contains a Limitation on Liability provision, which limits the parties ability to recover damages "under or in connection with" the 2001 Agreement. The provision provides:

ORDER 12–

> 8.2  <u>Limitation on Liability.</u> EXCEPT AS PROVIDED IN SECTION 8.1 AND EXCEPT FOR A BREACH OF THE EXCLUSIVITY PROVISIONS HEREOF, NEITHER PARTY WILL BE LIABLE TO THE OTHER UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY NATURE, FOR ANY REASON, INCLUDING WITHOUT LIMITATION, THE BREACH OF THIS AGREEMENT OR ANY TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT, OR OTHERWISE, EVEN IF THE OTHER PARTY HAS BEEN WARNED OF THE POSSIBILITY OF SUCH DAMAGES.

Holtman Decl., docket no. 164, at 41 (2001 Agreement, ¶ 8.2). Under Washington law, parties may limit their liability for breach of contract; the interpretation of such clauses is a matter of law. E.g., Am. Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wash.2d 217, 222 (1990). The applicability of a contractual limitation of liability is suitable for resolution on summary judgment. M.A. Mortenson Co., Inc. v. Timberline Software Corp., 140 Wash. 2d 568, 586 (2000).

### A. Bad Faith

A limitation of liability clause may not apply where the party relying on the clause acted in "bad faith." E.g. City of Dillingham v. CH2M-Hill Northwest, Inc., 873 P.2d 1271, 1275 (Alaska 1994) ("a party may contract to limit liability for damages resulting from breach of contract, but ... such a provision is not effective in case he acts fraudulently or in bad faith."), quoting 6A CORBIN ON CONTRACTS § 1472 (1962); see also, McNally Wellman Co. v. New York Elec. & Gas Corp., 63 F.3d 1188, 1198 (2d Cir. 1995) (finding liability limitation unenforceable where actions constituted an "intentional breach of the contract").

Genuine issues of material fact preclude summary judgment on the issue of bad faith. The Court DEFERS ruling on this question until trial. In the event Defendants' bad faith is established, the limitation of liability provision contained in the 2001 Agreement may not be applicable.

ORDER  13

### B. Scope of the Limitation on Liability

The limitation on liability provision limits liability of the parties for claims "under or in connection with" the 2001 Agreement. See Holtman Decl., docket no. 164, at 41 (2001 Agreement, ¶ 8.2).

#### 1. Breach of Contract

The 2001 Agreement grants Sierra/Vivendi a limited license for distribution of Valve games as "retail packaged product" in the "retail channel," and describes the obligations and responsibilities of the parties with respect to the Agreement. Valve asserts that Sierra/Vivendi breached the 2001 Agreement. See First Am. Compl., docket no. 40, at 7-8, ¶¶ 28-40; see also Supp. Compl., docket no. 108, at 4, ¶ 15-21. Sierra/Vivendi argues that claims for breach of contract "plainly arise 'under or in connection with this Agreement'" and that Valve's allegations of breach are asserted "on the basis of contract." Def. Mot. for Partial Summ. J., docket no. 144, at 10. The Court agrees. Plaintiff's claims for breach of the 2001 Agreement are subject to the limitation of liability provision. Plaintiff may not recover special, incidental, consequential, or punitive damages for breach of the 2001 Agreement.

Valve may, however, recover its general damages for any breach of contract. "General damages" are those that flow naturally from the breach of a contract, and include such items as loss of the bargain and lost profits. 22 AM. JUR. 2D DAMAGES § 41 (2004). Lost profits are considered to be general or direct damages in a breach of contract case, while they are considered to be special or indirect damages in a tort case. Moore v. Boating Industry Associations, 754 F.2d 698, 716-17 (7th Cir. 1985), rev'd on other grounds, 474 U.S. 895 (1985) (citing D.P. Serv., Inc. v. AM Intern., 508 F. Supp. 162, 166-67 (N.D.Ill. 1981)); see also Myers v. Stephens, 43 Cal. Rptr. 420, 433 (Cal. Ct. App. 1965).

ORDER 14–

Defendants argue that all lost profits are special damages. Gilmartin v. Stevens Inv. Co., 43 Wash.2d 289, 296 (1953) ("lost profits, or gains prevented, must be claimed specifically in the pleadings, as 'special' damages, and thus are distinguished from claims based upon some normal or usual standard"). "[L]ost profits, or gains prevented," as described in Gilmartin, are distinguishable from general contract damages in most breach of contract cases, because those damages resulted from the failure to achieve the special purpose of the parties' agreement.

The general measure of damages for breach of contract entitles the injured party (a) to recovery of all damages that accrue naturally from the breach, and (b) to be put into as good a position pecuniarily as it would have been had the contract been performed. Diedrick v. School Dist., 87 Wash.2d 598, 609-10 (1976). Alternatively stated, the measure of damages is the amount which would have been received if the contract had been kept, which means the value of the contract, including the profits and advantages which are its direct results. Rathke v. Roberts, 33 Wash.2d 858, 866 (1949). The general measure of contract damages is not barred by the limitation of liability provision in the 2001 Agreement.

### 2. Copyright Infringement

Valve also raises claims of copyright infringement for distribution of Valve games to cyber-cafés. The 2001 Agreement broadly limits the types of claims that can be brought "under or in connection with" the 2001 Agreement. However, the broad limitation is not applicable for claims that are not "under or in connection with" the 2001 Agreement. A licensee who acts outside the scope of a license infringes the copyright as if there were no license at all. See NIMMER ON COPYRIGHT § 10.15(A) ("[w]hen a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes infringement."). The 2001 Agreement grants Sierra/Vivendi a limited license, and all other rights are reserved. See Holtman Decl., docket no. 164, at 31 (2001 Agreement, ¶ 3.9.1).

Sierra/Vivendi's distribution to cyber-cafés exceeds the scope of its license, and infringes Valve's copyrights in its games. The limitation on liability provision is expressly limited to actions "under or in connection with" the 2001 Agreement, and by its own terms does not apply to infringing activities outside of the scope of the 2001 Agreement. The Court finds that Sierra/Vivendi's distribution of Valve games to cyber-cafés is not "under or in connection with" the 2001 Agreement, and that the limitation on liability provision does not apply to Plaintiff's copyright claims. Defendants have made themselves a "stranger" to the provisions and protections of the 2001 Agreement by exceeding the scope of their license. See Marshall v. New Kids on the Block Partnership, 780 F. Supp. 1005, 1009 (S.D.N.Y. 1991) ("a copyright licensee can make himself a 'stranger' to the licensor by using the copyrighted material in a manner that exceeds either the duration or the scope of the license").

Defendants may not rely on the provisions of the 2001 Agreement to limit their liability for infringement beyond the scope of that Agreement. Plaintiff may recover copyright damages for any infringement as allowed by law.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment Re Cyber-Café Rights, docket no. 143, is DENIED. Plaintiff's Cross Motion for Partial Summary Judgment Re Cyber-Café Rights, docket no. 165, is GRANTED. Defendants' Motion for Partial Summary Judgment Re Contractual Limitation of Liability, docket no. 144, is DENIED. Plaintiff's Cross Motion for Partial Summary Judgment Re Contractual Limitation of Liability, docket no. 162, is GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART, as set forth in this Order and in the Court's Order of November 22, 2004.

//
//
//

IT IS SO ORDERED.

DATED this 14th day of December, 2004.

_____
THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE

ORDER 17–